UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
                                  )
            V.                    )     Criminal No. 04-10298-DPW
                                  )
                                  )
MARKO BOSKIC                      )

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS
AND GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR
DISCOVERY RELATED TO HIS MOTION TO SUPPRESS

## I.    STATEMENT OF THE FACTS

On August 25, 2004, a criminal complaint and arrest warrant
were issued for defendant Marko Boskic.  Defendant's Exhibit D,
attached to Defendant's Motion to Suppress (hereinafter "Def.
Ex.").  At approximately 3:30 PM, the defendant appeared at the
JFK Federal Building in Boston in connection with his request for
travel documents.  Def. Ex. B, at 2.  He was met by Special Agent
("SA") Thomas Carroll of the Immigration and Customs Enforcement
("ICE") of the Department of Homeland Security.  Id.  SA Carroll
was aware of the arrest warrant for Boskic.

SA Carroll was careful to determine that the Defendant
understood his *Miranda* rights before commencing questioning of
Boskic, even though the Defendant was not in custody.  As the two
men walked towards the interview room, SA Carroll asked the
Defendant if he understood English.  The Defendant stated that he
did.[1]  Aff. Ex. 2, at ¶4.  Once in the interview room, SA Carroll

---

[1]Attached hereto is an Affidavit from SA Carroll, that is
marked as Exhibit 2 (hereinafter "Aff. Ex. 2").  The Affidavit

raised his right hand and told the Defendant to do the same. Id., at ¶5.  SA Carroll then administered an oath to the Defendant (in English).  Id., at ¶5, Def. Ex. B, at 2.  The agent then asked Boskic if he read English and the Defendant stated that he did.[2]  Aff. Ex. 2, at ¶6.  SA Carroll orally advised of Boskic of his rights while the Warning of Rights form was placed in front of Boskic with the English side facing him.  (SA Carroll, who was sitting across a table from the Defendant, read the rights upside down from the English version of the form.) Aff. Ex. 2, at ¶7.  The Defendant signed the English side and the SA Carroll dated the form, noted the time and signed as a witness.  Id., Def. Ex. B, at 2.  Further, when his rights were explained to him, the defendant stated: "yes, yes, I know what these are."[3]  Def. Ex. B, at 2.

SA Carroll then returned the form to the Defendant, showing him the Serbo-Croatian side.  After reading the form in his native tongue, the Defendant signed and dated the Serbo-Croatian

---

supplements his reports and that of SA Hughes.

[2]In his Affidavit, Def. Ex. A, the Defendant states that "I have only a limited command of English."  The Agents involved in the interview of the Defendant on August 25, 2004 would dispute this statement.  The Defendant's command of the English language was sufficient to make himself understood and to understand what was being said to him.  Aff. Ex., at ¶16.

[3]The defendant had a number of arrests in the United States and presumably, therefore, had previously received *Miranda* warnings.

side of the form.  Boskic also specifically indicated the time he
signed the form by writing the time.[4]  Aff. Ex. 2, at ¶8, Def.
Ex. B, at 2.  The date and time that appear on the Serbo-Croatian
side of the form ("8/25/04" "3₃₅") were written by the Defendant.
Def. Ex. E.[5], Aff. Ex. 2, at ¶8. There was no error in the time
indicated; the form was signed at 3:35 PM.[6]

SA Carroll asked Boskic questions concerning his request for
travel documents.  Def. Ex. B, at 2.  SA Carroll then questioned
Boskic about biographical information, and Boskic freely provided
information about his personal history.  Id., at 2-3.  SA Carroll

---

[4]Even a non-expert can see that the date and time on the
English side and the date and time on the Serbo-Croatian side
were not written by the same person.  In addition, the style of
the numbers on the Serbo-Croatian side are European and are
consistent with the date on the Consent to Search form in Serbo-
Croatian that was signed by the Defendant.  A copy of the Consent
to Search form (in Serbo-Croatian) is attached hereto and marked
"Ex. 1."

[5]The "Warning as to Rights" form is identified as Exhibit E
in the defendant's submission, but was not filed or scanned.  The
government is attaching hereto a copy of the forms in English and
Serbo-Croatian that were signed by the defendant, but referring
to the forms as Def. Ex. E.

[6]The defendant claims that the time on the form is incorrect
and that he did not receive any warnings until later in the day.
Both the English and Sebo-Croatian side of the form contain the
time "3:35 PM."  Def. Ex. E.  In addition, Exhibits B and C also
specifically reference the form that was signed before any
questioning.  Further, Boskic received Miranda warnings on
several additional occasions during the interview -- at least on
each occasion when someone new joined the interview, and again
before he wrote his statement.  The agents were so careful about
insuring that Boskic recognized that he did not have to tell them
anything that, at the third or fourth warning, he became
agitated.  Def. Ex. C at 5; Def. Ex. B at 6.

then asked about previous military service.  <u>Id.</u>, at 3.  The defendant stated that he had no military service other than the mandatory service in the Yugoslav military from 1983-1984.[7]  <u>Id.</u>

Boskic was then asked if he had ever been arrested in Bosnia, and Boskic stated that he had not.  SA Carroll showed Boskic paperwork that contradicted his assertion and told him that he would have to explain the details of the arrest to an agent of the Federal Bureau of Investigation ("FBI").[8]  <u>Id.</u>

At this point, Special Agent Gregory Hughes entered the room.[9]  <u>Id.</u>, at 3.  SA Hughes identified himself and SA Carroll reminded Boskic of his rights and that his rights all still applied.  <u>Id.</u>  SA Carroll, holding the Warnings as to Rights form, that had been previously signed by the Defendant, told the Defendant that his rights still applied.  Def. Ex. B, at 3, Aff. Ex. 2, at ¶9.  He was reminded that anything he said could be used against him and he could refuse to say anything.  Aff. Ex. 2, at ¶9.  Boskic acknowledged that he understood.  <u>Id.</u>, Def. Ex

---

[7]As set forth in the indictment in this case, this is untrue.

[8]Although, at this point, the agents did not tell Boskic, the true nature of their interest in Boskic, the defendant knew; while later writing out a statement, he said: "I knew what this was about as soon as someone from the FBI wanted to talk to me." Def. Ex. B at 7.

[9]From this point forward, Exhibit B (SA Carroll's ICE report) and Exhibit C (SA Hughes' FBI 302 report) document the same events.  For the ease of the narrative, citation will be to SA Carroll's report only.

B, at 3.  Boskic rose and raised his hand as if prepared to again be administered an oath.  Aff. Ex. 2, at ¶9.

Boskic again lied to the agents and told them that he had not served in the war.  Def. Ex. B, at 3.  In connection with his arrests in Bosnia, he stated they were long ago and the charges were dismissed.  (He also blamed the "Muslim people [who] had more power and that they can write or say what they want.")  He admitted that he failed to note the information on his immigration forms.  Id.  Boskic was also asked about whether he was present at a shooting in a bar in Bosnia in 1995; he lied and said he was not in Bosnia in 1995.  Id., at 3-4.

SA Hughes then informed Boskic that someone else wanted to speak with him.  Id., at 4.  Alistair Graham, an investigator with the International Criminal Tribunal of the Former Yugoslovia ("ICTY") entered the room with a Bosnian Serbo-Croatian interpreter.  SA Carroll again reminded the defendant of his rights and explained that all his rights previously given still applied.  Id., Aff. Ex. 2, at ¶10.  SA Carroll noted the Warning as to Rights form and made reference to the Defendant's right to remain silent and to an attorney.  Id.

Graham identified himself and told Boskic not to say anything until Graham finished what he had to say.  Def. Ex. B, at 4.  Graham stated that he was aware of Boskic's involvement with the 10th Sabotage Detachment and what they had done after

5

Sebrenica at locations including Branjevo Farm.  Graham stated
that he was seeking Boskic's cooperation against the senior
military officials and that Boskic was not the subject of his
investigation.  Graham told Boskic that he had a video, showing
that Boskic was in the military.  Graham stated that he was
interested in his cooperation and asked him if he wished to see
the video.  Boskic stated:  "It would be better if I saw the
video."  After being shown the video, Bokic was asked if he would
cooperate.  Boskic replied "yes," and admitted that he was a
member of the Unit.  He also said that he knew this day would
come.  Id.

Although Graham told Boskic that he was not the target of
his investigation, that his target was the senior military
officials, and that he was seeking Boskic's cooperation, Graham
never told Boskic that his statements would not be used against
him or that he would not be prosecuted.  Id., Aff. Ex. 2, at ¶11.
In fact, before Graham said anything, Boskic was reminded that he
had the right to refuse to answer any questions and that anything
he said could be used against him.  Id., at ¶10, Def. Ex. B, at
3.

Boskic then answered Graham's questions and provided
information concerning his involvement in the massacre at
Branjevo Farm as part of the Army of the Republic of Srpska.
Id., at 4-6.  He also admitted that he made no mention of his

6

military experience on his applications for admission to the United States, because that provided the best chance that he would be admitted to the United States.  <u>Id.</u> at 6.

Boskic expressed a willingness to help identify and find other guilty individuals and stated that he had telephone addresses and names at his house.  <u>Id.</u> at 6.  At 6:45 PM, Boskic signed a Consent to Search form in Serbo-Croatian.  <u>Id.</u> at 6 and Ex. 1.  The Defendant wrote the date on the form and the agent signing as a witness wrote the date and time.  Ex. 1.

All during the interview, the door to the room was open and breaks were taken to allow Boskic (and others) to use the restroom.  <u>Id.</u> at 7, Aff. Ex. 2, at ¶15.

Boskic was asked to make a written statement in his own words.  Boskic was reminded that his rights were still in effect and specifically told that no promises or guarantees were being made.  Def. Ex. B, at 6.  Both SA Hughes and SA Carroll told Boskic several times that he was under no obligation to write a statement.  Boskic repeatedly stated that he understood and acknowledged that he was waiving his rights.  He got agitated (by the repeated warnings) and stated: "If I am writing this, I understand what I am doing."  <u>Id.</u>  He then wrote a statement in Bosnian Serbo-Croatian.  <u>Id.</u>, at 6-7.  A translation of the statement of Marko Boskic is attached and marked Exhibit 3.  The statement begins as follows:  "I, Marko Boskic, understand and

give up my rights.  I am giving this statement voluntarily, without promises and guarantees." Exhibit 3, at 1.

At approximately 8:20 PM, before completing his written statement, Boskic asked what was going to happen that night after the interview was completed.  SA Carroll told Boskic that he would be held overnight and see a Judge in the morning.  Boskic asked if he was being arrested and SA Carroll told Boskic that he was being arrested on a federal criminal warrant for fraud in connection with his immigration paperwork.  Def. Ex. B, at 7, Aff. Ex. 2, at ¶15.  Boskic continued to write his statement until about 10:30 PM.  Def. Ex. B, at 7.

While writing his statement, Boskic stated: "I knew what this was about as soon as someone from the FBI wanted to talk to me." Id.

When he completed his statement, he was put in restraints and transported to a holding facility.  Id.

## II.  STATEMENT OF THE LAW

A confession given in a noncustodial setting is admissible unless it is the product of coercion.  Since the Defendant Boskic does not allege that he was in custody, nor has alleged any coercive acts by the interviewing agents, his motion lacks merit. Even if *Miranda* applies, because he was advised of his rights, and no agent made any affirmative misrepresentations that would tend to negate those warnings (and there was no coercion), his

motion to suppress should be denied.

**A.   The Defendant was not in "Custody"**

When the Defendant was questioned by SAs Carroll and Hughes and then by Mr. Graham, he was not "in custody" for *Miranda* purposes and, therefore, the agents did not have to advise the Defendant of his *Miranda* rights.  His statements are admissible unless they were coerced.

The *Miranda* custody test is an objective one.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S.Ct. 2140, 2148 (2004) (reversing the court of appeals' reversal of the denial of a <u>habe</u> petition; the district court had denied the petition because the court found that the defendant was not in custody when he made incriminating statements); <u>United States v. Ventura (I)</u>, 85 F.3d 708, 711 (1st Cir. 1996).  "Two discrete inquiries are essential: first, what were the circumstances surrounding the interrogation; and second given those circumstances, would a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  "[T]he court must apply an objective test to resolve the ultimate inquiry: was there formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Id.</u>; <u>Ventura (I)</u>, 85 F.3d at 712.

In <u>Yarborough v. Alvarado</u>, as in this case, the defendant came to the police station at the request of the investigating

officers and was questioned at the police station in a small
interview room.  Again, as in this case, during questioning, the
defendant was told by the interviewer that they did not believe
him -- that his responses were not truthful and that the police
"have witnesses that are saying quite the opposite."  124 S.Ct.
at 2145.  Further, the interviewer encouraged the defendant to
"be honest" and appealed to "his sense of honesty and the need to
bring [the shooter] to justice."  Id.  Finally, as in this case,
the defendant was offered the opportunity to take breaks during
the questioning.  Id. at 2146.[10]  Other factors, such as the
length of the interview (two hours) and the fact that the
defendant was not told that he was free to leave, were not
sufficient to overcome the finding that the defendant was not in
custody.  124 S.Ct. at 2150.

> [A] noncustodial situation is not converted to one in
> which Miranda applies simply because ... , even in the
> absence of any formal arrest or restraint on freedom of
> movement, the questioning took place in a "coercive
> environment."  Any interview of one suspected of a
> crime by a police officer will have coercive aspects to
> it, simply by virtue of the fact that the police
> officer is part of a law enforcement system which may
> ultimately cause the suspect to be charged with a
> crime.  But police officers are not required to
> administer Miranda warnings to everyone whom they
> question.  Nor is the requirement of warnings to be
> imposed simply because the questioning takes place in

---

[10]Unlike this case, however, at the end of the interview the
defendant in Yarborough v. Alvarado was allowed to leave.  This
cannot be a determinative factor on whether during the interview
anything was said or done to arrest the defendant or otherwise
restrict his freedom of movement.

the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been a restriction on a person's freedom as to render him "in custody."

Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

See also Beckwith v. United States, 425 U.S. 341 , 347 (1976) (holding that no *Miranda* warnings required even though defendant was the "focus" of investigation); California v. Behler, 462 U.S. 1121, 1125 (1983) (reversing suppression of defendant's statements because *Miranda* warnings were not required; defendant was not in custody even though questioning took place at police station and defendant was a suspect).

Some restraint on a suspect does not mean the suspect is in custody for *Miranda* purposes. See, e.g., United States v. Ventura (I), 85 F.3d 708 (1st Cir. 1996) and United States v. Ventura (II), 132 F.2d 844 (1st Cir. 1998) (twice reversing the district court's suppression of statements made to Customs agents). "The relevant inquiry ... is whether there was an arrest or restraint on freedom of movement of the degree associated with a formal arrest." 85 F.3d at 712. In Ventura, even though the suspect was not free to leave, the suspect was not in custody during questioning by a Custom's agent.

"The test is not applied mechanically, but in view of the totality of the circumstances." Ventura (II), 132 F.3d at 846.

The subjective views of both the suspect and the law enforcement officer doing the questioning are irrelevant.

11

Stansbury v. California 511 U.S. 318, 323 (1994); Ventura (I), 85
F.3d at 711.  Thus, even if it was the officer's intention to
take the suspect into custody, i.e., effect an arrest, that
"unarticulated plan" in the mind of the officer, 'has no bearing
on whether the suspect is "in custody" at a particular time.'
Berkemer v. McCarty, 468 U.S. 420, 442 (1984); United States v.
Nishniandize, 342 F.3d 6, 13 (1st Cir. 2003) ("The officer's
subjective belief is irrelevant.")

     In a case where it was the unarticulated intent of the
officer to arrest the suspect at some point, the suspect is not
"in custody" until the suspect is made aware of the intent to
arrest.  United States v. Landry, 345 F.Supp.2d 118, 121-122 (D.
Mass. 2004).  Thus, in Landry, as in this case, the defendant was
not in custody "until he asked for -- and was told that the
officers had -- an arrest warrant for him."  345 F.Supp.2d at
122.

     The Defendant Boskic concedes that he was not "in custody"
for Miranda purposes.  He states in his Affidavit that he
believed he was being questioned in connection with his request
for travel documents.  Def. Ex. A.  It was not until the very end
of the interview, when he was completing his signed statement,
that he was told that there was a warrant for his arrest, and
that he would be held overnight.  Therefore, all during the
interview, there was neither objective evidence that he was "in

                              12

custody" nor the subjective belief by the defendant that he was in custody.

**B.    The Defendant's Confession was Voluntary (and the Defendant Voluntarily Waived his Miranda Rights)**

Defendant was not in custody and, therefore, there was no need to administer *Miranda* warnings.  His statements are admissible unless they were coerced.  Out of an abundance of caution and to scrupulously protect the defendant's rights (over and above what the law requires), the agents gave the Defendant his *Miranda* warning on multiple occasions.  Thus, even if the Court decides that the Defendant was in custody, his statements are admissible because he voluntarily waived his rights.

"Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Miranda v. Arizona, 384 U.S. 436, 478 (1966).  The burden is on the government to prove voluntariness by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972).  The same burden applies when the government seeks to prove a voluntary waiver of a defendant's *Miranda* rights; the waiver must be proven by a preponderance of the evidence. United States v. Jackson, 918 F.2d 236 (1st Cir. 1990); United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000); United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000.  In both situations, to determine voluntariness, "it is necessary to looks at the totality of the circumstances."

13

Id.; Arizona v. Fulminate, 499 U.S. 279, 285-286 (1991); United
States v. Burns, 15 F.3d 211, 216 (1st Cir. 1994); United States
v. Bienvenue 632 F.2d 910, 913 (1st Cir. 1980); Palmer, 203 F.3d
at 60.  "Miranda forbids coercion, not mere strategic deception
by taking advantage of a suspect's misplaced trust ..." Illinois
v. Perkins, 496 U.S. 292, 297 (1990) (involving "misplaced trust"
in one the defendant believed was a fellow prisoner).  Any
interview by a police officer will contain some coercive aspects,
Oregon v. Mathiason, 429 U.S. 492, 494-495 (1977), but a
statement is not voluntary only if "the will of the defendant
[was] overborne so that the statement was not his free and
voluntary act." Procunier v. Atchley, 400 U.S. 446, 453 (1971);
Bryant v. Vose, 785 F.2d 364, 367-368 (1st Cir. 1986);
Bienvenue, 632 F.2d at 913.

    "[T]o determine voluntariness it is necessary to look at the
totality of the circumstances, including any promises[11] or
threats made by police officers or the prosecution, in order to
see whether the will of the accused was overborne." Jackson, 918
F.2d at 242.  (holding that even an 'implied "threat" or
"promise" that [defendant's] sister [who had been arrested] might

_____

    [11]Even good faith, but false, assurances by an officer that
the defendant would be protected from criminal prosecution will
not result in suppression where there was no evidence that the
defendant's will was overborne.  United States v. Lederman, 2000
WL 3403839 (N.D. Iowa 2000);  see also United States v. Flemmi,
225 F.3d 78, 91 (1st Cir. 2000).

14

be caused or spared harm depending on whether [the defendant] admitted to ownership of the firearm' did not lead to the conclusion that "his will was overborne.")

### 1.    Deception does not Equal Coercion

The kinds of situations where suppression of statements made after a valid *Miranda* waiver is proper include where police beat a confession, induce intoxication, deny a request for counsel or a stated desire to remain silent, or other forms of coercion. United States v. Bezanson-Perkins, 390 F.3d 34, 40 (1st Cir. 2004). Guile and trickery or some form of deceit do not make a subsequent confession involuntary. "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." Illinois v. Perkins, 496 U.S. 292, 297 (1990). Thus, court's distinguish lies that could amount to coercion, "such as where police falsely say they will take a child away unless the suspect cooperated." 390 F.3d at 41 (citing Lynum v. Illinois, 372 U.S. 528, 534 (1963).) "[O]nly confessions procured by *coercive police tactics* should be excluded as involuntary." United States v. Bynum, 145 F.3d 405, 407 (1st Cir. 1998), citing Colorado v. Connelly, 479 U.S. 157, 167 (1986) (emphasis in the original). (Connelly held that 'coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the

15

Due Process Clause of the Fourteenth Amendment.'  479 U.S. at 167.)

It is true that the government used a ruse to get the Defendant to come to the JFK Federal Building, and continued that ruse during the early stages of the interview.  Thus, at first, a reasonable man in the Defendant's position would likely have believed that he was being interviewed in connection with his request for travel documents.  However, getting a suspect to a place where he or she can be interviewed by means of a ploy is an acceptable law enforcement tactic.  <u>See</u>, <u>e.g.</u>, <u>United States v. White</u>, 847 F.Supp. 219 (D. Mass. 1994).  "[T]rickery is not automatically coercion."  <u>Byram</u>, 145 F.3d at 408.[12]

"Given the narrow definition of coercion [by the Supreme Court] in <u>Connelly</u>, it would be hard to treat as *coercion* a false

---

[12]In <u>Byram</u>, the defendant was questioned as a potential witness in a murder prosecution involving a firearm.  One investigator, while knowing that the defendant might be charged federally as a felon in possession of a firearm, asked another investigator to question the defendant about the murder and the defendant's handling of the firearm.  The investigator who questioned the defendant did not read the defendant his *Miranda* rights, even though he was in custody, and told him he as not "implicated in any of this."  145 F.3d at 406.  The defendant made incriminating statements and later testified at the murder trial.  He sought to suppress both his statements and his trial testimony.  The Court of Appeals stated that the defendant's statements were not coerced and therefore not involuntary.  145 F.3d at 408.  However, the suppression order of the district court was affirmed because the defendant's *Miranda* rights were violated; the "*Miranda* violation is not merely technical, ... there is a substantial nexus between the violation and the second statement, and ... the second statement is itself not preceded by an adequate *Miranda* warning."  145 F.3d at 410.

assurance to a suspect that he was not in danger of prosecution."
145 F.3d at 408.[13]  Therefore, an unfulfilled promise that
statements and evidence derived therefrom would not be used
against the defendant "does not constitute coercion, rendering
the statement involuntary or its fruits inadmissible."[14]  United
States v. Flemmi, 225 F.3d 78, 91 (1st Cir. 2000).[15]

---

[13]As the Court of Appeals for the First Circuit noted in
Byam, in a situation where Miranda warnings are given because a
defendant is in custody, false assurances that the suspect was
not in danger of prosecution, might undercut the warnings and
raise a question if Miranda was satisfied.  However, a statement
is 'not [] "involuntary" even if he were deceived." 145 F.3d at
408.

[14]The Court further noted that, "[e]ven if the government
could be charged with deceit ... we would still regard [the
defendant]'s statements as voluntary."  225 F.3d at 91 n. 5.

[15]In Flemmi, the district court, relying on some of the same
principles and the same cases cited by the Defendant Boskic,
enforced a promise made by FBI agents that statements made by
Flemmi would not be used against him (and evidence derived from
those statements would also not be used).  United States v.
Salemme, 91 F.Supp.2d 141 (D. Mass. 1999).  The district court
found that the promise was enforceable.  The court went on to
say, however, that even if unenforceable, the promise, under the
circumstances, made the statements involuntary.  91 F.Supp.2d at
347.  Some of the factors relied on by the district court,
included the promise made by the agents, the long term
relationship between the FBI and Flemmi, that "cultivated the
sense that he was friend and ally," and the fact that the agents
believed that the statements could not be used."  Id. at 349-350.
None of those factors are present in Boskic's case: no
affirmative promise was made to Boskic that his statements would
not be used (in fact the opposite was said); it would not have
been reasonable for Boskic to believe that he was a friend and
ally of the investigators; and all the agents knew that Boskic
was offering information that could be used against him.  Thus,
even the district court that suppressed the statements in Flemmi
would deny suppression given the facts of this case.  And, in any
event, on the facts in Flemmi, the Court of Appeals for the First

17

### 2. The Defendant Waived any *Miranda* Rights he may have had

As stated above, the government does not concede that the Defendant had any *Miranda* rights, because he was not in custody; however, if he did, they were waived.

"[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." <u>Colorado v. Spring</u>, 479 U.S. 564, 577 (1987). In <u>Spring</u>, agents received information that the defendant was involved in illegal gun sales and participated in a murder. The agents used an undercover to purchase a firearms from the defendant and arrested him on that offense. When they gave him his *Miranda* warnings, they did not tell him that they wanted to question him about the murder as well as the firearms sales. 479 U.S. at 853-854. The defendant successfully argued before the Colorado Supreme Court that his statements were not voluntary, because a suspect's awareness of the possible subjects of questioning is relevant in determining whether there was a valid waiver. 479 U.S. at 856. The Supreme Court reversed, noting that the defendant's "argument strains the meaning of compulsion past the breaking point." 479 U.S. at 857. A statement is not compelled if a defendant, absent coercion,

_____

Circuit reversed the suppression order and the finding that the statements were involuntary. 225 F.3d 91-92.

18

"voluntarily, knowingly and intelligently" waives his privilege.
Since the defendant failed to allege any coercion by "physical
violence or other deliberate means calculated to break [his]
will," then his waiver was voluntary.  479 U.S. at 573-574,
quoting Oregon v. Elstad, 470 U.S. 298, 312 (1985).  No coercive
police conduct overbore his will.  479 U.S. at 574, citing
Colorado v. Connelly, 479 U.S. 157, 163-164 (1986).  "Knowingly"
does not mean that he needs to know the subject matter the
interviewers intend to discuss; it means that he understands that
he has the right to remain silent and anything he chooses to say
can be used against him.  479 U.S. at 564.  "The Constitution
does not require that a criminal suspect know and understand
every possible consequence of a waiver of the Fifth Amendment
privilege."  Id.

     The defendant argued that his waiver was invalid because he
was the victim of trickery.  The Supreme Court rejected an
argument that 'mere silence by law enforcement officials as to
the subject matter of an interrogation is "trickery" sufficient
to invalidate a suspect's waiver of Miranda rights.'  479 U.S. at
575-576.

     In this case, the Defendant Boskic first believed that he
was being questioned in connection with his request for travel
documents.  SA Carroll and then SA Hughes, when they questioned
Boskic, did not tell him that they had an interest in him beyond

the travel documents.  They had no obligation to so inform the
defendant.  The made no affirmative misrepresentations.  It
doesn't matter that the Defendant believed (at first) that the
inquiry was in connection with administrative matters.[16]

In United States v. Okwumabua, 828 F.2d 950 (2d Cir. 1987),
the Court of Appeals for the Second Circuit reversed the district
court's order suppressing statements of a defendant to a special
agent of the General Services Administration.  The agent obtained
several statements from the defendant under the guise of doing an
audit of the defendant's and his company's dealings with the
Small Business Administration.  828 F.2d at 951.  The agent, who
was a special agent in the Inspector General's Office, did not
identify himself as an agent who is involved in criminal
investigations.  The defendant was not told that he was the
subject of a fraud investigation.  No *Miranda* warnings were give.
828 F.2d at 950.  There was no coercion, no promises or threats
were made, and the interviews were non-custodial.  These and
other factors led the Court of Appeals to conclude that the
defendant's "free will ... was not overborne."  828 F.2d at 953.

The defendant argued that the agent concealed the fact that
he was not merely an auditor.  The Court rejected the defendant's

---

[16]Once SA Hughes came into the room, the Defendant knew that
it was no longer an administrative inquiry, since the FBI does
not have any administrative jurisdiction.  Further, as the
Defendant admitted: "I knew what this was about as soon as
someone from the FBI wanted to talk to me."  Def. Ex. B, at 7.

argument; the agent merely failed to inform the defendant of the
true nature of his interest, but engaged in no affirmative
deceit.  "To prevail on this point, a defendant must produce
clear and convincing evidence that the agents affirmatively
misled him as to the true nature of the investigation."  828 F.2d
at 953.  The agents have no "legal or moral duty to inform the
defendant" of the nature of their investigation or the
allegations against the defendant.  Id.

      See also United States v. Mitchell, 966 F.2d 92 (2d Cir.
1992) (reversing the suppression of statements to EPA criminal
investigators who did not give Miranda warnings; no affirmative
misrepresentation where agent "permissibly emphasized cooperation
and deemphasized, but did not misrepresent, the criminal nature
of the inquiry."  966 F.2d at 100.); United States v. Prudden,
424 F.2d 1021 (5th Cir. 1970) (reversing the suppression of
statements to an IRS agent who failed to give Miranda warnings
and failed to tell defendant that investigation might result in
criminal charges against him -- after Revenue Agent had already
brought Special Agent in to assist in the investigation, having
found evidence of fraud); United States v. Sawinski , 2000 WL
1357491 (S.D. N.Y. 2000) (denying motion to suppress and finding
that waiver of Miranda voluntary even though agents withheld from
defendant information that he was the subject of their
investigation and they had already obtained a warrant for his

21

arrest).

In <u>United States v. Serlin</u>, 707 F.2d 953 (7th Cir. 1983),
the defendant was questioned by agents of the Internal Revenue
Service and told that they were investigating former business
associates.  The defendant was told that he was not the subject
of any investigation, but he was given the "IRS noncustodial
advisement of rights." 707 F.2d at 955.  The agents also asked
him whether he had filed returns in particular years.  707 F.2d
at 955-956.  The defendant claimed that he was misled by the
agents who referred to the investigation of his business
associates, "which served to mask the true nature of their
inquiry."  707 F.2d at 956.  The Court viewed the agents' actions
as a simple failure to inform the defendant of the subject of
their investigation and not affirmative deceit.  "One
insurmountable obstacle in the defendant's path is that the
statements about [the business associates] were true," <u>i.e.</u>, the
agents were investigating the associates.[17]  707 F.2d at 957.
The investigation had a dual purpose and, although the agent
first told the defendant he was not the subject of an
investigation, the questions posed to him and the advisement of
rights "should have alerted defendant, and beyond doubt did alert
him, that he was a subject of the investigation, and certainly

_____

[17]Alistair Graham *was* investigating senior military
officials in the Army of the Republic of Srpska.

22

defeat any claim that the agents affirmatively misled defendant." 707 F.2d at 957.  Thus, in this case, as in Serlin, there was no intentional deceit when Alistair Graham told Boskic that the target of his investigation was the senior military officials and that he was seeking Boskic's cooperation against those officials.

See also United States v. Irvine, 699 F.2d 43 (1st Cir. 1983) (reversing the suppression of defendant's statements to IRS agent, who did not tell defendant that he was the subject of a criminal investigation).

Even an intentional deception, without more, will not make a confession inadmissible.  In United States v. Kontny, 238 F.3d 815 (7th Cir. 2001), the Court of Appeals for the Seventh Circuit affirmed the denial of a motion to suppress statements to an IRS agent who told the defendant that he was conducting a "civil exam."  Since the statements were given in a noncustodial setting, *Miranda* did not apply and the admissions were voluntary unless obtained by threats or promises.[18]  238 F.3d at 817. "[P]olice commonly engage in ruses."  Id.  The Court analogized this situation to that of an undercover officer gaining the confidence of a suspect, who makes incriminating statements to the officer.  "There if no right to require secrecy of the people whom one confides in."  Id.  Therefore, "even if [the agent] was

---

[18]See also Flemmi (statements made were voluntary even though given after promise by agents that they would not be used; agents lacked authority to confer use immunity).

23

pretending to be conducting a civil investigation but was really ... conducting a criminal one, this would not, under the rules that govern the admissibility of incriminating statements (written or oral) made to government officers *even by a suspect who is in custody*, make the statements inadmissible." 238 F.3d at 818 (emphasis in the original). United States v. Boykoff, 186 F.Supp.2d 347 (S.D.N.Y. 2002) (denying defendant's motion to suppress statements to IRS agent, because defendant's argument was "no more persuasive than that of every common criminal who brags about his exploits to an undercover cop. Their will was not overborne; they were not threatened or beaten; there was no coercion." 186 F.Supp.2d at 353.)

See also United States v. Mast, 735 F.2d 745 (2d Cir. 1984) (reversing suppression of defendant's statements to special agents of the Department of Agriculture, who were investigating loans obtained by defendant; the court rejected defendant's claim that he was misled by the statement by the agent that he would not be prosecuted if he repaid loans that were fraudulently obtained, and by failure of agents to affirmatively assert that the investigation was criminal -- "it should have been absolutely clear to [the defendant] that he was no longer the subject of only a civil proceeding when [the] Special Agent ... identified himself, gave the *Miranda* warnings, and asked [the defendant] to read and sign a waiver of rights form." 735 F.2d at 745.)

###   C.    The Cases Cited by Defendant are Readily
            Distinguishable

The great weight of precedent establishes that the
statements of the Defendant were voluntary and are admissible.
The cases cited by the Defendant are readily distinguishable.[19]

United States v. Knowles, 2 F.Supp.2d 1135 (E.D. Wisc. 1998)
involved a "pattern of deceptions." 2 F.Supp.2d at 1137. The
agent, who had an arrest warrant for the defendant and intended
to immediately arrest him, did not advise the defendant of his
*Miranda* rights. Further, the agent told the defendant that he
was *not* in any trouble, that he was *not* going to be arrested and
that he was free to leave, and he was *only* being questioned as a
potential witness. 2 F.Supp.2d at 1142-1143. In this case,
Boskic was repeatedly warned of his *Miranda* rights. Boskic was
never told that he was *not* in trouble nor that he was *only* being
questioned as a potential witness. Further, he was not told that
he was not going to be arrested, nor was he told (until about
8:20 PM) one way or another whether he was free to leave.

In United States v. Walton, 10 F.3d 1024 (3rd Cir. 1993),
the defendant made incriminating statements to an ATF agent (who
he knew from high school) who agreed to meet with him "off the
cuff," i.e., off the record, after agents questioned the

---

[19]Further, the holdings of many of these cases might be
contrary to Flemmi, and therefore, should not be followed by a
District Court Judge in this Circuit.

defendant as part of, what was represented to be, a regulatory and not a criminal inquiry.  10 F.3d at 1030.  In fact, even the agent, because of the assurances he gave the defendant, believed that the admissions the defendant made were not admissible against him.  10 F.3d at 1027 and 1029.  The combination of the friendly setting, the assurances to the defendant, the regulatory inspection and the failure to give *Miranda* warnings[20] "induced [the defendant] to speak."  10 F.3d at 1024.  Similar facts were dispositive in United States v. Conley, 859 F.Supp. 830 (W.D. Pa. 1994)[21]  In this case, warnings were given immediately before any questioning, and then repeated at least three times.  No one gave any assurances to Boskic that his statements would not be used against him, in fact, the opposite was said.  There was no statement or suggestion that the interview was off the record, in fact, Boskic was told that anything he said could be used against him.  Finally, the unique facts of the pre-existing relationship with the agent is also absent.

In United States v. Swint, 15 F.3d 286 (3rd Cir. 1994) a defendant, who was arrested on state drug charges, agreed to an

---

[20]*Miranda* warnings had been given the previous day, before the agreement to meet "off the cuff."  10 F.3d at 1024.

[21]In Conley, in first meeting with defendant, agents assured defendant that their conversation was off the record, that he was not the target of the investigation, and that nothing he said could be used against him.  859 F.Supp. at 832.  Subsequent meetings referred to that first encounter.  859 F.Supp. at 838.

"off-the-record proffer regarding the cooperation he could
provide in exchange for a negotiated plea." 15 F.3d at 287.
During the proffer, which took place in the District Attorney's
Office, the state authorities asked the defendant about post-
arrest drug activity (that had been uncovered by federal agents).
After denials, the federal agents joined the meeting and
confronted the defendant with evidence. The defendant then
agreed to cooperate with the federal authorities as well. 15
F.3d at 287-288. His attorney then left the meeting, because he
didn't want to be present during the actual cooperation. The
defendant made inculpatory statements after his attorney left,
believing that he was still protected by the proffer agreement
with the state authorities. 15 F.3d at 288. The court ruled
that the statements were involuntary and affirmed the suppression
order.

Similarly, in United States v. Rogers, 906 F.2d 189 (5th
Cir. 1990), the defendant provided weapons to state law
enforcement after being assured that he would not be charged if
he cooperated. 906 F.2d at 190. He was subsequently asked to
come to the sheriff's office because somebody wanted to speak
with him. Id. Unbeknownst to the defendant, that somebody was
an ATF agent who knew he was a convicted felon. When he came to
the sheriff's office, the agent advised the defendant of his
*Miranda* rights. The defendant believed that his statements to

27

the agent were just follow up to the state investigation.   <u>Id.</u>
He made additional admissions that were used in a federal
prosecution.  "Given the peculiar facts" of the case, the court
found that defendant's confession was not voluntary.  906 F.2d at
191.  The state officials spoke with the defendant one day and
assured him he would not be prosecuted if he cooperated.  The
next day he turned in the firearms in reliance on those
assurances.  The next day he received the call to come to the
sheriff's office and the interview with the federal agents took
place in the sheriff's department.  He therefore reasonably
believed that the conversation with the agents was related to the
state investigation (and covered by the same assurances,
notwithstanding the *Miranda* warnings).  906 F.3d at 191-192.

     In contrast to <u>Swint</u> and <u>Rogers</u>, in this case, there was no
formal (or informal) agreement to engage in any off-the-record
discussions with Boskic and the prosecutors (or agents) for the
purpose of pursuing cooperation.  There were no promises to
Boskic that he would not be prosecuted.  (*Miranda* warnings were
administered.)

     Unique facts were also present in <u>United States v. Jacobs</u>,
312 F.Supp.2d 619 (D. Del. 2004).  In <u>Jacobs</u>, a defendant who had
a ten year informant relationship with law enforcement, made
incriminating statements that were then used against her.  The
facts that supported a finding under the totality of the

28

circumstances test that the statements were not voluntary but were coerced, included: the ten year informant relationship; the informant had no reason to believed she was the target of a criminal investigation when questioned; on numerous occasions in the past she had received assistance in connection with her own criminal activity; in the past she had been authorized to engage in criminal activity; she had been authorized to engage in criminal activity in connection with the same drug conspiracy that was the subject of the questions; and she had previously been paid for information.  312 F.Supp. 2d at 631.   The facts that distinguish this case from Jacobs are numerous and need not be enumerated.[22]

### D.    The Defendant's Sixth Amendment Right to Counsel had not Attached

"[T]he right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." United States v. Gouveia, 467 U.S. 180, 187 (1984). The right to counsel does **not** attach at the time of arrest, Id., 467 U.S. at 190, and certainly not before arrest (and after the issuance of a complaint and warrant); United States v. Toro, 840 F.2d 1221, 1234 (5th Cir. 1988) (holding that a defendant's constitutional rights do not attach at the moment the arrest warrant is issued; United States v. Sawinski, 2000 WL 1357491 at

---

[22]See also contrary holding on similar facts in Flemmi.

6-7 (S.D. N.Y. 2000).  The core purpose of the Sixth Amendment
'is to assure aid at trial, "when the accused [is] confronted
with both the intricacies of the law and the advocacy of the
public prosecutor."'  Gouveia, 467 U.S. at 188-189, quoting
United States v. Ash, 413 U.S. 300, 308 (1973). 'The arraignment
signals "the initiation of adversary judicial proceedings" and
thus the attachment of the Sixth Amendment.'  Michigan v.
Jackson, 475 U.S. 625, 629 (1986); United States v. Leon-Delfis,
203 F.3d 103, 110 (1st Cir. 2000).  "[T]he right to counsel
exists to protect the accused during trial-type confrontations
with the prosecutor." Gouveia, 467 U.S. at 190.

    In this case, the defendant was questioned after a complaint
had been issued and an arrest warrant on that complaint, but
before the defendant was arrested.  Even if the defendant had
been arrested, the right to counsel would not have attached until
his arraignment.  See United States v. D'Anjou, 16 F.3d 604, 608
(4th Cir. 1994) (holding that defendant's "claim fails because
this questioning occurred prior to the point at which the Sixth
Amendment right attached ... [because] the questioning occurred
immediately subsequent to the defendant's arrest and prior to
arraignment."); United States v. Duvall, 537 F.2d 15 (2d Cir.
1976) ("[w]e see no reason in principle why the filing of a
complaint should be deemed to give rise to counsel immediately
upon arrest pursuant to warrant." 537 F.2d at 22.)  A fortiori

if the defendant was not arrested, the right to counsel did not attach.

The defendant cites the Eight Circuit case of Manning v. Bowersox, 310 F.3d 571 (8th Cir. 2002) in support of the argument that formal charge by complaint obligates the government to bring the defendant to court and wait to question him until he "had or waived assistance of counsel." Def. Mot. at 6. The defendant's reliance on Manning v. Bowersox is misplaced. First, a holding by the Court of Appeals for the Eighth Circuit that the issuance of a complaint and warrant would trigger the Sixth Amendment right to counsel would be contrary to Supreme Court precedents cited above. Second, that was not the holding of the Eighth Circuit in Manning v. Bowersox. The Eighth Circuit held that there is no distinction between a case initiated by complaint versus one initiated by indictment. The Court did not address the timing of the attachment of the right to counsel. It is clear that the Court of Appeals for the Eighth Circuit recognizes that the right to counsel does not attach with the issuance of a complaint and warrant as argued by defense counsel. "The filing of a criminal complaint and the issuance of an arrest warrant do not constitute the initiation of an adverse judicial proceeding for the purposes of McNeil [v. Washington, 501 U.S. 171 (1991)]. Not until the preliminary hearing ... did [the defendant's] Sixth Amendment right to counsel attach." Von Kahl v. United States,

31

242 F.3d 783, 789 (8th Cir. 2001).  The analysis is not changed by the arrest of the defendant on the warrant.  <u>United States v. States</u>, 2004 WL 524682 (N.D. Ill. 2004).

### E.  The Agents had no Obligation to Arrest the Defendant Prior to the Interview

As the Court of Appeals for the First Circuit stated in <u>United States v. Berkovitz</u>, 429 F.2d 921, 926 (1st Cir. 1970), "[w]e are unaware of any right of a defendant to be arrested at a particular time."  <u>United States v. Toro</u>, 840 F.2d 1221, 1233-1234 (5th Cir. 1988) ("law enforcement officials are under no constitutional duty to terminate a criminal investigation the moment they have an arrest warrant in their hands.")  An officer can delay execution of a warrant until such "time when he can catch the accused 'with the goods.'"  <u>Gordenello v. United States</u>, 241 F.2d 575, 579 (5th Cir. 1957), <u>reversed on other grounds</u> 357 U.S. 480 (1958).  "Of course, law enforcement may postpone arrest in the hope that they may strengthen their case by uncovering further evidence."  <u>United States v. Kenaan</u>, 496 F.2d 181, 183 (1st Cir. 1974).

"There is no requirement that an arrest warrant be executed immediately after it issuance; rather, the general rule is that, while execution should not be unreasonably delayed, law enforcement officers have a reasonable time in which to execute a warrant and need not arrest at the first opportunity."  <u>United States v. Drake</u>, 655 F.2d 1025, 1027 (10th Cir. 1981).  Agents

can appropriately delay execution an arrest warrant "in order to strengthen their case." 655 F.2d at 1027.

However, agents cannot use the delay as a pretext, <u>Kenaan</u>, 496 F.2d at 183; thus, the exception to that general rule is expressed in the case cited by the Defendant, <u>McKnight v. United States</u>, 183 F.2d 977 (D.C. Cir. 1950). In that case, the agents had a warrant to arrest the defendant and a search warrant for a location on Euclid Street. They did not have a warrant for a location on Kent Place, "apparently because they did not know enough about it." 183 F.2d at 978. The agents purposely waited for the defendant to enter the Kent Place location, prior to executing the arrest warrant, so they could search the Kent Place location incident to the defendant's arrest. 183 F.2d at 978-979. The Court of Appeals for the D.C. Circuit ordered suppression in reliance on <u>United States v. Lefkowitz</u>, 285 U.S. 452, 467 (1932), wherein the Supreme Court held that "[a]n arrest may not be used as a pretext to search for evidence." 183 F.2d at 978.

But, it is clear that delay that is not a pretext to do a search that would not otherwise be permissible, does not violate a defendant's constitutional rights and any evidence seized during that period of delay is admissible.

In <u>United States v. Sawinski</u>, 2000 WL 1357491 (S.D. N.Y. 2000), agents did not tell a defendant that they had obtained an

33

arrest warrant prior to questioning.  "The agents' failure to inform Defendant that a warrant had been issued for his arrest may have affected his decision to speak, but the law does not require that he be so informed."  2000 WL 1357491 at 6.  "The government is not required to provide information that might be useful to the defendant."  Id.

In United States v. Payne, 423 F.2d 1125 (4th Cir. 1970), agents obtained an arrest warrant for the defendant on a Friday, based on his sale of drugs to an undercover, but did not arrest the defendant until Sunday, when he was delivering drugs to a correctional facility.  The agents delayed the arrest even though they had been told by the same undercover agent that had bought drugs from the defendant, that the defendant intended to deliver drugs to the correctional facility.  423 F.2d at 1125.  Because there was "nothing pretensive" to the issuance of the arrest warrant and it "was not designed to give an appearance of legitimacy to an otherwise unlawful search," the defendant's motion to exclude evidence was properly denied.  423 F.2d at 1126.

See also Gensel v. Beard, 2003 WL 22862645, at 6 (E.D. Pa. 2003) (denying defendant's suppression motion when law enforcement purposely delayed executing arrest warrant until after interview of defendant "in an attempt to obtain inculpatory evidence.")

**F.    Defendant's Written Confession and the Fruits of the Search of his Home and Vehicle are not Subject to Suppression Even if his Oral Confession is Suppressed**

Defendant asserts that, when he provided a written statement and consented to a search of his home and vehicle, he believed that he was not the target of any investigation and, in any event, "he had already told them everything," _i.e._, the cat was already out of the bag.  Def. Memorandum at 4.

The admissibility of any subsequent statements after there has been a confession in violation of _Miranda_ is decided "solely on whether it [the subsequent confession] is knowingly and voluntarily made."  Oregon v. Elstad, 470 U.S. 298, 309 (1985). The "psychological impact" of having "let the cat out of the bag" does not "qualif[y] as state compulsion [n]or compromise[s] the voluntariness of a subsequent informed waiver."  470 U.S. at 311-312.  "A subsequent administration of _Miranda_ warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of earlier statements."  470 U.S. at 314.

Therefore, if the Court finds that the Defendant was in custody and should have received his _Miranda_ warnings, and further finds that he received said warnings before he wrote the written statement, his later "written confession would be admissible because it was fully warned and given in circumstances

devoid of compulsion."[23]  <u>United States v. Vose</u>, 785 F.2d 364,

367 (1st Cir. 1986).

On August 25, 2004, while writing in his own hand, the

Defendant admitted that the written statement was given with an

understanding of his rights and the intention to give up those

rights, "voluntarily, [and] without promises and guarantees."

Ex. 3.  Therefore, his motion to suppress his written statement

should be denied, regardless of what the Court rules with

reference to his oral statements.

**G.   Discovery the Defendant Seeks in Connection with his
       Motion to Suppress is Unnecessary**

The Defendant seeks discovery of all those who participated

in the planning of the interview and arrest of the Defendant.  He

---

[23]From Defendant's Motion and Affidavit it is not clear
exactly when (he claims) the *Miranda* and consent to search forms
were signed.  His Affidavit suggests that he was asked to put his
statement in writing and that he agreed to the search at the same
time.  Def. Ex. A at ¶11.  He further states that he first signed
documents, including the form consenting to the search, after he
"already made statements."  Def. Ex. A at ¶12.  However, he does
not specifically say when the *Miranda* form was signed, nor if the
documents he signed were signed before or after his written
statement.  The time on the *Miranda* form is 3:30 PM and the time
on the consent to search form is 6:45 PM.  These times, contained
on Def. Ex. E and Ex. 1, are consistent with the reports
submitted as Exhibits B and C, but inconsistent with the
Defendant's version of events.  In addition, the Defendant was
not arrested until 8:20 PM.  Def. Ex. B at 1 and 7.  (He was
arrested when he was asked what was going to happen that night
and asked if he was being arrested.  The Agents told him the
truth.)  Finally, in his written statement he wrote: "I, Marko
Boskic, *understand and give up my rights*, I am giving this
statement *voluntarily and without promises and guarantees*."  Ex.
3 (emphasis added).

36

seeks the identify of witnesses who could not provide any
information that is relevant to his motion.  As stated above, the
standards to be applied are objective.  Therefore, any
discussions that preceded the interview of the Defendant and
which occurred outside his presence, are irrelevant.  See e.g.,
Yarborough v. Alvarado; Thompson v. Keohane; Stansbury v.
California; Berkemer v. McCarty.  Further, the government should
not be placed in a position of disclosing discussions of
investigative strategy.

**III. CONCLUSION**

A confession given in a noncustodial setting is admissible
unless it was the product of coercion.  See, e.g., Miranda v.
Arizona; Illinois v. Perkins; Procunier v. Atchley; Bryant v.
Vose; United States v. Bienvenue.  Deceit and trickery are
acceptable law enforcement tactics unless they are coercive.
See, e.g., Illinois v. Perkins; Lynum v. Illinois; United States
v. Bezanson-Perkins.  In a noncustodial setting, even affirmative
misrepresentations (e.g., telling a defendant that his statements
will not be used against him) since they are not coercive, will
not result in suppression.  See, e.g., United States v. Flemmi;
United States v. Lederman; but see United States v. Rogers;
United States v. Jacobs.

In a situation where *Miranda* applies, deceit and trickery
that does not undercut the warnings, does not negate the

voluntariness of a waiver of rights.  See, e.g., Colorado v.
Spring; United States v. Okwumabua.

A subsequent written statement will not be suppressed if it
was voluntarily given and not in violation of *Miranda*, even if an
earlier statement is suppressed.  See, e.g., Oregon v. Elstad;
United States v. Vose

On August 25, 2004, the defendant was not in custody until
approximately 8:20 PM -- after he made the statements that he now
seeks to suppress.  Nevertheless, SA Carroll of ICE gave Boskic
his *Miranda* warnings at 3:35 PM.  Those warnings were repeated
when SA Hughes entered to room, again when Alistair Graham of the
ICTY entered to question the Defendant, and yet again when Boskic
wrote his statement.  "That [law enforcement] informed [the
Defendant] several times of his right to an attorney and his
right to remain silent weigh against a determination of coercion.
...  [I]t would be difficult to conclude that the [agents]
coerced the confession while at the same time warning [the
Defendant] that he need not say anything."  United States v. Dowd
932 F.2d 739, 742 (8th Cir. 1991).

As the Defendant wrote on August 25, 2004,

I, Marko Boskic, understand and give up my rights, I am
giving this statement voluntarily, without promises and
guarantees.

For that reason, and the reasons stated herein, the
Defendant's motion to suppress his voluntary statements should be

38

denied.  Further, his motion for discovery in connection with this motion should also be denied.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                     By:   /s/ Jeffrey Auerhahn
                              JEFFREY AUERHAHN and
                              KIMBERLY P. WEST
                              Assistant U.S. Attorneys

DATE: March 21, 2005