UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| V. | )    Criminal No. 04-10298-DPW |
| | ) |
| | ) |
| MARKO BOSKIC | ) |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS
AND GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR
DISCOVERY RELATED TO HIS MOTION TO SUPPRESS

## I.    STATEMENT OF THE FACTS

On August 25, 2004, a criminal complaint and arrest warrant
were issued for defendant Marko Boskic. Defendant's Exhibit D,
attached to Defendant's Motion to Suppress (hereinafter "Def.
Ex."). At approximately 3:30 PM, the defendant appeared at the
JFK Federal Building in Boston in connection with his request for
travel documents. Def. Ex. B, at 2. He was met by Special Agent
("SA") Thomas Carroll of the Immigration and Customs Enforcement
("ICE") of the Department of Homeland Security. Id. SA Carroll
was aware of the arrest warrant for Boskic.

SA Carroll was careful to determine that the Defendant
understood his *Miranda* rights before commencing questioning of
Boskic, even though the Defendant was not in custody. As the two
men walked towards the interview room, SA Carroll asked the
Defendant if he understood English. The Defendant stated that he
did.[1] Aff. Ex. 2, at ¶4. Once in the interview room, SA Carroll

---

[1]Attached hereto is an Affidavit from SA Carroll, that is
marked as Exhibit 2 (hereinafter "Aff. Ex. 2"). The Affidavit

raised his right hand and told the Defendant to do the same. Id., at ¶5. SA Carroll then administered an oath to the Defendant (in English). Id., at ¶5, Def. Ex. B, at 2. The agent then asked Boskic if he read English and the Defendant stated that he did.[2] Aff. Ex. 2, at ¶6. SA Carroll orally advised of Boskic of his rights while the Warning of Rights form was placed in front of Boskic with the English side facing him. (SA Carroll, who was sitting across a table from the Defendant, read the rights upside down from the English version of the form.) Aff. Ex. 2, at ¶7. The Defendant signed the English side and the SA Carroll dated the form, noted the time and signed as a witness. Id., Def. Ex. B, at 2. Further, when his rights were explained to him, the defendant stated: "yes, yes, I know what these are."[3] Def. Ex. B, at 2.

SA Carroll then returned the form to the Defendant, showing him the Serbo-Croatian side. After reading the form in his native tongue, the Defendant signed and dated the Serbo-Croatian

---

supplements his reports and that of SA Hughes.

[2]In his Affidavit, Def. Ex. A, the Defendant states that "I have only a limited command of English." The Agents involved in the interview of the Defendant on August 25, 2004 would dispute this statement. The Defendant's command of the English language was sufficient to make himself understood and to understand what was being said to him. Aff. Ex., at ¶16.

[3]The defendant had a number of arrests in the United States and presumably, therefore, had previously received Miranda warnings.

side of the form.  Boskic also specifically indicated the time he signed the form by writing the time.[4]  Aff. Ex. 2, at ¶8, Def. Ex. B, at 2.  The date and time that appear on the Serbo-Croatian side of the form ("8/25/04" "3$_{35}$") were written by the Defendant. Def. Ex. E.[5], Aff. Ex. 2, at ¶8. There was no error in the time indicated; the form was signed at 3:35 PM.[6]

SA Carroll asked Boskic questions concerning his request for travel documents.  Def. Ex. B, at 2.  SA Carroll then questioned Boskic about biographical information, and Boskic freely provided information about his personal history.  Id., at 2-3.  SA Carroll

---

[4]Even a non-expert can see that the date and time on the English side and the date and time on the Serbo-Croatian side were not written by the same person.  In addition, the style of the numbers on the Serbo-Croatian side are European and are consistent with the date on the Consent to Search form in Serbo-Croatian that was signed by the Defendant.  A copy of the Consent to Search form (in Serbo-Croatian) is attached hereto and marked "Ex. 1."

[5]The "Warning as to Rights" form is identified as Exhibit E in the defendant's submission, but was not filed or scanned.  The government is attaching hereto a copy of the forms in English and Serbo-Croatian that were signed by the defendant, but referring to the forms as Def. Ex. E.

[6]The defendant claims that the time on the form is incorrect and that he did not receive any warnings until later in the day. Both the English and Sebo-Croatian side of the form contain the time "3:35 PM."  Def. Ex. E.  In addition, Exhibits B and C also specifically reference the form that was signed before any questioning.  Further, Boskic received Miranda warnings on several additional occasions during the interview -- at least on each occasion when someone new joined the interview, and again before he wrote his statement.  The agents were so careful about insuring that Boskic recognized that he did not have to tell them anything that, at the third or fourth warning, he became agitated.  Def. Ex. C at 5; Def. Ex. B at 6.

then asked about previous military service.  Id., at 3.  The
defendant stated that he had no military service other than the
mandatory service in the Yugoslav military from 1983-1984.[7]  Id.

Boskic was then asked if he had ever been arrested in
Bosnia, and Boskic stated that he had not.  SA Carroll showed
Boskic paperwork that contradicted his assertion and told him
that he would have to explain the details of the arrest to an
agent of the Federal Bureau of Investigation ("FBI").[8]  Id.

At this point, Special Agent Gregory Hughes entered the
room.[9]  Id., at 3.  SA Hughes identified himself and SA Carroll
reminded Boskic of his rights and that his rights all still
applied.  Id.  SA Carroll, holding the Warnings as to Rights
form, that had been previously signed by the Defendant, told the
Defendant that his rights still applied.  Def. Ex. B, at 3, Aff.
Ex. 2, at ¶9.  He was reminded that anything he said could be
used against him and he could refuse to say anything.  Aff. Ex.
2, at ¶9.  Boskic acknowledged that he understood.  Id., Def. Ex

_____

[7]As set forth in the indictment in this case, this is
untrue.

[8]Although, at this point, the agents did not tell Boskic,
the true nature of their interest in Boskic, the defendant knew;
while later writing out a statement, he said: "I knew what this
was about as soon as someone from the FBI wanted to talk to me."
Def. Ex. B at 7.

[9]From this point forward, Exhibit B (SA Carroll's ICE
report) and Exhibit C (SA Hughes' FBI 302 report) document the
same events.  For the ease of the narrative, citation will be to
SA Carroll's report only.

4

B, at 3.  Boskic rose and raised his hand as if prepared to again
be administered an oath.  Aff. Ex. 2, at ¶9.

Boskic again lied to the agents and told them that he had
not served in the war.  Def. Ex. B, at 3.  In connection with his
arrests in Bosnia, he stated they were long ago and the charges
were dismissed.  (He also blamed the "Muslim people [who] had
more power and that they can write or say what they want.")  He
admitted that he failed to note the information on his
immigration forms.  Id.  Boskic was also asked about whether he
was present at a shooting in a bar in Bosnia in 1995; he lied and
said he was not in Bosnia in 1995.  Id., at 3-4.

SA Hughes then informed Boskic that someone else wanted to
speak with him.  Id., at 4.  Alistair Graham, an investigator
with the International Criminal Tribunal of the Former Yugoslovia
("ICTY") entered the room with a Bosnian Serbo-Croatian
interpreter.  SA Carroll again reminded the defendant of his
rights and explained that all his rights previously given still
applied.  Id., Aff. Ex. 2, at ¶10.  SA Carroll noted the Warning
as to Rights form and made reference to the Defendant's right to
remain silent and to an attorney.  Id.

Graham identified himself and told Boskic not to say
anything until Graham finished what he had to say.  Def. Ex. B,
at 4.  Graham stated that he was aware of Boskic's involvement
with the 10th Sabotage Detachment and what they had done after

5

Sebrenica at locations including Branjevo Farm. Graham stated
that he was seeking Boskic's cooperation against the senior
military officials and that Boskic was not the subject of his
investigation. Graham told Boskic that he had a video, showing
that Boskic was in the military. Graham stated that he was
interested in his cooperation and asked him if he wished to see
the video. Boskic stated: "It would be better if I saw the
video." After being shown the video, Bokic was asked if he would
cooperate. Boskic replied "yes," and admitted that he was a
member of the Unit. He also said that he knew this day would
come. Id.

Although Graham told Boskic that he was not the target of
his investigation, that his target was the senior military
officials, and that he was seeking Boskic's cooperation, Graham
never told Boskic that his statements would not be used against
him or that he would not be prosecuted. Id., Aff. Ex. 2, at ¶11.
In fact, before Graham said anything, Boskic was reminded that he
had the right to refuse to answer any questions and that anything
he said could be used against him. Id., at ¶10, Def. Ex. B, at
3.

Boskic then answered Graham's questions and provided
information concerning his involvement in the massacre at
Branjevo Farm as part of the Army of the Republic of Srpska.
Id., at 4-6. He also admitted that he made no mention of his

6

military experience on his applications for admission to the
United States, because that provided the best chance that he
would be admitted to the United States.  Id. at 6.

Boskic expressed a willingness to help identify and find
other guilty individuals and stated that he had telephone
addresses and names at his house.  Id. at 6.  At 6:45 PM, Boskic
signed a Consent to Search form in Serbo-Croatian.  Id. at 6 and
Ex. 1.  The Defendant wrote the date on the form and the agent
signing as a witness wrote the date and time.  Ex. 1.

All during the interview, the door to the room was open and
breaks were taken to allow Boskic (and others) to use the
restroom.  Id. at 7, Aff. Ex. 2, at ¶15.

Boskic was asked to make a written statement in his own
words.  Boskic was reminded that his rights were still in effect
and specifically told that no promises or guarantees were being
made.  Def. Ex. B, at 6.  Both SA Hughes and SA Carroll told
Boskic several times that he was under no obligation to write a
statement.  Boskic repeatedly stated that he understood and
acknowledged that he was waiving his rights.  He got agitated (by
the repeated warnings) and stated: "If I am writing this, I
understand what I am doing."  Id.  He then wrote a statement in
Bosnian Serbo-Croatian.  Id., at 6-7.  A translation of the
statement of Marko Boskic is attached and marked Exhibit 3.  The
statement begins as follows: "I, Marko Boskic, understand and

7

give up my rights.  I am giving this statement voluntarily, without promises and guarantees." Exhibit 3, at 1.

At approximately 8:20 PM, before completing his written statement, Boskic asked what was going to happen that night after the interview was completed.  SA Carroll told Boskic that he would be held overnight and see a Judge in the morning.  Boskic asked if he was being arrested and SA Carroll told Boskic that he was being arrested on a federal criminal warrant for fraud in connection with his immigration paperwork.  Def. Ex. B, at 7, Aff. Ex. 2, at ¶15.  Boskic continued to write his statement until about 10:30 PM.  Def. Ex. B, at 7.

While writing his statement, Boskic stated: "I knew what this was about as soon as someone from the FBI wanted to talk to me." Id.

When he completed his statement, he was put in restraints and transported to a holding facility.  Id.

## II.  STATEMENT OF THE LAW

A confession given in a noncustodial setting is admissible unless it is the product of coercion.  Since the Defendant Boskic does not allege that he was in custody, nor has alleged any coercive acts by the interviewing agents, his motion lacks merit. Even if *Miranda* applies, because he was advised of his rights, and no agent made any affirmative misrepresentations that would tend to negate those warnings (and there was no coercion), his

motion to suppress should be denied.

### A.    The Defendant was not in "Custody"

When the Defendant was questioned by SAs Carroll and Hughes and then by Mr. Graham, he was not "in custody" for *Miranda* purposes and, therefore, the agents did not have to advise the Defendant of his *Miranda* rights. His statements are admissible unless they were coerced.

The *Miranda* custody test is an objective one. Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2148 (2004) (reversing the court of appeals' reversal of the denial of a habe petition; the district court had denied the petition because the court found that the defendant was not in custody when he made incriminating statements); United States v. Ventura (I), 85 F.3d 708, 711 (1st Cir. 1996). "Two discrete inquiries are essential: first, what were the circumstances surrounding the interrogation; and second given those circumstances, would a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995). "[T]he court must apply an objective test to resolve the ultimate inquiry: was there formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id.; Ventura (I), 85 F.3d at 712.

In Yarborough v. Alvarado, as in this case, the defendant came to the police station at the request of the investigating

9

officers and was questioned at the police station in a small interview room. Again, as in this case, during questioning, the defendant was told by the interviewer that they did not believe him -- that his responses were not truthful and that the police "have witnesses that are saying quite the opposite." 124 S.Ct. at 2145. Further, the interviewer encouraged the defendant to "be honest" and appealed to "his sense of honesty and the need to bring [the shooter] to justice." Id. Finally, as in this case, the defendant was offered the opportunity to take breaks during the questioning. Id. at 2146.[10] Other factors, such as the length of the interview (two hours) and the fact that the defendant was not told that he was free to leave, were not sufficient to overcome the finding that the defendant was not in custody. 124 S.Ct. at 2150.

> [A] noncustodial situation is not converted to one in which Miranda applies simply because ... , even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in

---

[10]Unlike this case, however, at the end of the interview the defendant in Yarborough v. Alvarado was allowed to leave. This cannot be a determinative factor on whether during the interview anything was said or done to arrest the defendant or otherwise restrict his freedom of movement.

> the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been a restriction on a person's freedom as to render him "in custody."

Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

See also Beckwith v. United States, 425 U.S. 341 , 347 (1976) (holding that no *Miranda* warnings required even though defendant was the "focus" of investigation); California v. Behler, 462 U.S. 1121, 1125 (1983) (reversing suppression of defendant's statements because *Miranda* warnings were not required; defendant was not in custody even though questioning took place at police station and defendant was a suspect).

Some restraint on a suspect does not mean the suspect is in custody for *Miranda* purposes. See, e.g., United States v. Ventura (I), 85 F.3d 708 (1st Cir. 1996) and United States v. Ventura (II), 132 F.2d 844 (1st Cir. 1998) (twice reversing the district court's suppression of statements made to Customs agents). "The relevant inquiry ... is whether there was an arrest or restraint on freedom of movement of the degree associated with a formal arrest." 85 F.3d at 712.  In Ventura, even though the suspect was not free to leave, the suspect was not in custody during questioning by a Custom's agent.

"The test is not applied mechanically, but in view of the totality of the circumstances." Ventura (II), 132 F.3d at 846.

The subjective views of both the suspect and the law enforcement officer doing the questioning are irrelevant.

11

Stansbury v. California 511 U.S. 318, 323 (1994); Ventura (I), 85
F.3d at 711.  Thus, even if it was the officer's intention to
take the suspect into custody, i.e., effect an arrest, that
"unarticulated plan" in the mind of the officer, 'has no bearing
on whether the suspect is "in custody" at a particular time.'
Berkemer v. McCarty, 468 U.S. 420, 442 (1984); United States v.
Nishniandize, 342 F.3d 6, 13 (1st Cir. 2003) ("The officer's
subjective belief is irrelevant.")

     In a case where it was the unarticulated intent of the
officer to arrest the suspect at some point, the suspect is not
"in custody" until the suspect is made aware of the intent to
arrest.  United States v. Landry, 345 F.Supp.2d 118, 121-122 (D.
Mass. 2004).  Thus, in Landry, as in this case, the defendant was
not in custody "until he asked for -- and was told that the
officers had -- an arrest warrant for him."  345 F.Supp.2d at
122.

     The Defendant Boskic concedes that he was not "in custody"
for Miranda purposes.  He states in his Affidavit that he
believed he was being questioned in connection with his request
for travel documents. Def. Ex. A.  It was not until the very end
of the interview, when he was completing his signed statement,
that he was told that there was a warrant for his arrest, and
that he would be held overnight.  Therefore, all during the
interview, there was neither objective evidence that he was "in

custody" nor the subjective belief by the defendant that he was
in custody.

**B.    The Defendant's Confession was Voluntary (and the
Defendant Voluntarily Waived his Miranda Rights)**

Defendant was not in custody and, therefore, there was no
need to administer *Miranda* warnings.  His statements are
admissible unless they were coerced.  Out of an abundance of
caution and to scrupulously protect the defendant's rights (over
and above what the law requires), the agents gave the Defendant
his *Miranda* warning on multiple occasions.  Thus, even if the
Court decides that the Defendant was in custody, his statements
are admissible because he voluntarily waived his rights.

"Confessions remain a proper element in law enforcement.
Any statement given freely and voluntarily without any compelling
influences is, of course, admissible in evidence."  Miranda v.
Arizona, 384 U.S. 436, 478 (1966).  The burden is on the
government to prove voluntariness by a preponderance of the
evidence.  Lego v. Twomey, 404 U.S. 477, 489 (1972).  The same
burden applies when the government seeks to prove a voluntary
waiver of a defendant's *Miranda* rights; the waiver must be proven
by a preponderance of the evidence.  United States v. Jackson,
918 F.2d 236 (1st Cir. 1990); United States v. Palmer, 203 F.3d
55, 60 (1st Cir. 2000); United States v. Palmer, 203 F.3d 55, 60
(1st Cir. 2000.  In both situations, to determine voluntariness,
"it is necessary to looks at the totality of the circumstances."

13

Id.; Arizona v. Fulminate, 499 U.S. 279, 285-286 (1991); United States v. Burns, 15 F.3d 211, 216 (1st Cir. 1994); United States v. Bienvenue 632 F.2d 910, 913 (1st Cir. 1980); Palmer, 203 F.3d at 60. "Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust ..." Illinois v. Perkins, 496 U.S. 292, 297 (1990) (involving "misplaced trust" in one the defendant believed was a fellow prisoner). Any interview by a police officer will contain some coercive aspects, Oregon v. Mathiason, 429 U.S. 492, 494-495 (1977), but a statement is not voluntary only if "the will of the defendant [was] overborne so that the statement was not his free and voluntary act." Procunier v. Atchley, 400 U.S. 446, 453 (1971); Bryant v. Vose, 785 F.2d 364, 367-368 (1st Cir. 1986); Bienvenue, 632 F.2d at 913.

"[T]o determine voluntariness it is necessary to look at the totality of the circumstances, *including* any promises[11] or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne." Jackson, 918 F.2d at 242. (holding that even an 'implied "threat" or "promise" that [defendant's] sister [who had been arrested] might

---

[11]Even good faith, but false, assurances by an officer that the defendant would be protected from criminal prosecution will not result in suppression where there was no evidence that the defendant's will was overborne. United States v. Lederman, 2000 WL 3403839 (N.D. Iowa 2000); see also United States v. Flemmi, 225 F.3d 78, 91 (1st Cir. 2000).

14

be caused or spared harm depending on whether [the defendant] admitted to ownership of the firearm' did not lead to the conclusion that "his will was overborne.")

### 1. Deception does not Equal Coercion

The kinds of situations where suppression of statements made after a valid *Miranda* waiver is proper include where police beat a confession, induce intoxication, deny a request for counsel or a stated desire to remain silent, or other forms of coercion. United States v. Bezanson-Perkins, 390 F.3d 34, 40 (1st Cir. 2004). Guile and trickery or some form of deceit do not make a subsequent confession involuntary. "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." Illinois v. Perkins, 496 U.S. 292, 297 (1990). Thus, court's distinguish lies that could amount to coercion, "such as where police falsely say they will take a child away unless the suspect cooperated." 390 F.3d at 41 (citing Lynum v. Illinois, 372 U.S. 528, 534 (1963).) "[O]nly confessions procured by *coercive police tactics* should be excluded as involuntary." United States v. Bynum, 145 F.3d 405, 407 (1st Cir. 1998), citing Colorado v. Connelly, 479 U.S. 157, 167 (1986) (emphasis in the original). (Connelly held that 'coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the

Due Process Clause of the Fourteenth Amendment.'   479 U.S. at 167.)

It is true that the government used a ruse to get the Defendant to come to the JFK Federal Building, and continued that ruse during the early stages of the interview.  Thus, at first, a reasonable man in the Defendant's position would likely have believed that he was being interviewed in connection with his request for travel documents.  However, getting a suspect to a place where he or she can be interviewed by means of a ploy is an acceptable law enforcement tactic.  See, e.g., United States v. White, 847 F.Supp. 219 (D. Mass. 1994).  "[T]rickery is not automatically coercion."  Byram, 145 F.3d at 408.[12]

"Given the narrow definition of coercion [by the Supreme Court] in Connelly, it would be hard to treat as *coercion* a false

_____

[12]In Byram, the defendant was questioned as a potential witness in a murder prosecution involving a firearm.  One investigator, while knowing that the defendant might be charged federally as a felon in possession of a firearm, asked another investigator to question the defendant about the murder and the defendant's handling of the firearm.  The investigator who questioned the defendant did not read the defendant his *Miranda* rights, even though he was in custody, and told him he as not "implicated in any of this."  145 F.3d at 406.  The defendant made incriminating statements and later testified at the murder trial.  He sought to suppress both his statements and his trial testimony.  The Court of Appeals stated that the defendant's statements were not coerced and therefore not involuntary.  145 F.3d at 408.  However, the suppression order of the district court was affirmed because the defendant's *Miranda* rights were violated; the "*Miranda* violation is not merely technical, ... there is a substantial nexus between the violation and the second statement, and ... the second statement is itself not preceded by an adequate *Miranda* warning."  145 F.3d at 410.

assurance to a suspect that he was not in danger of prosecution."
145 F.3d at 408.[13]   Therefore, an unfulfilled promise that
statements and evidence derived therefrom would not be used
against the defendant "does not constitute coercion, rendering
the statement involuntary or its fruits inadmissible."[14]   <u>United
States v. Flemmi</u>, 225 F.3d 78, 91 (1st Cir. 2000).[15]

---

[13]As the Court of Appeals for the First Circuit noted in
<u>Byam</u>, in a situation where *Miranda* warnings are given because a
defendant is in custody, false assurances that the suspect was
not in danger of prosecution, might undercut the warnings and
raise a question if *Miranda* was satisfied.  However, a statement
is 'not [] "involuntary" even if he were deceived."  145 F.3d at
408.

[14]The Court further noted that, "[e]ven if the government
could be charged with deceit ... we would still regard [the
defendant]'s statements as voluntary."  225 F.3d at 91 n. 5.

[15]In <u>Flemmi</u>, the district court, relying on some of the same
principles and the same cases cited by the Defendant Boskic,
enforced a promise made by FBI agents that statements made by
Flemmi would not be used against him (and evidence derived from
those statements would also not be used).  <u>United States v.
Salemme</u>, 91 F.Supp.2d 141 (D. Mass. 1999).  The district court
found that the promise was enforceable.  The court went on to
say, however, that even if unenforceable, the promise, under the
circumstances, made the statements involuntary.  91 F.Supp.2d at
347.  Some of the factors relied on by the district court,
included the promise made by the agents, the long term
relationship between the FBI and Flemmi, that "cultivated the
sense that he was friend and ally," and the fact that the agents
believed that the statements could not be used."  <u>Id</u>. at 349-350.
None of those factors are present in Boskic's case: no
affirmative promise was made to Boskic that his statements would
not be used (in fact the opposite was said); it would not have
been reasonable for Boskic to believe that he was a friend and
ally of the investigators; and all the agents knew that Boskic
was offering information that could be used against him.  Thus,
even the district court that suppressed the statements in <u>Flemmi</u>
would deny suppression given the facts of this case.  And, in any
event, on the facts in <u>Flemmi</u>, the Court of Appeals for the First

## 2.   The Defendant Waived any *Miranda* Rights he may have had

As stated above, the government does not concede that the Defendant had any *Miranda* rights, because he was not in custody; however, if he did, they were waived.

"[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." <u>Colorado v. Spring</u>, 479 U.S. 564, 577 (1987).  In <u>Spring</u>, agents received information that the defendant was involved in illegal gun sales and participated in a murder.  The agents used an undercover to purchase a firearms from the defendant and arrested him on that offense.  When they gave him his *Miranda* warnings, they did not tell him that they wanted to question him about the murder as well as the firearms sales.  479 U.S. at 853-854.  The defendant successfully argued before the Colorado Supreme Court that his statements were not voluntary, because a suspect's awareness of the possible subjects of questioning is relevant in determining whether there was a valid waiver.  479 U.S. at 856.  The Supreme Court reversed, noting that the defendant's "argument strains the meaning of compulsion past the breaking point."  479 U.S. at 857. A statement is not compelled if a defendant, absent coercion,

---

Circuit reversed the suppression order and the finding that the statements were involuntary.  225 F.3d 91-92.

18

"voluntarily, knowingly and intelligently" waives his privilege.
Since the defendant failed to allege any coercion by "physical
violence or other deliberate means calculated to break [his]
will," then his waiver was voluntary.  479 U.S. at 573-574,
quoting Oregon v. Elstad, 470 U.S. 298, 312 (1985).  No coercive
police conduct overbore his will.  479 U.S. at 574, citing
Colorado v. Connelly, 479 U.S. 157, 163-164 (1986).  "Knowingly"
does not mean that he needs to know the subject matter the
interviewers intend to discuss; it means that he understands that
he has the right to remain silent and anything he chooses to say
can be used against him.  479 U.S. at 564.  "The Constitution
does not require that a criminal suspect know and understand
every possible consequence of a waiver of the Fifth Amendment
privilege."  Id.

The defendant argued that his waiver was invalid because he
was the victim of trickery.  The Supreme Court rejected an
argument that 'mere silence by law enforcement officials as to
the subject matter of an interrogation is "trickery" sufficient
to invalidate a suspect's waiver of Miranda rights.'  479 U.S. at
575-576.

In this case, the Defendant Boskic first believed that he
was being questioned in connection with his request for travel
documents.  SA Carroll and then SA Hughes, when they questioned
Boskic, did not tell him that they had an interest in him beyond

the travel documents.  They had no obligation to so inform the
defendant.  The made no affirmative misrepresentations.  It
doesn't matter that the Defendant believed (at first) that the
inquiry was in connection with administrative matters.[16]

In <u>United States v. Okwumabua</u>, 828 F.2d 950 (2d Cir. 1987),
the Court of Appeals for the Second Circuit reversed the district
court's order suppressing statements of a defendant to a special
agent of the General Services Administration.  The agent obtained
several statements from the defendant under the guise of doing an
audit of the defendant's and his company's dealings with the
Small Business Administration.  828 F.2d at 951.  The agent, who
was a special agent in the Inspector General's Office, did not
identify himself as an agent who is involved in criminal
investigations.  The defendant was not told that he was the
subject of a fraud investigation.  No *Miranda* warnings were give.
828 F.2d at 950.  There was no coercion, no promises or threats
were made, and the interviews were non-custodial.  These and
other factors led the Court of Appeals to conclude that the
defendant's "free will ... was not overborne."  828 F.2d at 953.

The defendant argued that the agent concealed the fact that
he was not merely an auditor.  The Court rejected the defendant's

---

[16]Once SA Hughes came into the room, the Defendant knew that
it was no longer an administrative inquiry, since the FBI does
not have any administrative jurisdiction.  Further, as the
Defendant admitted: "I knew what this was about as soon as
someone from the FBI wanted to talk to me."  Def. Ex. B, at 7.

argument; the agent merely failed to inform the defendant of the
true nature of his interest, but engaged in no affirmative
deceit.  "To prevail on this point, a defendant must produce
clear and convincing evidence that the agents affirmatively
misled him as to the true nature of the investigation."  828 F.2d
at 953.  The agents have no "legal or moral duty to inform the
defendant" of the nature of their investigation or the
allegations against the defendant.  Id.

See also United States v. Mitchell, 966 F.2d 92 (2d Cir.
1992) (reversing the suppression of statements to EPA criminal
investigators who did not give Miranda warnings; no affirmative
misrepresentation where agent "permissibly emphasized cooperation
and deemphasized, but did not misrepresent, the criminal nature
of the inquiry."  966 F.2d at 100.); United States v. Prudden,
424 F.2d 1021 (5th Cir. 1970) (reversing the suppression of
statements to an IRS agent who failed to give Miranda warnings
and failed to tell defendant that investigation might result in
criminal charges against him -- after Revenue Agent had already
brought Special Agent in to assist in the investigation, having
found evidence of fraud); United States v. Sawinski , 2000 WL
1357491 (S.D. N.Y. 2000) (denying motion to suppress and finding
that waiver of Miranda voluntary even though agents withheld from
defendant information that he was the subject of their
investigation and they had already obtained a warrant for his

arrest).

In <u>United States v. Serlin</u>, 707 F.2d 953 (7th Cir. 1983),
the defendant was questioned by agents of the Internal Revenue
Service and told that they were investigating former business
associates.  The defendant was told that he was not the subject
of any investigation, but he was given the "IRS noncustodial
advisement of rights." 707 F.2d at 955.  The agents also asked
him whether he had filed returns in particular years.  707 F.2d
at 955-956.  The defendant claimed that he was misled by the
agents who referred to the investigation of his business
associates, "which served to mask the true nature of their
inquiry." 707 F.2d at 956.  The Court viewed the agents' actions
as a simple failure to inform the defendant of the subject of
their investigation and not affirmative deceit.  "One
insurmountable obstacle in the defendant's path is that the
statements about [the business associates] were true," <u>i.e.</u>, the
agents were investigating the associates.[17]  707 F.2d at 957.
The investigation had a dual purpose and, although the agent
first told the defendant he was not the subject of an
investigation, the questions posed to him and the advisement of
rights "should have alerted defendant, and beyond doubt did alert
him, that he was a subject of the investigation, and certainly

---

[17]Alistair Graham *was* investigating senior military
officials in the Army of the Republic of Srpska.

defeat any claim that the agents affirmatively misled defendant."
707 F.2d at 957.  Thus, in this case, as in <u>Serlin</u>, there was no
intentional deceit when Alistair Graham told Boskic that the
target of his investigation was the senior military officials and
that he was seeking Boskic's cooperation against those officials.

    <u>See also</u> <u>United States v. Irvine</u>, 699 F.2d 43 (1st Cir.
1983) (reversing the suppression of defendant's statements to IRS
agent, who did not tell defendant that he was the subject of a
criminal investigation).

    Even an intentional deception, without more, will not make a
confession inadmissible.  In <u>United States v. Kontny</u>, 238 F.3d
815 (7th Cir. 2001), the Court of Appeals for the Seventh Circuit
affirmed the denial of a motion to suppress statements to an IRS
agent who told the defendant that he was conducting a "civil
exam."  Since the statements were given in a noncustodial
setting, *Miranda* did not apply and the admissions were voluntary
unless obtained by threats or promises.[18]  238 F.3d at 817.
"[P]olice commonly engage in ruses."  <u>Id.</u>  The Court analogized
this situation to that of an undercover officer gaining the
confidence of a suspect, who makes incriminating statements to
the officer.  "There if no right to require secrecy of the people
whom one confides in."  <u>Id.</u>  Therefore, "even if [the agent] was

---

    [18]<u>See also</u> <u>Flemmi</u> (statements made were voluntary even
though given after promise by agents that they would not be used;
agents lacked authority to confer use immunity).