pretending to be conducting a civil investigation but was really

... conducting a criminal one, this would not, under the rules

that govern the admissibility of incriminating statements

(written or oral) made to government officers *even by a suspect*

*who is in custody*, make the statements inadmissible." 238 F.3d

at 818 (emphasis in the original). <u>United States v. Boykoff</u>, 186

F.Supp.2d 347 (S.D.N.Y. 2002) (denying defendant's motion to

suppress statements to IRS agent, because defendant's argument

was "no more persuasive than that of every common criminal who

brags about his exploits to an undercover cop. Their will was

not overborne; they were not threatened or beaten; there was no

coercion." 186 F.Supp.2d at 353.)

See <u>also</u> <u>United States v. Mast</u>, 735 F.2d 745 (2d Cir. 1984)

(reversing suppression of defendant's statements to special

agents of the Department of Agriculture, who were investigating

loans obtained by defendant; the court rejected defendant's claim

that he was misled by the statement by the agent that he would

not be prosecuted if he repaid loans that were fraudulently

obtained, and by failure of agents to affirmatively assert that

the investigation was criminal -- "it should have been absolutely

clear to [the defendant] that he was no longer the subject of

only a civil proceeding when [the] Special Agent ... identified

himself, gave the *Miranda* warnings, and asked [the defendant] to

read and sign a waiver of rights form." 735 F.2d at 745.)

C.  **The Cases Cited by Defendant are Readily Distinguishable**

The great weight of precedent establishes that the statements of the Defendant were voluntary and are admissible. The cases cited by the Defendant are readily distinguishable.[19]

United States v. Knowles, 2 F.Supp.2d 1135 (E.D. Wisc. 1998) involved a "pattern of deceptions." 2 F.Supp.2d at 1137. The agent, who had an arrest warrant for the defendant and intended to immediately arrest him, did not advise the defendant of his *Miranda* rights. Further, the agent told the defendant that he was *not* in any trouble, that he was *not* going to be arrested and that he was free to leave, and he was *only* being questioned as a potential witness. 2 F.Supp.2d at 1142-1143. In this case, Boskic was repeatedly warned of his *Miranda* rights. Boskic was never told that he was *not* in trouble nor that he was *only* being questioned as a potential witness. Further, he was not told that he was not going to be arrested, nor was he told (until about 8:20 PM) one way or another whether he was free to leave.

In United States v. Walton, 10 F.3d 1024 (3rd Cir. 1993), the defendant made incriminating statements to an ATF agent (who he knew from high school) who agreed to meet with him "off the cuff," i.e., off the record, after agents questioned the

---

[19]Further, the holdings of many of these cases might be contrary to Flemmi, and therefore, should not be followed by a District Court Judge in this Circuit.

25

defendant as part of, what was represented to be, a regulatory and not a criminal inquiry.  10 F.3d at 1030.  In fact, even the agent, because of the assurances he gave the defendant, believed that the admissions the defendant made were not admissible against him.  10 F.3d at 1027 and 1029.  The combination of the friendly setting, the assurances to the defendant, the regulatory inspection and the failure to give *Miranda* warnings[20] "induced [the defendant] to speak."  10 F.3d at 1024.  Similar facts were dispositive in United States v. Conley, 859 F.Supp. 830 (W.D. Pa. 1994)[21]  In this case, warnings were given immediately before any questioning, and then repeated at least three times.  No one gave any assurances to Boskic that his statements would not be used against him, in fact, the opposite was said.  There was no statement or suggestion that the interview was off the record, in fact, Boskic was told that anything he said could be used against him.  Finally, the unique facts of the pre-existing relationship with the agent is also absent.

In United States v. Swint, 15 F.3d 286 (3rd Cir. 1994) a defendant, who was arrested on state drug charges, agreed to an

---

[20]*Miranda* warnings had been given the previous day, before the agreement to meet "off the cuff."  10 F.3d at 1024.

[21]In Conley, in first meeting with defendant, agents assured defendant that their conversation was off the record, that he was not the target of the investigation, and that nothing he said could be used against him.  859 F.Supp. at 832.  Subsequent meetings referred to that first encounter.  859 F.Supp. at 838.

"off-the-record proffer regarding the cooperation he could
provide in exchange for a negotiated plea." 15 F.3d at 287.
During the proffer, which took place in the District Attorney's
Office, the state authorities asked the defendant about post-
arrest drug activity (that had been uncovered by federal agents).
After denials, the federal agents joined the meeting and
confronted the defendant with evidence.  The defendant then
agreed to cooperate with the federal authorities as well.  15
F.3d at 287-288.  His attorney then left the meeting, because he
didn't want to be present during the actual cooperation.  The
defendant made inculpatory statements after his attorney left,
believing that he was still protected by the proffer agreement
with the state authorities.  15 F.3d at 288.  The court ruled
that the statements were involuntary and affirmed the suppression
order.

        Similarly, in <u>United States v. Rogers</u>, 906 F.2d 189 (5th
Cir. 1990), the defendant provided weapons to state law
enforcement after being assured that he would not be charged if
he cooperated.  906 F.2d at 190.  He was subsequently asked to
come to the sheriff's office because somebody wanted to speak
with him.  <u>Id.</u>  Unbeknownst to the defendant, that somebody was
an ATF agent who knew he was a convicted felon.  When he came to
the sheriff's office, the agent advised the defendant of his
*Miranda* rights.  The defendant believed that his statements to

the agent were just follow up to the state investigation.  Id.
He made additional admissions that were used in a federal
prosecution.  "Given the peculiar facts" of the case, the court
found that defendant's confession was not voluntary.  906 F.2d at
191.  The state officials spoke with the defendant one day and
assured him he would not be prosecuted if he cooperated.  The
next day he turned in the firearms in reliance on those
assurances.  The next day he received the call to come to the
sheriff's office and the interview with the federal agents took
place in the sheriff's department.  He therefore reasonably
believed that the conversation with the agents was related to the
state investigation (and covered by the same assurances,
notwithstanding the *Miranda* warnings).  906 F.3d at 191-192.

     In contrast to <u>Swint</u> and <u>Rogers</u>, in this case, there was no
formal (or informal) agreement to engage in any off-the-record
discussions with Boskic and the prosecutors (or agents) for the
purpose of pursuing cooperation.  There were no promises to
Boskic that he would not be prosecuted.  (*Miranda* warnings were
administered.)

     Unique facts were also present in <u>United States v. Jacobs</u>,
312 F.Supp.2d 619 (D. Del. 2004).  In <u>Jacobs</u>, a defendant who had
a ten year informant relationship with law enforcement, made
incriminating statements that were then used against her.  The
facts that supported a finding under the totality of the

28

circumstances test that the statements were not voluntary but were coerced, included: the ten year informant relationship; the informant had no reason to believed she was the target of a criminal investigation when questioned; on numerous occasions in the past she had received assistance in connection with her own criminal activity; in the past she had been authorized to engage in criminal activity; she had been authorized to engage in criminal activity in connection with the same drug conspiracy that was the subject of the questions; and she had previously been paid for information. 312 F.Supp. 2d at 631. The facts that distinguish this case from <u>Jacobs</u> are numerous and need not be enumerated.[22]

### D.    The Defendant's Sixth Amendment Right to Counsel had not Attached

"[T]he right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." <u>United States v. Gouveia</u>, 467 U.S. 180, 187 (1984). The right to counsel does **not** attach at the time of arrest, <u>Id.</u>, 467 U.S. at 190, and certainly not before arrest (and after the issuance of a complaint and warrant); <u>United States v. Toro</u>, 840 F.2d 1221, 1234 (5th Cir. 1988) (holding that a defendant's constitutional rights do not attach at the moment the arrest warrant is issued); <u>United States v. Sawinski</u>, 2000 WL 1357491 at

---

[22]<u>See</u> <u>also</u> contrary holding on similar facts in <u>Flemmi</u>.

6-7 (S.D. N.Y. 2000).  The core purpose of the Sixth Amendment
'is to assure aid at trial, "when the accused [is] confronted
with both the intricacies of the law and the advocacy of the
public prosecutor."'  Gouveia, 467 U.S. at 188-189, quoting
United States v. Ash, 413 U.S. 300, 308 (1973).  'The arraignment
signals "the initiation of adversary judicial proceedings" and
thus the attachment of the Sixth Amendment.'  Michigan v.
Jackson, 475 U.S. 625, 629 (1986); United States v. Leon-Delfis,
203 F.3d 103, 110 (1st Cir. 2000).  "[T]he right to counsel
exists to protect the accused during trial-type confrontations
with the prosecutor."  Gouveia, 467 U.S. at 190.

     In this case, the defendant was questioned after a complaint
had been issued and an arrest warrant on that complaint, but
before the defendant was arrested.  Even if the defendant had
been arrested, the right to counsel would not have attached until
his arraignment.  See United States v. D'Anjou, 16 F.3d 604, 608
(4th Cir. 1994) (holding that defendant's "claim fails because
this questioning occurred prior to the point at which the Sixth
Amendment right attached ... [because] the questioning occurred
immediately subsequent to the defendant's arrest and prior to
arraignment."); United States v. Duvall, 537 F.2d 15 (2d Cir.
1976) ("[w]e see no reason in principle why the filing of a
complaint should be deemed to give rise to counsel immediately
upon arrest pursuant to warrant."  537 F.2d at 22.)  A fortiori

if the defendant was not arrested, the right to counsel did not
attach.

The defendant cites the Eight Circuit case of <u>Manning v.
Bowersox</u>, 310 F.3d 571 (8th Cir. 2002) in support of the argument
that formal charge by complaint obligates the government to bring
the defendant to court and wait to question him until he "had or
waived assistance of counsel." Def. Mot. at 6. The defendant's
reliance on <u>Manning v. Bowersox</u> is misplaced. First, a holding
by the Court of Appeals for the Eighth Circuit that the issuance
of a complaint and warrant would trigger the Sixth Amendment
right to counsel would be contrary to Supreme Court precedents
cited above. Second, that was not the holding of the Eighth
Circuit in <u>Manning v. Bowersox</u>. The Eighth Circuit held that
there is no distinction between a case initiated by complaint
versus one initiated by indictment. The Court did not address
the timing of the attachment of the right to counsel. It is
clear that the Court of Appeals for the Eighth Circuit recognizes
that the right to counsel does not attach with the issuance of a
complaint and warrant as argued by defense counsel. "The filing
of a criminal complaint and the issuance of an arrest warrant do
not constitute the initiation of an adverse judicial proceeding
for the purposes of <u>McNeil [v. Washington</u>, 501 U.S. 171 (1991)].
Not until the preliminary hearing ... did [the defendant's] Sixth
Amendment right to counsel attach." <u>Von Kahl v. United States</u>,

31

242 F.3d 783, 789 (8th Cir. 2001).  The analysis is not changed

by the arrest of the defendant on the warrant.  United States v.

States, 2004 WL 524682 (N.D. Ill. 2004).

      **E.**    **The Agents had no Obligation to**
               **Arrest the Defendant Prior to the Interview**

As the Court of Appeals for the First Circuit stated in

United States v. Berkovitz, 429 F.2d 921, 926 (1st Cir. 1970),

"[w]e are unaware of any right of a defendant to be arrested at a

particular time."  United States v. Toro, 840 F.2d 1221, 1233-

1234 (5th Cir. 1988) ("law enforcement officials are under no

constitutional duty to terminate a criminal investigation the

moment they have an arrest warrant in their hands.")  An officer

can delay execution of a warrant until such "time when he can

catch the accused 'with the goods.'"  Gordenello v. United

States, 241 F.2d 575, 579 (5th Cir. 1957), reversed on other

grounds 357 U.S. 480 (1958).  "Of course, law enforcement may

postpone arrest in the hope that they may strengthen their case

by uncovering further evidence."  United States v. Kenaan, 496

F.2d 181, 183 (1st Cir. 1974).

    "There is no requirement that an arrest warrant be executed

immediately after it issuance; rather, the general rule is that,

while execution should not be unreasonably delayed, law

enforcement officers have a reasonable time in which to execute a

warrant and need not arrest at the first opportunity."  United

States v. Drake, 655 F.2d 1025, 1027 (10th Cir. 1981).  Agents

can appropriately delay execution an arrest warrant "in order to strengthen their case." 655 F.2d at 1027.

However, agents cannot use the delay as a pretext, <u>Kenaan</u>, 496 F.2d at 183; thus, the exception to that general rule is expressed in the case cited by the Defendant, <u>McKnight v. United States</u>, 183 F.2d 977 (D.C. Cir. 1950). In that case, the agents had a warrant to arrest the defendant and a search warrant for a location on Euclid Street. They did not have a warrant for a location on Kent Place, "apparently because they did not know enough about it." 183 F.2d at 978. The agents purposely waited for the defendant to enter the Kent Place location, prior to executing the arrest warrant, so they could search the Kent Place location incident to the defendant's arrest. 183 F.2d at 978-979. The Court of Appeals for the D.C. Circuit ordered suppression in reliance on <u>United States v. Lefkowitz</u>, 285 U.S. 452, 467 (1932), wherein the Supreme Court held that "[a]n arrest may not be used as a pretext to search for evidence." 183 F.2d at 978.

But, it is clear that delay that is not a pretext to do a search that would not otherwise be permissible, does not violate a defendant's constitutional rights and any evidence seized during that period of delay is admissible.

In <u>United States v. Sawinski</u>, 2000 WL 1357491 (S.D. N.Y. 2000), agents did not tell a defendant that they had obtained an

arrest warrant prior to questioning. "The agents' failure to inform Defendant that a warrant had been issued for his arrest may have affected his decision to speak, but the law does not require that he be so informed." 2000 WL 1357491 at 6. "The government is not required to provide information that might be useful to the defendant." Id.

In United States v. Payne, 423 F.2d 1125 (4th Cir. 1970), agents obtained an arrest warrant for the defendant on a Friday, based on his sale of drugs to an undercover, but did not arrest the defendant until Sunday, when he was delivering drugs to a correctional facility. The agents delayed the arrest even though they had been told by the same undercover agent that had bought drugs from the defendant, that the defendant intended to deliver drugs to the correctional facility. 423 F.2d at 1125. Because there was "nothing pretensive" to the issuance of the arrest warrant and it "was not designed to give an appearance of legitimacy to an otherwise unlawful search," the defendant's motion to exclude evidence was properly denied. 423 F.2d at 1126.

See also Gensel v. Beard, 2003 WL 22862645, at 6 (E.D. Pa. 2003) (denying defendant's suppression motion when law enforcement purposely delayed executing arrest warrant until after interview of defendant "in an attempt to obtain inculpatory evidence.")

34

**F.    Defendant's Written Confession and the Fruits of the Search of his Home and Vehicle are not Subject to Suppression Even if his Oral Confession is Suppressed**

Defendant asserts that, when he provided a written statement and consented to a search of his home and vehicle, he believed that he was not the target of any investigation and, in any event, "he had already told them everything," i.e., the cat was already out of the bag.  Def. Memorandum at 4.

The admissibility of any subsequent statements after there has been a confession in violation of *Miranda* is decided "solely on whether it [the subsequent confession] is knowingly and voluntarily made."  Oregon v. Elstad, 470 U.S. 298, 309 (1985). The "psychological impact" of having "let the cat out of the bag" does not "qualif[y] as state compulsion [n]or compromise[s] the voluntariness of a subsequent informed waiver."  470 U.S. at 311-312.  "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of earlier statements."  470 U.S. at 314.

Therefore, if the Court finds that the Defendant was in custody and should have received his *Miranda* warnings, and further finds that he received said warnings before he wrote the written statement, his later "written confession would be admissible because it was fully warned and given in circumstances

35

devoid of compulsion."[23]  <u>United States v. Vose</u>, 785 F.2d 364, 367 (1st Cir. 1986).

On August 25, 2004, while writing in his own hand, the Defendant admitted that the written statement was given with an understanding of his rights and the intention to give up those rights, "voluntarily, [and] without promises and guarantees." Ex. 3.  Therefore, his motion to suppress his written statement should be denied, regardless of what the Court rules with reference to his oral statements.

### G.    Discovery the Defendant Seeks in Connection with his Motion to Suppress is Unnecessary

The Defendant seeks discovery of all those who participated in the planning of the interview and arrest of the Defendant.  He

---

[23]From Defendant's Motion and Affidavit it is not clear exactly when (he claims) the *Miranda* and consent to search forms were signed.  His Affidavit suggests that he was asked to put his statement in writing and that he agreed to the search at the same time.  Def. Ex. A at ¶11.  He further states that he first signed documents, including the form consenting to the search, after he "already made statements." Def. Ex. A at ¶12.  However, he does not specifically say when the *Miranda* form was signed, nor if the documents he signed were signed before or after his written statement.  The time on the *Miranda* form is 3:30 PM and the time on the consent to search form is 6:45 PM.  These times, contained on Def. Ex. E and Ex. 1, are consistent with the reports submitted as Exhibits B and C, but inconsistent with the Defendant's version of events.  In addition, the Defendant was not arrested until 8:20 PM.  Def. Ex. B at 1 and 7.  (He was arrested when he was asked what was going to happen that night and asked if he was being arrested.  The Agents told him the truth.)  Finally, in his written statement he wrote: "I, Marko Boskic, *understand and give up my rights*, I am giving this statement *voluntarily and without promises and guarantees.*"  Ex. 3 (emphasis added).

36

seeks the identify of witnesses who could not provide any
information that is relevant to his motion.  As stated above, the
standards to be applied are objective.  Therefore, any
discussions that preceded the interview of the Defendant and
which occurred outside his presence, are irrelevant.  See e.g.,
Yarborough v. Alvarado; Thompson v. Keohane; Stansbury v.
California; Berkemer v. McCarty.  Further, the government should
not be placed in a position of disclosing discussions of
investigative strategy.

### III. CONCLUSION

A confession given in a noncustodial setting is admissible
unless it was the product of coercion.  See, e.g., Miranda v.
Arizona; Illinois v. Perkins; Procunier v. Atchley; Bryant v.
Vose; United States v. Bienvenue.  Deceit and trickery are
acceptable law enforcement tactics unless they are coercive.
See, e.g., Illinois v. Perkins; Lynum v. Illinois; United States
v. Bezanson-Perkins.  In a noncustodial setting, even affirmative
misrepresentations (e.g., telling a defendant that his statements
will not be used against him) since they are not coercive, will
not result in suppression.  See, e.g., United States v. Flemmi;
United States v. Lederman; but see United States v. Rogers;
United States v. Jacobs.

In a situation where Miranda applies, deceit and trickery
that does not undercut the warnings, does not negate the

37

voluntariness of a waiver of rights.  See, e.g., Colorado v. Spring; United States v. Okwumabua.

A subsequent written statement will not be suppressed if it was voluntarily given and not in violation of *Miranda*, even if an earlier statement is suppressed.  See, e.g., Oregon v. Elstad; United States v. Vose

On August 25, 2004, the defendant was not in custody until approximately 8:20 PM -- after he made the statements that he now seeks to suppress.  Nevertheless, SA Carroll of ICE gave Boskic his *Miranda* warnings at 3:35 PM.  Those warnings were repeated when SA Hughes entered to room, again when Alistair Graham of the ICTY entered to question the Defendant, and yet again when Boskic wrote his statement.  "That [law enforcement] informed [the Defendant] several times of his right to an attorney and his right to remain silent weigh against a determination of coercion. ...  [I]t would be difficult to conclude that the [agents] coerced the confession while at the same time warning [the Defendant] that he need not say anything."  United States v. Dowd 932 F.2d 739, 742 (8th Cir. 1991).

As the Defendant wrote on August 25, 2004,

> I, Marko Boskic, understand and give up my rights, I am giving this statement voluntarily, without promises and guarantees.

For that reason, and the reasons stated herein, the Defendant's motion to suppress his voluntary statements should be

38

denied.  Further, his motion for discovery in connection with this motion should also be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

JEFFREY AUERHAHN and
KIMBERLY P. WEST
Assistant U.S. Attorneys

</div>

DATE: March 21, 2005

# EXHIBIT 1

MINISTARSTVO PRAVDE
SAVEZNI ISTRAŽNI URED

## SUGLASNOST ZA PRETRES

1.  Zamoljen sam od Specijalnih Agenata Saveznog Istražnog Ureda za
    dozvolu potpunog pretresa:
    (Opišite osobu(e), mjesto(a) ili stvar(i) za pretres.)

111 FOSTERE ST           BWE           GA
APARTMENT 311            DODGE INTREPID  M.B
PEABODY, MA 01960            4316 XN

2.  Savjetovan sam glede prava na odbijanje suglasnosti.

3.  Dozvolu dajem dragovoljno.

4.  Ovlašćujem ove agente da uzmu bilo koje predmete za koje oni
    odrede da se odnose na istragu.

08/25/04
Datum                              Potpis

Svjedok _____ FBI

8/25/2004  6:45 pm.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
                                  )
            v.                    )     Criminal No. 04-10298-DPW
                                  )
                                  )
MARKO BOSKIC                      )

AFFIDAVIT OF THOMAS CARROLL IN CONNECTION WITH GOVERNMENT'S
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

Thomas Carroll, having been duly sworn, does hereby depose and say,

1.   I am a Special Agent of Immigration and Customs Enforcement
     of the Department of Homeland Security (ICE).  I have been
     with ICE and the predecessor Immigration and Naturalization
     Service since August 1992.

2.   I was involved in the arrest and questioning of the
     Defendant Marko Boskic on August 25, 2004.

3.   My report of the events of that date, marked as Defendant's
     Exhibit B, accurately describes the substance and sequence
     of events on that date.  The purpose of this Affidavit is to
     supplement the information contained therein.

4.   While walking to the interview room, I asked Boskic if he
     understood English.  He stated that he did.

5.   Once in the interview room, I asked Boskic to raise his
     right hand (as I raised my right hand) and I administered an
     oath to the Defendant in English.

1

6.   I then asked Boskic if he read English.  He stated that he
     did.  I then asked him what was his other language and he
     told me Serbo-Croatian.  I then retrieved a two-sided
     Warning as to Rights form that contained the rights in
     English on one side and Serbo-Croatian on the other side.

7.   I placed the form on the table in front of him with the
     English side up.  I was seated across from him and I read
     the form (upside down).  He stated that he knew what his
     rights were.  I told him to sign the form if he agreed.  He
     signed the English side of the form.  I retrieved the form,
     filled in the date and time, and signed as a witness.

8.   I then gave the form back to Boskic, this time with the
     Serbo-Croatian side up, and told him to read it.  After
     reading the form in his native tongue, Boskic signed and
     dated the form and wrote the time.  I did not write the date
     and time on the Serbo-Croatian side; I only signed as a
     witness.

9.   When Special Agent Gregory Hughes ("SA Hughes") of the
     Federal Bureau of Investigation ("FBI") entered the room,
     holding and referring to the form Boskic had signed, I
     reminded Boskic that his rights still applied, that he had
     the right to remain silent, what he said could be used
     against him, and he could have an attorney present.  Boskic
     rose and raised his hand as if to be sworn again.  He again

2

acknowledged that he knew his rights.

10. When Alistair Graham entered the room, I again referred to
    the form he had signed and gave an abbreviated version of
    the *Miranda* warnings.

11. At no time did I, SA Hughes or Alistair Graham tell the
    Defendant that he would not be prosecuted.

12. At no time did I, SA Hughes or Alistair Graham tell the
    Defendant that what he said was off the record or
    confidential.  In fact, he was warned several times that
    anything he said could be used against him.

13. Marko Boskic never asked us what or who we were
    investigating.

14. At no time did I, SA Hughes or Alistair Graham tell the
    Defendant anything about ourselves, or our interest in the
    Defendant, or the nature of our investigations that was not
    true.

15. It was not until about 8:20 PM, while he was writing a
    statement, that he asked if he was going to be arrested.  I
    then told him he was under arrest.  Prior to that time, the
    door to the interview room was opened, we took a number of
    breaks, and he was not restrained.

16. During the interview, at no time did Boskic seem to or
    indicate that he did not understand what was being said to
    him in English.  Further, at no time did we have difficulty

3

understanding what he said in English.

17.   I have reviewed a number of recorded telephone conversations
between the Defendant Boskic and other individuals, that
were made during the time the Defendant was in custody at
the Essex County Jail in approximately April 2004.  These
conversations belie his statement claiming: "I have only a
limited command of English."

                                    Special Agent Thomas Carroll
                                    Immigration and Customs Enforcement
                                    Department of Homeland Security


        Signed under the pains and penalties of perjury this 21st
day of March, 2005.

4

# EXHIBIT 3

## STATEMENT

8-25-04

I, Marko Boskic, understand and give up my rights. I am giving this statement voluntarily, without promises and guarantees.

The end of December, 1993, I crossed into Serbian territory with the goal that I exit from Bosnia, because of war in Bosnia.

On the Serbian side, members of the military police took me into questioning and imprisoned me in the camp which is called "Batkovic".

They held me in "Batkovic" for around 6 months. The only way I got out of the camp was to join the military of the Republic of Serbia, or I would be liquidated.

Those were the conditions given to me by one of the members of the Republic, a Serbian captain named ZORAN MANOJLOVIC who was born and lives in Bijeljini.

I joined a unit of the military of the Serbian Republic which later grew larger and formed into the 10th sabotage detachment headed by Captain MANOJLOVIC and MISO PELEMIS.

(End of page 1 of handwritten text)

I do not remember the exact date, but I know this was in the summer of 1995.

MISO PELEMIS, commander of the 10th sabotage detachment, ordered that the unit will participate in the attack on Srebrenica. (I mention that the unit was located in Biljeljini - and one part of the unit was in Vlasenica.)

The unit became complete in Vlasenica, and in the evening we approached the vicinity of Srebrenica where we awaited the morning to carry out an attack on Srebrenica. The unit entered into Srebrenica very easily, because there was no type defense, and Srebrenica was deserted and there was no population. The same day, the unit returned to base in Vlasenica. We spent a certain number of days at base in Vlasenica, but I do not know the exact number of days.

Then, MAJOR PECANAC came with some colonels from the general staff who...

(End of page 2 of handwritten text)

went to PELEMIS in the office and stayed there quite a while. When they came out of the office with MISO PELEMIS, they stood outside in front of the base, and the colonel said that all fit men from Srebrenica will be shot. PECANAC and PELEMIS comfirmed this.

Then PELEMIS gave the order to BRANO GOJKOVIC, the Slovenian FRANC KOS, ZORAN - called MALJIC, as commanders. MISO PELEMIS ordered me, ERDEMOVIC, GOJKOVIC, the Slovenian, ZORAN (called MALJIC), ZORAN GORONJU, for that duty.

I told PELEMIS I do not want to do that. He came up (to me) and put a pistol on (my) forehead and said that I have to, or I will be dead. PELEMIS said to the commanders that in case someone refuses the duty task, they have the right to shoot him.

(End of page 3 of handwritten text)

The next day a group of us from the unit left for that assignment/duty. (I am unable to remember how many of us there were in that group, and also, I can't remember what the place was called where the liquidation of Muslims was supposed to be carried out.)

They took us to some school where the Muslims had been placed and were being guarded by military police. After a short time, one of the higher officers of the Zvornik corps came and ordered that we go to another location in some meadow. (I do not know the name of that place.) We went there and were awaited by more military police who were talking with GOJKOVIC and the Slovenian about the liquidation of the Muslims who were being bussed to that location.

The police brought the Muslims out from the buses, and they were arranged in lines, and we carried out the liquidation with automatic rifles.

(End of page 4 of handwritten text)

3

I do not know how many buses pulled up with Muslims (5, 6, or 7), and so also I do not know the number of how many people were in the buses. The only thing I know is that the buses were not full. Additionally, I mention that I did not do this of my own free will. I was personally ordered to do this by PELEMIS, and I was forced to do this.

Drivers of the buses also carried out the liquidation of Muslims with their own pistols, because they did not like them as Muslims.

Afterwards, we went to a bar - I do not know in which place that was - but it is on the road between Zvornik and Bijeljina. Here a commander awaited us and requested that we go further to carry out liquidation of Muslims, but the commanders...

(End of page 5 of handwritten text)

...refused this and said they only carry out orders from PELEMIS and PECANAC. And then we returned to the base in Vlasenica.

That which I saw on the video cassette was in Vlasenica. I think that was before the fall of Srebrenica, but I do not exactly remember the date.

_ I saw myself on the video cassette, and I recognized several members of the unit.

I left the unit in Spring of 1995, for Serbia, where I stayed for 12 - 16 months. Afterwards, I went to Germany, to Berlin, where I remained for more than two years. And I went through an agency by the name of I.O.M. and left for the U.S. in April, 2000.

(Signature of Marko Boskic)

(Four additional signatures are at the bottom of the page, including the signature of the interpreter present at the time)

(The initials of these signatories are on every handwritten sheet of text)

4

# DEFENDANT'S EXHIBIT E
# "DEF. EX. E"

Form 1-214
(Rev. 8–1–73) N

# UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

File No. A 77 686 625

## WARNING AS TO RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court, or in any immigration or administrative proceeding.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

_____
Signature

Date and hour: 8/26/04  3:35 pm  Place: Boston, MA

## CERTIFICATION

I HEREBY CERTIFY that the foregoing Warning and Waiver were read by me to the above signatory, that he also read it and has affixed his signature hereto in my presence.

_____
Immigration Officer  Signature

_____
Witness' Signature

_____
Interpreter's Signature                     Language

_____
Interpreter's Address

## INTERVIEW LOG

1. Person interviewed _____ 2. Officer(s) _____

_____ 3. Place (exact address and identity of room) _____

_____ 4. Date _____

5. Exact Time/place of encounter or arrest _____

6. If transported from place of encounter to interrogation point, show exact time involved. _____
   Note whether interrogation continued during transporting _____

7. Officer making arrest and/or transporting subject _____

8. Time interview began _____ 9. Time subject or suspect advised of right to remain silent and fact any statement could be used against him in court and name of officer furnishing advice _____

_____ 10. Time subject advised of right to presence of counsel

retained or appointed and name of officer furnishing advice _____

11. Time questioning concluded _____ 12. Time written statement commenced _____

13. Person preparing statement _____ 14. Time statement completed _____

15. Time statement reviewed by person interviewed _____ 16. Time statement signed _____

17. Record of requests and complaints of subject and actions taken thereon _____

_____

_____

Ministarstvo pravde Sjedinjenih Država
Služba za Useljeništvo i Naturalizaciju

Br. Predmeta_____

## Upozorenje o pravima

Prije nego što vam postavimo bilo kavo pitanje morate razumijeti koja su vaša prava.

Imate pravo ne govoriti ništa.
Bilo što izjavite može se koristiti protiv vas na sudu.
Prije nego što vam postavimo bilo kakvo pitanje imate pravo posavjetovati se sa odvjetnikom i imati ga prisutnog prilikom sasiušanja.
Ako želite možete dobiti odvjetnika prije sasiušanja ako niste u mogućnosti platiti istog.
Ako se odučite odgovoriti na pitanja bez prisustva odvjetnika vi možete u bilo koje vrijeme prekinuti sa odgovaranjem na pitanja.

Pročitao sam gornju izjavu o svojim pravima i svjestan sam koja prava imam. U ovom trenutku sam voljan dati izjavu i odgovoriti na pitanja. Ovom prilikom ne tražim odvjetnika. Razumijem i znam što radim. Niko mi nije prijetio ili davao obećanja i nikakva prinuda ili pritisak nije vršen na mene.

Datum i sat: _8/25/04_  _3 35_     Potpis  _8/25/04_    Mjesto: _BOSTON, MA_

## CERTIFICATION

I HEREBY CERTIFY that the foregoing Warning and Waiver were read by me to the above signatory, that he also read it and has affixed his signature hereto in my presence.

_____
Immigration Officer    Signature

_____
Witness' Signature

_____
Interpreter's Signature                    Language

_____
Interpreter's Address

## INTERVIEW LOG

1. Person interviewed _____ 2. Officer(s) _____

_____ 3. Place (exact address and identity of room) _____

_____ 4. Date _____

5. Exact Time/place of encounter or arrest _____

6. If transported from place of encounter to interrogation point, show exact time involved._____
   Note whether interrogation continued during transporting_____

7. Officer making arrest and/or transporting subject _____

8. Time interview began_____ 9. Time subject or suspect advised of right to remain silent and fact any statement could be used against him in court and name of officer funishing advice _____

_____ 10. Time subject advised of right to presence of counsel, retained or appointed and name of officer furnishing advice _____

11. Time questioning concluded _____ 12. Time written statement commenced_____

13. Person preparing statement_____ 14. Time statement completed_____

15. Time statement reviewed by person interviewed_____ 16. Time statement signed_____

17. Record of requests and complaints of subject and actions taken thereon_____