**UNITED
NATIONS**

---



| | |
|---|---|
| International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991 | Case No.    IT-96-22-T*bis*<br><br>Date:       5 March 1998<br><br>Original:   ENGLISH |

---

## IN THE TRIAL CHAMBER

**Before:**        **Judge Florence Ndepele Mwachande Mumba (Presiding)
Judge Mohamed Shahabuddeen
Judge Wang Tieya**

**Registrar:**     **Mrs. Dorothee de Sampayo Garrido-Nijgh**

**Judgement of:**  **5 March 1998**

### PROSECUTOR

v.

### DRA@EN ERDEMOVI]

---

### SENTENCING JUDGEMENT

---

**The Office of the Prosecutor:**

**Mr. Grant Niemann
Mr. Peter McCloskey**

**Counsel for the Accused:**

**Mr. Jovan Babi}
Mr. Nikola Kosti}**

I.     **INTRODUCTION AND PROCEDURAL HISTORY**

1.     The accused, Dra`en Erdemovi}, came into the custody of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the former Yugoslavia since 1991, hereinafter referred to as the "International Tribunal", on 30 March 1996, further to an order for his transfer to the custody of the International Tribunal made by Judge Fouad Riad on 28 March 1996.

2.     The accused had been detained since 2 March 1996 by the authorities of the Federal Republic of Yugoslavia, hereinafter referred to as the "FRY", in connection with their investigations into serious violations of international humanitarian law committed against the civilian population in and around what was declared a "safe area" of Srebrenica in July 1995. On 29 May 1996, Trial Chamber II requested the FRY to defer to the International Tribunal all investigations and criminal proceedings respecting serious violations of international humanitarian law alleged to have been committed by the accused in and around Srebrenica in July 1995[1].

3.     Since his transfer to the International Tribunal, the accused has been cooperating with the investigators of the Office of the Prosecutor, hereinafter referred to as the "OTP", with respect to events surrounding the fall of Srebrenica.  In July 1996, he testified at a hearing pursuant to Rule 61 of the Rules of Procedure and Evidence of the International Tribunal in the case of *Prosecutor v. Radovan Karad`i} and Ratko Mladi}*[2].

4.     The accused was indicted on 22 May 1996 on one count of a crime against humanity and on an alternative count of a violation of the laws or customs of war.  On 29

---

[1] Decision in the Matter of a Proposal for a Formal Request for Deferral to the Competence of the International Tribunal addressed to the Federal Republic of Yugoslavia in the Matter of Dra`en Erdemovi}, Case No. IT-96-22-D, T. Ch. II, 29 May 1996.
[2] Review of the Indictments Pursuant to Rule 61 of the Rules of Procedure and Evidence, *Prosecutor v. Radovan Karad`i} and Ratko Mladi}*, Case Nos. IT-95-5-R61 and IT-95-18-R61, T.Ch. I, 11 July 1996.

May 1996, the indictment was confirmed by Judge Rustam Sidhwa[3]. It alleged that on or about 16 July 1995, the accused shot, killed and participated with other members of his unit, the 10th Sabotage Detachment of the Bosnian Serb Army, hereinafter referred to as the "BSA", and other soldiers in the shooting and killing of unarmed Bosnian Muslim men at the Pilica collective farm. These summary executions resulted in the deaths of hundreds of Bosnian Muslim male civilians, the exact number of which has not been ascertained.

5. At his initial appearance before Trial Chamber I on 31 May 1996, the accused pleaded guilty to the count of a crime against humanity. That Trial Chamber accepted the accused's guilty plea and dismissed the alternative count of a violation of the laws or customs of war. Due to concerns about the state of health of the accused, the Trial Chamber commissioned psychiatric and psychological evaluation. The expert medical commission reported that the accused was suffering from post-traumatic stress of such severity that he was unable to stand trial and recommended that a second examination be held in six months' time. At a status conference on 4 July 1996, the accused affirmed that he wished to continue to plead guilty.

6. A second psychiatric and psychological evaluation was undertaken and upon the basis of the expert medical commission's report of 17 October 1996, which confirmed that the accused was sufficiently able to stand trial, a pre-sentencing hearing was held on 19 and 20 November 1996. The Trial Chamber, having accepted the accused's plea of guilty to the count of a crime against humanity and having considered the submissions of the parties with respect to sentencing, sentenced him on 29 November 1996 to ten years' imprisonment.

7. On 23 December 1996, an appeal against the Sentencing Judgement was lodged by counsel for the accused[4]. The Judgement of the Appeals Chamber was delivered on 7

---

[3] Review of Indictment, *Prosecutor v. Dra`en Erdemovi}*, Case No. IT-96-22-PT, Judge Sidhwa, 29 May 1996.
[4] Appellant's Brief filed by Counsel for the Accused Dra`en Erdemovi} against the Sentencing Judgement, *Prosecutor v. Dra`en Erdemovi}*, Case No. IT-96-22-T, 23 December 1996. This was supplemented on 14 April 1997 by a further document.

October 1997.  The Appeals Chamber remitted the case to a new Trial Chamber, holding, *inter alia*, that:

(a)    in the circumstances of the case, the accused's plea of guilty was not informed; and

(b)    duress does not afford a complete defence to a soldier charged with a crime against humanity and/or a war crime involving the killing of innocent human beings: it is admissible in mitigation.

In view of the above, the Appeals Chamber directed that the accused be allowed to replead with full knowledge of both the nature of the charges against him and the consequences of his plea before another Trial Chamber.

8.    On 14 January 1998, this Trial Chamber took a fresh plea from the accused.  He pleaded guilty to the charge of a violation of the laws or customs of war.  The Prosecutor withdrew the alternative count of a crime against humanity.  Thereafter, the Chamber heard submissions on sentencing at the pre-sentencing hearing.

## II.    <u>THE GUILTY PLEA</u>

9.    <u>The Statute and the Rules of Procedure and Evidence of the International Tribunal</u>

Article 20 (3) of the Statute provides that:

> The Trial Chamber shall read the indictment, satisfy itself that the rights of the accused are respected, confirm that the accused understands the indictment, and instruct the accused to enter a plea. The Trial Chamber shall then set the date for trial.

In case of a guilty plea, Rule 62 *bis* of the Rules of Procedure and Evidence provides:

> Guilty pleas
>
> If an accused pleads guilty in accordance with Rule 62 (v), or requests to change his or her plea to guilty and the Trial Chamber is satisfied that:
> (a)    the guilty plea has been made voluntarily;
> (b)    the guilty plea is not equivocal; and

(c)     there is a sufficient factual basis for the crime and the
accused's participation in it, either on the basis of independent
indicia or of lack of any material disagreement between the
parties about the facts of the case,

the Trial Chamber may enter a finding of guilty and instruct the
Registrar to set a date for the pre-sentencing hearing.

This Trial Chamber has borne these provisions in mind.

10.     Jurisprudence of the International Tribunal

The Appeals Chamber Decision laid down a number of criteria for dealing with a plea of
guilty, *inter alia*, which this Trial Chamber has to apply.   The Joint Opinion of Judge
McDonald and Judge Vohrah stated that:

> "....certain pre-conditions must be satisfied before a plea of guilty can
> be entered.  In our view, the minimum pre-conditions are as follows:
>
> (a)     The guilty plea must be voluntary.  It must be made by an accused
> who is mentally fit to understand the consequences of pleading guilty
> and who is not affected by any threats, inducements or promises.
> (b)     The guilty plea must be informed, that is, the accused must
> understand the nature of the charges against him and the
> consequences of pleading guilty to them.  The accused must know to
> what he is pleading guilty.
> (c)     The guilty plea must not be equivocal.  It must not be accompanied
> by words amounting to a defence contradicting an admission of
> criminal responsibility."

11.     The guilty plea of the accused

At the replea hearing on 14 January 1998, the Trial Chamber explained to the accused the
difference between the two alternative charges in accordance with the Statute and the
Appeals Chamber Decision and reminded the accused of his options when pleading.  Before
pleading, the accused confirmed that he understood the indictment against him, that he
understood what had been explained to him, that he understood the consequences of any

plea that would be made by him, and that he had availed himself of the legal advice of his Defence Counsel with whose services he was satisfied.

The accused, having entered a plea of guilty to count 2 of the indictment, namely "a violation of the laws or customs of war punishable under Article 3 of the Statute of the Tribunal and recognised by Article 3(1)(a) (murder) of the Geneva Conventions", the Trial Chamber considered whether the plea was valid and acceptable under the applicable criteria. The Trial Chamber made the necessary enquiries of the accused, the Prosecution and Defence Counsel, established the factual basis of the allegations and advised the accused of the possible penalties. Having duly considered the circumstances surrounding the entering of the plea, the Trial Chamber was satisfied with the guilty plea and convicted the accused accordingly.

## III.    SENTENCING GUIDELINES

12.    The Statute and the Rules of Procedure and Evidence of the International Tribunal

The Statute provides as follows:

**Article 7**
**Individual criminal responsibility**

. . .

4. The fact that an accused person acted pursuant to an order of a Government or of a superior shall not relieve him of criminal responsibility, but may be considered in mitigation of punishment if the International Tribunal determines that justice so requires.

### Article 24
### Penalties

1. The penalty imposed by the Trial Chamber shall be limited to imprisonment. In determining the terms of imprisonment, the Trial Chambers shall have recourse to the general practice regarding prison sentences in the courts of the former Yugoslavia.

2. In imposing the sentences, the Trial Chambers should take into account such factors as the gravity of the offence and the individual circumstances of the convicted person.

3. In addition to imprisonment, the Trial Chambers may order the return of any property and proceeds acquired by criminal conduct, including by means of duress, to their rightful owners.

The Rules of Procedure and Evidence provide as follows:

### Rule 101
### Penalties

(A) A convicted person may be sentenced to imprisonment for a term up to and including the remainder of his life.

(B) In determining the sentence, the Trial Chamber shall take into account the factors mentioned in Article 24(2) of the Statute, as well as such factors as:
(i)   any aggravating circumstances;
(ii)  any mitigating circumstances including the substantial cooperation with the Prosecutor by the convicted person before or after conviction;
(iii) the general practice regarding prison sentences in the courts of the former Yugoslavia;
(iv)  the extent to which any penalty imposed by a court of any State on the convicted person for the same act has already been served, as referred to in Article 10(3) of the Statute.

(C) The Trial Chamber shall indicate whether multiple sentences shall be served consecutively or concurrently.

(D) The sentence shall be pronounced in public and in the presence of the convicted person, subject to Sub-rule 102(B).

(E) Credit shall be given to the convicted person for the period, if any, during which the convicted person was detained in custody pending his surrender to the Tribunal or pending trial or appeal.

The Trial Chamber has duly considered these provisions.


## IV.    EVIDENCE


13.    The material before the Trial Chamber


In the course of the previous proceedings against the accused before the International Tribunal, evidence was submitted and accepted in accordance with the procedures of the International Tribunal. This included evidence given by the accused during oral examination, evidence of protected witnesses X and Y and psychiatric and psychological reports on the accused.


At the pre-sentencing hearing on 14 January 1998, both the Prosecutor and Defence Counsel sought the consent of the Trial Chamber to have certain of those documents submitted as evidence, along with the transcripts of certain portions of the previous proceedings.


With the consent of both sides, the Trial Chamber admitted in evidence:

(a)    Transcript of the testimony of the accused given at the Rule 61 hearing on 5 July 1996 in the matter of *Prosecutor v. Radovan Karad`i} and Ratko Mladi};*

(b)    Transcript of the initial appearance of the accused before Trial Chamber I on 31 May 1996;

(c)    Psychiatric and psychological evaluation dated 24 June 1996 by a Commission of Medical Experts appointed by Trial Chamber I, hereinafter "Medical Report I";

(d)    Psychiatric and psychological evaluation dated 14 October 1996 by a Commission of Medical Experts appointed by Trial Chamber I, hereinafter "Medical Report II";

(e)     Transcripts of the Pre-Sentencing Hearing before Trial Chamber I on 19 November and 20 November 1996, including the testimony of the accused, protected witnesses X and Y, and Mr. Jean-René Ruez; and

(f)     Letter from Vanessa Vasic-Janekovic, a journalist, dated 7 January 1998 addressed to the Registrar.

The accused, although present in court, declined to give oral testimony and requested that his previous statements in the course of judicial proceedings before the International Tribunal be relied on instead. Mr. Jean-René Ruez, the Investigating Officer in charge of the OTP's investigations into the fall of the enclave of Srebrenica, was the only witness to give oral evidence before the Trial Chamber.

The parties were agreed on the facts. In particular, the accused agreed that the events alleged in the indictment were true, and the Prosecutor agreed that the accused's claim to have committed the acts in question pursuant to superior orders and under threat of death was correct.

In these circumstances, the Trial Chamber accepts as fact the version of events which the parties have submitted, that is that the facts alleged in the indictment and the version of events described by the accused in his previous testimonies are statements of fact. Of particular importance are the facts set out in paragraphs 8 to 12 of the indictment:

> "8. Between 13 July 1995 and approximately 22 July 1995, thousands of Bosnian Muslim men were summarily executed by members of the Bosnian Serb army and Bosnian Serb police at divers locations including, but not limited to a warehouse at Kravica, a meadow and a dam near La`ete and divers other locations.
>
> 9. On or about 16 July 1995, **DRA@EN ERDEMOVI]** and other members of the 10th Sabotage Detachment of the Bosnian Serb army were ordered to a collective farm near Pilica. This farm is located northwest of Zvornik in the Zvornik Municipality.

10. On or about 16 July 1995, **DRA@EN ERDEMOVI]** and other members of his unit were informed that bus loads of Bosnian Muslim civilian men from Srebrenica, who had surrendered to Bosnian Serb military or police personnel, would be arriving throughout the day at this collective farm.

11. On or about 16 July 1995, buses containing Bosnian Muslim men arrived at the collective farm in Pilica. Each bus was full of Bosnian Muslim men, ranging from approximately 17-60 years of age. After each bus arrived at the farm, the Bosnian Muslim men were removed in groups of about 10, escorted by members of the 10th Sabotage Detachment to a field adjacent to farm buildings and lined up in a row with their backs facing **DRA@EN ERDEMOVI]** and members of his unit.

12. On or about 16 July 1995, **DRA@EN ERDEMOVI]**, did shoot and kill and did participate with other members of his unit and soldiers from another brigade in the shooting and killing of unarmed Bosnian Muslim men at the Pilica collective farm. These summary executions resulted in the deaths of hundreds of Bosnian Muslim male civilians."

14.    However, the Trial Chamber also accepts that the accused committed the offence in question under threat of death. At different stages in the previous proceedings, he testified as follows:

Before Trial Chamber I on 31 May 1996:
"Your Honour, I had to do this. If I had refused, I would have been killed together with the victims. When I refused, they told me: "If you are sorry for them, stand up, line up with them and we will kill you too". I am not sorry for myself but for my family my wife and son who then had nine months, and I could not refuse because they would have killed me."

Before Trial Chamber I dealing with the Rule 61 proceedings against Radovan Karad`i} and Ratko Mladi} on 5 July 1996:
"Q.    What happened to those civilians?
A.    We were given orders to fire at those civilians, that is, to execute them.
Q.    Did you follow that order?
A.    Yes, but at first I resisted and Brano Gojkovic told me if I was sorry for those people that I should line up with them; and I knew that this was not just a mere threat but that it

could happen, because in our unit the situation had become such that the Commander of the group has the right to execute on the spot any individual if he threatens the security of the group or if in any other way he opposes the Commander of the group appointed by the Commander Milorad Pelemis."

Before Trial Chamber I on 19 November 1996:
"It was so difficult for me, but I had no choice. I had no choice."

Before Trial Chamber I on 19 November 1996:
"The Lieutenant Colonel took us to a farm. I did not know the name of that farm. I just explained the location. I knew that the village of Pilica was there, but it was only when we got there that I learned what was happening. They told us that a bus load of civilians would come from Srebrenica. I said immediately that I did not want to take part in that and I said, "Are you normal? Do you know what you are doing?" But nobody listened to me and they told me, "If you do not wish to, if you ....you can just go and stand in the line together with them. You can give us your rifle."

I told you last time, if I had been alone, if I had not had my wife and a son, I would have fled and something else would have happened. I had to do that. I was forced to do that."

Before Trial Chamber I on 19 November 1996:
"Your Honours, I would first like to say that I did not wish to do that. It was...I was under orders. If I had not done that, my family, would have been hurt and nothing would have been changed."

Before Trial Chamber I on 19 November 1996:
"Q.        Did you know at the time of anyone who was shot for having disobeyed orders?
A.        You know, I will tell you, I am sure that I would have been killed had I refused to obey because I remember that Pelemis had already ordered one man to slaughter another man and I am familiar with some other orders, I mean, what a Commander was entitled to do if he was disobeyed; he could order this person's liquidation immediately. I had seen quite a bit of that over those few days and it was quite clear to me what it was all about."

Before Trial Chamber I on 20 November 1996:

> "When this Lieutenant Colonel sat in the vehicle and started going away, then Brano said, "Now buses will be brought in with civilian population from Srebrenica, men." He emphasised civilians, that is to say, that they would be wearing civilian clothes. I said, "People, I do not want this, are you normal?" Nothing. "Mr. Erdemovic"...this is what Brano told me .... "if you do not want to, stand with them so that I, so that we can kill you too or give them weapons so that they can shoot you."
>
> I was not afraid for myself at that point, not that much. If I were alone, I would have run away, I would have tried to do something, just as they tried to flee into the forest or whatever. But what would happen to my child and to my wife? So there was this enormous burden falling on my shoulders. On the one hand, I knew that I would be killing people, that I could not hide this, that this would be burning at my conscience."

Before Trial Chamber I on 20 November 1996:

> "Q.    . . . That is, from the moment on 16 July 1995 when you realised what your task was going to be and until around 3 o'clock in the afternoon when the shooting stopped, did you at any point have any possibility to avoid taking part in this shooting without jeopardising your life?
>
> A.    No. No, that is my most sincere and frank answer; not because I am defending myself. I am really being honest . . ."

## V.    <u>APPLICATION OF THE LAW TO THE FACTS</u>

15.    <u>Aggravating factors</u>

The Trial Chamber accepts that hundreds of Bosnian Muslim civilian men between the ages of 17 and 60 were murdered by the execution squad of which the accused was part. The Prosecution has estimated that the accused alone, who says that he fired individual shots using a Kalashnikov automatic rifle, might have killed up to a hundred (100) people. This approximately matches his own estimate of seventy (70) persons. No matter how reluctant his initial decision to participate was, he continued to kill for most of that day. The Trial Chamber considers that the magnitude of the crime and the scale of the accused's role in it

are aggravating circumstances to be taken into account in accordance with Article 24(2) of the Statute of the International Tribunal.

16.     <u>Mitigating factors</u>

i.     <u>*Personal circumstances*</u>

*Age*

At the time of the killings at the Pilica collective farm, the accused was 23 years old. He is now 26 years old and evidence has been provided that he is "not a dangerous person for his environment"[5].

The Trial Chamber believes that his circumstances and character (see below) indicate that he is reformable and should be given a second chance to start his life afresh upon release, whilst still young enough to do so.

*Family and background*

The accused has a wife, who is of different ethnic origin, and the couple have a young child who was born on 21 October 1994. Defence Counsel has submitted that the accused's family has fallen on hard times and will suffer hardship due to his serving a prison sentence.

The accused is a locksmith by training and was drawn into the maelstrom of violence that engulfed the former Yugoslavia. He has professed pacifist beliefs and claims to have been against the war and nationalism. He claims that he had to join the BSA in order to feed his family. In July 1995, he was a private in the 10th Sabotage Detachment where he was not in a position of command. He was, apart from a two month period as a sergeant in that unit, a mere footsoldier whose lack of commitment to any ethnic group in the conflict is demonstrated by the fact that he was by turns a reluctant participant in the Army of the Republic of Bosnia-Herzegovina, hereinafter referred to as the "ABH", the Croatian

---

[5] Medical Report I.

Defence Council, hereinafter referred to as the "HVO", and the BSA. The possibility of his being a soldier of fortune has not been suggested by any of the parties.

The 10th Sabotage Detachment was involved with reconnaissance in enemy territory and placing explosives in the artillery of the areas controlled by the ABH. According to the accused, he chose this unit because "it did not involve the loss of human lives. It involved artillery, old iron."[6] In addition, he chose it as there were other non-Serb soldiers in it and it did not have a reputation for brutality at the material time.

*Character*

The Prosecution stated that they found no inconsistencies with the information which he gave them; their investigations have confirmed much of what he told them, indicating that the accused is of an honest disposition. This is supported by his confession and consistent admission of guilt, in particular by the fact that he came forward voluntarily and told of his part in the massacres before his involvement was known to any investigating authorities.

In his submissions, the Defence Counsel portrayed the accused as an easygoing young man showing no signs of bigotry or intolerance, with a desire to help others in difficulty. The accused's upbringing was steeped in values of tolerance for others, and this is reflected in the fact that he chose to marry a woman from another ethnic group. Defence Counsel sees the accused as a victim of the whirlwind of war and a victim of his own deeds[7].

Whilst the Commission of Medical Experts made a finding of emotional immaturity[8], which is noted, there is nothing to substantiate Defence Counsel's submission to Trial Chamber I (which was not raised again before this Trial Chamber) that when the accused committed the killings, he "lacked mental responsibility because he suffered a temporary mental disorder or, at best, his mental responsibility was significantly diminished also."[9]

---

[6] Transcript, 19 November 1996.
[7] Transcript, 20 November 1996.
[8] Medical Report I.
[9] Transcript, 20 November 1996.

The Trial Chamber notes that the accused has no criminal record and that he has said that, prior to the mass murder in Srebrenica, he had never killed.

Witness X, who had been in the HVO Military Police with the accused, testified before Trial Chamber I that the accused had saved his life on Mount Majevica[10].  The accused was with some other soldiers of the BSA when they came across Witness X, and he prevented his fellow soldiers from killing his former colleague.  It was upon the insistence of the accused that Witness X was finally released unharmed.

Witness Y, who also testified before Trial Chamber I, met the accused in 1993 and they were part of a group of multi-ethnic friends[11].  According to this witness, the accused was not a nationalist.  He was a popular, vivacious and outgoing person who was non-confrontational.  Witness Y was certain that the accused hated the war and the army but believed that he simply had to do all of it; he was not the sort of person to kill of his own free-will.

According to the evidence of the accused before Trial Chamber I, admitted by this Trial Chamber, he had helped a family of Serb civilians, mainly women and children, to escape from the Tuzla area to Republika Srpska, which led to his being assaulted by soldiers from the HVO.  He also appears to have been imprisoned as a result[12].  The accused has told the International Tribunal that during the killings at the Pilica collective farm, he tried to save a man, but was not able to do so because his commander, Brano Gojkovic, said that he did not want to have any witnesses to that crime.

ii.    *Admission of guilt*

The Trial Chamber notes the submission of Defence Counsel that the accused's statements as to guilt should "above all, be taken as his moral attitude towards the truth on the one hand

---

[10] Transcript, 20 November 1996.
[11] Transcript, 20 November 1996.

and as a plea for understanding of how far the limits of the abuse of man in this region were stretched, not only in his local environment but also in the wider scope."[13] An admission of guilt demonstrates honesty and it is important for the International Tribunal to encourage people to come forth, whether already indicted or as unknown perpetrators. Furthermore, this voluntary admission of guilt which has saved the International Tribunal the time and effort of a lengthy investigation and trial is to be commended.

iii.   *Remorse*

The accused told Trial Chamber I that:

> "I only wish to say that I feel sorry for all the victims, not only for the ones who were killed then at that farm. I feel sorry for all the victims in the former [sic] Bosnia and Herzegovina regardless of their nationality."[14]

On 24 June 1996, the Commission of Medical Experts noted that the accused had an ambivalent feeling about his guilt. "He knew he killed innocent civilians, but he had no choice himself. There were other people who ordered him to shoot people. In a legal sense he doesn't feel guilty of the crimes he is accused of."[15] The post-traumatic stress which the accused suffered from in the aftermath of the Srebrenica atrocities demonstrates how he himself has suffered from being forced to commit the killings against his will.

The Trial Chamber also takes note of the testimony of Mr. Jean-René Ruez. Having been able to study the accused closely in the course of the OTP's investigations, Mr. Ruez has told the Trial Chamber that he had no doubt that the accused's feelings of sorrow and remorse were genuine and real, and that he really was going through an emotional process.

This is consistent with his earlier evidence to Trial Chamber I that:

---

[12]The Expert Medical Commission note in Medical Report I that he was jailed for 25 days; it was referred to by Defence Counsel, Transcript, 20 November 1996; confirmed by the testimony of Witness X, Transcript, 20 November 1996.
[13] Transcript, 14 January 1998.
[14] Transcript, 20 November 1996.
[15] Medical Report I.

"One thing is sure, however, and that is in the course of the
contacts I have had with him he expressed his sincere regrets
to being involved in that situation.  He has always had a tough
time saying how things happened during those events.  Bringing
all those memories together was something very difficult for
him and always has been.  On every occasion whenever he
would go into details in the course of hearings, he would say
how sorry he was to have participated in those events."[16]

iv.     *Cooperation with the OTP*

"The collaboration of Dra`en Erdemovi} has been absolutely excellent."[17]  These are words

rarely spoken by the Prosecution of an accused.  The Trial Chamber, remembering its

obligation to consider such cooperation under Rule 101 of the Rules of Procedure and

Evidence of the International Tribunal, takes note accordingly.  It also notes the submission

of the Prosecution, supported by the testimony of Mr. Ruez, that the accused cooperated

without asking for anything in return and that the extent and value of his cooperation has

been such as to justify considerable mitigation.

*Provision of new information including names and identities of other perpetrators,*
*substantiation and corroboration of existing information*
Whilst the OTP knew in general terms of the killings committed in Srebrenica, the testimony

of the accused was particularly valuable for providing them with details of four incidents of

which they did not previously know: the killings at the Pilica collective farm, those at the

Pilica cultural hall, the killing of an unidentified civilian male of military age in Srebrenica as

the accused entered the town, and a killing in Vlasenica on 13 July 1996 after he returned to

Bijeljina, by soldiers who, under orders, cut the throat of a prisoner.  Prior to the testimony

of the accused, the OTP had no knowledge of these incidents.

The accused provided substantial details in connection with the aforementioned incidents

such as the identification of his commanders and fellow executioners, as well as information

---

[16] Transcript, 19 November 1996.
[17] Testimony of Mr. Jean-René Ruez, Transcript, 14 January 1998.

Case No. IT-96-22-T*bis*                                         5 March 1998

on the Drina Corps, the structure of the BSA and the units that were involved in the takeover of Srebrenica such as the 10th Sabotage Detachment and the Bratunac Brigade.

*Evidence given in Rule 61 hearing*

On 5 July 1996, the accused gave evidence in the Rule 61 hearing of the case brought against Radovan Karad`i} and Ratko Mladi}[18]. His testimony was significant in two respects: it contributed to the decision of the Rule 61 Chamber to issue international arrest warrants for the two, and secondly, his testimony, that of an insider in the BSA, is evidence of what happened in Srebrenica.

17.    Duress

The Trial Chamber has applied the ruling of the Appeals Chamber that "*duress does not afford a complete defence to a soldier charged with a crime against humanity and/or a war crime involving the killing of innocent human beings*"[19]. It may be taken into account only by way of mitigation.

It has been accepted by the parties and the Trial Chamber that there was duress in this case. The earlier testimony of the accused has been cited above. Mr. Ruez has testified of the circumstances of a very vicious and cruelly fought war, the brutal nature of the battle for Srebrenica, the attendant environment of soldiers killing pursuant to superior orders, the accused's vulnerable position as a Bosnian Croat in the BSA and his history of disagreements with his commander, Milorad Pelemis, and subsequent demotion. He feels that had the accused refused to shoot, "most certainly, he would get into very deep trouble. . ."[20]

The accused displays a tendency to feel the helpless victim; there are several references in his testimonies to his having no choice in a variety of situations. He speaks of his having to

---

[18] Review of the Indictments Pursuant to Rule 61 of the Rules of Procedure and Evidence, *Prosecutor v. Radovan Karad`i} and Ratko Mladi}*, Case Nos. IT-95-5-R61 and IT-95-18-R61, T.Ch. I, 11 July 1996.
[19] Appeals Chamber Decision.

become a soldier, that he had no choice in leaving the Republic of Croatia for Republika Srpska, that he had to join the BSA "to feed my family", that he "simply had to" go to the military barracks and leave behind his bedridden wife and sick child, that he had no choice in taking part in the Srebrenica operation, and that he "had to shoot those people" murdered in the Pilica collective farm massacre[21].  On the other hand, he has provided testimony of incidents when he broke out of this chain of helplessness and took positive action; such as when he saved some Serbs in Tuzla, when he saved Witness X, when he refused to comply with the orders of Lieutenant Milorad Pelemis, when he tried to refuse to kill at the collective farm and when he refused to kill at the hall in Pilica.  Thus, he was capable of taking positive action, once he had weighed up his options.  The risks that he took appear to have been calculated and considered.

The evidence reveals the extremity of the situation faced by the accused.  The Trial Chamber finds that there was a real risk that the accused would have been killed had he disobeyed the order.  He voiced his feelings, but realised that he had no choice in the matter: he had to kill or be killed.

## VI.     PLEA BARGAIN AGREEMENT

18.     On 8 January 1998, both sides filed with the Registry a "Joint Motion for Consideration of Plea Agreement between Dra`en Erdemovi} and the Office of the Prosecutor".  Attached thereto was a plea agreement between the parties, the purpose of which was expressed to be to clarify the understanding of the parties as to the nature and consequences of the accused's plea of guilty, and to assist the parties and the Trial Chamber in ensuring that the plea entered into by the accused was valid, according to the rules of the International Tribunal.  The essential elements of the plea agreement were that:

---

[20] Transcript, 14 January 1998.
[21] Transcript, 20 November 1996.

(a)     The accused would plead guilty to count 2, a violation of the laws or customs of war, in full understanding of the distinction between that charge and the alternative charge of a crime against humanity, and the consequences of his plea.

(b)     The accused's plea was based on his guilt and his acknowledgement of full responsibility for the actions with which he is charged.

(c)     The parties agreed on the factual basis of the allegations against the accused, and in particular the fact that there was duress.

(d)     The parties, in full appreciation of the sole competence of the Trial Chamber to determine the sentence, recommended that seven years' imprisonment would be an appropriate sentence in this case, considering the mitigating circumstances.

(e)     In view of the accused's agreement to enter a plea of guilty to count 2, the Prosecutor agreed not to proceed with the alternative count of a crime against humanity.

19.     Plea bargain agreements are common in certain jurisdictions of the world.  There is no provision for such agreements in the Statute and Rules of Procedure and Evidence of the International Tribunal.  This is the first time that such a document has been presented to the International Tribunal.  The plea agreement in this case is simply an agreement between the parties, reached on their own initiative without the contribution or encouragement of the Trial Chamber.  Upon being questioned by the Presiding Judge of the Trial Chamber, the accused confirmed his agreement to and understanding of the matters contained therein.  The parties themselves acknowledge that the plea agreement has no binding effect on this Chamber, although submissions recommending it were made by both the Prosecutor and Defence Counsel at the hearing on 14 January 1998, in addition to the recommendations in the joint motion.  Whilst in no way bound by this agreement, the Trial Chamber has taken it into careful consideration in determining the sentence to be imposed upon the accused.

## VII.   SENTENCING POLICY OF THE CHAMBER

20.    In addition to the aggravating and mitigating circumstances already discussed, the sentence determined by the Trial Chamber has taken into account the circumstances of the killings, looking in particular at the degree of suffering to which the victims of the massacre were subjected before and during the killings, the means used by the accused to kill and his attitude at the time.  The atmosphere of terror and violence has been well-illustrated to the Trial Chamber by the accused and Mr. Ruez; the victims were, in particular after the arrival on the scene of members of the Bratunac Brigade, subjected to physical assault, humiliation and verbal abuse.  For the victims who arrived after the first set of killings, there was the certain knowledge of death, as they will have seen the bodies of those already murdered and heard the gunshots fired by the accused and his fellow executioners.  The degree of suffering of these people cannot be overlooked.  But the accused's reluctance to participate and his reaction to having to perform this gruesome task have already been discussed elsewhere in this Judgement.  It is clear that he took no perverse pleasure from what he did.

21.    It is in the interests of international criminal justice and the purposes of the International Tribunal to give appropriate weight to the cooperative attitude of the accused. He truthfully confessed his involvement in the massacre at a time when no authority was seeking to prosecute him in connection therewith, knowing that he would most probably face prosecution as a result.  Understanding of the situation of those who surrender to the jurisdiction of the International Tribunal and who confess their guilt is important for encouraging other suspects or unknown perpetrators to come forward.  The International Tribunal, in addition to its mandate to investigate, prosecute and punish serious violations of international humanitarian law, has a duty, through its judicial functions, to contribute to the settlement of the wider issues of accountability, reconciliation and establishing the truth behind the evils perpetrated in the former Yugoslavia.  Discovering the truth is a cornerstone of the rule of law and a fundamental step on the way to reconciliation: for it is the truth that cleanses the ethnic and religious hatreds and begins the healing process.  The International Tribunal must demonstrate that those who have the honesty to confess are treated fairly as part of a process underpinned by principles of justice, fair trial and protection of the fundamental rights of the individual.  On the other hand, the International Tribunal is a vehicle through which the international community expresses its outrage at the atrocities committed

in the former Yugoslavia.  Upholding values of international human rights means that whilst protecting the rights of the accused, the International Tribunal must not lose sight of the tragedy of the victims and the sufferings of their families.


## VIII.    CREDIT FOR TIME SERVED


22.     Under Rule 101 (E) of the Rules of Procedure and Evidence of the International Tribunal, the Trial Chamber is required to give credit to the convicted person for the period, if any, during which he was detained in custody pending his surrender to the International Tribunal, or pending trial or appeal.   Time spent in custody in respect of domestic prosecutions is not given credit for, until a formal request for deferral to the jurisdiction of the International Tribunal is made.   In the instant case, an "Order for Transfer to the Custody of the International Tribunal" was made by Judge Fouad Riad on 28 March 1996. The relevant period of time spent in custody will therefore run from that date.


## IX.    PENALTY


23.     FOR THE FOREGOING REASONS, having considered all of the evidence and the arguments of the parties and the jurisprudence of the International Tribunal, THE TRIAL CHAMBER, in accordance with the Statute and Rules of Procedure and Evidence, imposes on Dra`en Erdemovi} the sentence of five (5) years' imprisonment for the VIOLATION OF THE LAWS OR CUSTOMS OF WAR to which he pleaded guilty on 14 January 1998, with credit to be given for his time in detention since  28 March 1996.

## X.     DISPOSITION

**TRIAL CHAMBER II *TER* UNANIMOUSLY**

**FOR THE FOREGOING REASONS**

**PURSUANT** to Articles 23, 24 and 27 of the Statute and Rules 100, 101 and 103 of the Rules of Procedure and Evidence,

**NOTING** the indictment of 22 May 1996, confirmed on 29 May 1996,

**NOTING** the guilty plea of Dra`en Erdemovi} on 14 January 1998 to the count of a VIOLATION OF THE LAWS OR CUSTOMS OF WAR, pursuant to Article 3 of the Statute,

**HAVING CONSIDERED** the evidence submitted in this matter and **HAVING HEARD** the submissions of the parties,

**SENTENCES** Dra`en Erdemovi}, born on 25 November 1971, to five (5) years' imprisonment and **RULES** that from this sentence shall be deducted the time spent in custody from 28 March 1996,

**DIRECTS** that the imprisonment be served in a state to be designated by the International Tribunal in accordance with Rule 103(A) of the Rules of Procedure and Evidence,

**ORDERS** that until the expiry of fifteen days from the date hereof within which Dra`en Erdemovi} may lodge an appeal against this judgement pursuant to Rule 88 *bis* of the Rules of Procedure and Evidence, and pending the finalisation of arrangements for his transfer to the state where his sentence will be served, Dra`en Erdemovi} shall remain in the custody of the International Tribunal,

**RULES** that in accordance with Rule 102 of the Rules of Procedure and Evidence, the sentence, subject to the above mentioned deduction, shall begin to run from today, 5 March 1998.

Done in English and French, the English text being authoritative.

_____
Florence Ndepele Mwachande Mumba
Presiding

_____                    _____
Mohamed Shahabuddeen                               Wang Tieya

Judge Shahabuddeen appends a Separate Opinion to this Judgement.

Dated this fifth day of March 1998
At The Hague,
The Netherlands.

**[Seal of the Tribunal]**