# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— )
)
UNITED STATES OF AMERICA )
)     Case No. 04-CR-10298-DPW
)
v. )
)
MARKO BOSKIC )
———————————————————— )

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW IN SUPPORT OF HIS MOTIONS TO SUPPRESS EVIDENCE AND TO DISMISS COUNT FIVE

This memorandum is in support of defendant's various claims based upon the involuntary

nature of his statements.  The memorandum summarizes the applicable legal standards as set

forth in defendant's previously filed memoranda[1] and provides the Court with proposed findings

_____

[1] Defendant has filed the following pleadings:

- Defendant Marko Boskic's Motion to Suppress Evidence (Docket #32)(3/7/05);
- Memorandum in Support of Defendant Marko Boskic's Motion to Suppress Evidence (Docket #33)(3/7/05);
- Defendant's Reply to Government's Opposition to His Motion to Suppress Evidence (Docket #65)(6/20/05);
- Defendant Marko Boskic's Motion to Dismiss Count Five (Docket #84)(2/21/06);
- Defendant's Consolidated Supplementary Memorandum in Support of Motion to Suppress and Memorandum in Support of Motion to Dismiss Count Five (Docket #85)(2/21/06);
- Defendant's Reply to Government's Further Opposition to Defendant's Motion to Dismiss and Suppress (Docket #93)(4/10/06).

Defendant also presses the other grounds set forth in his initial motion papers, which are not based on involuntariness.  These grounds are not summarized here.

of fact and rulings of law in support of Defendant's Motion to Suppress Evidence and Motion to Dismiss Count Five.

## I.  The Applicable Legal Standards

### A.  Counts One Through Four

The defendant's case for suppression of evidence of his statement from the trial of Counts One through Four is based upon three sources of law.  First, the Fifth Amendment guarantees the right of every person not to incriminate himself.  Accordingly, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."[2]  Second, the Due Process Clause prohibits the government from obtaining statements by means of certain techniques which are considered fundamentally unfair.[3]  Specifically, it may not use involuntary statements – i.e. statements which are obtained by government "overreaching,"[4] or "coercion,"[5] defined as consisting of "intimidation, coercion, or deception"[6] and which deprive the suspect of

---

[2] Moran v. Burbine, 475 U.S. 412, 421 (1986); Miranda v. Arizona, 384 U.S. 436, 476 (1966); Colorado v. Spring, 479 U.S. 564, 576, n. 8 and cases cited.

[3] Colorado v. Connelly, 479 U.S. 157, 163 (1986) ("[B]y virtue of the due process clause 'certain interrogation techniques. . . are so offensive to a civilized system of justice that they must be condemned'" quoting Miller v. Fenton, 474 U.S. 104, 109 (1985); Id. at 163 ("[T]he cases considered by this Court over the 50 years since Brown v. Mississippi have focused upon the crucial element of police overreaching."); United States v. Kordel, 397 U.S. 1 (1970) (Improper use by the government of a civil proceeding to obtain evidence for a criminal prosecution violates due process.); United States v. Stringer, 2006 WL 44193, p. 6 (holding it is fundamentally unfair in the context of a civil proceeding for the government to engage in "deceit and trickery to keep the criminal investigation concealed" from the defendant).

[4] Colorado v. Connelly, 479 U.S. at 163.

[5] Id. at 170.

[6] Id. at 170 quoting Moran v. Burbine, 475 U.S. at 421.

a free and deliberate choice.[7]  These are independent constitutional doctrines,[8] although they

often overlap.  Third, 18 U.S.C. §3501 calls for suppression of a confession which is involuntary

in light of  "all the circumstances" set forth in the statute.  Among the circumstances to be

considered are whether the defendant has been deprived of knowledge of  "the offense with

which he was charged or of which he was suspected."[9]

In sum, contrary to the government's contention, it is not free to employ all forms of

deception and deceit.  Trickery is tantamount to coercion when it is intentionally designed to,

and does, mislead the defendant about the consequences of abandoning his rights.[10]  Although

not all forms of deception are prohibited, [11] at the least, a statement must be suppressed when (1)

---

[7] Id. at 170 quoting Moran v. Burbine, 475 U.S. at 421.

[8] Miller v. Fenton, 474 U.S. 104, 110 (1985).

[9] 18 U.S.C. §3501(b)(1).  The statute was passed, in part, to supplant the McNabb/Mallory rule fashioned by the Supreme Court under its supervisory power, to require automatic suppression of any confession obtained while a defendant was in custody after an arrest where arraignment was unreasonably delayed.  See United States v. Alvarez-Sanchez, 511 U.S. 350, 354 (1994).  One purpose of the McNabb/Mallory rule was to insure that the defendant would be promptly advised by the magistrate of the nature of the charge against him.  See McNabb v. United States, 318 U.S. 332, 343-344 (1943);  Mallory v. United States, 354 U.S. 449, 452-453 (1957).  Responding to this issue, Congress eliminated the per se suppression rule, but it retained, as a circumstance to be considered, the issue of whether the defendant actually knew of the nature of the charge or the investigation.

[10] E.g. United States v. Mitchell, 966 F.2d 92, 100 (2nd Cir. 1992) (Due process violated where there is clear and convincing evidence that agents affirmatively misled defendants as to the true nature of their investigation and that those misrepresentations materially induced them to make incriminating statements.);  United States v. Okwumabua, 828 F.2d 950, 953 (2nd Cir. 1987);  United States v. Mast, 735 F.2d 745, 750 (2nd Cir. 1984);  United States v. Serlin, 707 F.2d 953, 956 (7th Cir. 1983).

[11] For example, the police may mislead the defendant as to the state of their knowledge or the progress of their investigation. Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992) (police may use ruse which challenges suspect's beliefs about his guilt and evidence of it, but not "extrinsic" matters which overcome will by distorting rational choice).

government agents engage in misrepresentations calculated to deceive the defendant into believing that he is not the subject of any investigation,[12] which (2) materially induce the defendant into making the statement.  Misrepresentations include both language and "consciously misleading conduct,"[13] as well as "half-truths" which the maker knows are misleading because of the failure to provide qualifying information.[14]  The recitation of Miranda rights to a suspect does not itself insulate a statement from attack if, at the same time, the government, through intentionally misleading conduct, deprives the defendant of the knowledge essential to the exercise of those rights.[15]

---

[12] Courts have reached differing results when government agents have misled a suspect into believing that an investigation is a civil matter, when in reality it is criminal.  Most of these cases arise in the IRS audit context where the taxpayer always knows, at the least, that he is the subject of an investigation.  Compare e.g. United States v. Tweel, 550 F.2d 297 (5th Cir. 1977) (relief granted; audit portrayed as civil when in fact conducted by DOJ Organized Crime Section) with United States v. Kontny, 238 F.3d 815 (7th Cir. 2001).  The government has cited no case – and defense counsel have encountered none – sustaining a confession as voluntary where government agents intentionally misled the defendant to believe that he is not under investigation at all.

[13] United States v. Flemmi, 225 F.3d 78, 92 (1st Cir. 2000).

[14] United States v. Okwumabua, 828 F.2d 950 (2nd Cir. 1987) (Silence by a government agent can amount to an affirmative "misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading.) Citing United States v. Prudden, 424 F.2d 1021, 1032 (5th Cir. 1970).  See Restatement (Second) of Torts §529: "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation."

[15] Missouri v. Seibert, 542 U.S. 600, 616 (2004) (Statements of defendant must be suppressed where law enforcement used interrogation "strategy adapted to undermine the Miranda warnings.");  United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) ("Of course, a false assurance might undercut the gist of a warning, raising questions whether *Miranda* had been satisfied.");  United States v. Rogers, 906 F.2d 189, 191 (5th Cir. 1990)(Statements deemed involuntary where officers "assured [defendant] that he would not be arrested if he cooperated with them . . .")

**B.  Count Five**[16]

A special case is presented where, as in Count Five, the government charges the
defendant with having committed perjury or made false statements in the interrogation itself and
the defendant claims that the statement was coerced.  In such a situation, there is no Fifth
Amendment incrimination clause violation because the perjurious statement is not considered to
be incriminating.[17]  Similarly, under the Due Process Clause, in which the underlying question
relates to the fundamental fairness of government tactics, the fact that a defendant might have
been coerced into submitting to an interrogation, does not protect a suspect against making a
<u>false</u> statement in response to a particular inquiry.  Thus, those cases which address the perjury
trap doctrine focus on whether the government intentionally set out to entrap the defendant into
committing the crime of perjury.[18]

**II.  Proposed Findings of Fact**[19]

**A.  The Government's Plan**

In the fall of 2002, the Joint Terrorism Task Force ("JTTF") opened an investigation of
the defendant, Marko Boskic (Tr. 1, p. 51).  The JTTF is composed of representatives from
numerous agencies of the federal and state government including Immigration and Customs

---

[16] The defendant has also moved to dismiss Count Five.  There is no practical difference
between suppression of the evidence in the trial of this count and dismissal.

[17] <u>United States v. Babb</u>, 807 F.2d 272, 277 (1st Cir. 1986).

[18] <u>Wheel v. Robinson</u>, 34 F. 3d 60, 68 (2nd Cir 1994).

[19] The transcripts of the hearing on Defendant's Motion to Suppress will be referred to as
follows:
       Transcript of Day One, April 10, 2006 - Tr. 1, p. <u>x</u>
       Transcript of Day Two, April 18, 2006 - Tr 2, p. <u>x</u>
       Transcript of Day Three, April 19, 2006 - Tr. 3, p. <u>x</u>

Enforcement ("ICE"), the State Department, the Federal Bureau of Investigation ("FBI"), the military, the United States Attorney's Office, and state and local police (Tr. 2, pp. 50-51; Tr. 2, p. 27). FBI agent Greg Hughes was assigned to the investigation in August, 2002 (Tr. 2, p. 27) and ICE agent Thomas Carroll was assigned to the investigation in December, 2003 (Tr. 1, p. 51). It was their assignment to investigate whether Marko Boskic had committed "immigration fraud" (Tr. 1, p. 52). One of their objectives was "to confirm if Mr. Boskic had any military history" in Bosnia (Tr. 1, p. 52). Specifically, they were investigating whether Mr. Boskic made a materially false statement on his Application for Refugee Status and his Application to Become a Resident Alien when he did not reveal participation in the Bosnia-Serb 10th Sabotage Detachment during the Bosnian conflict in 1995. (Tr. 1, pp. 52-53; Exhibit 17).

In late December 2003 or early January 2004, agent Carroll and/or AUSA Kimberly West contacted Peter McCloskey, the prosecutor for the International Criminal Tribunal for the former Yugoslavia ("ICTY"), to request ICTY's "help" with their investigation of Marko Boskic for immigration fraud. (Tr. 1, p. 52). Alistar Graham, who had been investigating alleged war crimes in Northern Bosnia, and in particular Srebrenica, first as a Senior Investigator from 1998 to 2000 and later as an Investigations Team Leader from 2001 to 2004, was assigned to assist the JTTF with its criminal investigation of Marko Boskic. (Tr. 2, pp. 63, 67).

Through his work as an ICTY investigator, Graham had collected evidence that identified Marko Boskic as a member of the 10th Sabotage Detachment of the Army of the Republika Srpska. (Tr. 2, pp. 65-66).

In December of 2003, agent Carroll learned that in 2002 Marko Boskic had filed an application for travel documents with ICE (at the time, the Immigration and Naturalization

Service) and ICE had never acted on the application. (Tr. 1, p. 55). Sometime thereafter, agent Carroll, agent Hughes and AUSA Kimberly West devised a plan whereby Marko Boskic would receive a notice to appear at the JFK Building for an interview concerning travel documents. (Tr. 1, pp. 56-55). The government agents, however, had no intention of issuing travel documents to defendant. Their real purpose was to interrogate defendant concerning his military history for use in their criminal investigation of him. (Government Opposition, p. 16; Tr. 1, p. 64).

On August 9, 2004, the government sent Boskic a notice to come to the JFK Building on August 25, 2004 at 3:30 p.m. for an interview regarding his application for refugee travel documents. (Tr. 1, p. 63). Alistar Graham was summoned from the Hague to come to Boston for the interview and a Serbo-Croatian interpreter was brought in from Washington, D.C. (Tr. 1, pp. 63, 75; Tr. 2, pp. 32-33).

AUSA West, agent Carroll, agent Hughes and Alistar Graham spoke on the telephone and then met, at least once, to plan how they would conduct the interview. (Tr. 1, pp. 69-70, 73). The decision was made to have an arrest warrant in place prior to the time Boskic arrived for the interview. (Tr. 1, p. 62). Accordingly, on August 25, 2004, Special Agent Greg Nevano applied for and obtained a criminal complaint and an arrest warrant for two counts of immigration fraud. The fraud counts concerned Mr. Boskic's alleged failure to reveal military service with the 10th Sabotage Detachment on his September 3, 1999, Application for Refugee Status and his April 5, 2001, Application to Become a Permanent Resident Alien. (Tr. 1, pp. 60-61). Agent Nevano filed a detailed affidavit setting forth much of the evidence the agents had collected. (Exhibit 17).

It was the government's plan to "get Mr. Boskic talking and see how much information

they could get out of him" about his military history  (Tr. 1, p. 67), while "not let[ting] out" that

he was under criminal investigation and that he was, in fact, already a defendant. (Tr. 1, p. 94).

According to agent Carroll, they realized that if Boskic knew that he was under investigation, he

was not likely to talk. (Tr. 1, p. 75).  Indeed, the plan was to take every possible precaution to

shield from Boskic the fact that he was under investigation and was a criminal defendant.  Thus,

although there was a working video-camera set up in the interview room, the agents and AUSA

West decided not to record the interview because defendant might suspect something.  (Tr. 1, p.

75)[20].  Similarly, although a Serbo-Croatian interpreter would be available to interpret for Mr.

Boskic during the entire interview, the agents and AUSA West decided against using an

interpreter during the first part of the interview when agents Carroll and Hughes were asking

questions.[21]   The plan was that nothing Carroll or Hughes said to defendant up to the time

Alistar Graham started talking, including any claimed recitation of <u>Miranda</u> rights, would be

translated.  The agents and AUSA West were worried that since interpreters are generally not

available for travel document interviews, the presence of an interpreter may cause defendant to

wonder if there was some kind of investigation.[22]  Thus, the government agents and the AUSA

---

[20] The agents theorized that defendant might know that ICE agents generally recorded interviews only when they were going to deny benefits, and they did not want Boskic to think he was on the "verge of being denied" because it might cause him to suspect that he had been or was being investigated (Tr. 1, p. 75).

[21] Defendant has quite limited English skills.  He testified that he knows "basic words," but he has trouble understanding and making himself understood when he is asked "complicated questions" or has to use "complicated words."  The entirety of his English language training was at North Shore Community College where he took a language class for six months that met two or three times a week. (Tr. 3, pp. 5-6).

[22] This explanation, of course, sheds no light on why the interpreter was not used to translate any recitation of <u>Miranda</u> rights that may have occurred <u>after</u> Alistar Graham and the interpreter entered the room.

decided to sacrifice the accuracy and the understanding that a video recorder and an interpreter would bring to the interview because they so desperately wanted to hide their investigation from defendant.  (Tr. 1, pp. 77-78).

The government's plan was to start the interview with only ICE agent Carroll in the room.  Although the government had no intention of issuing travel documents, Carroll "would start out the interview...by asking him about why he wanted travel documents and so forth...[a]nd that would get him talking."  (Tr. 1, p. 70).  That "would lead to the questions of what [defendant] did in Europe before he came to the United States," which would lead to questions about whether defendant had been in the military, which the agents knew would elicit a denial, and questions about whether he had a criminal record. (Tr. 1, 70).  The question about the criminal record would lead to agent Hughes entering the room on the pretext that when a criminal record comes up, the applicant must be interviewed by the FBI.  Then finally, Graham and an interpreter would be brought in to get to the real substance. (Tr. 1, pp. 70-72).  The plan was that Graham would start off  by challenging defendant's denial of military service by showing him a video-tape of him in the 10th Sabotage Detachment Unit, and then convince defendant to admit to and discuss his involvement in the 10th Sabotage Detachment by telling him that he was not the subject of the investigation and that he only wanted his cooperation in the investigation of senior officials. (Tr. 1, pp. 94-95).

**B.  The Execution of the Government's Plan - The Interview**

Defendant arrived at the JFK Building for his travel document interview at approximately 3:00 p.m. on August 25, 2004, with his notice to come to the interview in hand.  (Tr. 3, p. 4). Agent Carroll conceded that the notice was "misleading" because the purpose of the interview

was not to screen Mr. Boskic for travel documents.  The purpose of the interview was, in fact, to interrogate the defendant for use in the criminal investigation.  (Tr. 1,  p. 64).  At approximately 3:35 p.m., agent Carroll escorted the defendant from the reception area to the interview room.  (Tr. 1, p. 81).  Defendant showed Carroll the appointment notice he had received and explained he was there to obtain travel documents to visit his family in Europe.  Agent Carroll agreed with defendant that that was the purpose of the interview.  (Tr. 1, pp. 30, 32).  The defendant believed him (Tr. 3, p. 12) and the government concedes that it was reasonable for him to do so. (Gov't Opposition, p.16).  Agent Carroll's representation to defendant that he was there for a travel document interview was false.  It was an affirmative misrepresentation.  The government agrees that defendant was not under consideration for travel documents.  He was going to be arrested and incarcerated at the conclusion of the interview  (Tr. 1, p. 62) and the real purpose of the interview was to "get Mr. Boskic talking" about his military history.  (Tr. 1, p. 67).

Defendant proceeded to answer all of Carroll's questions.  He did so, he explained, "because Mr. Carroll...works in the immigration status and he's in charge of me and I thought that I had to answer his questions." (Tr. 3, p.10).

Agent Carroll asked defendant "biographical" questions for about forty-five minutes. (Tr. 1, p. 29).  One of the "biographical" questions Carroll asked was whether Boskic had any additional military history other than the two years of service in 1983 and 1984 that he had disclosed.  Carroll asked this question despite knowing that this was exactly the focus of his criminal investigation and despite knowing that the criminal complaint and arrest warrant were based on defendant's allegedly false answers to this question on two different immigration forms.  (Tr. 1, pp. 85-86).  In fact, Carroll had every reason to believe that Boskic would answer

-10-

Case 1:04-cr-10298-DPW    Document 100    Filed 05/01/2006    Page 11 of 26

that question as he had in the past. Carroll understood that the fact that Boskic did not know there was a criminal investigation "might affect his answer" at that time. (Tr. 1, p. 86). Carroll did not need an answer to this question to further his investigation as he already had in the government's possession the video-tape showing defendant as a member of the 10th Sabotage Detachment. (Exhibit 17). Carroll did not dwell on this question. He asked it and after he got the answer he expected he would get,[23] he moved on to questions about the defendant's criminal record (Tr. 1, p. 86-87) so that he would have a "reason" to bring agent Hughes into the room. Accordingly, despite the fact that Carroll had in his possession a copy of defendant's criminal record in Bosnia, he asked defendant whether he had a criminal record in Bosnia. When defendant denied having such a record, Carroll, according to the government's well-orchestrated plan, produced a copy of his Bosnia criminal record, and explained to defendant that whenever an applicant for travel documents has a criminal record, the applicant must speak to an FBI agent. (Tr. 1, pp. 70-72, 87).

This was false. Not only is an FBI agent not required to interview every applicant for travel documents who has a criminal record (Tr. 1, pp. 71-71), but in this case, agent Hughes' questions had nothing to do with defendant obtaining travel documents – defendant was going to be arrested. He was not going to receive travel documents. The questions by Carroll and Hughes were intended to elicit denials about defendant's additional military service and to keep defendant talking, all the time believing that agents Carroll and Hughes were both part of the

---

[23] The government had no reason to ask this question other than to set a perjury trap. The agents and AUSA West already knew the "correct" answer to this question and they knew the answer the defendant would give. Indeed, it was precisely because they were so certain that defendant would answer the question the way that he did, that they brought Alistar Graham all the way from The Netherlands to be part of their ruse.

-11-

travel document procedure and that their questions about his military service and criminal record were just routine travel document questions. (Tr. 1, p. 72). The plan worked perfectly. When agent Hughes entered the room, defendant believed that Hughes was there as part of the travel document interview. (Tr. 3, pp. 11-12).[24] This time, Hughes took the seat behind the desk and Carroll sat next to defendant. (Tr. 1, p. 32).

Hughes' first question to defendant was "[w]here are you from?" When defendant replied "Bosnia," Hughes asked, "were you in the war?" After Hughes got his anticipated and desired response of "no," he moved on to ask questions about defendant's criminal record in Bosnia. (Tr. 2, pp. 8-9). The questioning lasted about fifteen minutes. (Tr. 2, p. 10). At this point, defendant had been speaking for approximately an hour. (Tr. 1, p. 89). According to plan, agent Hughes then announced that there was yet another person who wanted to speak to defendant. Hughes left the room and returned with Alistar Graham and a Serbo-Croatian interpreter. (Tr. 1, pp. 35-36).

Graham introduced himself as a prosecutor with ICTY. He did not tell defendant that his "primary" reason for being there was to assist the United States government with its criminal prosecution of him (Tr. 2, pp. 92-93), even though that was, in fact, his principle reason for being there. (Tr. 2, p. 67). He told defendant that before he said anything, he wanted defendant to listen to him. For about ten minutes, Graham explained his investigative work concerning the

---

[24] The defendant never said that he knew what the investigation was about as soon as the FBI agent appeared. (Tr. 3, p. 21) In fact, just as planned and anticipated by the agents, the pretext concerning defendant's foreign criminal record successfully concealed the true purpose of the FBI agent's involvement. Defendant first realized that the interview concerned events in Bosnia, and not his need for travel documents, when Graham, the ICTY investigator, introduced himself. (Tr. 3, p. 12). Significantly, Agent Carroll did not testify about this alleged statement that Hughes claims defendant made to Carroll and that defendant denies making.

events in Srebrenica.  He explained that he knew about the 10th Sabotage Detachment and he

knew that defendant had been a member of that unit.  He explained that he had video footage of

defendant  in the unit.  At that point, Graham explained that defendant was not the subject of  the

investigation.  (Tr. 2, pp. 92-94).[25]  He explained that he was there on behalf of the Tribunal to

seek defendant's cooperation in the investigation of "senior officials".  (Tr. 2,  p. 51).   He

showed the defendant a videotape of him in the 10th Sabotage Unit.[26]  Graham repeated that

defendant was not the subject of his investigation, that he only wanted his cooperation.  This

half-truth throughly misled defendant and was an outright misrepresentation.   Defendant

believed that any statements he gave would be to benefit the Tribunal, would further their work

and would lead to the arrest of the senior officials who had ordered defendant to participate in

the events at Srebrenica under threat of "liquidation".  (Tr. 3, pp. 11-13; Exhibit 18).   This all

made sense to defendant.  Indeed, Graham asked defendant specific questions about Pelemis, the

very person who "put a pistol on defendant's forehead" and ordered him to participate or be shot.

(Tr. 2, p. 95; Exhibit 18).

       After Graham sat behind the desk questioning defendant for an hour, the three

interrogators switched seats.  Hughes took the seat behind the desk and asked many of the

questions.  Hughes, Carroll and Graham took turns asking questions. (Tr. 2, pp. 14-15).  All

three used the interpreter to translate their questions into Serbo-Croatian and the interpreter

---

       [25]  Graham claims he used the phrase "my investigation" (Tr. 2, pp. 92-94), but defendant
testified that Graham said "this investigation."  (Tr. 3, p.13).

       [26]  According to the government's carefully laid plan, the CD was already set to be played
in the computer on the desk in the interview room and it was immediately shown to defendant.
(Tr. 2, p. 14).

translated Boskic's answers for all of them.  (Tr. 3, pp. 14-15).

Defendant believed that Carroll, Hughes and Graham were all working together on the same matter. (Tr. 3, p. 15).  When Graham told Boskic that he was not a subject of the investigation, even if he used the words "my investigation," Boskic could not have understood this to mean that he was left open to a different investigation by Carroll and/or Hughes.  He was not told of any other investigation. (Tr. 1, p. 91).  The agents specifically did not want to "let it out" for fear it would cause Boskic to stop talking (Tr. 1, p. 94).  And, in fact, all of the agents were working together.  Not only could Boskic not have interpreted the assurances any other way, the agents knew and specifically intended that this would be so. (Tr. 1, pp. 94-95). [27]

---

[27]  Agent Carroll testified as follows:

Q.  And you realized that when Mr. Graham said that Mr. Boskic was not the subject of an investigation, that that would encourage Mr. Boskic to keep talking, correct?
A.  Yes.
Q.  But you didn't think it was important to clarify that point and to say that that representation only applies to Mr. Graham, right?
A.  We still didn't let him know that he was the subject of our investigation.  We wanted to not let that out until we actually arrested him.
Q.  And Mr. Graham, that wasn't the only thing that he said along those lines, was it?
A.  Regarding?
Q.  Well, he also said, "we're after the senior officials," right?
A.  Yes.
Q.  Essentially we're not after you, we're after the higher ups, right?
A.  Yes.
Q.  And he repeated these things more than once; isn't that right?
A.  Yes.
Q.  More than once, he told him he wasn't the subject of an

In fact, Boskic clearly believed that he was acting just as a witness – to help the investigation of others. It was only at that point that he dramatically reversed course and admitted the history that he had previously denied, and, indeed, as he testified, had for years consistently tried to forget. (Tr. 3, p. 35; Exhibit 18). And, as soon as he was led to the belief that he was there to help the investigation of others, his story tumbled out. He told Alistar Graham, "I am at your disposal. If I should go to the Hague, I will. Whatever I have to do to help, I'm ready to help." (Tr. 3, p. 34).

When the interview was over, Hughes asked defendant for a written statement. Defendant, however, was hesitant. (Tr. 1, p. 43). Accordingly, for the next ten to fifteen minutes, Hughes explained "the benefits of him writing his story in his own words. (Tr. 2, pp. 16-17). Carroll also explained "that it may be beneficial to him." (Tr. 1, p. 43). No one warned defendant that this statement might be used against him. Only the so-called "benefits" were disclosed. (Tr. 1, pp. 43-44; Tr. 2, pp.16-18). When defendant finally agreed to write the statement, agent Hughes dictated the first two sentences[28], which the interpreter then translated to defendant in Serbo-Croatian. Defendant wrote down the translation as dictated. (Tr. 3, p. 37;

---

   investigation, correct?
  A. Yes. That's true.

(Tr.1, pp. 94-95)(emphasis added).

[28] The two sentences dictated by agent Hughes are as follows: "I, Marko Boskic, understand and give up my rights. I am giving this statement voluntarily, without promises and guarantees." (Exhibit 18). Defendant testified that he could not remember what "rights" were being referred to when he wrote the sentence. (Tr. 3, p. 32). At the time defendant wrote the sentence as dictated, however, he did not believe he was under investigation for anything. He believed he was cooperating with the Tribunal. (Tr. 3, p.13)

Exhibit 18).

Defendant proceeded to write the statement with help from agents Hughes and Carroll. Alistar Graham assisted with names and places, but the preparation of the statement, which defendant believed he was writing to assist the Tribunal, was supervised and orchestrated by Hughes and Carroll. (Tr. 2, pp.79-80).

At approximately 6:45 p.m., defendant agreed to sign a consent form to permit agents to search his home and car for documents or photographs that would help identify "senior officials." (Exhibit. 16). Again, he believed he was doing this to aid the Tribunal in its search for senior officials. At the time defendant signed the consent to search form, he did not know he was under investigation. (Tr. 3, p. 16). At the time defendant signed the consent to search form, defendant was well into his written statement. According to agent Carroll, about one-third of the total time it took defendant to write his statement had elapsed. (Tr. 1, p. 102). Defendant continued writing for another ninety minutes, until 8:20 p.m., when he stopped and asked agent Carroll a question. (Tr. 1, p. 104).

## C. __The Arrest and Miranda Rights__

At approximately 8:20 p.m., while he was writing his statement, defendant asked agent Carroll, "what's going to happen to me?" Carroll responded, "you will be held overnight and we'll take you before a judge in the morning." (Tr. 1, p. 104). Defendant then asked "[a]m I going to be arrested?" and Carroll responded, "yes." (Tr. 1, pp. 104-105).

According to agent Carroll, defendant was "probably about halfway finished with his statement when he was told he was under arrest. (Tr. 1, p. 105).

It was at this point, at approximately 8:20 p.m., that defendant first understood that he

was being given his <u>Miranda</u> rights. (Tr. 3, pp. 18-19).  Defendant recalls agent Carroll showing

him the English side of <u>Miranda</u> card, and telling him to sign it.  Agent Carroll then wrote

"8/25/04," "3:35 p.m." and "Boston, MA" in the spaces on the form for "place", "date" and

"time."  He then turned the card over to the Serbo-Croatian side.  He told defendant to sign the

card and told him to record the date, time and place as they had on the other side. (Tr. 3, pp. 18-

21).

      The credible evidence is that the rights were not given until the end, as defendant

testified.  The investigators were not legally required to give warnings.  Boskic was not "in

custody" for <u>Miranda</u> purposes since he was not aware that he was under arrest. (See Gov't Opp.

at pp. 9-13 and cases listed therein.).  Not giving warnings until defendant was told of the arrest

was consistent with the whole plan, in which the agents took excessive care to avoid even the

slightest possibility that Boskic might infer that he was under investigation, even to the point of

not using an interpreter or a video camera, both seemingly neutral things.  Also, both agents'

accounts of how the rights were given were internally inconsistent and inconsistent with each

other. [29]  Graham testified that he did not hear any rights being given to defendant when he was

_____

[29]  In his FBI report, Agent Hughes wrote that "Carroll furnished Boskic with an 'Advice of Rights' form written in both Croatian and English that listed Boskic's <u>Miranda</u> warnings."  He made no mention in his report of any warnings being given orally. (Tr. 2, p. 43).  The "Advice of Rights" form that was eventually signed by defendant was an Immigration and Naturalization Service form, not the standard FBI Miranda waiver form.  The INS form warned  defendant that his statements could be used against him "in court or in any immigration or administrative proceeding." (Exhibit 16).  Agent Carroll testified that he administered the warnings at the start of the interview, and again when Hughes entered the room, and finally again when Graham entered the room. (Tr. 1, p. 48).  He agrees, however, that he never mentioned any of these recitations in the twenty-three pages of notes he took during the interview. (Tr. 1, pp. 105-106).

According to agent Carroll, he gave defendant "a condensed version" of his rights when Hughes entered the room.  He told him "he had the right to an attorney, he had the right to leave at any time, and he doesn't have to answer any questions."  (Tr. 1, pp. 32-33).  When pressed on

in the room.  (Tr. 2, p. 91).

If defendant was given his <u>Miranda</u> rights before 8:20 p.m., it was clearly and

deliberately done in such a way as to make no impression on him.  If, at any time prior to 8:20

p.m., defendant had understood that he was under criminal investigation for making false

statements on immigration forms, he would not have answered the agents' questions and he

would have asked for an attorney.  (Tr. 3, p.10).

Defendant believed he was being arrested "because of the war in Bosnia."  He had no

understanding of the charges against him. (Tr. 3,  p. 18).  He continued to write his statement

because he had already "said everything." ( Tr. 3,  p. 18).

## III.    <u>Proposed Rulings of Law</u>

**A.    All Incriminating Oral and Written Statements Made By Defendant Between 3:30 p.m. and When Defendant Was Arrested at 8:20 p.m. Must Be Suppressed Because They Are Involuntary Statements Resulting From <u>Governmental Overreaching and Deception</u>.**

There can be no doubt that the investigators in this case developed and executed a

detailed plan deliberately designed to mislead defendant into giving up his right against self-

incrimination.  The government's plan worked.  Defendant's decision to speak with Carroll,

---

what he said to the defendant, he testified differently, stating that he told him "these rights that we went over previously are still in effect" and "I just told him that he had a right to an attorney and just a few of the highlights of the form." (Tr. 1, pp. 33).  When pressed further, he testified that he told him "he has the right to an attorney, he has the right to stop answering questions at any time." (Tr. 1, pp. 33)  On cross-examination, agent Carroll fluctuated between claiming he gave a condensed version when Hughes came in  (Tr. 1, p. 87), the full version (Tr. 1, p. 88) or a still different version of his condensed version.  (Tr. 1, p. 88).  According to agent Hughes, when he entered the room, Carroll simply told defendant that "the rights that he had waived before were still in effect."  Hughes testified that when Graham came into the room with the interpreter, Carroll told defendant in English "your rights are still in effect" and the interpreter did not translate that statement.  (Tr. 2,  pp. 13, 48).

Hughes, and finally Graham was the product of government coercion which did not allow the defendant to make a "free and deliberate choice" about whether to speak with the investigators. As such, any use of these statements would violate defendant's self-incrimination and due process rights under the Fifth Amendment and 18 U.S.C. §3501.

Agent Carroll, agent Hughes and ICTY investigator Graham, through their conduct, speech, elaborate staging, scripting, and sequencing of the interrogation, at all times prior to 8:20 p.m., misrepresented to defendant that he was not under investigation at all. Throughout the entirety of Carroll's and Hughes' interviews, defendant believed he was answering routine travel document questions. The interviews were intentionally staged and sequenced to send defendant that incorrect and misleading message. Indeed, Carroll admitted that he told defendant that both he and Hughes were interviewing him for travel documents. The plan was to create a continuous and seamless interrogation which came progressively closer to the heart of the issue, all the while encouraging defendant to talk by assuring him he was not under investigation. Once defendant denied his military involvement to Carroll and Hughes, Graham was brought in with his video to convince defendant to admit his involvement in military activities in Bosnia. When the introduction of Graham and the nature of his questions revealed the existence of an investigation, defendant was then told that he was wanted only as a witness and informant. He was specifically told that he was not a subject.[30] He believed he was assisting the Tribunal based

---

[30] The government strains to separate Graham's investigation on behalf of the ITCY from its own investigation in its hope to defeat defendant's contention that when Graham told the defendant that he was not a subject of "my" investigation it was not a misrepresentation (the idea being that Graham's use of the pronoun "my" was exclusive to the ITCY and did not include the instant criminal investigation). However, the idea that the defendant could have distinguished "my" investigation from some other undisclosed investigation borders on the ludicrous. The interrogation of the defendant by Carroll, Hughes and Graham occurred in the same place at the

on the investigators' repeated reassurances to him. He was never told that his written statement could be used against him. In fact, however, he was not only the subject of the federal investigation, and not only a target – he was already actually and formally a defendant.

The severity of the government's "consciously misleading conduct" in this case is extraordinary. The government consciously misled defendant into believing that he was not under investigation at all, and then manipulated him into making an incriminating statement, when all the while he was already charged criminally. In United States v. Swint, 15 F.3d 286 (3rd Cir. 1994), a case relied upon by the First Circuit in United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000), the Court found a confession obtained under very similar circumstances constitutionally infirm. In Swint, the defendant was invited to a meeting with state authorities concerning potential cooperation, which he understood to be "off-the-record," based upon the common practice. Once he got there, and was engaged in a dialogue, DEA agents joined the meeting, confronted him with evidence against him and urged him to cooperate with them. He

---

same time, concerned the same subject matter and utilized the same translator. In United States v. Mannarino, 850 F.Supp 57, 66 (Dist Ct. Mass. 1994), this Court addressed a similar claim regarding an attempt by the government to distance itself from the misconduct of a Maine law enforcement officer working on the government's behalf. This Court looked to agency principles to resolve the issue and it should do the same here. The Restatement (Second) of Agency §8B states:

> (1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if. . .
> (b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts. . .
> (3) Change of position, as the phrase is used in the restatement of this subject, indicates payment of money, expenditure of labor, suffering a loss or subjection to legal liability.

Furthermore, Graham testified that his primary purpose is coming to the United States was to assist the government with its criminal investigation.

made a statement.  The Third Circuit characterized this as a "coercive 'bait-and-switch'
technique," which caused Swint to believe that the federal agents would likewise not attempt to
use the statements against him.  "Although misleading an accused about the evidence against
him might not render a confession involuntary, misleading him about whether his confession
may be used against him should have that consequence in the circumstances of this case."  Id. at
290, n.6.  Similarly, in United States v. Rogers, 906 F.2d 189 (5th Cir. 1990), because the
defendant "misunderstood the consequences of speaking freely to the law enforcement officials,"
and the "federal agents in no way revealed to him that he . . . was the target of their
investigation," the administration of Miranda rights did nothing to cure the involuntariness of the
confession.  The Court held that, "Rogers' waiver of his Fifth Amendment rights was not made
with a full awareness of the consequences of the decision to abandon his rights or with the
requisite level of comprehension."  Id. at 192.  See Missouri v. Seibert, 542 U.S. 600
(2004)(Government tactics specifically designed to thwart defendant's constitutional rights
require suppression of resulting statements.)

     Here, the government's "consciously misleading conduct" constituted, by definition,
affirmative misrepresentation.  See Restatement (Second) of Torts §529: "A representation
stating the truth so far as it goes but which the maker knows or believes to be materially
misleading because of his failure to state additional or qualifying matter is a fraudulent
misrepresentation."  And, the deception was not just to mislead defendant as to the quantum of
evidence the investigators had, but was calculated to make him believe that he was not under
investigation at all.  It deprived the defendant of the ability to make a rational choice, and thus
violated his self-incrimination and due process rights under the Fifth Amendment.

**B.    Any Incriminating Statements Made By the Defendant After 8:20 p.m.  Must Be Suppressed Because The Taint of the Involuntariness of the Defendant's Initial Confession Was Not Dissipated When the Government Finally Administered His Rights and Revealed that the Defendant Was Going to Be Arrested.**

The defendant has established that the government's coordinated plan to mislead him with regard to his status as the subject of a criminal investigation and failure to administer Miranda warnings violated his Fifth Amendment rights and thus rendered his confession to them involuntary.  The late revelation at 8:20 p.m. by the government that the defendant was going to be arrested, and the reading to him of his Miranda warnings, could not have dissipated the taint of the initial violation of the defendant's rights. Any incriminating statements made after 8:20 p.m. must therefore also be suppressed.

It is well established that if the government violates an individual's constitutional rights, any evidence obtained as a result of that violation may not be admitted against a defendant at trial ("fruit of the poisonous tree").  Wong Sun v. United States, 371 U.S. 471 (1963). Accordingly, the Supreme Court's opinion in United States v. Elstad, 470 U.S. 298 (1985), and further clarified in Missouri v. Seibert, 542 U.S. 600 (2004), makes it clear that if a suspect's initial, unwarned, incriminating statements are *involuntary* any subsequent incriminating statements must be suppressed unless the taint of the constitutional violation is dissipated. United States v. Williams, 435 F.3d 1148, 1153 (9th Cir. 2006).

In United States v. Elstad, a burglary suspect made incriminating statements to a police officer at his home without first receiving a Miranda warning.  Officers then took the suspect to the sheriff's office and, prior to interrogating him, read him his Miranda rights. During this interrogation the suspect made a more expansive incriminating statement.  There was no dispute

that the defendant's initial statement made at his home was voluntary.  The Court thus held that

his subsequent statement at the sheriff's office after he received his <u>Miranda</u> warning should not

be suppressed.  The Court reasoned that a "suspect who has once responded to unwarned yet

uncoercive questioning is not thereby disabled from waiving his rights and confessing after he

has been given the requisite <u>Miranda</u> warnings." <u>Id.</u> at 318.  However, the Court made it clear

that the voluntariness of the defendant's initial statements was crucial to its decision.  As the

Ninth Circuit recently recognized, "The Court's belief that Elstad's prewarning statements were

voluntary played a decisive role in its analysis." <u>United States v. Williams</u>, 435 F.3d 1148, n. 3

(9th Cir. 2006).  The Ninth Circuit further pointed out that Justice O'Connor explained in her

dissent in <u>Missouri  v. Seibert</u> that "if [the prewarning] statement is shown to have been

*involuntary,* the court must examine whether the taint dissipated through the passing of time or a

change in circumstances." <u>Id.</u> at 1153.  Thus, the Ninth Circuit in <u>United States v. Williams</u>

concluded that under <u>Elstad</u> if a pre-warning statement was involuntary, the subsequent

statement is inadmissible unless there is a change in time and circumstances that dissipates the

taint. <u>Id.</u> at 1153.

     The relevant considerations in determining whether the taint of a previous constitutional

violation has been dissipated are "the time that passes between confessions, the change in place

of interrogations, and the change in identity of the interrogators . . ." <u>United States v. Elstad,</u> 470

U.S. at 310.

     There can be no question that the taint was not dissipated in the present case.  No time

passed between the confessions.  At the time the defendant was told that he would be arrested

and read his <u>Miranda</u> warnings he was in the middle of writing his statement.  Agent Carroll

testified that defendant was "probably halfway finished with his statement." (Tr. 1 p. 105).

Furthermore, he remained in the same office where he had been for the previous several hours

and the interrogators remained the same.  Indeed, nothing stood as a demarcating line between

the defendant's initial and subsequent confessions.  The interrogation was continuous.

Accordingly, any statements made after 8:20 p.m. were a fruit of the initial violation of

defendant's rights and therefore they must be suppressed.

### C.  The Search of Defendant's Home and Car Were Also Illegal "Fruits" of the <u>Violations of Defendant's Rights</u>.

The "consent" by the defendant to a search of his home and car were also procured

through the same unconstitutional means as were his incriminating statements.  The defendant

was told that the search was in order to aid in the investigation of others responsible for atrocities

in Bosnia.  Accordingly, the products of the search of his property must also be suppressed.

<u>Schnechloth v. Bustamone</u>, 412 US 218, 223 (1973).

### D.  Count Five of the Indictment is the Result of A "Perjury Trap" and Must <u>Therefore Be Dismissed</u>.

The defendant previously argued in Defendant's Consolidated Supplementary

Memorandum in Support of Motion to Suppress and Memorandum in Support of Motion to

Dismiss Count Five that count five of the indictment must be dismissed because it is the result of

a perjury trap (pp. 8-10).  The testimony at the hearing in this case makes it clear that when

agents Carroll and Hughes questioned defendant about his military service they already knew the

answer he was going to give and they asked the question for the sole purpose of obtaining an

indictment for perjury.

As the defendant has previously argued  "[a] 'perjury trap' is created when the

government calls a witness…for the primary purpose of obtaining false testimony from him in

order to prosecute him later for perjury." <u>Wheel v. Robinson</u>, 34 F.3d 60, 68 (2nd Cir. 1994)

citing <u>United States v. Chen</u>, 933 F.2d 793, 796-97 (9th Cir. 1991); <u>United States v. Simone</u>, 627

F.Supp 1264, 1268 (D.N.J. 1986); <u>United States v. Crisconi</u>, 520 F.Supp 915, 920 (D.Del 1981).

The issue to be determined with regard to this defense is "whether there was a premeditated

design on the part of the government to trap the witness into perjury in such an unfair way that a

due process test may provide a viable defense. . .<u>Basic to the concept of 'fairness' to a witness is

the government's warning of and the witness' knowledge of (1) the subject matter of the

government's inquiry</u> and (2) the witness' constitutional rights." <u>United States v. Simone</u>, *supra*

at 1269.  (emphasis added).  Accordingly, the government may not use the subterfuge of a civil

proceeding in which it intentionally hides its intentions to prosecute the defendant in order to

gain incriminating information. See <u>United States v. Scrushy</u>, 366 F.Supp2d 1134, 1137 (N.D.

Al. 2005) (dismissing indictments for perjury where the government intentionally kept from the

defendant its intention to use an SEC investigation in order to gain information to be used in the

criminal matter); <u>United States v. Waldon</u>, 363 F.3d 1103, 1112-13 (11th Cir. 2004); <u>United

States v. Parrott</u>, 248 F.Supp. 196 (D.D.C. 1965) (dismissing indictments where government's

civil investigation was used to gain information to be used in the criminal matter.)

     It is clear that the government's purpose in asking defendant about his military service

was to set up a prosecution for perjury.  The government already knew the answer that the

defendant would give to the question regarding his military service.  There was no other reason

to ask it other than to secure a perjury indictment.  At the time that Carroll and Hughes asked the

question, Graham was in the other room waiting to be brought in so that he could confront the

defendant with a video showing that defendant was a member of the 10th Sabotage Unit. Asking

defendant about his military service had no legitimate investigatory purpose at the time the

question was asked. Its only purpose was to manufacture another crime with which to indict

Marko Boskic.

<div style="margin-left:40%">

Respectfully submitted,


/s/ *Max D. Stern*
Max D. Stern
BBO. No. 479560
Patricia Garin
BBO No. 544770
Jeffrey Wiesner
BBO. No. 655814
Stern, Shapiro, Weissberg
   & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114-2022
(617) 742-5800

</div>

Dated: May 1, 2006


G:\SSWG\BOSKIC\proposed findings of fact.wpd