UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. |
| | ) | 04-10298-DPW |
| | ) | |
| MARKO BOSKIC | ) | |
| | ) | |

MEMORANDUM AND ORDER
June 2, 2006


Defendant Marko Boskic, accused in five counts of making false declarations on immigration applications and in an interview with federal agents in violation of 18 U.S.C. §§ 1546(a) and 1001, moves to suppress statements made to the federal agents in a staged immigration interview on August 25, 2004 and all evidence seized in a search at his home that day. He also moves to dismiss Count Five of the indictment, the § 1001 count alleging that he was trapped into making perjurious statements made during the interview. I find that Boskic's statements were voluntary and that the Government's carefully contrived and executed plan did not violate principles of fundamental fairness. I will therefore deny both motions.


## I. FINDINGS OF FACT

Having afforded the parties a full opportunity to develop the record in these matters, I find the following.

-1-

## A. The Underlying Offenses

Defendant Marko Boskic, a Bosnian-Croat who is currently a permanent resident of the United States, is alleged to have lied to United States authorities about his involvement in ethnic conflict that took place in the former Yugoslavia between 1992 and 1995.

Boskic filed an I-590 Application for Registration for Classification as Refugee in Germany on February 17, 2000. His application was approved and he immigrated to the United States in 2000, settling in Peabody, Massachusetts where he worked in construction. On or about April 5, 2001, Boskic filed an I-485 Application to Register Permanent Residence or Adjust Status, which was approved on June 29, 2002.

Count One of the indictment alleges that Boskic falsely stated on his application for refugee status, and Count Two alleges he falsely stated on his application for permanent residency, that he had only served in the Yugoslavia Army from 1983-1984, when he knew that he had in fact also served in the Army of the Republika Srpska in the 1990s. Count Three alleges that Boskic falsely indicated on his application for refugee status, and Count Four alleges he falsely stated on his application for permanent residency, that he had never ordered, assisted, or otherwise participated in the persecution of any person because of race, religion and political opinion, when he

knew that he had in fact participated in the massacre of Muslim men at the Branjevo Military Farm outside Srebrenica as part of the 10th Sabotage Detachment of the Army of the Republika Srpska.

Count Five alleges that Boskic again lied about his military service record to federal agents in an interview on August 25, 2004 in Boston, Massachusetts.

**B. The Government's Plan**

In the fall of 2002, the Joint Terrorism Task Force ("JTTF") in Boston opened an investigation of Boskic. The JTTF is composed of representatives from numerous federal and state agencies including Immigration and Customs Enforcement ("ICE"), the Federal Bureau of Investigation ("FBI"), and the United States Attorney's Office. FBI Agent Greg Hughes was assigned to the investigation in August 2002, and ICE Agent Thomas Carroll was assigned to the investigation in December 2003. Assistant United States Attorney ("AUSA") Kimberly West became involved in the Boskic investigation at some point.

Agent Carroll was initially assigned to investigate whether Boskic had committed "immigration fraud." One of the investigative goals was to determine whether Boskic had performed additional undisclosed military service in Bosnia. Specifically, the investigation focused on whether Boskic made materially false statements on his applications for refugee status and for permanent residency when he did not reveal his participation in

the conflict in the former Yugoslavia as a member of the 10th Sabotage Detachment of the Army of the Republika Srpska.

In late December 2003 or early January 2004, JTTF representatives contacted Peter McCloskey, a Senior Trial Attorney with the Office of the Prosecutor for the International Criminal Tribunal for the former Yugoslavia ("ICTY"), to request ICTY's "help" with the JTTF investigation of Boskic. At some point, Alistar Graham, who had been investigating for the ICTY alleged war crimes that occurred in and around Srebrenica, first as a Senior Investigator from 1998 to 1999 and later as an Investigations Team Leader from 2001 to 2004, was assigned as the ICTY representative to assist the American authorities. Graham subsequently came to the United States in August 2004, primarily to assist the JTTF with its investigation of Boskic, but also to seek Boskic's cooperation with the ICTY's ongoing investigations of senior military officials involved in the Srebrenica massacres. Through his work as an ICTY investigator, Graham had collected evidence that identified Boskic as a member of the 10th Sabotage Detachment of the Army of the Republika Srpska.

In December 2003, Agent Carroll requested Boskic's A-file[1] and information on any open applications. He learned that Boskic had filed an application for travel documents, which the former

---

[1] An A-file is a record on a foreign resident that contains the whole immigration history of the alien, including all of the applications he or she has filed with immigration authorities.

Immigration and Naturalization Service ("INS") received on
September 3, 2002.  The immigration service center had yet to
adjudicate the application, a process which usually takes about
six months. Agent Carroll pulled the application out of the queue
in January 2004.

Sometime thereafter, Agent Carroll, Agent Hughes, and AUSA
West devised a plan whereby Boskic would receive a notice to
appear at the JFK Federal Building in Boston, Massachusetts for
an interview concerning the application for travel documents.
The government agents had no intention of issuing travel
documents to Boskic.  Rather, their true purpose was to interview
Boskic in connection with their ongoing investigation about his
history prior to coming to the United States.

On March 23, 2004, Agent Carroll sent Boskic a generic form
called a G-56 Call-In-Notice.  The form requested that Boskic
appear at the JFK Building, Room No. E-170, where immigration
interviews take place, on Friday, April 2, 2004 at 3:30 p.m.  The
form indicated that the reason for the appointment was: "Form I-
131, Refugee Travel Document Filing, LIN-02-276-51148."  The plan
was that Agent Carroll and Agent Hughes would question Boskic
about his history in Bosnia in the interview.  On April 2, 2004,
Agent Carroll and Agent Hughes waited for Boskic to appear at the
JFK Building without an interpreter, but as expected, Boskic did
not appear because he faced unrelated criminal matters.  A few
days later, Boskic came to the JFK Building to apologize for

-5-

having missed the appointment.  He asked that the immigration authorities send him another notice.

On August 9, 2004, Agent Carroll sent Boskic another G-56 notice requesting he appear at the JFK Building for an interview regarding his application for refugee travel documents, this time for August 25, 2004 at 3:30 p.m.  Graham was summoned from the Hague to come to Boston for the interview and a Serbo-Croatian interpreter was brought in from Washington, D.C.

AUSA West, Agent Carroll, Agent Hughes, and Graham spoke on the telephone and then met, at least once, to plan how they would conduct the interview.  The decision was made to have an arrest warrant in place, unbeknownst to Boskic, prior to the time he arrived for the interview.

According to Agent Carroll, the government agents believed that if Boskic knew that he was under investigation, he would probably not talk.  Consequently, they devised the following plan to elicit the information they desired from Boskic about his military history, while shielding the fact that he was under investigation and that an arrest warrant had already been acquired.

The plan was to start the interview with only Agent Carroll in the room.  Agent Carroll would simply begin by asking Boskic about why he wanted travel documents to get Boskic talking. According to Agent Carroll, the agents anticipated that this would lead to the questions of what he did in Europe before he

came to the United States, which would lead to questions about whether Boskic had a criminal record.  The questions about the criminal record would provide the occasion for Agent Carroll to bring Agent Hughes into the room because Agent Carroll would tell Boskic that when a criminal record comes up, the applicant must be interviewed by the FBI, even though that would not always be the case.  Finally, Graham and an interpreter would be brought in to extract the real substance of Boskic's knowledge of and involvement in the 10th Sabotage Detachment.

In addition to staging the sequence of the interviews, the agents planned to shield the extraordinary nature of the interview by not using the video-camera that was set-up in the interview room or the Serbo-Croatian interpreter at the outset, even though she would be available throughout.  Although these measures would have preserved a more accurate record, the agents were concerned that they might have caused Boskic to suspect that this was not an ordinary interview for travel documents.[2]

## C. The Execution of the Government's Plan

1.  <u>The Arrest Warrant</u>

---

[2]  The agents theorized that Boskic might know that immigration agents generally only record interviews when they are going to deny benefits, and they did not want Boskic to think he was on the verge of being denied because it might cause him to suspect that he had been or was being investigated.  Similarly, the agents were worried that since interpreters are generally not made available for immigration interviews -- if someone needs an interpreter, they are told to bring their own -- the presence of an interpreter might cause Boskic to wonder if there was something else going on.

On August 25, 2004, prior to the scheduled interview of Boskic, Special Agent Greg Nevano applied for and obtained a criminal complaint and an arrest warrant for Boskic for two counts of immigration fraud.

2.   The Interviews, Consents, and Waivers

Boskic arrived at the JFK Building for his travel document interview at approximately 3:00 p.m. on August 25, 2004.

*(a)   The Interview by Agent Carroll* - Around 3:30 p.m., Agent Carroll went to the interview room reception area and called for Boskic.  Boskic identified himself.  After Agent Carroll introduced himself simply as "Tom Carroll," he proceeded to escort Boskic down the hallway behind the reception area to Interview Room 24.  They exchanged small talk along the way. Upon arriving in Room 24, Agent Carroll located himself across from Boskic behind the desk.

Agent Carroll asked Boskic to remain standing so that he could administer the oath.  After reciting the oath, Agent Carroll asked Boskic to sit and he read Boskic his rights in English from a two-sided Miranda rights form that had been prepared in advance.[3]  Agent Carroll asked Boskic to sign the

---

[3] The form was titled "UNITED STATES DEPARTMENT OF JUSTICE, Immigration and Naturalization Service, Warning As To Rights." The form provided the standard Miranda warning except that it added a specification: "[a]nything you say can be used against you in court, or in any immigration or administrative proceeding." (emphasis supplied).  The interpreter had translated the form beforehand and the agents had photocopied the English version and the typed translation in a way to make one two-page

English side of the form, which he did.  After Agent Carroll put
the time (3:35 p.m.), date (9/25/05), and location (Boston, MA)
on the English side, he asked Boskic to read, sign, and date the
Serbo-Croation version, which Boskic did.[4]  Agent Carroll asked
Boskic if he agreed with what he had read and Boskic indicated
that he agreed and understood.

Agent Carroll proceeded to explain that the purpose of the
interview was to "go over" his application for a re-entry permit.
Boskic believed him and, as the Government concedes, it was
reasonable for him to do so.  Agent Carroll first asked to see
Boskic's passport and Massachusetts identification, which Boskic

---

document, with English on one side and the Serbo-Croatian
translation on the other.

[4] I do not credit Boskic's testimony that Agent Carroll did
not show him the INS rights form until 8:20 p.m.  Boskic
acknowledged that it was his signature on both sides and that he
wrote in 3[35] on the Serbo-Croation side.  He explained, however,
that the time corresponds to when the interview began, not when
he was given his rights and signed this form.  I do not find this
contention credible.  It does not make sense that Boskic would
write down the time that the interview started instead of the
actual time he signed the form when he did the opposite on the
Consent To Search form he acknowledges he signed at 6:45 p.m. as
indicated on the form.
    Contrary to the defense's contention, the introduction of
Miranda rights at the outset is not necessarily inconsistent with
the plan to hide the true nature of the interview.  Although
Boskic was not in custody when the interview began -- and as a
result Agent Carroll was not required to "Mirandize" Boskic --
the agents plainly sought to protect the fruits of their efforts
in case Boskic challenged their surreptitious strategy, as he now
does.  The agents were apparently willing to risk that Boskic
would not be surprised or suspicious about receiving Miranda
warnings on an INS form, in addition to an oath, at the outset of
an immigration interview.

produced.  Agent Carroll then asked Boskic "biographical"
questions, such as name, date of birth, social security number,
current address, when he came into the United States, and why he
was applying to travel, for about forty-five minutes.  Boskic
answered all of Agent Carroll's questions because, as he
explained, "Mr. Carroll ... works in the immigration status and
he's in charge of me and I thought that I had to answer his
questions."

While Boskic was answering the preliminary biographical
questions, Agent Carroll examined Boskic's passport and
determined that he did not need a travel document to travel
outside the United States because his passport was valid and it
had an I-551 stamp showing that he was a permanent resident of
the United States.  Despite Agent Carroll's observation, which he
relayed to Boskic, Boskic insisted that he wanted a travel
document because a friend had told him that he could not travel
on his Bosnian passport, even if his passport was still valid
according to the date on the passport itself, because Bosnia and
Herzegovina had issued a new series of passports since his was
issued.  Consequently, he remained and the interview proceeded.

Agent Carroll asked Boskic whether he had any military
experience.  Boskic indicated that he had fulfilled the two-year
mandatory military service for the Yugoslav Army in 1983-1984.
Agent Carroll then asked if he had any additional military
history; Boskic denied that he did.  Next, Agent Carroll asked

Boskic whether he had a criminal record in Bosnia.  When Boskic denied having such a record, Agent Carroll stated that "we" have information that Boskic had a criminal outside the United States and produced a copy of his Bosnia criminal record.  He then stated, as planned, that whenever questions about a criminal record are raised, the FBI must be brought in.  Accordingly, Agent Carroll left the room and returned about a minute later with FBI Agent Hughes.[5]  Agent Carroll then gave what he called a condensed version of the Miranda rights in English and reminded Boskic that they were still in effect.  Boskic started to stand up and raise his right hand as if to take an oath again, but Agent Carroll indicated that he did not need to because he was still under oath.

    (b)   *The Interview by Agent Hughes* - Agent Hughes took the seat behind the desk and Agent Carroll sat next to Boskic.  Agent Hughes's first question to Boskic was "[w]here are you from?"  When Boskic replied "Bosnia," Agent Hughes asked, "were you in the war?"  After receiving a negative response, he moved on to ask questions about Boskic's criminal record in Bosnia.  Agent

---

[5]   Contrary to his testimony, I find Boskic must have become at least suspicious that the interview was not just about the travel documents when Agent Hughes entered the room and began to question him about his criminal history in Bosnia.  I credit Agent Hughes's testimony and Agent Carroll's written report that later that evening Boskic said that he "knew what this was about when the FBI came in."  I find further, however, that Boskic did not have any of the suspicions caused as a result of the presence the FBI fully confirmed until Alistair Graham of the ICTY introduced himself.

Hughes showed Boskic a document he said he had received from the Bosnian government and asked Boskic whether he had put these arrests on his immigration form.  Boskic tried to explain that the charges had happened a long time ago and that they had been dismissed.  He specifically stated that the alleged shooting in 1995 was not him because he was not in Bosnia at the time and that the Muslims in charge made up one of the other charges because he would not join the military.  This questioning by Agent Hughes lasted about fifteen minutes.

As planned, Agent Hughes then announced that there was yet another person who wanted to speak to Boskic.  Agent Hughes left the room and returned with Graham and a Serbo-Croatian interpreter.

(c)  *The Interview by Graham* - Graham took the seat behind the desk.  Agent Carroll again reminded Boskic that his rights were still in effect.  After introducing himself as an investigator from the ICTY and the interpreter, Graham first asked if Boskic would prefer to continue the interview using the interpreter; Boskic accepted the offer.  Graham then told Boskic not to say anything and just listen to what Graham had to say. For about ten minutes, Graham proceeded to explain his investigative work concerning the events in and around Srebrenica.  He explained that he knew about the 10th Sabotage Detachment and that he knew that Boskic had been a member of that

unit.  He then explained that he had video footage of Boskic in the unit.  When he finished, he explained to Boskic that he was not the subject of his investigation.[6]  Graham said he was there on behalf of the ICTY to seek Boskic's cooperation in the investigation of senior officials.

Graham asked Boskic if he wanted to talk to him or if Boskic preferred to see the video of the 10th Sabotage Unit first. Boskic chose the latter and Graham played a CD that was already loaded in the computer on the desk in the interview room.  After watching a portion of the video showing an awards ceremony for the 10th Sabotage Unit, Boskic identified himself in the video and said that he knew this day would come.  Graham then repeated that Boskic was not the subject of his investigation, that he only wanted his cooperation.  Boskic agreed to cooperate and even go to the Hague if he had to.  After describing his participation in the Branjevo Military Farm massacre, Boskic said that "if he was to go down for what happened, others would go down as well."

For about an hour, Graham and Boskic discussed the events at Srebrenica and Boskic's participation.  When the interpreter asked for some water everyone took a break and snacks were

_____

[6] Graham testified that he used the phrase "my investigation."  I find Boskic did not understand that Graham's investigation was different from the investigation of the American officials in the room.  Neither Agent Hughes nor Agent Carroll said anything to alert Boskic to the fact that Graham's assurances did not pertain to any investigation they were conducting.

-13-

offered.

(d)  *The Joint Interview and Consents to Search* - Upon
return, Agent Hughes sat behind the desk and the three officials
took turns asking questions.  All three officials used the
interpreter to translate their questions into Serbo-Croatian and
the interpreter translated Boskic's answers that were more than
yes or no.

At about 6:45 p.m., Agent Hughes asked Boskic if he knew of
any other people involved in Srebrenica who were located in the
United States.  Boskic said he did not but he offered that he had
names and addresses of people abroad at his apartment.  Rather
than accept Boskic's offer to take them to his apartment, Agent
Hughes asked that Boskic permit agents to search his home.
Boskic agreed and signed a Consent to Search form that had
already been translated into Serbo-Croatian.  He gave the agents
a key to his apartment.  Shortly thereafter, at about 7:00 p.m.,
the main office lights shut off automatically.  Nobody else was
left in the office so the agents got lamps from other offices to
create enough light to continue the interview.

Later in the evening, when other agents went to Boskic's
apartment they called Agent Hughes and asked if they could also
look in Boskic's car.  Boskic agreed that they could and Agent
Hughes wrote down "Blue Dodge Intrepid 4316XN" on the Consent to
Search form.  Boskic and Agent Hughes initialed the addition.

(e)   *The Written Statement* - When the questioning of Boskic
was over, Agent Hughes suggested that Boskic should write down
his statement.  Boskic was hesitant, but after 10 or 15 minutes
of listening to Agent Hughes and Agent Carroll explain the
benefits to him of putting his story in his own words rather than
relying on their version of his story, he agreed to make a
written statement.  None of the agents warned Boskic at this
point that his statement might be used against him.  Agent Hughes
did, however, remind Boskic that he did not have to write down
the statement.  Agent Hughes dictated the first two sentences,[7]
which the interpreter then translated into Serbo-Croatian.
Boskic wrote down the translation as dictated.  When asked
whether he understood that writing the statement was voluntary
Boskic replied in English: "If I'm writing this down, I know what
I'm doing."

Starting at about 7:00 p.m., Boskic proceeded to write a
six-page statement in Serbo-Croatian with the assistance of
Agents Hughes and Carroll through the interpreter.  Graham also
assisted with names and places, but he was in and out of the
interview room during the writing process.  The parties took
another break at some point, but continued this interactive
writing process until about 8:20 p.m., when Boskic asked Agent

---

[7] The two sentences dictated by Agent Hughes are as follows:
"I, Marko Boskic, understand and give up my rights. I am giving
this statement voluntarily, without promises and guarantees."

Carroll what was going to happen to him.

3.  <u>The Arrest</u>

At approximately 8:20 p.m., when Boskic was about halfway finished with his statement, Agent Carroll responded to Boskic's inquiry saying, "you will be held overnight and we'll take you before a judge in the morning."  Boskic then asked "[a]m I going to be arrested?" Carroll responded, "yes" and said it was for "violating immigration laws."  At this point, Boskic understood that he was being arrested "because of the war in Bosnia," but he may not have completely understood the charges against him. After a few minutes, Boskic continued to write his statement because, as he testified, he had already "said everything."

When Boskic was finishing his statement, Agent Hughes suggested that Boskic write something down about lying on his immigration forms since he put the "other stuff" down.  Boskic refused to write anything on this subject, although he told Agent Hughes something about lying in order to be with someone he loved.

At approximately 10:20 p.m., Boskic was formally placed under arrest, handcuffed with leg restraints, and transported to Suffolk County House of Corrections.

## II. CONCLUSIONS OF LAW

Boskic moves to suppress the statements he made to Agent Carroll, Agent Hughes, and Graham on August 25, 2004 based on the

Fourth, Fifth, and Sixth Amendments.  Boskic also moves to dismiss Count Five of the Indictment based on principles of fundamental fairness entrenched in the Due Process Clause of the Fifth Amendment.

## A. Sixth Amendment Rights

Boskic argues that his Sixth Amendment right to counsel attached when the criminal complaint was filed.  On this basis, he contends that since his statements were elicited in the absence of counsel after that time, all of his statements must be suppressed.

The Sixth Amendment provides that "[i]n all criminal **prosecutions**, the **accused** shall enjoy the right ... to have the Assistance of Counsel for his defense."  U.S. Const. Amend. VI (emphasis supplied).  This right "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of **formal charge**, preliminary hearing, indictment, information, or arraignment."  Texas v. Cobb, 532 U.S. 162, 167-68 (2001) quoting McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)(emphasis supplied).

The First Circuit has held that the Sixth Amendment right to counsel only attaches "when 'formal charges' have been initiated" -- transforming an individual into an "accused" person -- or "when 'the government has committed itself to prosecute.'" Roberts v. State of Maine, 48 F.3d 1287, 1290 (1st Cir. 1995)

quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 430-32 (1986); <u>United States v. Gouveia</u>, 467 U.S. 180, 189 (1984); and <u>Kirby v. Illinois</u>, 406 U.S. 682, 688 (1972).  It is only then, when "the government's role shifts from investigation to accusation[,] ... that the assistance of one versed in the intricacies of law, is needed to assure that the prosecution's case encounters the crucible of meaningful adversarial testing." <u>Roberts</u>, 48 F.3d at 1290 <u>quoting</u> <u>Moran</u>, 475 U.S. at 430 (1986) (alterations and quotations omitted).

Boskic contends that Agent Nevano's procurement of a criminal complaint against him pursuant to Fed. R. Crim. P. 3 sometime before 3:30 p.m. on August 25, 2004 amounted to the practical equivalent of a formal charge initiating adversary judicial criminal proceedings.  The Government responds that Sixth Amendment rights do not attach either at the time of arrest, <u>see</u> <u>Gouveia</u>, 467 U.S. at 190-92, or with the filing of a criminal complaint.  <u>See</u> <u>Von Kahl v. United States</u>, 242 F.3d 783, 789 (8th Cir.), <u>cert. denied</u>, 534 U.S. 941 (2001)("The filing of a criminal complaint and the issuance of an arrest warrant do not constitute the initiation of an adverse judicial proceeding for purposes of <u>McNeil</u>.").  I agree with the Government.

The <u>Kirby</u> formulation cited in <u>McNeil</u> and <u>Cobb</u>, tellingly omits a complaint from the list of "formal charge, preliminary hearing, indictment, information, or arraignment." <u>Kirby</u>, 406 U.S. at 689 (plurality opinion).  Furthermore, several circuits

-18-

have specifically held that the mere filing of a complaint does not suffice to initiate adversary judicial criminal proceedings.[8] As the Eighth Circuit has explained:

> [T]he principal function of a complaint under Fed. R. Crim. P. 3 is to serve as the basis for a judicial determination of probable cause for an arrest warrant under Fed. R. Crim. P. 4(a). Complaints under Fed. R. Crim. P. 3 are, therefore, by definition, issued before an arrest occurs.  If an arrest does not trigger the Sixth Amendment right to counsel, we are unable to see how the issuance of a complaint that serves as the basis for a probable cause determination authorizing a later arrest would trigger that right.  Because warrantless arrests are sometimes authorized, moreover, we note that if we were to hold that the right to counsel does attach when a complaint under Fed. R. Crim. P. 3 issues, we would be granting greater protection to persons arrested with warrants than without, thus discouraging the use of warrants in making arrests for federal crimes. See [United States v. ]Duvall, 537 F.2d [15,] 22 [(2nd Cir.) (Friendly, J.), cert. denied, 426 U.S. 950 (1976)].  We therefore hold that the issuance of a complaint under Fed. R. Crim. P. 3 is not the type of 'formal charge' contemplated by Kirby, 406 U.S. at 689 (plurality opinion), and that a person's Sixth Amendment right to counsel does not attach upon the filing of such a complaint.

United States v. Moore, 122 F.3d 1154, 1156 (8th Cir. 1997), cert. denied, 522 U.S. 1135 (1998).

---

[8]  See Beck v. Bowersox, 362 F.3d 1095, 1102 n. 4 (8th Cir. 2004) citing the following for the proposition that the Sixth Amendment right to counsel does not attach with "an arrest preceded by the filing of a complaint under Rule 3": Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir.), cert. denied, 534 U.S. 941 (2001); United States v. Moore, 122 F.3d 1154, 1156 (8th Cir. 1997), cert. denied, 522 U.S. 1135 (1998); United States v. Langley, 848 F.2d 152, 153 (11th Cir.), cert. denied, 488 U.S. 897 (1988); United States v. Pace, 833 F.2d 1307, 1312 (9th Cir. 1987), cert. denied, 486 U.S. 1011 (1988); United States v. Duvall, 537 F.2d 15, 21-22 (2nd Cir.) (Friendly, J.), cert. denied, 426 U.S. 950 (1976).

The First Circuit has not expressly addressed this issue
except to suggest in <u>dicta</u> that  the filing of the criminal
complaint is "[t]he first state action that **could conceivably
resemble** a formal charge." <u>Roberts</u>, 48 F.3d at 1290 (emphasis
supplied)(where the filing of the complaint did not occur until
after the challenged blood/alcohol test, in any event).  In the
next paragraph of <u>Roberts</u>, however, the First Circuit equates
formal charge with an "indictment or arraignment" and recognizes
that "[o]verall, Supreme Court jurisprudence on the Sixth
Amendment appears to allow for few exceptions to the bright-line
rule that the right to counsel does not attach until the
government initiates official proceedings by making a formal
charge." <u>Id.</u> at 1291.  The <u>Roberts</u> court cited <u>United States v.
Heinz</u>, 983 F.2d 609 (5th Cir. 1993) for the proposition that
Supreme Court jurisprudence calls for a "strictly formal test for
determining the initiation of judicial proceedings as opposed to
a more functional test." <u>Roberts</u>, 48 F.3d at 1290 <u>citing</u> <u>Heinz</u>,
983 F.2d at 612-13.  I find nothing in <u>Roberts</u>, despite its
passing reference to "conceivable resemblance" of a complaint to
a formal charge, to suggest I should not follow the fully
developed opinions of the Second, Eighth, Ninth, and Eleventh
Circuits.

Given this determination, I conclude that Boskic's Sixth
Amendment right had not yet attached when he spoke with Agent

Carroll, Agent Hughes, and Graham on August 25, 2004, even though Agent Nevano procured an arrest warrant and filed a criminal complaint against Boskic before the interview.  In any event, it is only "once this right to counsel has attached and has been **invoked**" that "any subsequent waiver during a police-initiated **custodial interview** is ineffective." McNeil, 501 U.S. at 175 citing Michigan v. Jackson, 475 U.S. 625 (1986)(emphasis supplied).  I note that despite the Miranda warning, Boskic never invoked the right to counsel.

## B. Delay In Executing Warrant

Boskic argues that the delay in executing the arrest warrant procured before the interview was unreasonable in violation of the Fourth Amendment and amounted to a circumvention of the obligation under Fed. R. Crim. P. 5(a)(1)(A), which requires "[a] person making an arrest within the United States ... [to] take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."

It is settled that "[t]here is no requirement that an arrest warrant be executed immediately after its issuance; rather, the general rule is that, while execution should not be unreasonably delayed, law enforcement officers have a reasonable time in which to execute a warrant and need not arrest at the first opportunity." United States v. Drake, 655 F.2d 1025, 1027 (10th

Cir. 1981).  Accord United States v. Berkowitz, 429 F.2d 921, 926
(1st Cir. 1970)("We are unaware of any right of a defendant to be
arrested at a particular time."); United States v. Joines, 258
F.2d 471, 472-73 (3rd Cir. 1958)("[O]rdinarily there is no legal
requirement that a warrant of arrest must be executed immediately
or at the first opportunity.  While its execution should not be
unreasonably delayed there may be perfectly valid reasons why
further investigation should be made before the drastic step is
taken of arresting a citizen on a criminal charge.  Certainly
there is no constitutional right to be arrested promptly or
otherwise.")(internal citations omitted); United States v. Toro,
840 F.2d 1221, 1233 (5th Cir. 1988)("[L]aw enforcement officials
are under no constitutional duty to terminate a criminal
investigation the moment they have an arrest warrant in their
hands.").

    The rationale behind this settled understanding is simple:
"evidence sufficient to sustain issuance of an arrest warrant,
i.e., probable cause, may not be sufficient to sustain a
conviction."  Toro, 840 F.2d at 1233-34 citing United States v.
Cravero, 545 F.2d 406, 413 (5th Cir. 1976), cert. denied sub nom,
Miller v. United States, 429 U.S. 1100 (1977).  Consequently,
"[t]he police are not required to guess at their peril the
precise moment at which they have probable cause to arrest a
suspect, risking a violation of the Fourth Amendment if they act
too soon, and a violation of the Sixth Amendment if they wait too

long," and they "are under no constitutional duty to call a halt
to a criminal investigation the moment they have the minimum
evidence to establish probable cause, a quantum of evidence which
may fall far short of the amount necessary to support a criminal
conviction."  Hoffa v. United States, 385 U.S. 293, 310 (1966).

There is no question here that the agents executed the
warrant within a per se reasonable time (within 12 hours).
Compare Toro, 840 F.2d at 1234 (finding a "three-week delay
between issuance and arrest is not per se unreasonable").
Nevertheless, Boskic points to language in the Tenth Circuit's
Drake opinion suggesting that an otherwise reasonable delay in
executing an arrest warrant may justify suppression if the
government acted improperly in delaying the arrest.

Drake held that "[d]elay has been held fatal, however, when
government agents have purposely delayed execution to gain a
tactical advantage not otherwise attainable for example, to
search 'incident to arrest' premises for which a warrant was
unobtainable." 655 F.2d at 1027 citing McKnight v. United States,
183 F.2d 977 (D.C. Cir. 1950).[9]  The Fifth Circuit made a similar

---

[9] On the facts in Drake, the Tenth Circuit concluded that
the arrest was not purposely delayed to gain a tactical advantage
not otherwise attainable.  "The agents apparently delayed service
in order to strengthen their case and to obtain peaceful
possession of the birds.  The legal question is whether such a
delay is, in and of itself, impermissible.  We hold it is not
when the evidence thus obtained could have been lawfully secured
without the arrest warrant."  United States v. Drake, 655 F.2d
1025, 1027 (10th Cir. 1981).

comment in <u>dicta</u> in <u>Toro</u>, suggesting that a search may be
unreasonable if "the government acted unreasonably during the
period or [if] its reasons for delaying execution were improper."
840 F.2d at 1234.

In <u>McKnight</u>, the case that provided the basis for the Tenth
Circuit's comment in <u>Drake</u>, the D.C. Circuit suppressed evidence
obtained incident to an arrest of a defendant in his home because
the police had rejected a convenient opportunity to arrest him in
a public street.  The court reasoned, "[n]either policemen nor
private citizens can justify breaking into a house, or other
violence, by deliberately creating an alleged necessity for it.
Since McKnight's arrest was accomplished by a needless and
violent invasion of a private house, it was illegal, particularly
since the real purpose of the invasion was not an arrest but a
search."  <u>McKnight</u>, 183 F.2d at 978.

I decline to extend the broad principle cautioning against
use of a Complaint to occasion a contrived search incident to
arrest to cases where government officials delay execution in
order to carry out a non-custodial interrogation.  The Supreme
Court rejected a somewhat similar contention in <u>Hoffa</u>.  There,
the petitioner argued that his statements, made after the point
in time when the government had probable cause to arrest him for
attempting to bribe members of the jury, were acquired "only by
flouting the petitioner's Sixth Amendment right to counsel."
<u>Hoffa</u>, 385 U.S. at 310.  He reasoned that if the government

-24-

agents had arrested him when they had cause, they "could not have
continued to question the petitioner without observance of his
Sixth Amendment right to counsel." <u>Id.</u> at 309.  The Supreme
Court rejected this argument holding:

> Nothing in <u>Massiah</u>, in <u>Escobedo</u>, or in any other case
> that has come to our attention, even remotely suggests
> this novel and paradoxical constitutional doctrine, and
> we decline to adopt it now.  There is no constitutional
> right to be arrested.  The police are not required to
> guess at their peril the precise moment at which they
> have probable cause to arrest a suspect, risking a
> violation of the Fourth Amendment if they act too soon,
> and a violation of the Sixth Amendment if they wait too
> long.  Law enforcement officers are under no
> constitutional duty to call a halt to a criminal
> investigation the moment they have the minimum evidence
> to establish probable cause, a quantum of evidence which
> may fall far short of the amount necessary to support a
> criminal conviction.

<u>Id.</u> at 310 (footnote omitted).

To the degree that there may nonetheless be "improper"
reasons for delaying execution that might create a Fourth
Amendment issue, as suggested in <u>Toro</u>, <u>McKnight</u>, and <u>Drake</u>, I
find that the resulting issues in this case would overlap with
Boskic's argument that the Government's tactics were
fundamentally unfair.  I will consider this argument below when
addressing Boskic's due process and self-incrimination claims.
As for Rule 5(c), I find that the Rule does not require
government agents to execute arrest warrants at the first
available opportunity.  Rather the provision requires, as the
plain language suggests, arresting agents to have any arrested
person arraigned without unnecessary delay after effecting the

arrest.  See Mallory v. United States, 354 U.S. 449, 451-56
(1957).

**C. Voluntariness**

Boskic argues that the statements he made before 8:20 p.m.
were obtained in violation of the Fifth Amendment since they were
induced (coerced) by the misrepresentations of Agents Carroll and
Hughes as to the purpose of the interview.  He also claims that
any incriminating statements made after 8:20 p.m. must be
suppressed because the taint of involuntariness of the initial
confession was not dissipated when he learned that he would be
arrested.  For purposes of clarity in the course of my discussion
in Section II.C.3, infra, of the totality of the circumstances, I
will consider the statements Boskic made to Agents Carroll and
Hughes before Graham entered the room separately from admissions
after Graham entered the room until about 8:20 p.m. and from his
admissions and confession after 8:20 p.m.

The Fifth Amendment provides that "[n]o person shall ... be
**compelled** in any criminal case to be a witness against himself."
U.S. Const. Amend. VI (emphasis supplied).  Since Chief Justice
Marshall first considered the scope of the Fifth Amendment right
against compulsory self-incrimination, "all have agreed that a
necessary element of compulsory self-incrimination is some kind
of compulsion."  Hoffa, 385 U.S. at 304.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme

Court concluded "that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. It is only "to combat these [inherently compelling] pressures and to permit a full opportunity to exercise the privilege against self-incrimination, [that] the accused must be adequately and effectively apprised of his [Miranda] rights and the exercise of those rights must be fully honored." Id. Since Miranda, the Supreme Court has "specifically stressed that it was the Custodial nature of the interrogation which triggered the necessity for adherence to the specific requirements of its Miranda holding." Beckwith v. United States, 425 U.S. 341, 346 (1976). See, e.g., Colorado v. Connelly, 479 U.S. 157, 170 (1986)("The sole concern of the Fifth Amendment, on which Miranda, was based, is governmental coercion."). Consequently, a non-custodial interview of a person, even someone that is the subject or "focus" of an investigation, "does not present the elements which the Miranda Court found so inherently coercive as to require its holding." Beckwith, 425 U.S. at 347 (finding that statements made by a taxpayer to Internal Revenue agents in an interview conducted in a private home, which the agents had been invited into, were admissible against the taxpayer in the ensuing

criminal tax fraud prosecution, even though the taxpayer was the focus of a criminal tax investigation and he had not been given Miranda warnings prior to the interview).

Boskic concedes that he was not "in custody" until approximately 8:20 p.m. when Agent Carroll told him that he would be arrested and held overnight.  Throughout the afternoon and early evening until then the door to the interview room remained open and Boskic believed he was being questioned in connection with his request for travel documents until Graham introduced himself as an investigator from the ICTY. Nevertheless, "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of ... law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" Id. at 347-48 quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961).  See also Unites States v. Burns, 15 F.3d 211, 214 (1st Cir. 1994).  However, "only confessions procured by coercive official tactics should be excluded as involuntary."  United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) quoting United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998).  To find that officials used coercive tactics, the facts must "add up to 'police overreaching.'" Genao, 281 F.3d at 310 quoting Connelly, 479 U.S. at 170.  When such a claim is raised, the court must "'examine the entire record and make an independent determination of the ultimate

issue of voluntariness.'" <u>Beckwith</u>, 425 U.S. at 348 <u>quoting</u>
<u>Davis v. North Carolina</u>, 384 U.S. 737, 741-42 (1966).  A
voluntary confession is one that is "the product of a free and
deliberate choice rather than intimidation, coercion, or
deception." <u>Moran</u>, 475 U.S. at 421.

The burden is on the government to prove voluntariness by a
preponderance of the evidence. <u>Lego v. Twomey</u>, 404 U.S. 477, 489
(1972).  The voluntariness of an admission depends on "'whether
the will of the defendant was overborne [by coercive police
activity] so that the statement was not his free and voluntary
act, and that question is to be resolved in light of the totality
of the circumstances,'" <u>Bryant v. Vose</u>, 785 F.2d 364, 367-68
(1st Cir. 1986) <u>quoting</u> <u>Procunier v. Atchley</u>, 400 U.S. 446, 453
(1971)(alteration added), "<u>including</u> any promises or threats made
by police officers or the prosecution." <u>United States v.</u>
<u>Jackson</u>, 918 F.2d 236, 242 (1st Cir. 1990).  <u>See also</u> 18 U.S.C. §
3501(b)("The trial judge in determining the issue of
voluntariness shall take into consideration all the circumstances
surrounding the giving of the confession.").

The circumstances to be considered include:

(1) the time elapsing between arrest and arraignment of
the defendant making the confession, if it was made after
arrest and before arraignment, (2) whether such defendant
knew the nature of the offense with which he was charged
or of which he was suspected at the time of making the
confession, (3) whether or not such defendant was advised
or knew that he was not required to make any statement
and that any such statement could be used against him,
(4) whether or not such defendant had been advised prior

-29-

to questioning of his right to the assistance of counsel;
and (5) whether or not such defendant was without the
assistance of counsel when questioned and when giving
such confession.

18 U.S.C. § 3501(b). The Supreme Court has listed other

potential circumstances that are relevant to the voluntariness of

the confession. See Withrow v. Williams, 507 U.S. 680, 693-94

(1993). They "include not only the crucial element of police

coercion; the length of the interrogation; its location; its

continuity; the defendant's maturity; education; physical

condition; and mental health. They also include the failure of

police to advise the defendant of his rights to remain silent and

to have counsel present during custodial interrogation." Id.

(citations omitted). Other courts have considered the suspect's

demeanor, see, e.g., United States v. Kruger, 151 F.Supp.2d 86,

107 (D.Me. 2001)("Kruger's demeanor did not indicate that he felt

coerced in any way"), cf. United States v. Tingle, 658 F.2d 1332,

1334 (9th Cir. 1981)(noting that the defendant was sobbing and

shaking throughout the interrogation); the atmosphere of the

interview, see, e.g., Byram, 145 F.3d at 408 (where the

atmosphere "appears to have been benign"); the suspect's

familiarity with the criminal justice system, see, e.g., United

States v. White, 847 F.Supp. 219, 224 (D.Mass. 1994)(where the

defendant "was an assistant clerk magistrate and a bail bondsman

who was familiar with the criminal justice system") and Lynumn v.

Illinois, 372 U.S. 528, 534 (1963)(where the defendant had "no

-30-

previous experience with the criminal law, and had no reason not
to believe that the police had ample power to carry out their
threats"); and whether the suspect or the government agents
initiated the contact, see, e.g., White, 847 F.Supp. at 224
("[A]though the FBI deceived White to get him to the FBI office
and attempted to use psychologically coercive techniques to
obtain his cooperation in the" first encounter, "White was the
one who [subsequently] initiated contact with the FBI ..., and it
was during that meeting that he confessed and agreed to
cooperate.").

Recognizing that the record reveals "no 'physical or
psychological pressures' that could 'overr[i]de the defendant's
will,'" United States v. Lawrence, 889 F.2d 1187, 1189 (1st Cir.
1989) quoting New Jersey v. Portash, 440 U.S. 450, 459 (1979),
Boskic's involuntariness claim rests on the contention that the
government agents used the intrinsically coercive nature of an
immigration interview and misled him into believing he was not
the subject of a criminal investigation.

1. Coercive Nature of an Immigration Interview

Although Boskic conceded that the interview was not formally
custodial before 8:20 p.m., I find that the quasi-coercive nature
of an official immigration interview in a federal building,
whether the door is open or not, to be a factor to be considered
in deciding whether a confession was given voluntarily.

Miranda reasoned that custodial interrogation is inherently

-31-

coercive because "[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will." Illinois v. Perkins, 496 U.S. 292, 297 (1990). Here, Boskic answered all of Agent Carroll's questions because, as he explained, "Mr. Carroll ... works in the immigration status and he's in charge of me and I thought that I had to answer his questions." Thus, although Boskic did not initially understand the nature of his interview, it would be naive to ignore the perception -- indeed fear -- of all non-citizens in the United States that immigration authorities control their fate. As Boskic points out, immigration officers have the "power without warrant ... to interrogate any alien ... as to his right to be or to remain in the United States." 8 U.S.C. §1357(a)(1). They also have the "power without warrant ... to arrest any alien in the United States, [upon] reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. §1357(a)(2). Consequently, unlike in Perkins, for instance, where the suspect did not know that he was speaking to a government agent, there is a real possibility that a non-citizen might feel coerced into speaking with immigration authorities. Perkins, 496 U.S. at 297 (distinguishing Mathis v. United States, 391 U.S. 1 (1968), which held that an inmate's statements to a known Government official

-32-

who was investigating the possibility of noncompliance with the tax laws were inadmissible because no Miranda warnings were given).  Nevertheless, the potentially coercive nature of an official immigration interview in a federal building is insufficient in and of itself to render a confession involuntary. And that is particularly so here where Boskic himself pressed on with the interview even after Agent Carroll told him the travel documents he sought were not necessary.

2. Deception Generally

Boskic's deception argument rests on the contention that his confession was involuntary because in misrepresenting the existence of a criminal investigation, the Agents deprived him of the ability to make rational choice.

To the degree that Boskic is suggesting that misleading him as to the nature of the investigation deprived him of information essential to his ability to knowingly exercise his privilege against self-incrimination, I must distinguish the concepts of voluntariness and knowingly/intelligently.  While a waiver of Miranda rights in custodial interrogations must be made both "voluntarily" and "knowingly and intelligently," Moran, 475 U.S. at 421 quoting Miranda, 384 U.S. at 444, the latter concept of a requisite level of comprehension to knowingly relinquish a constitutional right is not part of the voluntariness analysis in non-custodial interrogations.  A voluntary confession is simply

-33-

one that is "the product of a free and deliberate choice rather
than intimidation, coercion, or deception."  Moran, 475 U.S. at
421.  Consequently, the circumstances of this case are different
from those in United States v. Rogers, 906 F.2d 189 (5th Cir.
1990), where the Fifth Circuit concluded that "Rogers' **waiver** of
his Fifth Amendment rights was not made with a full awareness of
the consequences of the decision to abandon his rights or with
the requisite level of comprehension" because "the interview was
conducted under the auspices of the Lee County Sheriff's
Department, whose representatives had assured Rogers that he
would not be prosecuted for his purchase of the stolen guns."
Id. at 192 (emphasis supplied).  In any event, even in a
custodial setting, "the Constitution [does not] require that the
police supply a suspect with a flow of information to help him
calibrate his self-interest in deciding whether to speak or stand
by his rights."  Moran, 475 U.S. at 422.

    To the degree Boskic's argument is attempting to resurrect
the older phraseology that for a confession to be voluntary it
must be "the product of a rational intellect and a free will,"
Townsend v. Sain, 372 U.S. 293, 307 (1963) quoting Blackburn v.
Alabama, 361 U.S. 199, 208 (1960), it is imperative to recognize
that although "at common law, confessions produced by promises
not to prosecute or offers of leniency were often excluded as
involuntary[,] ... in recent years, the Supreme Court has

confined the voluntariness concept by holding that only
confessions procured by coercive official tactics should be
excluded as involuntary."  <u>Byram</u>, 145 F.3d at 407; <u>see</u> <u>also</u>
<u>United States v. Flemmi</u>, 225 F.3d 78, 91 (1st Cir. 2000). "'Free
choice' [distinct from state coercion] is no longer a touchstone;
indeed, the Supreme Court has ruled in <u>Connelly</u> that a
volunteered confession was admissible even if the product of a
psychosis that undermined the suspect's ability to make a free
and rational choice." <u>Byram</u>, 145 F.3d at 407-08.  Consequently,
the privilege against self-incrimination "forbids coercion, not
mere strategic deception by taking advantage of a suspect's
misplaced trust in one he supposes to be a fellow prisoner....
Ploys to mislead a suspect or lull him into a false sense of
security that do not rise to the level of compulsion or coercion
to speak are not within [the] ... concerns" of the privilege
against self-incrimination.  <u>Perkins</u>, 496 U.S. at 296, 297, 300
(holding that "an undercover law enforcement officer posing as a
fellow inmate need not give Miranda warnings to an incarcerated
suspect before asking questions that may elicit an incriminating
response" because "[t]he essential ingredients of a
'police-dominated atmosphere' and compulsion are not present when
an incarcerated person speaks freely to someone that he believes
to be a fellow inmate").

The First Circuit has recognized that "some types of police
trickery can entail coercion: consider a confession obtained

because the police falsely threatened to take a suspect's child away from her if she did not cooperate." Byram, 145 F.3d at 408 citing Lynumn, 372 U.S. at 534 (the defendant only confessed after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not cooperate).  "But trickery is not automatically coercion." Byram, 145 F.3d at 408.  While, "trickery can sink to the level of coercion, ... this is a relatively rare phenomenon." Flemmi, 225 F.3d at 91 n. 5. "Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect.  While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations." Byram, 145 F.3d at 408.  See, e.g., Frazier v. Cupp, 394 U.S. 731, 739 (1969) (holding that the fact that the police misrepresented the statements that the co-conspirator had made "is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible"); Byram, 145 F.3d at 408 (holding that falsely assuring a suspect that he was not in danger of prosecution does not amount to coercion); Holland v. McGinnis, 963 F.2d 1044, 1051-52 (7th Cir. 1992), cert. denied, 506 U.S. 1082 (1993)(holding that falsely misrepresenting the strength of the evidence does not amount to coercion).  But see Spano v. New York, 360 U.S. 315, 323

(1959)(concluding that the "petitioner's will was overborne by
official pressure, fatigue and sympathy falsely aroused," where
the officer, a childhood friend of the petitioner, falsely told
the petitioner that his job was in jeopardy, and that loss of his
job would be disastrous to his three children, his wife and his
unborn child, if the petitioner did not confess).

The relevant question is whether the deliberate ruse planned
and carried out by AUSA West, Agent Carroll, Agent Hughes, and
Graham "sink[s] to the level of coercion," given the totality of
the circumstances.  Flemmi, 225 F.3d at 91 n. 5.  The First
Circuit provided some direction as to what kind of deception
would cross the line in Byram.  Its citation to the Seventh
Circuit's decision in Holland suggests the value of the following
more extensive guidance:

> Of the numerous varieties of police trickery ... a lie
> that relates to a suspect's connection to the crime is
> the least likely to render a confession involuntary.
> Such misrepresentations, of course, may cause a suspect
> to confess, but causation alone does not constitute
> coercion; if it did, all confessions following
> interrogations would be involuntary because "it can
> almost always be said that the interrogation caused the
> confession." Thus, the issue is not causation, but the
> degree of improper coercion, and in this instance the
> degree was slight.  Inflating evidence of Holland's guilt
> interfered little, if at all, with his 'free and
> deliberate choice' of whether to confess, for it did not
> lead him to consider anything beyond his own beliefs
> regarding his actual guilt or innocence, his moral sense
> of right and wrong, and his judgment regarding the
> likelihood that the police had garnered enough valid
> evidence linking him to the crime. In other words, the
> deception did not interject the type of **extrinsic
> considerations** that would overcome Holland's will by

distorting an otherwise rational choice of whether to confess or remain silent.

By way of contrast, consider the brand of police trickery the Supreme Court considered inherently coercive in <u>Lynumn v. Illinois</u>. In that case, the police told a female suspect that she was in jeopardy of losing welfare benefits and custody of her children, but offered to recommend leniency if she would confess. Unlike the tactic employed during Holland's interrogation, **this particular deceptive practice did more than affect the suspect's beliefs regarding her actual guilt or innocence, and judgments regarding the evidence connecting her to the crime.** It also distorted the suspect's rational choice (i.e., is it wise or morally right to confess given the aforementioned beliefs and judgments?) by introducing a completely extrinsic consideration: an empty but plausible threat to take away something to which she and her children would otherwise be entitled. This extrinsic consideration not only impaired free choice, but also cast doubt upon the reliability of the resulting confession, for one can easily imagine that a concerned parent, even if actually innocent, would confess and risk prison to avoid losing custody of her children and their welfare benefits.

<u>Holland</u>, 963 F.2d at 1051-52 (internal citations omitted; emphasis supplied).

I find here none of the extrinsic circumstances the case law has identified as necessary to ground a claim that government deception constitutes coercion.

3. <u>Totality of the Circumstances</u>

(a) *Before the Graham interview* - It is clear that the Agents intended to deceive Boskic into believing at first that the interview was only about his travel request so that they could get him talking. <u>Compare Flemmi</u>, 225 F.3d at 91 n. 5 ("Here, there is no evidence that Morris or Connolly intended to

mislead Flemmi or tried to dupe him."). To carry out the first part of the plan, the Agents pulled Boskic's unprompted travel application out of the normal processing queue and sent him a misleading notice for an interview about the request, hoping to use the quasi-coercive nature of an official immigration interview to get him talking. On the day of the August 25th interview, Agent Carroll introduced himself simply as Tom Carroll, and did not specify that he was an ICE investigator, as opposed to an adjudicator of applications in normal course. He also led Boskic to believe that the purpose of the interview was to adjudicate his travel application. The Agents deliberately chose not to use the interpreter or the video camera in the interview room to avoid raising any suspicion. And Agent Carroll misrepresented that whenever questions about a criminal record are raised, the FBI must be brought in as pretext to transition Agent Hughes into the room without raising too much suspicion.

Nevertheless, until Graham entered the room, there is no question that Boskic's statements were voluntary. Although the agents initiated the interview, Boskic chose to remain even after Agent Carroll explained that he did not need a travel document. Boskic's demeanor was relaxed and the atmosphere was conversational. He was given an oath and signed an INS form providing the standard Miranda warning, yet he chose to repeat his claim that he had no additional prior military experience and his denial of a prior criminal record outside the United States

in the hope that he could secure the travel document he believed that he needed.  Under these circumstances, it is plain that Agents Carroll and Hughes did not coerce Boskic into denying his additional prior military experience.

I will, however, return to Boskic's objection to the admissibility of his statements during the pre-Graham portion of the interview in my analysis of the perjury trap doctrine discussed <u>infra</u> in Section II.E.

*(b) The Graham interview and until 8:20 p.m.* - Boskic's statements after Graham entered the scene until about 8:20 p.m., when he learned he would be arrested, present a more difficult set of issues because when Graham told Boskic he was not the subject of his investigation, Agents Carroll and Hughes did not clarify that their investigation was different from Graham's investigation and that Boskic was in fact the target of their separate investigation.  Instead, Agents Carroll and Hughes purposefully allowed Boskic to think that he was not the subject of investigation.  They did this through their silence and by the way the three officials carried out the remainder of the interview in a coordinated fashion.  In doing so, the actions of Agents Carroll and Hughes suggested that the three officials were all working together in furtherance of Graham's goal of prosecuting Boskic's senior officers for their roles in the Srebrenica massacres and that Graham's assurance applied equally

to American authorities.

The Third Circuit disapproved of such Government misrepresentation in United States v. Swint, 15 F.3d 286 (3rd Cir. 1994), where the fact that "neither the state nor federal agents clearly informed Swint or his attorney that Swint's statements to the DEA agents would not be off-the-record," as had been suggested to the defendant, was one of the factors relied upon in concluding that the defendant's statements were involuntary. Id. at 290. The First Circuit, however, appears to have taken a less rigorous approach than the Third Circuit to police trickery through false assurances. In Byram, the court found that "[a]t first, Byram was reluctant to talk, but he spoke readily after [the officer] told him that he was not 'implicated in any of this.'" 145 F.3d at 406. This assurance was "literally true so far as the murder charge was concerned but a suggestio falsi as pertains to a possible possession charge." Id. at 408. Nevertheless, the court held that "[g]iven the narrowed definition of coercion in Connelly, it would be very had to treat as coercion a false assurance to a suspect that he was not in danger of prosecution." But see Flemmi, 225 F.3d at 92 (where the First Circuit distinguished Flemmi from Swint because there was "no evidence of consciously misleading conduct on the part of the FBI agents" in Flemmi as there was in Swint).

Here, as in Byram, Agents Carroll and Hughes were careful not to make any literally false statements after Graham entered

the room.[10]  Nevertheless, their actions and silence were
intended to create a false assurance that Boskic was not the
subject of any domestic investigation.  But given the holding in
Byram, I find that such a false assurance cannot be considered to
have coerced Boskic into confessing.  While the implicit false
assurance may have "caused" him to confess, it did not introduce
"a completely extrinsic consideration" that coerced him into
confessing.  Holland, 963 F.2d at 1052.

     While the Government's deception is "'insufficient [by
itself] to make [an] otherwise voluntary confession
inadmissible,' [it] is one factor to consider among the totality
of circumstances in determining voluntariness."  Holland, 963
F.2d at 1051 quoting Frazier, 394 U.S. at 739.  Nevertheless, my
review of the totality of the circumstances on August 25, 2004
convinces me that Boskic's statements during this period were
voluntary.

     Supporting a finding of involuntariness, is the fact that
Boskic did not know that the "nature of the offense with ...
which he was suspected at the time of making the confession," nor
even that he was a suspect.  18 U.S.C. § 3501(b)(2).  He was also
without counsel during the interview.  18 U.S.C. § 3501(b)(5).

---

[10] Although Agent Carroll initially misrepresented that the
purpose of the interview was to "go over" Boskic's re-entry
permit application and that the FBI has to be brought in when
criminal records come up, Boskic certainly understood that these
representations were false by the time Graham entered the room.

In contrast to his demeanor before Graham entered the room,
Boskic became "unnerved" and "unsettled" after Graham began his
interview.  When Agent Hughes asked him to put his statement in
writing he became "nervous" and "hesitant."[11]  There is also the
fact that it took Agents Hughes and Carroll 10 or 15 minutes of
explaining the "benefit" of him putting his story in his own
words rather than relying on their version of his story, to
convince Boskic to write out his statement.  Finally, there is,
of course, the deception by Agents Hughes and Carroll leading
Boskic to believe the interview had been set-up so that he would
provide information to help the ICTY prosecute senior officials.

Supporting a finding of voluntariness, however, is the
important fact that Boskic signed a <u>Miranda</u> form at the outset of
the interview.  Agent Carroll also reminded him of those rights
when he brought both Agent Hughes and Graham into the room.  18
U.S.C. § 3501(b)(3),(4).  At the beginning of the written
statement, Boskic also wrote out in his own hand, following Agent
Hughes's dictation, that he understood and was giving up his
rights and that he was giving the "statement voluntarily, without
promises and guarantees."  Boskic, who had had prior encounters
with law enforcement in the United States, was also familiar with
his constitutional rights.  The interview was not lengthy and

---

[11] Boskic's demeanor was, however, not as indicative of
coercion as in <u>Tingle</u>, 658 F.2d at 1334, where the defendant was
sobbing and shaking throughout the interrogation.

Boskic was given breaks and offered food and drink.  Boskic was
of a mature age (40 years old on August 25, 2004) and while
English is not his native language, he was assisted by a
translator during this part of the interview.  Finally, despite
the implicit false assurances by Agents Carroll and Hughes that
Boskic was not the subject of any investigation, Boskic appears
to have been aware that a man implicated in a genocide would not
escape all consequences for his crimes against humanity.
According to Graham, Boskic said that "if he was to go down for
what happened, other would go down as well."  Together, these
facts outweigh those suggesting Boskic was coerced.

   *(c) Statements after 8:20 p.m.* - Boskic was about halfway
finished with his written statement when he was told around 8:20
p.m. that he would be arrested.  He argues that any incriminating
statements made after 8:20 p.m. must be suppressed because the
taint of involuntariness of the initial confession was not
dissipated when he learned that he would be arrested.  Since I
have found that his statements up until 8:20 p.m. were voluntary,
I will not suppress the later statements.

   Boskic was aware of his rights when he was told he would be
arrested.  He had signed both sides (English and Serbo-Croatian)
of the Warning as to Rights form at the outset of the interview
five hours earlier and Agent Carroll reminded him of those rights
when Agent Hughes and Graham were each brought into the room.

Although Agent Carroll only did so in English, I find that
Boskic's English was proficient enough to understand, at the very
least, that Agent Carroll was referring to the rights written out
in Serbo-Croatian on the Warning as to Rights form Boskic had
signed.  At the beginning of the written statement, Boskic also
wrote out in his own hand following Agent Hughes's dictation that
he understood and was giving up his rights and that he was giving
the "statement voluntarily, without promises and guarantees."
Furthermore, when he was told that he would be arrested, Boskic
paused for a few minutes, plainly contemplating what he should
do.  He chose to continue writing his statement because, as he
testified, he had already "said everything."  Consequently, I
find that Boskic "voluntarily, knowingly and intelligently,"
<u>Miranda</u>, 384 U.S. at 444, waived his Miranda rights when he chose
to finish his written statement.

   *(d) Fruits of the search* - Finally, Boskic also seeks to
suppress the fruits of any searches of his apartment and car.  He
claims that his consent was not voluntary and thus the search
violated his Fourth Amendment Rights.

   As Boskic points out, the principles for determining the
voluntariness of consent for a search are the same as those for
determining the voluntariness of a confession -- i.e. "whether
consent is voluntary turns on questions of fact, determinable
from the totality of the circumstances."  <u>United States v.</u>

-45-

Romain, 393 F.3d 63, 69 (1st Cir. 2004) citing Schneckloth v.
Bustamonte, 412 U.S. 218, 227 (1973).  Consequently, for the same
reason that Boskic's statements were voluntary, I find his
consent to search was also voluntarily given.

**D. Fundamental Fairness**

In support both of his motion to suppress and of his motion
to dismiss Count Five, Boskic also argues that the government
violated his Fifth Amendment due process rights because the
investigators' surreptitious conduct transgressed fundamental
principles of fairness.  The Supreme Court contemplated this
additional avenue of constitutional protection in United States
v. Kordel, 397 U.S. 1, 11-13 (1970).

As with the voluntariness issue, I will consider separately
Boskic's conceptually distinct grievances: he complains (i) that
he was tricked into providing the government with additional
statements that can be used as evidence against him in the
prosecution of the several perjury counts and (ii) that he was
unfairly tricked into perjuring himself for an alleged fifth
time.  I address the question of admissibility in this section
and address the perjury trap doctrine in the next section.

In Kordel, the Supreme Court suggested that "even if the
Government's conduct did not violate [the defendant's] Fifth
Amendment privilege against compulsory self-incrimination, it
[may] nonetheless reflect[] such unfairness and want of

consideration for justice as independently to require the

reversal of [the defendant's] convictions." 397 U.S. at 11. On

the record in Kordel, however, the Court concluded that "the

respondents have made out [n]either a violation of due process

[n]or a departure from proper standards in the administration of

justice requiring the exercise of our supervisory power." Id.

But the Court took pains to distinguish the facts in Kordel from

cases where:

> the Government has brought a civil action solely to
> obtain evidence for its criminal prosecution or has
> failed to advise the defendant in its civil proceeding
> that it contemplates his criminal prosecution; []or ...
> where the defendant is without counsel or reasonably
> fears prejudice from adverse pretrial publicity or other
> unfair injury; []or ... [where there are] any other
> special circumstances that might suggest the
> unconstitutionality or even the impropriety of this
> criminal prosecution.

Id. at 11-12 (footnotes omitted).  The Supreme Court later

reaffirmed the possibility that inculpatory statements procured

by police misconduct may necessitate suppression, but only where

"the challenged conduct [is]... of the kind of misbehavior that

so shocks the sensibilities of civilized society as to warrant a

federal intrusion into the criminal processes of the States."

Moran, 475 U.S. at 433-34.  In Moran, however, the Court found

that the "impropriety" of conveying false information to an

attorney is not the kind of behavior that "should be condemned as

violative of canons fundamental to the 'traditions and conscience

of our people.'" Id. at 432 quoting Rochin v. California, 342

U.S. 165, 169 (1952)(quoting Snyder v. Massachusetts, 291 U.S. 97, 105 (1934)).

More recently, the First Circuit also contemplated the possibility that "regardless of coercion, the methods used to obtain [a suspect's] statements [might be] so shocking to the conscience that they violated [the suspect's] rights to 'substantive due process.'"  Byram, 145 F.3d at 408.  As support for this proposition, the court cited the "classic case" of Rochin, "where retrieving evidence by pumping the suspect's stomach was regarded as so at odds with civilized values that the evidence had to be excluded."  Byram, 145 F.3d at 408.  On the facts in Byram, however, the First Circuit refused to suppress the statements at issue, concluding that "[g]iven the district court's finding of good faith, the police conduct cannot be described as shocking to the conscience or beyond the bounds of civilized behavior."  Id.

Relying upon the possibility left open in Kordel, Moran, and Byram, Boskic contends that the Government's pretextual use of an immigration interview to obtain statements from him when he was without counsel for use in a pending criminal case of which he was not apprized was conduct fundamentally unfair and a violation of due process.

Boskic analogizes the circumstances here with the facts underlying the dismissals of the indictments in United States v.

<u>Stringer</u>, 408 F.Supp.2d 1083 (D.Or. 2006)[12] and <u>United States v. Rand</u>, 308 F.Supp. 1231 (N.D. Ohio 1970).[13]  Despite these decisions, I conclude that the Government's misrepresentation as to the existence of a separate federal investigation of Boskic was not so outrageous as to violate "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment."  <u>United States v.</u>

------

[12] In <u>United States v. Stringer</u>, the "deceit and trickery [of SEC personnel] to keep the criminal investigation concealed ... went so far as to instruct court reporters to refrain from mentioning the U.S. Attorney's involvement and to have [the Assistant United States Attorney] avoid being near certain interviews for fear his presence would cause the criminal investigation to surface.  Moreover, [the SEC attorney] misled [the defendant] and his attorney into believing he was not a target and evaded the question about the USAO's involvement." 408 F.Supp.2d 1083, 1089 (D.Or. 2006).  The Court found that dismissal of the indictment against the defendants was warranted because this governmental misconduct was "'so grossly shocking and so outrageous as to violate the universal sense of justice.'" <u>Id.</u> <u>quoting</u> <u>United States v. Smith</u>, 924 F.2d 889, 897 (9th Cir. 1991).

[13] In <u>United States v. Rand</u>, the FDA began civil proceedings to determine whether the defendant business should be enjoined from transporting its cancer vaccine in interstate commerce. Despite the individual defendant's willingness to cooperate, the government went ahead with a civil trial and questioned the defendant on completely irrelevant matters.  The SEC participated to some extent in the civil proceedings and the defendant was granted immunity.  When the government later tried to prosecute Rand for SEC violations, arguing that the scope of the immunity could not have included SEC violations because it was unaware of them until the end of the trial, the court dismissed the indictment because the government had "engaged in an obnoxious form of using parallel proceedings" by eliciting incriminating statements in civil proceedings "from a defendant who had been lulled into believing he was immunized from prosecution" where the Government knew but did not inform the defendant that criminal proceedings were pending.  <u>United States v. Rand</u>, 308 F.Supp. 1231, 1234 (N.D. Ohio 1970).

Santana, 6 F.3d 1, 4 (1st Cir. 1993).

In Stringer, for example, the district court suggested that "[a] government agency may not develop a criminal investigation under the auspices of a civil investigation.  It would be a 'flagrant disregard of individuals' rights' to 'deliberately deceive, or even lull' someone into incriminating themselves in the civil context when 'activities of an obvious criminal nature are under investigation.'"  408 F.Supp.2d at 1089 quoting United States v. Grunewald, 987 F.2d 531, 534 (8th Cir. 1993).  See also United States v. Tweel, 550 F.2d 297 (5th Cir. 1977).  However, the First Circuit has observed that suppression is only available where the government made "fairly serious affirmative misrepresentations.  No case holds that an IRS agent breaches a constitutional duty when he obtains information merely by failing to state specifically that he is conducting a criminal investigation."  United States v. Irvine, 699 F.2d 43, 46 (1st Cir. 1983)(emphasis in original).  Even if the term "fairly serious affirmative misrepresentations" is given an expansive definition, the Government did not abuse a civil investigation or abuse civil process in this case.  The cases cited by Boskic in support of his due process theory involve questionable government conduct where "parallel proceedings" initiated by the government were in play and the subject defendant was unaware of the pending criminal investigation when cooperating and providing incriminating information to the civil investigators.  The agents

here simply summoned Boskic for a staged interview in response to
his own optional application for a travel permit.  Boskic chose
to remain even after Agent Carroll explained that he did not need
a travel document.  The agents were under no affirmative duty to
provide more background information to someone like Boskic who
himself put in motion the conditions for the encounter by
pressing his application.  Cf. United States v. Robson, 477 F.2d
13, 18 (9th Cir. 1973) quoting United States v. Prudden, 424 F.2d
1021, 1032 (5th Cir. 1970) ("'Silence can only be equated with
fraud where there is a legal or moral duty to speak or where an
inquiry left unanswered would be intentionally misleading.'").
Boskic did not ask what would happen to him until about 8:20
p.m., at which point the agents told him the truth -- he would be
arrested.

       More fundamentally, I conclude that the Government did not
use tactics that were "truly outrageous, uncivilized, and
intolerable."  Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir.
1999).  "[A]n abuse of power practiced by the executive branch of
state government sinks to a level cognizable under the Due
Process Clause only when it is so extreme and egregious as to
shock the contemporary conscience."  DePoutot v. Raffaelly, 424
F.3d 112, 118 (1st Cir. 2005) citing County of Sacramento v.
Lewis, 523 U.S. 833, 846 (1998).  "Even violations of the law
resulting from bad faith do not necessarily amount to
unconstitutional deprivations of substantive due process; conduct

-51-

that is 'more egregious and more extreme' is required." McConkie
v. Nichols, No. 05-2727, slip op. at 4, (1st Cir. May 15, 2006)
quoting DePoutot, 424 F.3d at 119.  Consequently, "even where an
officer questions a suspect in an unlawful manner, this does not
necessarily mean that the questioning entitles the plaintiff to
damages under section 1983" for violating substantive due
process.  McConkie, slip op. at 6.

      Based on this standard, the First Circuit in McConkie
affirmed summary judgment granted to a police detective sued
under 42 U.S.C. §§ 1983 and 1988 for an alleged affirmative false
assurance arguably comparable to -- although, I find, even more
egregious and extreme than -- the behavior of Agents Carroll and
Hughes at issue here.  The plaintiff in McConkie claimed that in
a non-custodial interview concerning possible sexual abuse of a
child, the police detective defendant told him that "this stuff
stays confidential, especially because a juvenile is involved."
Slip op. at 5.  Based on that statement, the plaintiff alleged
that the detective intentionally deceived him about his Fifth
Amendment right in violation of his substantive due process
rights.  Id. at 3.  The First Circuit held that although the
detective's conduct was not something to be condoned, "[e]ven
construing [his] statements as lies, lies alone are not
necessarily considered conscience-shocking."  Id. at p. 6 citing
Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 623 (1st Cir.
2000)(holding that it was not conscience-shocking for police

officers to deliberately lie in official documents and perjure themselves in official court proceedings) and Byram, 145 F.3d at 408-09.  The Court specifically distinguished the detective's statement in McConkie from the shocking behavior of the law enforcement officers in Limone v. Condon, 372 F.3d 39 (1st Cir. 2004), who, in order to protect the true perpetrators, deliberately fabricated evidence and framed individuals for crimes they did not commit.  In Limone the government conduct clearly violated the substantive due process rights of those wrongfully convicted.  The conduct here, however, is more akin to the false assurance given by the detective in the non-custodial interview in McConkie.

In sum, while the Government's conduct was certainly pretextual, especially since Agents Carroll and Hughes had procured an arrest warrant against Boskic prior to the interview, it was not fundamentally unfair.  "[T]he Supreme Court's tolerance of police guile in Frazier makes clear that the police can often mislead suspects, at least where coercion is not involved; thus, it is impossible to treat all such false statements as improper, let alone outrageous or uncivilized." Byram, 145 F.3d at 408.  Consequently, "facts more egregious than those presented" here, "would be required to 'rise to a level of a due process violation.'" Id. quoting Moran, 475 U.S. at 432, and to justify suppression of the resulting statements.

**E. Perjury Trap**

Finally, Boskic contends that his statements prior to when Graham entered the room should be suppressed -- and the fifth perjury count should be dismissed -- because they were elicited pursuant to a perjury trap in violation of the basic principles of fundamental fairness entrenched in the Due Process Clause of the Fifth Amendment.

The government contends that even an alleged constitutional violation is not a defense to perjury or false statements, citing a long list of cases including <u>United States v. Mandujano</u>, 425 U.S. 564 (1976), <u>United States v. Wong</u>, 431 U.S. 174, and <u>United States v. Babb</u>, 807 F.2d 272 (1st Cir. 1972).  However, as Boskic points out, the Supreme Court and the First Circuit appear to have left open the possibility that perjurious statements may be suppressed and/or perjury indictments may be dismissed where there is egregious prosecutorial or government misconduct, despite the accepted rule that the Fifth Amendment privilege against self-incrimination does not shelter perjury.  <u>See</u> <u>Babb</u>, 807 F.2d at 277 (distinguishing the defendant's Fifth Amendment self-incrimination and fundamental fairness claims and concluding under the latter heading that "perjured testimony before a grand jury will be suppressed because of prosecutorial misconduct only if the misconduct undermines the validity of the grand jury process itself").  <u>See also</u> <u>Mandugano</u>, 425 U.S. at 570 <u>quoting</u>

United States v. Orta, 253 F.2d 312, 314 (1958) ("'The only debatable question is one of the supervision of the conduct of Government representatives in the interest of fairness.'"). Given the language in the case law, I will not categorically foreclose the possibility of suppressing evidence or dismissing a perjury charge as a result of the government's allegedly fundamentally unfair conduct.

Turning to the merits of Boskic's more specific constitutional claim, however, I find little support for the proposition that a perjury trap can justify suppression of perjurious statements or dismissal of a perjury count.  See, e.g., Wong, 431 U.S. at 179 ("[A]ccepting, arguendo, respondent's argument as to the dilemma posed in the grand jury procedures here, perjury is nevertheless not a permissible alternative."). Boskic was not compelled either to attend or to continue the interview.  He had the choice to leave without the travel permit, whose pursuit was his own choice.

The purpose of the interview was not to catch Boskic in another lie; the purpose was to elicit a confession as evidence that he lied on his immigration documents and to extract Boskic's information about what happened and who else was involved in the Srebrenica massacres.  As the First Circuit explained in Babb, 807 F.2d at 279:

> Even if we assume, for purposes of Babb's contentions,
> that the prosecutor purposely attempted to mislead Babb,
> the obvious reason for such misrepresentations would have

been to induce Babb to waive his fifth amendment privilege and to give helpful testimony to the grand jury. As we discussed above, Babb was not misled in this manner. In fact, it defies logic to argue that assurances that might have lulled a witness into giving incriminating statements had the effect of inducing the witness to commit perjury. Consequently, we find that Babb has failed to establish the necessary nexus between the alleged misconduct and his subsequent perjurious testimony in order to support a claim of fundamental unfairness.

See also United States v. Gonzales, 620 F.Supp. 1143, 1148-49 (N.D.Ill. 1985).[14]

As in Babb, "the record [does not] support[] an inference that [Boskic]'s reliance on the misrepresentations make[s] any subsequent proceedings against him fundamentally unfair," Babb, 807 F.2d at 278-79, and I decline to suppress the allegedly perjurious statements or dismiss the fifth count.


### III. CONCLUSION

As the Supreme Court recognized in Miranda, "confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." 384 U.S. at 478. I find the

---

[14] "It was not inconceivable that, under oath for the first time, defendant would testify as the government apparently believed the truth to be, and its case would be certain. If in fact he lied under oath, as the government charges, he cannot be insulated from a perjury charge solely because he said what the government anticipated he probably would say. Defendant had non-coercive options and he was fully warned. If he, an attorney, chose to lie, that was his decision, and the government can compel him to answer for the consequences." United States v. Gonzales, 620 F.Supp. 1143, 1148-49 (N.D.Ill. 1985).

statements at issue here to be voluntary.  Consequently, for the reasons set forth more fully above, I DENY Boskic's motion to suppress and I DENY Boskic's motion to dismiss.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE