UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA     )
 )
 )
        V.         )    Criminal No. 04-10298-DPW
 )
 )
MARKO BOSKIC         )

## TRIAL BRIEF OF THE UNITED STATES

The defendant Marko Boskic is charged in a five count indictment with various false statements on immigration documents and to investigators, that were intended to hide his military service as a member of the Army of the Republic of Srpska and his participation in the massacre of over 1000 Muslim civilian men and boys, as part of the campaign of "ethnic cleansing" in Bosnia in the 1990s.

### I.   The Indictment

The first four counts of the indictment allege violations of Title 18, United States Code, Section 1546(a).  Count Five alleges a violation of Title 18, United States Code, Section 1001.  The specific charges are as follows:

#### Count One

Count One concerns a false statement contained in Form I-590, Registration for Classification as a Refugee.  The alleged false statement concerns the defendant's military service.  The indictment alleges that the defendant stated that his only military service was with the Yugoslav National Army.  The indictment further alleges that the statement was untrue because

the defendant had in fact served in the Army of the Republic of Srpska.

Question 14 on the Form I-590 requests information about past military service.  The defendant only listed "SFR Yugoslovia ... 1983-84."  He intentionally omitted information about his service in the Army of the Republic of Srpska.

**Count Two**

Count Two concerns a similar false statement contained on Form I-485, Application to Register as Permanent Resident or Adjust Status.  As with Count One, the indictment alleges that the defendant stated that his only military service was with the Yugoslav National Army.  The indictment further alleges that the statement was untrue because he had in fact served in the Army of the Republic of Srpska.

Part 3, section C of the Form requests a list of "present and past membership in or affiliation with" organizations, groups, clubs, etc.  The instructions specifically direct the applicant to "[i]nclude any foreign military service."  The defendant only listed "1983-1985 Yugoslavia military."

**Count Three**

Count Three concerns a second false statement in the I-590 Form.  The indictment alleges that the defendant stated that he "never ordered, assisted, or otherwise participated in the persecution of any person because of race, religion and political

2

opinion." The indictment further alleges that statement was false because the defendant had in fact participated in such persecution.

On the signature page of the I-590 Form signed by the defendant, the document requires the applicant to certify (and the defendant so certified) that "I have never ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion." On July 16, 1995, as a member of the 10th Sabotage Detachment of the Army of the Republic of Srpska, the defendant participated in the massacre of over 1000 Muslim civilians at Branjevo Military Farm in Bosnia.

### Count Four

Count Four concerns a similar false statement contained in Form I-485. The indictment alleges that the defendant stated that he "never ordered, incited, assisted, or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin and political opinion." The indictment further alleges that statement was false because the defendant had in fact participated in such killing.

Question 8, in part C of the I-485 Form asks: "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion."

3

The defendant checked the box next to the response: "No." This was false because the defendant murdered civilians who were targeted because they were Muslims.

### Count Five

Count Five alleges that, on August 25, 2004, when questioned by Special Agents of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") and the Federal Bureau of Investigation ("FBI"), he told them that he had only previously served in the Yugoslavian Army. That statement was false because he had previously also served in the Army of the Republic of Srpska.

## II. Context of the Defendant's False Statements

In the 1990s, several of the states that made up the former Yugoslavia broke away and declared independence. Through the early 1990s Bosnia became the battleground for fighting between Croats, Serbs and the Muslim population. The self-proclaimed Republic of Srpska controlled part of Serb-held Bosnia. In July of 1995, the Army of the Republic of Srpska (the "VRS") attacked Srebrenica, which had become an enclave for Muslims fleeing from other parts of Bosnia and Serbia. During several days in mid-July, the VRS killed over 7,000 Muslim men and boys of military age, in the area around Srebrenica.

In the single largest massacre in Europe since World War II, approximately 1200-1500 were killed over several hours on July

4

16, 1995, at the Branjevo Military Farm.  The unit of the Army of the Republic of Srpska that carried out the massacre at Branjevo was the 10th Sabotage Detachment of the VRS.  The defendant Marko Boskic was an ethnic Croat who was a member of the 10th Sabotage Detachment and personally participated in the executions at Branjevo.

In seeking to gain admission to the United Stares as a refugee, the defendant purposely hid his membership in the VRS and his participation in the massacre of civilians as a member of the 10th Sabotage Detachment.  As he acknowledged on August 25, 2004, he was advised and knew that hiding his military service would make it easier to gain entry into the United States.  He also likely knew that admitting participation in the events at Branjevo would doom any such chances.

## III. List of Witnesses:

    A.   Expert Testimony re: The Background of the Massacres

        1.   Richard J. Butler

        2.   Andras Riedlmayer

    B.   The Victims

        1.   Becir Salihovic

        2.   Ahmo Hasic

    C.   The Forensic & Other Corroborating Evidence

        1.   United States Government Photographs:

            Eric R. Benn, National Geospatial Agency

2.   The ICTY Investigators & Forensics: Stipulation

3.   ICTY Investigator Alistair Graham

Defendant's Admissions

10th Sabotage Detachment Video

D.   The Immigration Documents

1.   Joanne Sassone

2.   Francis Monin

3.   Serbo-Croatian Interpreter: Rexhap Neza

E.   Defendant's Additional False Statement & Admissions

1.   Thomas Carroll

2.   Gregory Hughes

## IV. Outline of the Evidence

### A.   Expert Testimony Regarding the Background of the Massacres

#### 1.   Richard J. Butler

Richard Butler ("Butler") was a U.S. Army Intelligence Analyst until his retirement in 2001.  (A copy of his CV is attached to this Trial Brief.)  In 1997, he was assigned by the Army to assist the Office of the Prosecutor ("OTP"), International Criminal Tribunal for the Former Yugoslavia ("ICTY") as a military analyst.  He continued in that capacity after his retirement from the Army, until October 2003.  He is currently an Intelligence Research Specialist with Department of Homeland Security ("DHS"), Immigration and Customs Enforcement

("ICE") in Atlanta, Georgia.  Butler has previously testified as an expert on the former Yugoslav National Army ("JNA") and VRS during trials in the Hague, and it is expected that he will again testify for the OTP later this year or early next year.

Butler has studied and analyzed manuals, regulations and laws governing the structure, procedures and command functions of the JNA and the VRS.  In addition, he has reviewed voluminous documents captured or seized from the VRS that relate to both the procedures of the VRS, and the details of the military takeover of the Srebrenica enclave, and the aftermath of the takeover.  He testified in the <u>Blagojevic/Jokic</u> and the <u>Krstic</u> trials at the Hague.[1]  In addition, he has testified as an expert witness on the former Yugoslavia in federal immigration courts in the United States.

## 2.    Andras Riedlmayer

---

[1] A number of individuals who committed war crimes in the former Yugoslavia have been prosecuted by the OTP at the ICTY in the Hague.  The trials that are relevant to this case concerned activities in and around Srebrenica in July of 1995, including, but not limited to, the massacre at Branjevo Military Farm. <u>Prosecutor v. Radislav Kristc</u>, IT-98-33 (General Radislav Krstic was first Chief of Staff and later Commander of the Drina Corps of the VRS; the Zvornik and Bratunac Brigades made up the Drina Corps); <u>Prosecutor v. Vidoje Blagojevic and Dragan Jokic</u>, IT-02-60 (Vidoje Blagojevic was Commander of the Bratunac Brigade, and Major Dragan Jokic was Chief of Engineering of the Zvornik Brigade, both of the VRS).  Dragen Erdemovic, who was also a member of the 10th Sabotage Detachment of the VRS, was also prosecuted at the Hague for his role in the Branjevo massacre. <u>Prosecutor v. Dragan Erdemovic</u>, IT-96-22.  Erdemovic also testified in the other two trials referenced herein.

Since 1985, Andras J. Riedlmaeyr ("Riedlmaeyr") has been bibliographer in charge of the Documentation Center of the Aga Khan Program for Islamic Architecture, at the Fine Arts Library at Harvard University. (A copy of his CV is attached to this Trial Brief.) He is a native of Budapest, Hungary, and was educated in Germany and the United States. His academic involvement with Bosnia began decades ago in 1969, when he wrote his senior theses (A.B., History, University of Chicago) on "Bosnia-Herzegovina and the Congress of Berlin." He also traveled through the former Yugoslavia in the 1970s as a graduate student. He holds graduate degrees from Princeton University (M.A., Near Eastern Studies) and Simmons College (M.S., Library and Information Science). Riedlmayer has studied, traveled and written extensively on the Balkans.

In 2002 and 2003, Riedlmayer testified as an expert on the destruction of Muslim cultural heritage in Bosnia-Herzegovina in 1992-1996 and in Kosovo in 1998-1999, during the trial of Slobodan Milosevic at the ICTY. He has also testified as an expert at the International Court of Justice in 2006.

In addition to extensive review of first person and other sources, he did field work in Bosnia for the ICTY in 1997, 1998, 2001 and 2002.

### 3.   The Testimony of the Experts

After World War II, the Federal Republic of Yugoslavia

8

("Yugoslavia") was composed of six separate Republics: Bosnia and Herzegovina ("Bosnia"), Croatia, Macedonia, Montenegro, Serbia and Slovenia.  Certain Republics were populated predominantly by one ethnic group.  For example, Serbs in Serbia (Orthodox) and Croats in Croatia (Catholic).  Bosnia was the most multi-ethnic of all the Republics, with a pre-war population of 44 percent Muslim, 31 percent Serb, and 17 percent Croat.

World War II marked a time of particularly bitter ethnic strife in the area.  However, Marshal Tito's post-war government discouraged ethnic division and nationalism with a focus on the unity of the communist state.  The resulting peaceful relationship among the different ethnic groups was also encouraged by the JNA, which was instrumental in keeping ethnic tensions at bay.  Obligatory military service of one year in the JNA was required of both men and women.[2]  Nonetheless, the various ethnic groups remained conscious of their separate identities.

After Tito's death in 1980, rising nationalism and ethnic friction eventually came to a head.  Slovenia and Croatia both declared independence from Yugoslavia in June 1991.  Although Slovenia's status was secured after an unimpressive ten days of fighting with the predominantly Serb forces of the JNA, the armed

---

[2]The defendant Boskic completed such obligatory service in 1983-1984.

conflict in Croatia stretched on for some months.  Macedonia
broke off successfully in September 1991.

Bosnia was recognized by the European Community on April 6,
1992, and by the United States the following day.  International
recognition, however, did not dissuade the fierce struggle for
territorial control which ensued among the three major ethnic
groups in Bosnia: Muslim, Serb and Croat.

By 1992, each ethnic group within Bosnian had formed their
own military groups: the Army of the Republic Srpska ("VRS") of
the Bosnian Serbs; the Croatian Defense Council ("HVO") of
Bosnian Croats; and Armija ("AbiH") of Bosnian Muslims.

By late 1992, the Vance-Owen peace plan was moving forward,
by which separate regions would be created within Bosnia, that
were each dominated by a particular ethnic group.  The dominant
ethnic group in Srebrenica was the Muslims.  Between 1992 and
1995, each group - the Croats, the Serbs and the Muslims, sought
to expand their area of control prior to peace.

The Muslim enclaves, including Srebrenica, were located in
eastern Bosnia, adjacent to Serbia.  Croatia is on Bosnia's
western border.  In May 1995, the leadership of the Republic of
Srpska decided to attack the Muslim enclaves in the east, force
the Muslims to leave, and then re-deploy its troops to face the
Croats in the west.  Srebrenica was the largest Muslim enclave,
containing 20-25,000 elderly men, women and children and 10-

10

15,000 men.

On July 11, the Serbs launched an offensive against Srebrenica and captured the town.  The United Nations ("UN") troops, that had been "protecting" the Muslims, withdrew. Between approximately July 12-16, 1995, the VRS executed over 7,000 Muslim men and boys in the area of Srebrenica, Bosnia.  The male Muslim victims were separated from the females at the UN safe haven in Potocari[3] (a town adjacent to Srebrenica), and some were captured in the woods surrounding Srebrenica[4].  The men and military aged boys were then bussed to different holding sites. Ultimately, they were bussed to different locations where they were executed.  On July 16, 1995, at the Branjevo Military Farm, Boskic and other members of the 10th Sabotage Detachment were responsible for the killing of approximately 1,200 Muslims.

The massacres at Branjevo and at other locations in eastern Bosnia were part of an effort to "cleanse" the area of Muslims – to wipe out the Muslim population, as well as destroy evidence of their cultural heritage.

### 4.    Admissibility of Testimony of Historians Pursuant to Rules of 702 of the Federal Rules of Evidence

---

[3]That is what happed to Ahmo Hasic, who survived the Branjevo massacre and whose testimony is set forth below.

[4]That is what happed to Becir Salihovic, who survived the Branjevo massacre and whose testimony is set forth below.

Rule 702 of the Federal Rules of Evidence provides for the admissibility of testimony by experts concerning "scientific, technical, or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue."  The kind of expert testimony that is admissible pursuant to this rule, is not limited to pure scientific expertise, and includes "other specialized" knowledge.  <u>Kumho Tire v. Carmichael</u>, 526 U.S. 137, 141 (1999); <u>United States v. Reynoso</u>, 336 F.3d 46, 49 (1st Cir. 2003) (affirming the admissibility of a DEA agent that the quantity of cocaine seized was too large to have been exclusively for personal use); <u>United States v. Angiulo</u>, 847 F.2d 956, 973-975 (1st Cir. 1988) (affirming admissibility of expert testimony concerning structure of La Cosa Nostra Family and opinion concerning the positions of defendants within the Family).  Historians have routinely been used as experts pursuant to Rule 702 in cases involving de-naturalization proceedings brought against those who participated or assisted in the Nazi atrocities during World War II.  <u>See</u>, <u>e.g.</u>, <u>United States v. Dailide</u>, 227 F.3d 385 (6th Cir. 2000); <u>United States v. Lileikas</u>, 929 F.Supp. 31, 38 (D.Mass. 1996); <u>United States v. Schiffer</u>, 831 F.Supp. 1166 (E.D.PA 1993), <u>aff'd</u> 31 F.3d 1175 (3rd Cir. 1994).

**B.    The Victims**

   **1.    Becir Salihovic**

Becir Salihovic ("Salihovic") is a legal resident of the United States and is employed by a construction company in the Milwaukee area.

In July 1995, he was in his early 20s and living in Srebrenica in the former Yugoslavia. On or about July 11, 1995, he was ordered to leave Srebrenica, which had been overrun by the Serbs. He and many other Muslim men and older boys separated from the women, children and the elderly. The women went to Potocari and the area that was supposed to be under the control of the United Nations. Salihovic, accompanied by his brother-in-law, who was 13 years old, headed toward Jaglic. Salihovic estimated that approximately 15,000 Muslim men (and boys) gathered there. On about July 12, the column began to walk towards Tuzla - an area that was controlled by the Muslim forces. While walking through the woods, they were shelled by the Serbs. Many of the Muslims were killed by the shelling and ambushes. Salihovic was separated from his brother-in-law.

While crossing a road with about 10 other men, he was captured by the Serbs. The Serbs took away their belongings and their food and ordered them to put their hands over their heads. The group was marched to a school or barracks, and held in a small room.

Salihovic and the other men were captured early in the morning of the 13th of July. Sometime that afternoon, they were

moved to a soccer field.  There were about 2,000 Muslim prisoners on the field.  General Mladic ("Mladic") arrived and spoke to the prisoners.  He told them that they were going to be exchanged. Mladic also said that the route to Tuzla was covered by Serbian military and that no one would get through it.  Television cameras captured his speech.[5]

Mladic ordered the soldiers to make a list of the prisoners on the field.  Salihovic wrote down his name and date of birth. One prisoner got up and the Serb soldiers kicked him and hit him with their rifles.  Then one soldier shot the Muslim with a pistol and his body was thrown into the nearby river.

The Muslim prisoners boarded four or five buses.  As they rode past a warehouse or hangar in Kravica, Salihovic saw dead bodies near the entrance to the warehouse, and heard shooting from behind the building.  They were driven to a school in Bratunac, where they spent the night on the buses outside the school.

During the night, men were taken off the buses.  Salihovic heard shooting and never saw the men again.  During the next morning, the bus driver started the bus, turned on the heat and left it running.  It was left that way for two to three hours. In the stifling heat, they were not given any water.

_____

[5]The government will seek to introduce a portion of a videotape recording of this event.

Later that day, the buses were driven to a school in Pilica. In route from Bratunac to Pilica, the bus stopped and a young child got on to pick someone to shoot. The Muslim man left the bus with the child, and Salihovic heard shots fired. The man did not return.

At Pilica, they were unloaded into a gymnasium at a school. The building was very crowded. After nightfall, they asked for volunteers to get water. He and a few others volunteered. As they were filling their buckets, Salihovic heard buses arrive behind the school. As they headed back to the gymnasium, he heard shots and cries for help from the direction of the buses.

During the night, several men died and their bodies were removed. The water they had brought was not enough.

During the next day (July 15th), Serb soldiers demanded money and jewelry from the Muslim prisoners. The Serbs also removed some Muslim men who were then executed.

On the morning of July 16th, the Serb soldiers announced that the young Muslims would be exchanged and they should head toward the buses. Salihovic lined up with the others. As they were leaving the building, they were lined up against the wall, told to face the wall, and their hands were tied behind their backs. Salihovic believed that he was going to be killed.

The buses were filled with the Muslim prisoners and about three buses headed out. After a short distance, the buses turned

15

off the road and reached a meadow.  Salihovic could see a large
number of dead bodies in a field.  When the buses stopped, the
soldiers started taking the Muslim prisoners off in groups of
ten.  They walked to the meadow where the dead bodies were lying.
The soldiers lined up the Muslim men and shot them near where the
bodies had fallen.  Salihovic could see this happening from the
bus.  He was on the second bus.

When it was time to empty the bus he was on, Salihovic was
in the third group.  He walked to the meadow with his head down
and held onto the shirt of the man behind him.  The soldiers
ordered the group to walk to the front of the pile of dead bodies
and stand in line.  Approximately 10 Serbs soldiers lined up
parallel with Salihovic's line and shot at him and the other
Muslim men.  When the Serb soldiers started firing at his group,
Salihovic fell to the ground, and a dead person fell on top of
him.  One of the Serb soldiers walked up to the Muslims who had
just been shot to determine if they were dead.  Salihovic heard
someone tell the soldier that he shouldn't shoot them in their
heads, but rather shoot them in their backs.  When the soldier
shot at Salihovic, the bullet passed underneath Salihovic's
armpit.

Salihovic heard one man cry for help.  The man was suffering
and begged to be killed.  Salihovic heard one of the Serb
soldiers say: "Let him suffer; we'll kill him later."

16

Additionally, some soldiers asked whether anyone was injured and offered to help.  Some victims responded and were shot.

Salihovic lay there the rest of the day into the night. During the day, he heard more buses arrive and more killings. After dark, he heard a machine that sounded like a tractor dump some bodies.  He crawled away over the dead bodies because he was concerned that they would either find him and kill him, or bury him alive.

Salihovic spent the next day hiding in a creek under a nearby bridge.  During the day, he heard big machines traveling over the bridge, but he remained hiding.  When night came, Salihovic fled.

While fleeing, Salihovic ran into other survivors (including Ahmo Hasic).  After 15 days, Salihovic was captured by the Serbs and put in a Serbian detention camp at Batkovic.  For the first three weeks at the camp he was sick and could not walk, but he ultimately recovered.

The International Red Cross visited the camp once a month. Salihovic wrote his family a letter telling them he was alive. He received a letter in return and discovered that they were living in Tuzla.  Salihovic was held in the camp for five months. During that time, he dug trenches at the front lines for the Serbs.  In December 1995, he was exchanged for Serbian prisoners and was reunited with his family.

17

From January 1996 through 2000, Salihovic and his family
lived in a house in Vozuca, Bosnia.  The house had been abandoned
by a Serb family during the war.  In 2000, Salihovic traveled
with his wife and two children to Zagreb, Croatia and applied for
entrance into the United States as a refugee.  His refugee
application was granted and he was admitted into the United
States.  He subsequently applied to become a permanent resident
alien and his application was granted.

> **2.  Ahmo Hasic**

Ahmo Hasic ("Hasic") is currently in his 60s, and resides in
Bosnia-Herzegovina.

Hasic was born and spent most of his life in Srebrenica.  He
was, principally, a farmer.  On July 11, 1995, when Srebrenica
fell to the Serbs, he fled to Potocari, with his wife, daughter-
in-law and grandchildren.  His two sons had already fled.[6]

On July 12th, Serb soldiers arrived and, at first,
distributed sweets, while a camera was filming.  Later, the Serbs
started taking people away.  All during the night, people were
taken away, and Hasic heard shots.

On July 13th, the Serbs started to separate the Muslim men
and women.  The men were loaded on buses and they headed towards
Bratunac.  They were unloaded at a school, where they were held
for two nights.  At times, men were beaten by the soldiers, and

---

[6]They were later killed.

18

others were ordered out of the building.  Hasic could hear the
cries of pain and moans, until they grew weaker and weaker as the
victim died.  Sometimes he heard shots fired.  They received some
water, but no food and not enough water.

After two nights in Bratunac, they were told they were going
to Tuzla, which was controlled by the Muslim forces.  They were
given a little bread and some biscuits.  They traveled in the
buses towards Pilica.  Someone with him told Hasic that he had
counted seven buses.  Near Pilica they stopped for over an hour.
Someone tried to flee and was shot.

At Pilica, they stopped at a school and went inside.  Hasic
heard cries for help, curses and bursts of gunfire.  All through
the school were Muslim men between the age of 14 and 80.  They
were held in the school one or two nights without food.

At one point, the Serbs told them that they could leave for
Sarajevo on a bus if they paid 20 German Marks.  One man said he
had 100 and bought five spots on the bus.

A sheet of material was brought in and torn into strips.
The strips were used to tie the Muslim prisoners' hands behind
their backs.  They were told they were going to freedom in Tuzla.
Hasic knew that was not true.  As he was heading out the
building, he saw a man lying on the ground with a head wound;
blood was all around him and he was dead.

They boarded the buses and traveled over 2 kilometers.  As

they approached the end of the trip, Hasic heard gunfire.  They
traveled towards the gunfire, the buses stopped, and the door of
the bus opened.  The Serb troops told them to get off the bus.
They yelled: "Get off now.  Fuck your mothers and Alija's
[Allah's] and everybody's.  Get off.  Alija doesn't want you."

After a group of the men got off the bus, they were told to
stop.  Hasic was in the second half of the bus.  He saw those who
had exited the bus walk down a path to where dead bodies were
lying on the ground.  The men from the bus were lined up.  The
Serbs were yelling and cursing.  Bursts of gunfire mowed the
Muslim prisoners down and they fell.

Serb soldiers came back for the rest of the Muslim prisoners
on the bus.  They were marched toward the killing area.  One of
the soldiers told Hasic to give him Marks.  Hasic said he didn't
have any, so the soldier kicked Hasic in the stomach.

As he got to where the dead bodies were lying, Hasic saw the
bodies of those who had paid 100 Marks for their trip to
Sarajevo.  Hasic was lined up with the other prisoners and the
order to fire was given.  He fell to the ground.  A Serb soldier
asked if anyone was alive and two responded and asked to be
killed.  Hasic kept silent.  About seven or eight Serb soldiers
were shooting the prisoners.

Column after column of Muslims were marched to the killing
field and shot.  Hasic's elbow was grazed by a bullet.  Every so

often (after killing about six columns of men), the shooters
would take a break in the shade.  Hasic estimated that 1000 to
1500 Muslims were killed.

Hasic lay on the ground for awhile, but decided he had to
try and escape, because he was afraid that a machine would come
to bury him or a truck to pick him up, and he would be cut to
pieces.  He crawled for awhile and then hid in the brambles.  He
escaped through the woods.  He met other survivors, but split up
because they were younger and Hasic could not keep up with them.
While he was on the run, he saw a large truck filled with dead
bodies.  He also met Salihovic while hiding from the Serbs.  He
later surrendered and was taken to the Serbian controlled
detention camp at Batkovic.  He was exchanged just before the New
Year.

### C.    ICTY Investigators and Experts and Other Corroborating Evidence

To corroborate the testimony of the victim/survivors of the
massacre, and to establish the defendant's membership in the Army
of the Republic of Srpska and his role in the Branjevo massacre,
the government will submit the following evidence: (1) United
States aerial surveillance photographs taken in 1995, evidencing
a burial site at the Branjevo Farm, the secondary site on Cancari
Road, sites where Salihovic and Hasic were held[7], and a site

---

[7]Some of these photographs were taken at the time the
witnesses were at the sites depicted.

where Salihovic observed dead bodies; (2) photographs taken in
2005 of areas where Salihovic and Hasic were held and the site
referenced above where Salihovic observed dead bodies in the days
leading up to July 16, 1995; (3) forensic evidence from ICTY
investigators, pathologists and archaeologists, by way of
stipulation, that several hundred bodies and body parts were
exhumed at Branjevo Farm and the secondary location on Cancari
Road; (4) a videotape of the defendant in uniform at the one-year
anniversary of the forming of the 10th Sabotage Detachment; and
(5) the defendant's admissions to Alistair Graham (formerly) with
the ICTY, Special Agent Thomas Carroll of ICE and Special Agent
Gregory Hughes of the FBI, and the defendant's written statement.
The defendant admitted to the substance of the false statements
(that is, that what he wrote on the immigration forms was untrue)
and that he lied to better his chances to come to the United
States.

> ### 1.    United States Government Photographs:
> ### Eric R. Benn[8]

Eric Benn ("Benn") has been an employee of the Department of
Defense since 1983.  (He also had three previous years of
military service in the 1970s.)  He is currently a senior analyst

---

[8]At this time, the government believes that Eric Benn will
be the witness who will authenticate and testify concerning the
aerial surveillance photographs.  This might change because of
Benn's vacation schedule.  If so, someone equally qualified and
with a similar resume will testify.

and supervisor, involved in producing intelligence and geospatial
intelligence for the Department of Defense, national policy and
national security communities.  Using cameras, sensors,
satellites and other equipment, Benn is involved in documenting
and analyzing what is observed on the ground.  His training in
the field began in the Army in the mid-1970s.  He continued his
training in the private sector and received a graduate degree in
this field, and then returned to the Defense Intelligence Agency.
He rose within the Department of Defense as a civilian employee,
and has been in his current position since December 1999.  He is
a civilian employee, with what would be the equivalent military
rank of a two-star general.  He has received a number of awards
for his work.

He has viewed and interpreted tens of thousands of images.
He previously testified in various federal trials concerning the
analysis and interpretation of particular images.  He will
testify concerning the process of the collection of images that
are relevant to this case and the interpretation of those images.

As a result of reconnaissance missions, various surveillance
platforms produced overhead imagery ("photographs") of the
Branjevo Farm site on July 5, and again on July 17, 1995, the day
after the massacre.  The early July photographs show undisturbed
farmland.  The photographs taken on July 17, 1995, depict the
dead bodies lying on the ground and the Serbs digging the graves

23

for the victims killed at Branjevo.

Within one month, Secretary of State Madeleine Albright displayed the photographs of the Branjevo site to the United Nations Security Council.  On September 10, 1995, Richard Holbrooke asked Milosevic for access to the area.  In an effort to hide their crimes, the Serbs exhumed the bodies at many of the primary grave sites and re-buried them at more remote secondary sites.

Additional photographs of Branjevo were taken September 21, 1995, showing an undisturbed site (- the bodies had been buried and the soil returned).  Photographs taken September 27, 1995, depict a newly excavated trench.  A backhoe and front loader are present at the site.  Photographs from Cancari 12 (one of a number of burial sites along the Cancari Road) show the creation of a trench on September 27, 1995.  On October 2, 1995, the trench had been filled.  This evidence (along with some of the forensic evidence discussed below) helps establish that the bodies from Branjevo had been re-buried at Cancari 12, between September 21 and October 2, 1995.

Other photographs that will be introduced depict locations that will be described by the survivors and others.  A series of photographs of the town of Bratunac depict busses lined up on July 12, 1995; these buses were used the next day to transport Muslim prisoners (including Hasic) from Potocari.  Another series

of photographs were taken on July 12 and 13 of people and buses
in Potocari.  (Hasic was in Potocari on the 12th and 13th and
transported from there on the 13th.)  A photograph of a soccer
field at Nova Kasaba was taken in the afternoon of July 13, and a
large crowd (that included Salihovic) can be seen in the
photograph.  A seond photograph depicts a bus convoy headed in
the direction of Kravica.  About the same time, a photograph was
taken of the warehouse at Kravica.  When Salihovic was driven by
there a few hours later, the buses depicted in the photograph
were gone; however, Salihovic could see the dead bodies.

### 2.    The ICTY Investigators & Forensic Experts

The parties have agreed to stipulate as follows:

Beginning in 1996, investigators working for the
International Criminal Tribunal for the former Yugoslavia
("ICTY"), examined locations in eastern Bosnia, and unearthed
mass burial sites.  Some areas were identified as primary graves
and others as secondary graves, that is, in a number of
instances, primary grave sites were disturbed, and the bodies dug
up and then re-buried at secondary sites.  As a result of the
exhumations and re-burials, many of the bodies at the secondary
sites were broken and dismembered.  In addition, some of the
bodies at the primary disturbed site were similarly damaged.

The Branjevo Military Farm was one such primary grave site.
It is located in the Republic of Srpska region of Bosnia-

Herzegovina.  The Branjevo grave site was exhumed by the ICTY between September 10 and 24, 1996.  Autopsy examinations were conducted between October 6 and 23, 1996.  A secondary grave site along the Cancari Road, designated Cancari 12, that is linked to the Branjevo site, was exhumed in 1998.

Every detail of every exhumation was photographed and documented.  Archaeologists, anthropologists and pathologists were involved in the exhumations.  Archaeologists are experts in recognizing disturbed soil and recovering bodies and artifacts. Pathologists conducted autopsies and determined cause of death. Others were involved in recovering, documenting, photographing and analyzing artifacts and other evidence.  Anthropologists studied recovered bones for the purpose of determining age and sex, and interpreting breaks and other holes in bones.  They also determined - based on an analysis of bodies and body parts recovered, how many separate individuals were recovered.  In the case of disturbed primary sites and secondary sites, because the bodies were broken and dismembered in the process of being dug up and re-buried, determining the exact number of individuals recovered at a grave site was difficult.  Anthropologists arrived at a conservative number based on a process involving the counting of specific bones.  This process resulted in an undercounting of individuals in the fully exhumed grave sites.

The grave site at Branjevo was on the edge of a cultivated

field, approximately 150 meters from the gravel driveway leading
to the farm.  The grave had been dug by a machine and the
disturbed area was large enough to accommodate several hundred
persons.

From the grave site at Branjevo, a minimum of 132 separate
individuals were recovered.  In all instances where sex of the
remains could be determined, the remains were male.  The age
range of all the victims was between 15 and 61 years of age.  All
were wearing civilian clothes, except for one body that had
military-type pants; no military insignias were observed.  Some
of the identified remains had their wrists bound by cloth.
Blindfolds were also noted.  The victims were Muslims and
artifacts, such as prayer books and the Koran, as well as
religious objects, such as amulets and prayer beads, were
recovered that linked the victims to Islam.  Some victims were
identified through name-bearing documents removed from clothing,
and some by DNA comparisons to relatives.  Artifacts, personal
papers, including various kinds of identification cards, and
other evidence linked the victims to Srebrenica and the time
frame of the alleged massacre, that is, July 1995.  When exhumed
in 1996, the bodies appeared to have been buried for
approximately one year.  A cause of death by gunshot wounds was
attributed to all complete and nearly complete individuals.  Many
victims were killed by "spray"-type shooting, at close range.

27

The Cancari 12 site was one of a number of secondary sites located near the Cancari Road in Bosnia-Herzegovina. It was determined that some bodies dug up from Branjevo were re-buried at Cancari 12. Cancari 12 was exhumed May 10 through 25, 1998. The procedures for exhumation and analysis and the participation of forensic experts were the same as at Branjevo. Other grave sites along the Cancari road have not yet been exhumed.

Based on an analysis of the "grave matrix," that is, rock, soil and plants recovered between the body parts in the grave, a palynologist (one who studies pollen and spores) determined that the grave matrix did not originate from the site of Cancari 12 grave site. The experts further determined that the bodies and grave matrix originated at the Branjevo Military Farm. In addition, other experts analyzed the cloth found binding the wrists and over the eyes of some of the bodies recovered at Branjevo and Cancari 12; the experts determined that the same cloth was used to bind wrists and as blindfolds on the bodies recovered at both locations.

There were few intact bodies recovered at Cancari 12; bodies were dismembered in the process of exhumation and re-burial. A minimum of 177 individuals were recovered at Cancari 12. In all cases where sex could be determined, the victims were identified as males. None of the bodies carried any weapons, and none were wearing any army, military or police uniforms. The age range of

28

all the victims was from child to elderly; five were between 8
and 13 years of age and six were over 55.  The wrists of some
victims were bound with cloth and a few were blindfolded.  In all
cases where cause of death could be determined, the cause was
gunshot wound(s).  The injuries were consistent with automatic
weapons fire.  Identifying documents and other evidence linked
the victims to Srebrenica.

### 3.    Alistair Graham: 10th Sabotage Detachment Video and Defendant's Admissions

Alistair Graham joined the Lancashire Police in the United
Kingdom in October 1985.  He was a uniformed officer for three
years, until he was promoted Detective.  He received subsequent
promotions to Detective Sergeant and then Detective Inspector.
In 1998, he joined the ICTY as a senior investigator in
connection with Srebrenica.  He received subsequent promotions
and transfers within the ICTY, which involved being stationed in
and conducting investigations and interviews in the former
Yugoslavia.  In May 2001, he returned to the Hague as
Investigation Team Leader, overseeing several investigations,
including Srebrenica.  In November 2004, he left the ICTY to
become a Senior Investigator with the Independent Inquiry into
Oil for Food based at United Nations in New York.  He continued
there until the final report completed in December 2005, and
returned to the UK.  He is currently a temporary Detective
Inspector in Organized Crime Unit Lancashire Constabulary in

Northern England.

He will testify generally about the ICTY and the scope of its mandate and the investigations in which he was involved. As Investigations Team Leader he was responsible for supervising a number of investigators and analysts investigating crimes committed during the Yugoslav conflict.  The massacre at Branjevo Military Farm on July 16, 1995, was one of the atrocities he investigated.  In connection with his work for the ICTY, he traveled to Bosnia on several occasions and visited some of the massacre and grave sites.  He will also testify concerning his role in this investigation.

In August 2004 he traveled to the United States to assist U.S. investigators, because of his extensive knowledge of the facts of the Branjevo massacre, and to seek Boskic's cooperation on behalf of the ICTY.

He had with him a video of celebration of 10th Sabotage Detachment.  He brought the copy intending to show it to Boskic to prove to Boskic that he knew who he was and what he had done. The video is identified as a celebration of the 10th Sabotage Detachment.  In addition, the unique patch of the Unit is shown in the video.  Finally, the defendant Boskic is seen in the video.

On August 25, 2004, at a federal building in Boston, after the defendant was first interviewed by Tom Carroll of ICE and

Greg Hughes of the FBI, Agent Hughes came out of the interview room and got Graham and a Serbo-Croatian interpreter.  Graham entered the room and introduced himself to the defendant as Investigations Team Leader for the ICTY.  He told Boskic he wanted to ask some questions.  Agent Carroll spoke briefly to the defendant and then Graham began talking.  Graham told the defendant that he knew Boskic was part of 10th Sabotage Detachment, and that he (Graham) had brought a video with him.  Graham further told the defendant that he had knowledge of Srebrenica and various execution sites, including Branjevo, Kravica Warehouse and Pilica.  Graham stated that he was seeking Boskic's assistance for the Tribunal's investigations.

Graham played the video and froze it at Boskic's photo.  Boskic acknowledged it was him, that he was a member of that Unit.  He also identified others in the video.  Boskic said he would cooperate with the Tribunal - do anything to assist, and that he was prepared to travel to the Hague.

The defendant admitted to participating in the massacre of Branjevo and described the events beginning with the fall of Srebrenica.  He admitted to participating in massacre of Muslims at Branjevo.  His description of what happened at Branjevo and the manner of execution was consistent with the statements of Salihovic and Hasic that are set forth above.  Boskic identified the other members of his Unit who were at Branjevo.  Boskic

31

stated that the Muslims were lined up in small groups and were killed with automatic rifles.  He stated that he participated because he had no choice.  After the killings at Branjevo, the Unit refused to participate in additional killings at the Pilica Cultural Centre.

The defendant told Graham that he lied about his prior military service because he wanted to come and live in the United States.  Boskic said he was advised that it was best to leave out his military service.

The defendant was asked to put his statement in writing and he agreed to do so.  He wrote the statement in Serbo-Croatian. Both the original and a translated version of the statement will be offered as evidence during the trial.

Near the end of writing his statement, Boskic said that when the FBI came in he knew the game was up.

### D.    The Immigration Documents

#### 1.    Joanne Sassone

Joanne Sassone will testify and introduce records of the Citizen and Information Services, formerly Immigration and Naturalization Services ("INS"), including the contents of the defendant's "A file" and explain the forms that are the subject of Counts One through Four.  She is the Records and Information Services Officer of the Citizens and Information Services, of the Department of Homeland Security office in Boston, Massachusetts.

There are three different divisions of the Department of Homeland Security; the three divisions are: Citizens and Information Services, which administers benefits; Immigration and Customs Enforcement ("CIS"), which is the enforcement branch; and Customs and Border Protection, which is responsible for the border and ports.

In March 2003, INS became CIS, which is where Sassone works. She has worked for CIS/INS since 1988 (except for approximately 18 months during 1990-1991).

There are different divisions of CIS, consisting of Records, Examinations and Information.  Records maintains A files, documents and computers.  Examinations adjudicates applications for benefits.  Information is the division where applicants file applications and resolve problems, and the division that provides information.

Her work history with INS/ICE included 15 months as an Information Specialist, FOIA officer and Congressional liaison; in the status verification division; an Information Officer; Supervisor of Information Division; and from October 1995 to the present, as Supervisor of all three divisions and "Keeper of the Records" for CIS.

Aliens' applications are maintained in an "A File."  Each

job mentioned above involved the handling of A files.  Sassone
will explain the various forms filled out by the defendant that
brought him to the United States and established his residence
here.  She will explain the process and the requirements.  In
addition, the specific forms submitted by the defendant will be
introduced and discussed.  The forms, in addition to containing
the personal information of the defendant and containing his
signature, in some cases include a photograph of the defendant.

Additionally, Sassone will testify that the false statements
by the defendant were material to the granting of his application
to adjust his status to that of a permanent legal resident of the
United States.

### 2.    Francis Monin

Francis Monin ("Monin") is the Immigration Official who
received from the defendant and reviewed with him the forms that
he submitted in Germany in 2000 to gain asylum in the United
States.  Monin will likely not specifically remember the
defendant.  However, he will testify that it is his practice to
carefully review each application with each applicant and to
orally ask the questions that are contained on the forms, as well
as review the narrative.  Monin's role in processing Boskic's
application will be established by the documents; for example,
Form I-590 contains several signatures of Francis Monin, that
certify that the defendant was interviewed, that the contents of

the form were certified as true by the defendant, and that the defendant's signature was witnessed by Monin.

The false statements by the defendant were material to the granting of his request for asylum.  Based on the (false) statements by the defendant, his application for asylum was approved by Monin.

### 3.    Serbo-Croatian Interpreter[9]

The Form I-590, that is the subject of Counts One and Three, was signed by the defendant in both an English and Serbo-Croatian form.  The government will offer the testimony of a Serbo-Croatian translator to establish the meaning of the words on the Serbo-Croatian version of the form and the accuracy of the translation on the English version.

---

[9]The government will need the services of an interpreter or interpreters for three purposes: first, as discussed in this section, to testify about the translation of certain documents; second, to translate for the jury the testimony of Becir Salihovic and Ahmo Hasic, who will testify in Serbo-Croatian; and third, to translate for the government during the trial preparation of Salihovic and Hasic.  The government seeks the approval of the Court to use the same court-certified interpreter (Rexhap Nezra, who is employed by the FBI as a linguist and has previously testified and translated in court) for all three purposes, even though this would technically violate a sequestration order.  Defense counsel has stated that he has no objection to government's request.  The same exception would apply to his interpreter; should defense counsel see the need to have a Serbo-Croatian interpreter testify, he will seek to use the interpreter who will be translating the English testimony for the defendant.

In addition, when applying for refugee status, the defendant completed a supplemental questionnaire and provided a written statement.  The questionnaire was also translated, and the defendant signed the English version as well.  Further, his written statement was translated.  The translator will translate the Serbo-Croatian version and confirm the accuracy of the translations.

Finally, on August 25, 2004, the defendant provided a written statement to Agents Hughes and Carroll.  The translator will authenticate the English translation of this statement.

## E.  Defendant's Additional False Statement & Admissions

### 1.  Thomas Carroll

Thomas Carroll ("Carroll") has been with the Immigration and Customs Service ("ICE") (previously Immigration and Naturalization Service) since 1992.  He worked his way up through various jobs with ICE and is now a Special Agent in criminal investigations, assigned to the Joint Terrorism Task Force.

In 2004, Carroll was involved in the investigation of Marko Boskic for false statements on immigration documents and war crimes.  He learned that Boskic had applied for travel documents, and arranged for the defendant to come into the federal building for an interview.  When Boskic arrived at the Tip O'Neil Building, Carroll took Boskic into an office to be interviewed. Before the interview, Carroll administered an oath to Boskic, and

advised him of his *Miranda* rights.  Carroll used a two-sided form
that had an English version and a Serbo-Croatian version of the
rights.  Both Boskic and Carroll signed the form, and indicated
the date and time.

They discussed Boskic's request for travel documents;
Carroll told the defendant that he did not need the form he was
requesting.

Agent Carroll asked the defendant personal information,
including military service.  The defendant repeated the lies
contained in his immigration documents – he claimed his only
military service was the mandatory service in the Yugoslav
military in 1983-1984.  He also denied that he had ever
previously been arrested.

Agent Carroll showed the defendant a document concerning
criminal activity in Bosnia.  The defendant shrugged his
shoulders.  Agent Carroll then told him that someone from the
Federal Bureau of Investigation had to speak to him about his
criminal past.  At that time, Carroll left and returned with
Special Agent Hughes.

Rather than repeat what happened next, the narrative will
continue in the description of the anticipated testimony of Agent
Hughes that follows.

Additionally Agent Carroll will testify that the false
statements by the defendant were material to the granting of his

37

application to adjust his status to that of a permanent legal resident of the United States.

### 2.    Gregory Hughes

Gregory Hughes ("Hughes") has been a Special Agent of the FBI for approximately four years.  He is currently assigned to the Joint Terrorism Task Force.  In August of 2004, he was involved in the investigation of the defendant Marko Boskic for war crimes and immigration fraud.  On August 25, 2004, he participated in an interview of the defendant at the Tip O'Neill Federal Building in Boston.

After an initial short interview by Special Agent Carroll, of Immigration and Customs Enforcement, Hughes joined the defendant and Agent Carroll in a small office.  A two-sided Advice of Rights Form (in English and Serbo-Croatian) was on the desk in front of the defendant.  Agent Carroll reminded the defendant that his rights as they had been explained to him still applied, and repeated some of the *Miranda* rights.  Boskic stood as if to again take an oath, but was told that he did not have to do that again.

Agent Hughes asked the defendant if he was in the war, and the defendant lied and stated that he was not.  Hughes asked him about arrests overseas, and the defendant denied that he had ever been arrested.  Agent Hughes showed him some documents that contradicted that statement.  The defendant claimed that was from

a long time ago, and the charges were dismissed.  The defendant
acknowledged, however, that he did not include the arrests on his
immigration forms.  In discussing arrests in 1992, the defendant
stated that the Muslims were in power, and they can make stuff
up.

Agent Hughes also told the defendant that his name came up
in police report regarding shooting in 1995.  The defendant
claimed that was not him, because he was not in Bosnia in 1995.

At that point, Agent Hughes told the defendant that someone
else wanted to talk to him.  Agent Hughes left the room and
returned with Alistair Graham and an interpreter.  The defendant
was again reminded of his *Miranda* rights.

Graham told Boskic not to say anything until he finished
telling him what he wanted to say.  Graham then explained where
he was from (the ICTY) and that he was investigating senior
military officials.  Graham offered to show Boskic a video of
Boskic in the military.  Boskic said it would be better if he saw
the video.  The video of the 10th Sabotage Detachment was then
played for Boskic, and Boskic acknowledged that he was one of
those depicted in the video.

The defendant then discussed his Unit's role in Srebrenica
and the subsequent massacre at Branjevo for approximately one
hour.

39

At some point, Agent Hughes again asked questions of the
defendant.  He asked the defendant to put his statement in
writing.  Before beginning the statement, Boskic was questioned
by Agent Hughes to confirm that he knew he was answering
questions and writing his statement of his own free will, without
coercion or promises.

Boskic agreed to write the statement, and the process took
several hours.  He was asked whether anyone else from his Unit
was in the United States.  He said no, but he had names and
addresses at his apartment.  Boskic then agreed to a search of
his apartment and later agreed to a search of his car as well.

We will seek to introduce the original of the statement
Boskic wrote and an English translation as well.  In his
statement, that was written in his own hand, the defendant
admitted that he "joined a unit of the military of the Serbian
Republic which later grew larger and formed into the 10th
Sabotage Detachment ..."  (This military service was not listed
on the defendant's immigration documents discussed above.)

Boskic described the Unit's participation in the takeover of
Srebrenica.  According to Boskic, they entered Srebrenica without
confronting any opposition - apparently the Muslim forces had
fled.  After returning to their base in Vlasenica for a couple of
days, they were visited by superior officers, who met privately
with their commander.  After the meeting, their commander told

40

them that "all fit men from Srebrenica will be shot."

Members of the Unit were assigned to go on the mission. Boskic was chosen and claimed that he told the commander he didn't want to go.  According to Boskic he was told that he would be shot for refusing.

The next day, they went on their mission.  They went to a school where the Muslims were being guarded by military police.[10] A short time later, an officer came and directed them to a meadow at another location [- the Branjevo Military Farm].  "The police brought the Muslims from buses, and they were arranged in lines, and we carried out the liquidation with automatic rifles."

After they completed the massacre, the went to a bar [in Pilica].  They were given an order to kill more Muslims, but they refused.

During the time he was writing his statement, at about 8:20 p.m., Boskic asked Hughes what would happen that night after the interview.  Boskic was told that he would be held in jail overnight and see a judge in the morning.  He then asked if he was being arrested.  Agent Hughes told Boskic that he was being arrested on a criminal warrant for fraud on immigration documents.  Boskic continued writing his statement.

After he was finished, Agent Hughes asked him to include in

---

[10]This was likely the school in Pilica that was described by Salihovic and Hasic.

his statement his admission that he had lied on his immigration documents.  Boskic refused.  When asked why, Boskic said:  "Greg, Greg, if you had a woman you loved, would you lie to keep a girl."

Boskic put his initials on each page of the statement. Towards the end, Boskic said: "I knew what this about when the FBI came in."

The process was completed about 10:30 p.m.

## V.  Conclusion

The defendant lied on several documents submitted to ICE for the purpose of gaining entry into the United States as an asylum seeker, and then to gain status in the United States as a permanent legal resident.  He purposely withheld information about his prior military service and his role in the Branjevo massacre, because he knew that he would not have been allowed entry to the United States if he had told the truth.

When initially questioned on August 25, 2004, by Special Agents Carroll and Hughes, he repeated some of his lies, and denied that he was a member of the Army of the Republic of Srpska.  (In fact, he claimed that he was not involved in the war in Bosnia, and was not in Bosnia in 1995.)

In subsequent statements to Agents and investigators, he admitted to the substance of the lies and the fact that he purposely omitted certain information on his immigration

documents.

Substantial independent evidence and the defendant's own admissions establish his guilt on each of the five counts of the indictment.

## VI.  Voir Dire Questions and Jury Instructions

The Court directed the parties to submit proposed voir dire questions and jury instructions.

The government does not request that any special voir dire questions be ask of the potential jurors.

The government does not, at this time, have any specific requests for jury instructions.  The government requests the right to modify this position in light of the defendant's requests and based on the testimony and evidence that is received by the jury.

Respectfully submitted,

For the United States:

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ Jeffrey Auerhahn
JEFFREY AUERHAHN
KIMBERLY P. WEST
Assistant U.S. Attorneys

Dated:    June 8, 2006

## CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants

as identified on the Notice of Electronic Filing (NEF)

        /s/ Jeffrey Auerhahn
Jeffrey Auerhahn
Assistant U.S. Attorney