# ATTACHMENT A

## Report of Susan Berk-Seligson
## June 25, 2006

**My Background, Expertise**

I am a professor at Vanderbilt University, specializing in linguistics. My appointments are in the Department of Spanish and Portuguese and in the Center for Latin American and Iberian Studies. I hold a Ph.D. in linguistics and have spent the last twenty-five years doing research in the field of language and the law—sometimes referred to as forensic linguistics—with a particular focus on interpreting/translating issues.

As a linguist specializing in legal interpreting/translating, I have published a book on interpreting in the courtroom (*The Bilingual Courtroom: Court Interpreters in the Judicial Process*, 1990 and 2002, The University of Chicago Press), as well as scholarly articles in refereed journals and in edited volumes on linguistic issues involved in legal interpreting. The book won the 1991 award of the British Association for Applied Linguistics for "The Outstanding Book in the Field of Applied Linguistics." It was also nominated for the Scribes Book Award at the 1991 annual meeting of the American Bar Association.

I have served as an officer of the International Association of Forensic Linguists, and since 1999 have been a member of the editorial board of *Speech, Language and the Law: The International Journal of Forensic Linguistics*. I am also a member of the advisory board of the *Journal of Interpreting: International Journal of Research and Practice in Interpreting*, and have served as a consulting editor for the *Journal of Interpretation*. I have been a research affiliate of the National Center for State Courts, and in that capacity have served as an advisory committee member on the Federal Court Interpreter's Certification Exam. I currently serve on the scientific committee of a conference whose focus is community interpreting (Critical Links 5). In my capacity as a college professor, I have taught courses on Language and the Law in four universities (Northwestern University, Purdue University, University of Pittsburgh, and in fall 2006 I will teach it at Vanderbilt University). A significant component of the course is the topic of legal interpreting. I have directed or co-directed fifteen Ph.D. dissertations in the field of linguistics. One of them has focused on interpreting in immigration hearings (Marjorie Zambrano, 2005, "The Interpreter's Linguistic Power: A New Courtroom Reality in Immigration Hearings").

**Research Relevant to United States of America v. Marko Boskic**

The body of research on interpreting/translating shows the inherent difficulties in performing these duties. The goal of legal interpreting/translating is to render in the target language the equivalent of what was said in the source language, without adding to, omitting from or changing any of the content of the source language utterances/sentences. Equivalence entails not shifting the register (i.e., the style associated with a level of formality) or the tone of the source language material.

1

To maintain the linguistic equivalence between source and target language, the interpreter must possess a relatively balanced bilingualism, that is, must be nearly equally proficient in his/her two languages.

Bilingual proficiency, however, is only a necessary but not a sufficient qualification for work as a legal interpreter. Interpreters must possess interpreting skills as well. Specifically, they must demonstrate the capacity to perform consecutive interpreting, simultaneous interpreting, and sight translating. *Consecutive interpreting* entails listening while the speaker is speaking, waiting until s/he finishes, and then rendering aloud an interpretation of what s/he has said. *Simultaneous interpreting* requires that the interpreter listen and speak at the same time, lagging behind the person who holds the floor, and in a whispered voice rendering the source language utterances into the target language for the benefit of the accused or plaintiff. *Sight translating* entails looking at a document written in one language and interpreting the contents aloud in the target language (e.g., reading a form filled out in Serbo-Croatian and rendering it aloud in English for everyone to hear).

Beyond the requisite bilingual proficiency and proven competence to perform interpreting skills, the professional interpreter must adhere to a code of professional ethics and responsibilities. Different interpreting/translating associations have their own codes, yet they are remarkably similar, even across countries (Berk-Seligson 1999).

Professional interpreters/translators can demonstrate their qualifications in a variety of ways. One way is to pass a certification exam, if one exists in the particular language in which the interpreter/translator works. The U.S. federal court interpreters exam has had an overall pass rate of 4.9% since 1980 (i.e., 95% of test takers have failed it) (Hewitt, personal communication, June 2006). There is a set of state court interpreting exams administered by the National Center for State Courts. For the ten languages for which exams exist, since 1995 the highest pass rate has been 26% (for Spanish and Haitian Creole). The next closest pass rate has been for Russian (21%) and Hmong (22%). For the remaining six languages (Arabic, Cantonese, Korean, Laotian, Mandarin and Vietnamese) the pass rates have been quite low: 1%, 0%, 3%, 0%, 8%, and 3%, respectively (Romberger, June 2006). These exams test for a range of lexical and grammatical styles, including a formal style that typically only persons who have had two years of college would have mastered, in *both* of their interpreting languages.

Unfortunately, even professional interpreters make interpreting mistakes. The empirical research findings of Berk-Seligson (1990 and 2002, 1999), Hale (1999, 2002, 2004), and Rigney (1999), for example, demonstrate this. Interpreters working in the courtroom alter the meaning of lawyers' questions and witnesses' answers.

Why are there discrepancies between source language and target language when an interpreter/translator has served as an intermediary? A number of factors will produce distortions of meaning. (1) First of all, there is generally ignorance on the interpreter's part of the importance of pragmatic meaning, that is, meaning that comes from the context in which words are uttered. Context refers to the appropriate use of language

2

according to the culture and situation in which the language is used. Context will indicate the register to be used (for example, a member of an adolescent gang will use vocabulary that belongs to his local street slang, whereas a medical doctor testifying about the nature of a wound might resort to highly technical medical terminology; the sentences of two such witnesses are likely to vary in their syntax as well). Interpreters might not be familiar with such speech varieties, and might not know the equivalent terms in the target language or even their meaning in the source language.

(2) A second factor that will produce inaccuracies in interpreting/translating is the existence of cultural differences between the interpreter and the persons for whom s/he is interpreting. For example, if it is culturally appropriate behavior to address a Latin American middle-aged woman with the honorific *señora* (Ma'am), then an interpreter of Latin American national origin interpreting for a Latin American middle-aged female may often address her with that honorific, even though the individual conducting the interrogation may not have used the politeness marker 'Ma'am' in his or her questions.

(3) Sometimes there is no equivalent vocabulary in two languages because a given cultural notion does not exist in two given cultures. For example, if clitorectomy and circumcision are not practiced in a given culture, there might not be native words for such practices. Of course cultures borrow words from other languages once the two cultures have been in contact, but until that happens, finding an equivalent lexical item to refer to the concept will be difficult, and will require circumlocutious phrasing.

(4) Sometimes a word in one dialect of a language may have a different meaning in another dialect (e.g., the Spanish word *guagua* means 'bus' in Puerto Rico and in some other nearby Caribbean Spanish-speaking countries, but it means 'baby' in Chile).

(5) If the source language speaker and the interpreter speak markedly different dialects of the same language, communication difficulties might arise from differences in pronunciation.

(6) One common reason why target language interpretations/translations are divergent from the source language original is that the interpreter/translator has certain biases toward the person for whom s/he is interpreting. When interpreters/translators are relatives or friends of the person needing interpreting/translating services, they often will see themselves as advocates for that person, and will slant the interpretations/translations in a direction that they perceive is beneficial to him or her. Since they are not professional interpreters/translators, but *ad hoc* ones, they most likely are not familiar with the profession's code of ethics and would not even know that fidelity to the source language is the expected outcome of their task.

(7) In the case of using children as interpreters/translators, the risk that the interpretations/translations will be faulty is even greater, since it is unlikely that someone who has not completed a high school education in any language will have the range of registers required in legal settings.

(8) The grammatical complexity of the source language text is a serious problem in the interpreting context. This is true for two reasons. First, when a text is marked by grammatical complexity, it will be difficult for the average person who has not had a college education to understand it when the text is read aloud to them. When a person is not able to read the text by him/herself, it will be far more difficult to understand because reading a text gives the reader the option of rereading those portions that are particularly troublesome. Second, grammatical complexity in a source language document can be problematic for an interpreter/translator who is not qualified for the job—either because his/her proficiency in the two languages is not sufficiently high for the task, or because s/he has not had sufficient experience in interpreting/translating and therefore does not have well-honed skills in this field. An interpreter/translator who has not had previous experience in sight translating government or other legal documents will have great difficulty in doing such translating, and even more so if his/her command of the target language is not that of a college-educated native speaker.

**The Translation of Form I-485 to Marko Boskic**

While all of the above pitfalls in interpretation come to bear on the manner in which Form I-485 was interpreted to Mr. Boskic, three aspects of the difficulties inherent in translating are profoundly apparent: grammatical complexity of the source language text, lexical difficulty of the source text, and the lack of qualifications of the interpreter/translator.

*Grammatical complexity and lexical difficulty*

The difficulty in Form I-485 comes mainly from the presence of a number of sentences characterized by a combination of highly complex syntactic structure and sheer length. Sentence length is problematic because, as one legal scholar and linguist has noted, "A long sentence is normally much harder to follow than one that is broken down into pieces" (Tiersma 1999:58). In addition, the register of the vocabulary in I-485 is at times too high for someone having only a high school education to comprehend, particularly when that education was not academic in its orientation (e.g., the term 'moral turpitude' in #1a of the Processing Information set of questions is a legal term, one that would be difficult to understand even for many college educated native speakers of English; how many high school educated Americans would be able to define 'turpitude'?).

Form I-485 is filled with characteristics of legal language, and for this reason is difficult to comprehend, even if one is given the opportunity to read it. In the case of Marko Boskic, it should be kept in mind, the form was sight-translated for him, and therefore he had to grasp the meaning of I-485 aurally, rather than by reading a translation of it by himself. The task of understanding the questions aurally had to be far more demanding than reading them in his native language. He did not have the luxury of rereading them, to be able to make complete sense of all the constituent parts of these complicated sentences.

The following features typical of legal language are found in Part 2 of I-485. (1) Frequent use of coordination is one of the characteristics of legal language (Gibbons

2003:59). Repeated instances of conjunction within the same sentence can be found in: (b) my spouse **or** parent applied for adjustment of status **or** was granted lawful permanent residence in an immigrant visa category that allows derivative status for spouses **and** children; (d) I was granted asylum **or** derivative asylum status as the spouse **or** child of a person granted asylum **and** am eligible for adjustment; (e) I am a native **or** a citizen of Cuba admitted **or** paroled into the U.S. after January 1, 1959, **and** thereafter have been physically present in the U.S. for at least one year; (f) I am the husband, wife **or** minor unmarried child of a Cuban described in (e) **and** am residing with that person, **and** was admitted **or** paroled into the U.S. after January 1, 1959, **and** thereafter have been physically present in the U.S. for at least one year; preceding (i), I am already a permanent resident **and** am applying to have the date I was granted permanent residence adjusted to the date I originally arrived in the U.S. as a nonimmigrant **or** parolee, **or** as [illegible] May 2, 1964, whichever date is later, **and**: (Check one) [ ] I am a native citizen of Cuba **and** meet the description in (e) above. [ ] I am the husband, wife **or** minor unmarried child of a Cuban, **and** meet the description in (f), above. (2) Archaic deictic vocabulary (e.g. 'thereafter'). (3) Specialized meanings for ordinary words or for words that normally have a different meaning (e.g., 'derivative status' in (b), 'derivative asylum' in (d).

This creates a double interpreting/translating problem: (1) syntactically complicated sentences filled with specialized, technical vocabulary will be difficult for the interpreter/translator to interpret accurately on-the-spot; (2) even if the interpretations are accurate, the sentences will be exceedingly difficult to comprehend for the person who is listening to them. It is worthwhile stressing the crucial point that form I-485 was meant to be read by the applicant him/herself, not to be heard by him/her through the filter of another speaker. The analysis below gives some details demonstrating the difficulties that Boskic faced in having I-485 sight-translated for him.

Part 3 ("Processing Information") of form I-485 is just as filled with legal language as are the other sections of I-485. The beginning of section C of Part 3 is distinct from the rest of Part 3, in that the opening request for information comes in the form of five declarative sentences, grouped together as one paragraph. There is no way in which someone listening to them read aloud as a group could remember the details of this set of sentences. It is likely that an interpreter/translator would read them one-by-one. Since these declaratives are pragmatically requests for information, it is highly possible and even likely that an interpreter would have reformulated them in the interrogative mode (i.e., as questions), since the declaratives are instructions to the reader on how to fill out that section of the form. Since it was not the visa applicant, Boskic, who was filling out the form, but someone else, the interpreter's job was to obtain the information from Boskic and then have the information filled in, either by writing the answers down himelf or by having a third party write them down, which turns out to have been the case. If the set of instructions was in fact broken down into its constituent five sentences, and these sentences in turn were reformulated as questions—which is most likely since the applicant was not being instructed to do the writing—then we have no way of knowing what the wording was of these newly formulated questions. For example, the applicant is asked to list his or her "present and past membership in or

5

affiliation with every political organization, association, fund, foundation, party, club, society or similar group in the United States or in other places since your 16th birthday. Include any foreign military service in this part." If the second sentence were converted to a question, what would it be? If the sentences were interpreted one by one, the second one now being separated from the first one, and as a question rather than as a declarative, then it is possible that the scope of the word 'any' could be understood in more than one way (i.e., that it is ambiguous): (1) 'any' can be interpreted existentially (there is at least one foreign military service in which the applicant has served); and (2) 'any' can be interpreted universally, that is, all the military service organizations that the applicant has served in. The context in which the sentence is read very much affects the interpretation of the meaning of the sentence (e.g., what is uttered immediately before the sentence in question is said and what is uttered immediately afterwards), as does the sentence stress: does the primary stress in the sentence fall on 'any' or does it fall on some other word in the sentence? These will give different semantic readings of 'any'.

The remainder of Part 3, Processing Information, consists of a series of items worded as questions. The questions typify legal English in that most of them have unusually complex sentence structure, and are noteworthy for their inclusion of lists of units. When a sentence combines lengthy prepositional phrases with lists of both verbs and nouns, the sentence becomes difficult to understand even in writing, let alone when conveyed orally. Question #7 is an example of such an unwieldy question: "Did you, during the period from March 23, 1933 to May 8, 1945, in association with either the Nazi Government of Germany or any organization of government associated or allied with the Nazi Government of Germany, ever order, incite, assist or otherwise participate in the persecution of any person because of race, religion, national origin or political opinion?"

Question #4 is a classic example of a sentence written in legal English. First of all it is lengthy (66 words long, in comparison with scientific prose, which has a mean length of 27.6 words, according to Tiersma (1999:56)). Secondly it is characterized by numerous clauses, numerous lists, many conjunctions and an embedded clause containing its own conjunctions and lists. Sentence #4, if heard rather than read to oneself, would be virtually impossible to comprehend in its entirety on a first hearing. Communicated orally, it would almost certainly have to be broken up into smaller chunks for the listener to follow.

The use of lists and numerous conjunctions can be seen throughout Part 3 of I-485. Question #8 is a particularly vivid example of this phenomenon. The question would be difficult to understand if heard out loud rather than read to oneself. It is particularly important know how this question was translated to Mr. Boskic. Slight variations in the translation could change the meaning of the question and make it impossible to judge the truth or falsity of the answer.

The vocabulary in Part 3 reflects the lexical nature of legal language. Terms such as 'abetted', 'incited', 'controlled substance', 'waiver', 'rehabilitation decree', 'clemency' and 'colluded' are specialized words belonging to the realm of the law, and

6

unlikely to be part of the lexicon of a high school educated person who has had little experience with U.S. law.

To sum up, the language of form I-485 has all the earmarks of legal writing, and if read aloud to a native speaker of English who is not college educated, it would be very difficult to comprehend. But this form was intended to be read by the applicant, not to be heard aloud. Even if the sight translation of I-485 for Marco Boskic was carried out perfectly, it had to have been very difficult for this vocational high school graduate to understand it. However, as the discussion below explains, it is very doubtful that Boskic was given an accurate translation of I-485.

### *Qualifications of the interpreter/translator*

It is most likely that the sight translations of the interpreter/translator who rendered form I-485 from English into Serbo-Croatian for Boskic were faulty. I say this for several reasons. (1) First, my understanding is that the person who did the sight translating was not a qualified interpreter and possibly a child. Someone of that age would not have completed high school as yet. (2) Because many of the questions on the form are written in such a grammatically complex, verbose fashion, it is likely that the interpreter would have resorted to breaking down each question into constituent parts. If he in fact did this (and we can surmise that Boskic would have asked the interpreter/translator to repeat many of the questions), we have no idea how the interpreter/translator broke down each question. We cannot tell where the distortions would have been and how the English questions were rendered in the rephrasing process. What we do know from prior research, is that when interpreters rephrase Miranda-type warnings in the United Kingdom, the outcome is a distortion of how the warnings should read (Russell 2000). Even when police rephrase these cautionary statements in a monolingual English-speaking situation, the warnings emerge quite changed from the way in which they are written (Cotterill 2000).

An additional complicating factor in the interpreting situation is that the interpreter/translator was not the person who filled out the I-485 form. Rather, there was a third party present during the sight-translating event: a college student volunteer who routinely would assist visa applicants in this visa office, helping them to fill out the I-485 forms in English. The student would do this in conjunction with the ad hoc interpreters/translators who would come to accompany the persons applying for visas.

Finally, if the sight translations were faulty, then we do not know for certain what questions Boskic was answering. Since the event was not audio recorded, this will forever be unknowable. What we do know is this: if, hypothetically, the questions were sight translated to Boskic accurately, then it is highly unlikely that he fully understood them, because of the high register of language in which the documents were written. In the case of the I-485 form, which was translated aloud for him, it would have been impossible for him to accurately grasp all of the questions in their entirety, because even reading them in one's native language would have required rereading many because of their linguistic complexity. If the questions were broken down into shorter chunks, we have no idea how accurately these chunks corresponded to the original questions. In

either case, Boskic would have been responding to something other than what the questions meant. And if the sight translations were faulty, which is highly likely, this too would have resulted in imperfect comprehension of the questions and therefore unreliable answers.

In short, the interpreting/translating speech event that went on in the visa application office I believe were likely to have produced a disturbingly large degree of misunderstanding on Boskic's part, for the reasons enumerated above.

Susan Berk-Seligson, Ph.D.    *Susan Berk-Seligson, Ph.D.*

Date June 25, 2006

## REFERENCES

Berk-Seligson, S. (1990 and 2002a). *The Bilingual Courtroom: Court Interpreters in the Judicial Process.* Chicago: University of Chicago Press.

Berk-Seligson, S. (1999). The impact of court interpreting on the coerciveness of leading questions. *Forensic Linguistics* 6, 30–56.

Cotterill, J. (2000). "Reading the rights: A cautionary tale of comprehension and comprehensibility." *Forensic Linguistics: The International Journal of Speech, Language and the Law* 7(1):4-25.

Gibbons, J. (2003). *Forensic Linguistics: An Introduction to Language in the Justice System.* Oxford, UK/Melbourne, Victoria, Australia/Berlin, Germany: Blackwell Publishing.

Hale, S. (1999). Interpreters' treatment of discourse markers in courtroom questions. *Forensic Linguistics* 6, 57–82.

Hale, S. (2002). "How faithfully do court interpreters render the style of non-English speaking witnesses' testimonies? A data-based study of Spanish-English bilingual proceedings." *Discourse Studies* 4(1):25-47.

Hale, S. (2004). *The discourse of court interpreting.* Amsterdam, Philadelphia: John Benjamins Publishing Company.

Hewitt, W. (2006). Personal communication. Williamsburg, Virginia: National Center for State Courts.

Rigney, A. C. (1999). Questioning in interpreted testimony. *Forensic Linguistics* 6, 83–108.

Romberger, W. (2006). Personal communication. Williamsburg, Virginia:National Center for State Courts.

Russell, S. (2000). "Let me put it simply...": the case for a standard translation of the police caution and its explanation. *Forensic Linguistics* 7, 26–48.

Solan, L. (1993). *The Language of Judges.* Chicago: The University of Chicago Press.

Tiersma, P. M. (1999). *Legal Language.* Chicago: The University of Chicago Press.