UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) ) ) ) | Case No. 04-CR-10298-DPW |
| v. |  |  |
| MARKO BOSKIC |  |  |

**DEFENDANT'S SENTENCING MEMORANDUM**

**Introduction**

On July 12, 2006, after a jury trial, defendant was found guilty of two counts of fraud and misuse of visas, permits and other documents in violation of 18 U.S.C. § 1546(a). Defendant was arrested on these charges on August 25, 2004 and, as of the date of sentencing, will have spent 26 months in federal custody on the instant offenses.

The Probation Department has submitted a Presentence Report which calculates the defendant's Total Offense Level under the Sentencing Guidelines as 10, which would, given the defendant's criminal history category (Category II), if followed, produce a sentencing range of 8 to 14 months. This determination, however, is based on one contested finding: a two level upward adjustment for obstruction of justice, under U.S.S.G. § 3C1.1. As argued below, adjustment for obstruction of justice is warranted. Computed correctly, defendant's Guideline level is 8, which would, if followed, produce a sentencing range of 4 to 10 months.

Since defendant already has been detained 26 months on these charges, he has completed his sentence whether the Probation Department's Guideline level is followed or the defendant's Guideline level is followed.

In the Presentence Report, the Probation Department makes two observations without

making any recommendation for a departure or a variance with the Guidelines. First, the Probation Department notes, without making a recommendation, that "[a]lthough the defendant's participation in the mass execution at Branjevo collective farm has never resulted in a conviction and that conduct is not similar to the instant offense, the Court may consider whether this conduct fits within the type of information permissible to form the basis of an upward departure." (PSR, p.29)   Second, the Probation Department notes, without making any recommendation, that "the Court may wish to consider whether the defendant's false statements on immigration forms enabled him to evade judicial accountability for prior actions in his home country for many years" and, if so, whether such information is a factor that may warrant a sentence outside of the advisory guideline range. (PSR, p.30).

     In Argument I, below, we discuss sentencing post-<u>Booker</u> and the application of the Guidelines as advisory.  In Part I(A), we set forth why an upward adjustment is not warranted for obstruction of justice under Guideline § 3C1.1 based on defendant's testimony at the suppression hearing.  Defendant's testimony was not perjurious, but rather was the result of confusion, mistake, and language problems.  In Part I(B), we respond to the Probation Department's observation that defendant's conduct in Bosnia in 1995 may fit within the type of information permissible to form the basis of an upward departure for criminal history under Guideline § 4A1.3(a) (inadequacy of criminal history category).  No departure is warranted for defendant's conduct in Bosnia.

     In Argument II, we discuss why defendant's proposed sentence is reasonable under 18 U.S.C. § 3553(a) and why this Court should not consider a sentence outside of the advisory guideline system.  Defendant did not make the false statements on the immigration forms in

order to evade judicial accountability for prior actions and, in any event, this is not a factor that calls for a sentence outside of the Guidelines.

## Proposed Findings of Fact[1]

This case arises out of the tragic three-way ethnic and religious civil war in the former Yugoslavia – between ethnic Muslims, Serbians (Eastern Orthodox) and Croats (Roman Catholic).  Defendant, an ethnic Croat, was born and raised in a small town in the mountains outside of Tuzla, in Bosnia-Herzogovina ("BiH, or Bosnia").  He served in the Yugoslav National Army ("JNA") in 1983-84.   In the early 1990s, the nation of Yugoslavia broke apart.  BiH declared its own independence, under a government controlled by the Muslim majority,[2] and Serbians rebelled, forming the so-called "breakaway" "Serbian Republic" ("Republica Srpska") which sought annex or affiliation with Serbia.  At the beginning of the conflict, defendant returned to the family home.  There, he and his brother, Goran, assisted persons to escape from Bosnia, over mountain trials, to the Serbian lines.  In 1993 they were arrested by the Bosnian state security police and remained in custody for approximately 2 months.  While in detention, defendant was registered as a prisoner by the International Committee of the Red Cross ("ICRC").   Defendant and his brother were convicted, but released on appeal and ordered to report for duty to the Bosnian army.  Instead, however, they decided to flee, intending to leave the former Yugoslavia altogether.

When they reached Serbian lines, however, they were arrested and remanded to the

---

[1] This statement of facts is taken from the Statement of Relevent Conduct that defendant provided to the Probation Department and is included in the PSR as "Defendant's Version of the Offense" (PSR, pp. at 7-9).  The information is taken from the testimony and exhibits at trial.

[2] Muslims then constituted 44% of the population, Serbs 31%, and Croats 17%.

infamous Batkovic concentration camp, where they were held with Muslim and other Croat prisoners and were registered again by the ICRC. Conditions in the Batkovic camp were harsh to the point of life-threatening. In June 1994, there were offered release from the camp if Boskic would join a newly formed sabotage unit of the army of the Serbian Republic ("VRS"), made up mostly of other released prisoners. Boskic agreed, was released, and for the next year, participated in behind enemy lines sabotage operations, but no combat. During that time, the unit was reformed into the "10th Sabotage Detachment," with the addition of Serbian volunteers.

In July 1995, the unit was ordered to participate in the capture of Srebenica, a Muslim town under United Nations protection. After the town was taken, orders came from the high command of the VRS to execute every able-bodied Muslim man in the town. Milorad Pilemis, the commander of the unit, assigned this task to a group of 8-10 men, including Boskic. Boskic refused, but Pelemis threatened him with death, pressing a pistol to Boskic's head. The mass execution took place at the Branjevo collective farm. Defendant participated, as ordered.

The war ended in December of 1995, and defendant eventually made his way to Germany. In 2000 he applied for a visa for entry to the United States as a refugee. In the application he was asked the fill out a section entitled "Military Service" and he noted his service in the Yugoslav National Army. He did not, however, note any service in the VRS, and this became the subject of COUNT ONE, in which he was convicted of falsely stating that he "had served in the Yugoslav National Army and no other."

He was admitted to the United States, where he lived openly, under his own name, in Peabody, MA. In April, 2001, he applied for Permanent Resident status. The application contained a similar inquiry concerning military history and, again, he noted only his service in

the JNA. This then became the subject of COUNT TWO, in which he was convicted of the same false statement as charged in the other count.

The Refugee Application in 2000 also asked whether the applicant had ever "ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion" and defendant answered "No." This was the subject of COUNT THREE, in which he was charged with falsely stating "that he had never ordered, assisted or otherwise participated in the persecution of any person because of race, religion and political opinion." Similarly, in his 2001 Application for Permanent Resident Status, Boskic answered "No" to the question, "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion?" This was the subject of COUNT FOUR. The government contended that he had falsely answered these questions because of his participation in the Srebenica mass execution, in which the prisoners had been selected because they were Muslim. But defendant contended that his answers were literally true, as he had not participated in the killings <u>because</u> of the persons' religion, nationality, or ethnic origin – he had done it only because he had been forced to do it.[3] The jury acquitted him of these two counts.

In 2003, unknown to the defendant, the government opened an investigation. On August 25, 2004, he was drawn to the JFK building, ostensibly for an interview on an application he had made for refugee travel documents. The interview was begun by ICE agent Thomas Carroll,

---

[3] In his statement, defendant wrote: "I told Pelemis I do not want to do that. He came up (to me) and put a pistol on (my) forehead and said that I have to or I will be dead...I did not do this of my own free will. I was personally ordered to do this by Pelemis, and I was forced to do this."

then joined by FBI Special Agent Hughes. They concealed from defendant the real purpose of the interview, as well as the fact that they had already obtained a warrant for his arrest. Finally, they introduced one Alistair Graham, an investigator for the International Criminal Tribunal for the former Yugoslavia (ICTY), and an interpreter, who had been waiting in the next room. Graham informed Boskic that he was not a subject of his investigation, and that he was only seeking the defendant's cooperation against higher officers. Boskic then confessed his entire involvement in the 10th Sabotage Detachment and the Branjevo executions.

Agents Carroll and Hughes testified that during the initial part of the interview defendant, upon inquiry, had falsely stated that he had no other military service beyond the JNA. Thus, COUNT FIVE charged the defendant with making a false statement, similar to COUNTS ONE and THREE, concerning defendant's military service. But there was no interpreter in the room at that point and defendant had only a rudimentary command of English. And there was no accurate record of what was asked, and answered, or how, since the agents purposefully had not used a video machine in the room. The defendant was acquitted on this count.

### Argument

**I.      THE COURT SHOULD FIRST CALCULATE THE SENTENCE USING THE GUIDELINES**.

Following the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), holding the Guidelines unconstitutional, the First Circuit prescribed the procedure to be followed and the considerations to be entertained by district courts during sentencing. United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006). The First Circuit has emphasized repeatedly the continuing importance of the now advisory Guidelines in sentencing and admonished that a calculation of a defendant's sentence under them is the first step to be taken

by the district court in its sentencing procedure. Id. at 518.

> "The guidelines continue in our view to be an important consideration in sentencing, both in the district court and on appeal, which should be addressed in the first instance by the sentencing judge. . . At the same time, the guidelines cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a) 2000, because they are the only *integration* of the *multiple* factors and, with important exceptions, their calculations were based on the actual sentences of many judges." Id. at 518.

It is only after the calculation of the guideline sentence that the district court is to "decid[e] whether to exercise its new-found discretion to impose a non-guidelines sentence." Id. at 518. "[T]he district court should decide whether 'other factors' beyond the guidelines warrant[] an ultimate sentence above or below the guideline range." United States v. Smith, 445 F.3d 1, 5 (1st Cir. 2006) citing United States v. Jimenez-Beltre, 440 at 518. "Reasonableness within the meaning of Booker is not common-law reasonableness; it is reasonableness in light of Congress' purposes in enacting the Sentencing Reform Act of 1984." Id. at 521-522. (Howard, J. Concurring). "[T]he farther the judge's sentence departs from the guidelines sentence. . .the more compelling the justification based on factors in section 3553(a) that the judge must offer to enable the court of appeals to assess the reasonableness of the sentence imposed." United States v. Smith, 445 F.3d 1, 4 quoting United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005). "[A] sentence should be no higher than needed to meet statutory goals." United States v. Scherrer, 444 F.3d 91, 95 (1st Cir. 2006).

      **A.**    **Under U.S.S.G. § 3C1.1, No Adjustment for Obstruction of Justice is Warranted**.

In the PSR, the Probation Department recommended that "[b]ased upon the Court's determination that it did not credit certain aspects of the defendant's testimony [at the hearing on

the motion to suppress]. . . a two-level adjustment for obstruction of justice is appropriate pursuant to §3C1.1." (PSR, p.10)

Defendant testified at his suppression hearing on April 19, 2006 about events which occurred on August 25, 2004, during his interview with ICE agent Thomas Carroll and FBI agent Gregory Hughes. The interview, which began in English with only Hughes and Carroll, ended up lasting seven hours. There were two aspects of defendant's testimony about this interview that this Court did not fully "credit." First, Hughes and Carroll testified, and this Court found, that Hughes and Carroll read Boskic his Miranda rights during the English only part of the interview (the first hour) and that defendant signed a Miranda waiver form (in English and Serbo-Croatian) at approximately 3:35 PM. Defendant, on the other hand, testified that he signed the forms much later during the interview, when there was an interpreter in the room. There is no dispute that defendant did sign a form authorizing agents to search his apartment and his car at approximately 6:45 P.M. that evening and that this form was translated to him by the interpreter.

In its Findings of Fact on the Motion to Suppress, this Court wrote: "I do not credit Boskic's testimony that Agent Carroll did not show him the INS right form until 8:20 P.M." (Memorandum and Order, p. 9, n.4).

Second, Hughes testified, Carroll wrote in his report, and this Court found that defendant told Hughes that he "knew what this was about when the FBI came in." (Memorandum and Order, p. 11, n.5) Defendant, however, testified that he did not know what was going on until ICTY investigator Alistair Graham introduced himself. This Court made findings of fact somewhere in the middle:

> contrary to his testimony, I find Boskic must have become at least
> suspicious that the interview was not just about the travel
> documents when Agent Hughes entered the room and began to
> question him about his criminal history in Bosnia. . . .I find
> further, however, that Boskic did not have any of the suspicions
> caused as a result of the presence [of] the FBI fully confirmed until
> Alistair Graham of the ICTY introduced himself.

(Memorandum and Order, p.11, n.5). This Court did not find that defendant had lied or had committed perjury relative to these two aspects of his testimony. Rather, the Court simply did "not credit" defendant's testimony. This is completely consistent with defendant's testimony at the motion hearing having been the product of the passage of time since the interview, the language problems at the interview, the fact that the interview lasted just over seven hours, and the confusion and mistake inherent in such a stressful interrogation.

The Commentary to Guideline §3C1.1[4] advises the court that:

> This provision is not intended to punish a defendant for the
> exercise of a constitutional right. . . . In applying this provision in
> respect to alleged false testimony or statements by the defendant,
> the court should be cognizant that inaccurate testimony or
> statements sometimes may result from confusion, mistake, or
> faulty memory and, thus, not all inaccurate testimony or statements
> necessarily reflect a willful attempt to obstruct justice.

In order for a defendant's testimony to support an obsturction of justice enhancement, the defendant must have given "false testimony concerning a material matter with the willful intent

---

[4] Guideline §3C1.1 provides:

§3C1.1 <u>Obstructing or Impeding the Administration of Justice</u>

If (A) the defendant willfully obstructed or impeded, or attempted to obsturct or impede, the administration of justice during the course of the invesitgation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstrucitve conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

to provide false testimony." United States v. Rowe, 202 F.3d 37 (1st Cir. 2000) (reversing obstruction of justice enhancement where "perjury was less than apparent on the record as a whole.")

The record here reveals a nervous and frightened defendant, who had language difficulties, being interviewed for seven hours, signing numerous forms during the course of the evening and being interrogated by three agents. The weight of the evidence points to mistake and confusion rather than perjury. No enhancement is warranted.

> **B.      Under U.S.S.G. §4A1.3(a), No Adjustment is Warranted or Allowed for Defendant's Alleged Conduct in Bosnia**

Nonetheless, Part E of the Presentence Report (Factors That May Warrant Departure), suggests that the Court may consider the defendant's former conduct as a basis for an upward departure. The Second Circuit, however, has rightly held that conduct committed in a foreign country, which lacks any relationship to the conduct for which the defendant was convicted in a United States court, cannot be used to increase the defendant's sentence. United States v. Chunza-Plazas, 45 F.3d 51 (2nd Cir. 1995). As the Second Circuit pointed out, the Sentencing Commission "has chosen to assign foreign crimes a rather limited role [in the Guidelines]." United States v. Azeem, 946 F.2d 13, 17 (2nd Cir 1991).

In suggesting the possibility of an upward departure in the defendant's criminal history score, the probation department referred to guideline § 4A1.3(a), which provides:

> If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted.

Subsection 2 of § 4A1.3(a) sets out five categories of information, (A) through (E), that may be used to justify a departure. Those categories are as follows:

> (A) Prior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal offenses).
>
> (B) Prior sentence(s) of substantially more than one year imposed as a result independent crimes committed on different occasions.
>
> (C) Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.
>
> (D) Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.
>
> (E) Prior similar adult criminal conduct not resulting in a criminal conviction.

Probation concedes that none of these categories captures defendant's conduct in the former Yugoslavia. Of the two that are even close, subsection A applies only to "sentences" and subsection E applies only to "similar" conduct. The defendant was not prosecuted and therefore did not receive a sentence for his conduct; also, it could not be argued that the defendant's conduct at the Branjevo farm approximates his convictions for lying on immigration documents and so his conduct could not be said to be similar.

Nonetheless, the Pre-sentence Report suggests that this Court is not limited to consideration of conduct that fits into categories A through E. Even accepting that suggestion, the Court may not consider the defendant's conduct in the former Yugoslavia. The Second Circuit in United States v. Azeem, 946 F.2d 13 (2nd Cir 1991) made it clear that foreign criminal conduct is only to be considered where the sentencing commission has explicitly stated it should

be considered. The Guidelines, however, are silent with respect to uncharged foreign criminal conduct.

In <u>Azeem</u> the defendant was convicted of conspiring to import heroin into the United States. The conspiracy involved one instance of importing heroin into New York and one instance of importing into Cairo. The originating point for both transactions was Pakistan.[5]

In computing the defendant's base offense level the district court included the weight of the drugs that had been involved in the Cairo transaction. The defendant objected that the Cairo transaction should not have been included because it did not involve an offense against the United States. The Court agreed. The specific issue addressed under the Guidelines was whether the defendant's foreign conduct should be included as relevant conduct under § 1B1.3(a)(2), which requires inclusion of, "all such acts and omissions that were part of the same course of conduct or common scheme or plan. " <u>Id.</u> at 17. Although the Court determined that the foreign conduct was "a part of the same course of conduct..." it rejected the use of foreign conduct on the ground that the Guidelines "assign to foreign crimes a rather limited role." <u>Id.</u> at 17. The Court pointed out that foreign criminal conduct was not explicitly mentioned in § 1B1.3(a)(2) while foreign sentences are specifically mentioned in criminal history guidelines §§ 4A1.2(h) and 4A1.3(a). These latter sections provide that foreign <u>sentences</u> may not be used in computing a defendant's criminal history category, but may be used for upward departures.

The court reasoned that because Congress did not expressly provide for the use of foreign criminal sentences in 1B1.3(a)(2), but did expressly provide for their use in §§ 4A1.2(h) and

---

[5] A third transaction occurred after the defendant temporarily moved to the Philippines and attempted a sale of heroin to an undercover agent there, however that transaction played no part in the decision.

4A1.3(a), the court should not assume that the use of foreign crimes could be read into a guideline. "In general, congressional consideration of an issue in one context, but not another, in the same or similar statutes implies that Congress intends to include that issue only where it has so indicated." Id. at 17. The Court concluded that "Congress has already shown that where it intends to include foreign crimes in sentencing, it will do so." Id. at 17.

Although the Court in Azeem did not consider the specific issue of criminal history departures based on foreign conduct, it soon did in United States v. Chunza-Plazas, 45 F.3d 51 (2nd Cir. 1995) and arrived at the same result. In that case, the defendant pleaded guilty to two counts of possessing fraudulent alien-registration cards. The Guideline calculation for his offense yielded a 0-6 month sentence. However, the government sought a departure pursuant to various Guideline provisions including 4A1.3, on the ground that the defendant had committed various crimes including murder in Columbia, for which he was never prosecuted. The Second Circuit reversed the district court's decision to depart based on this uncharged foreign conduct. "The district court's reliance on Chunza's activities in Columbia was an improper basis for increasing Chunza's criminal history category." Id. at 56.

> The same considerations considered in *Azeem* with respect to base offense level, should guide our determination of whether Chunza's conduct in Colombia may be considered for an upward departure. Like Azeem's Egyptian conspiracy, Chunza's illegal activities in Colombia were not crimes against the United States, and therefore should not be included in the guideline calculation. Moreover, while Azeem's Egyptian heroin conspiracy was viewed as part of the same course of conduct underlying his United States activity, Chunza's possession of the fraudulent registrations and the counterfeit social-security cards was not part of the same crimes as committing and terrorist acts for the Medellin cartel in Colombia. Thus, the reasons for excluding consideration of Chunza's foreign conduct are even stronger than the circumstances in *Azeem*. Id. at 58.

As in <u>Chunza-Plazas</u>, in the present case the reasons for excluding the defendant's foreign conduct are stronger than in <u>Azeem</u>. His conduct in the former Yugoslavia is completely distinct from the crimes for which he was convicted.

> II. **THE PROPOSED SENTENCE IS CONSISTENT WITH THE CIRCUMSTANCES OF THE OFFENSE AND PURPOSE UNDERLYING CONGRESS' SENTENCING POLICY**

An upward departure beyond the advisory guideline range would be unreasonable in this case and therefore would violate the First Circuit's post-<u>Booker</u> jurisprudence. The Guideline computation remains the first step in the sentencing process, <u>United States. v. Jimenez-Beltre</u>, 440 F.3d 514 (1st Cir. 2006); for good reason. The Supreme Court's decision in <u>Booker</u> held that the aspect of the Guidelines, which required enhancements in sentencing based on conduct that was not charged in an indictment and not proved by a jury, violated the 6th Amendment. The Supreme Court's opinion, however, did not disagree with the policies that prescribed the sentences in Guidelines in the first place. The Guidelines reflect Congress' judgment with respect to its enactment of the Sentencing Reform Act of 1984. Therefore, the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a) 2000, because they are the only *integration* of the *multiple* factors. . ." <u>Id.</u> at 518. "The district court is required to give due weight to the Guidelines range in providing justification for the sentence." <u>United States v. Brown</u>, 450 F.3d 76, 82 (1st Cir. 2006).

A court may depart from the guidelines sentence but its discretion in doing so must hew to the factors set out in 18 U.S.C. § 3553(a) 2000. Those factors are as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed–
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to

>    provide just punishment for the offense;
>            (B) to afford adequate deterrence to criminal conduct;
>            (C) to protect the public from further crimes of the defendant; and
>            (D) to provide the defendant with needed educational or vocational training,
>    medical care, or other correctional treatment in the most effective manner
>    (3) the kinds of sentences available;
>    (4) the kinds of sentence and the sentencing range established for. . .the applicable
>    category of defendant as set forth in the guidelines . . .
>    (5) any pertinent policy statement. . .issued by the Sentencing Commission. . .
>    (6) the need to avoid unwarranted sentence disparities among defendants with similar
>    records who have been found guilty of similar conduct; and
>    (7) the need to provide restitution to any victims of the offense.

"[A] sentence should be no higher than needed to meet [these] statutory goals." United States v. Scherrer, 444 F.3d 91, 95 (1st Cir. 2006).

A departure from the Guidlines based on Probation's suggestion that the Defendant's crimes may have allowed him to evade judicial accountability for his conduct in Bsonia would be unreasonable. Part F of the Pre-sentence report suggests the Court, pursuant to 3553 (a)(1) may depart from the guideline sentence on the ground that the defendant's crimes allowed him to evade judicial accountability for his crimes in the former Yugoslavia. There is no evidence, however, that the defendant came to the United States to evade judicial accountability. Indeed, the defendant's conduct was manifestly inconsistent with such a theory. Furthermore, there is no evidence that there was anyone seeking to hold defendant accountable for his conduct.

Defendant applied for refugee status in the United States using his own name and date of birth and he lived openly in both Peabody and Salem, Massachusetts. There is no evidence that defendant took any steps to hide his identity. Furthermore, there is no evidence that anyone either in the former Yugoslavia or the International War Crimes Tribunal for the Former Yugoslavia ("ICTY") was pursuing him. In fact, the evidence points in the opposite direction. Alistair Graham, an investigator for ICTY, testified at the suppression hearing that his principle

purpose in coming to the United States was to aid the American government in its prosecution of the defendant. His secondary purpose was to gain information for ICTY. He explicitly stated that the war crimes tribunal was not interested in defendant. There is therefore no evidence that the defendant's crimes enabled him to avoid judicial accountability for his conduct in the former Yugoslavia. See United States v. Chunza-Plazas, 45 F.3d 51, 58 (2nd Cir. 1995) (holding a departure unwarranted because there was no evidence that defendant's immigration crimes facilitated concealment of his offenses in Columbia.)

Accordingly, there is no evidence to sustain a departure in the defendant's sentence based on 3553(a) and it therefore would be unreasonable to do so.

## Conclusion

For the reasons set forth above, the Court should find the Guideline level is 8, and the sentencing range is 4-10 months.

Respectfully submitted,

/s/ Patricia Garin

Max D. Stern
BBO No. 479560
Patricia Garin
BBO. No 554770
Jeffrey Wiesner
BBO. No. 655814
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114-2022
(617) 742-5800

Dated: October 19, 2006

**CERTIFICATE OF SERVICE**

   I hereby certify that this document(s) filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on <u>10/19/06.</u>

<u>/s/ Patricia Garin</u>

G:\SSWG\BOSKIC\Trial Docs\sentencing memo.wpd