UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. No.  04-10298-DPW |
| | ) | |
| | ) | |
| MARKO BOSKIC | ) | |

<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

On July 12, 2006, Marko Boskic ("the defendant") was
convicted of making two material false statements on immigration
forms, in violation of 18 U.S.C. § 1546(a).  The false statements
regarded the defendant's past service in the Army of the Republic
of Srpska ("VRS") in Bosnia in 1995.  The defendant admitted in
an interview with investigators in August 2004 that he had not
truthfully revealed his membership in the VRS on the immigration
documents because he had been told that keeping it secret would
give him a better chance of getting into the United States.
Government witness, Francis Monin ("Monin"), corroborated the
defendant's statement, and testified that a refugee applicant's
membership in the VRS would not of itself have resulted in an
adverse ruling by the Immigration and Naturalization Service
("INS"); however, because it was known at the time that members
of the VRS had participated in persecutions and war crimes in
Bosnia, if the defendant had admitted his membership in the VRS,
Monin would have asked the applicant about his dealings with
civilians and prisoners, and whether the applicant had taken part

in the persecution of civilians and other prisoners.  An applicant, such as the defendant, who had been involved in the murder of civilian prisoners, would have been denied entry to the United States as a refugee.  Therefore, the defendant's denial of his membership in the VRS was a false statement that was material.  In his August 2004 interview, the defendant also admitted his role as a shooter during the massacre of over 1000 civilian prisoners at Branjevo Farm.

The defendant was acquitted[1] of counts that alleged two other material false statements on immigration forms, in violation of 18 U.S.C. § 1546(a).  These false statements regarded whether he had ever "ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion" and whether he had ever "ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion."  In defendant's August 2004 interview, when confronted with the video evidencing his membership in the 10th Sabotage Unit, the defendant qualified his role in the killings indicating that he was forced to take part and that he "didn't want to do it."[2]  In the defendant's handwritten statement, he

---

[1] The defendant was also acquitted of one count of making a false statement, in violation of 18 U.S.C. § 1001.

[2] The transcripts from the trial are not yet finished.  The quotes here come from the government's notes taken during trial.

wrote "I told [the Commander of the 10th Sabotage Unit, Milorad] Pelemis I do not want to do that.  He came up (to me) and put a pistol on (my) forehead and said that I have to, or I will be dead.  Pelemis said to the commanders [of the Branjevo mission] that in case someone refuses the duty task, they have a right to shoot him."

This Court should consider both the conduct for which the defendant was convicted and those counts of which he was acquitted in determining an appropriate sentence.  Further, although he was acquitted of the counts that concerned his statements about his participation in persecution, that participation would have been revealed had he truthfully answered the questions about military service and would have, therefore, resulted in his exclusion from the United Sates.  In order to convict the defendant, the jury was required to find that the false statement was material.  Membership in the VRS would not have resulted in the denial of his application for refugee status.  The only evidence of the materiality of that false statement was that a truthful answer would have led to questions that would have revealed the defendant's role in the massacre (had he answered them truthfully.)  His role in the Branjevo massacre was what made his false statement about his military service "material," and his role in mass murder was related to his counts of conviction.

In addition, the government submits that other information provided herein regarding the history and characteristics of the defendant is also relevant to the court's analysis.

The government recommends that the defendant be sentenced to 135 months imprisonment, 3 years supervised release, $200 special assessment and no fine.

An upward departure is warranted for a number of reasons. First, various courts of appeals have approved upward departures that rely on analogous guideline provisions, even where a specific provision applies to the offense of conviction.  For the reasons discussed below, the offense level that most accurately captures the defendant's conduct is the voluntary manslaughter guideline, U.S.S.G. 2A1.3, which assigned a base offense level of 25 to such conduct.[3]  Second, 135 months complies with those factors outlined in 18 U.S.C. § 3553(a) and is a second avenue by deviation warranting a sentence of 135 months.  Third, where the offense in this matter was so unusual to American jurisprudence, the government relies on the prosecution and sentencing of Drazen Erdemovic, another admitted shooter at Branjevo Farm.  His sentencing before the International Criminal Tribunal for the Former Yugoslavia ("ICTY") provides this Court with relevant information concerning the appropriate sentence for the

---

[3] When the offense was committed, the base offense level for manslaughter was 25.  It has since been increased to 29.

4

defendant.

## I.    Relevant Conduct and Other Information

In addition to the Offense Conduct included in the Pre-Sentence Report, the following information is relevant to the Court's decision in crafting an appropriate sentence.

### A.    The Victims

In July 1995, Becir Salihovic ("Salihovic") was in his early 20s and living in Srebrenica in the former Yugoslavia.  On or about July 11, 1995, when Srebrenica fell to the Serbs, he and the other Muslim men and older boys (including a young brother-in-law) separated from the women, children and the elderly and headed towards Tuzla through the woods.  The women went to Potocari, the area that was supposed to be under the control of the United Nations.

While walking through the woods, Salihovic and the other Muslims were shelled by the Serbs.  He was separated from his brother-in-law.  Many of the Muslims were killed by the shelling and ambushes.  While crossing a road with about 10 other men, Salihovic was captured by the Serbs.  The Serbs took away their belongings and their food and ordered them to put their hands over their heads.  The group was marched to a school or barracks, and held in a small room.

On the morning of July 16, after being held in two different schools without any food and limited water, the Serb soldiers

5

announced that the Muslims would be exchanged for Serb prisoners who were being held by the Muslim forces. The prisoners were directed to head towards the buses outside. Salihovic lined up with the others. As they were leaving the building, they were lined up against the wall and their hands were tied behind their backs. The buses were filled with the Muslim prisoners and about three buses headed out. After a short distance, the buses turned off the road and reached a meadow. Salihovic could see a large number of dead bodies. When the buses stopped, the soldiers started taking the Muslim prisoners off in groups of ten. They walked to the meadow where the dead bodies were lying. They lined up the Muslim men and shot them near where the bodies lay. Salihovic could see this happening from the bus. He was on the second bus.

When it was time to empty the bus he was on, Salihovic was in the third group. He walked to the meadow and was lined up. There were about 10 Serbs soldiers lined up, who shot at the Muslims. When the Serb soldiers started firing at his group, Salihovic fell to the ground, and a dead person fell on top of him. One of the Serb soldiers walked to the Muslims who had just been shot to determine if they were dead. Salihovic heard someone tell the soldier that he shouldn't shoot them in their heads, but rather shoot them in their backs. When the soldier shot at Salihovic, the bullet passed underneath his armpit.

Salihovic heard one man cry for help.  The man was suffering and begged to be killed.  Salihovic heard one of the Serb soldiers say: "Let him suffer; we'll kill him later."

Salihovic lay there the rest of the day into the night. During the day, he heard more buses arrive and more killings. After dark, he heard a machine that sounded like a tractor dump some bodies.  Just before dawn the next morning, he managed to escape.  He crawled away because he was concerned that they would either find him and kill him, or bury him alive.

While fleeing, Salihovic ran into other survivors (including Ahmo Hasic).  Salihovic was later captured by the Serbs and put in the Batkovic Prisoner Camp.  He stayed there until December 1995, when he was exchanged for other prisoners.

Ahmo Hasic ("Hasic") was born and spent most of his life in the villages near Srebrenica.  On July 11, 1995, he fled to Potocari, with his wife, daughter-in-law and grandchildren.  His two sons had already fled.[4]

On the 13th, the Serbs started to separate the men and women.  After the women were transported to areas in Muslim control, the men were loaded on buses and transported to Bratunac.  They were unloaded at a school, where they were held for two nights.  After two nights in Bratunac, they were

---

[4]  They were later killed.  Two of Hasic's brothers were also murdered.

7

transferred to another school in Pilica. All through the school were Muslim men between the age of 14 and 80. They were held in the school one or two nights without food.

On July 16th, a sheet of material was brought in and torn into strips. The strips were used to tie the Muslim prisoners' hands behind their backs. They were told they were going to freedom in Tuzla. As Hasic left the building, he saw a man lying on the ground with a head wound; blood was all around him and he was dead.

They boarded the buses and traveled over 2 kilometers. As they approached the end of the trip, Hasic heard gunfire. They traveled towards the gunfire, the buses stopped, and the door of the bus opened. The Serb troops told them to get off the bus. They yelled: "Get off now. Fuck your mothers and Alija's [Alija Izetbegovic was the leader of the Bosnian Muslims] and everybody's. Get off. Alija doesn't want you." After a group of the men got off the bus, they were told to stop. Hasic was in the second half of the bus. He saw those who had exited the bus walk down a path to where dead bodies were lying on the ground. The men from the bus were lined up. The Serbs were yelling and cursing. Bursts of gunfire mowed the Muslim prisoners down and they fell.

Serb soldiers came back for the rest of the Muslim prisoners on the bus. They were marched toward the killing area. One of

8

the soldiers told Hasic to give him Marks [money].  Hasic said he
didn't have any, so the soldier kicked Hasic in the stomach.
Hasic was lined up with the other prisoners and the order to fire
was given.  He fell to the ground.  A Serb soldier asked if
anyone was alive and two responded and asked to be killed.  Hasic
kept silent.  About seven or eight Serb soldiers were shooting
the prisoners.

Hasic estimated that 1500 Muslims were killed at Branjevo
that day.  Hasic lay on the ground until late in the day.  He
decided he had to try and escape, because he was afraid that a
machine would come to bury them or a truck to pick them up, and
he would be cut to pieces.  He crawled for awhile and then hid in
the brambles.  He escaped through the woods.  He met Salihovic
while hiding from the Serbs.  Hasic later surrendered and was
taken to Batkovic Prisoner Camp.  He was exchanged just before
the New Year.

**B.    Other Relevant Information**

A number of witnesses have been interviewed in regard to
their knowledge about how Boskic spent his time in Bosnia and
here in the United States.  That information is as follows.

**(1)  Drazen Erdemovic[5]**

---

[5]  Drazen Erdemovic was interviewed by United States law
enforcement on several occasions, including in January 2004 and
June 2005.  Reports of these two interviews are hereto attached
as Exhibit A.  Any information not sourced from the reports is
individually cited.

Drazen Erdemovic ("Erdemovic") was also born in Tuzla, Bosnia, and like Boskic is a Bosnian-Croat. Erdemovic served in the Yugoslav National Army ("JNA") from 1990 through 1992. By the time he left, the war had come to Tuzla and he joined the village defense force for four months. He followed his service in the village defense force with a three month stint in the ABiH, the army of the Bosnian Muslim government. After his ABiH service, he joined the HVO (the Bosnian-Croat Army) from October 1992 through November 1993. Erdemovic joined the HVO because there was room in the military police unit, a position which would keep him away from the battle.

In November 1993, Erdemovic was arrested for smuggling Serbs across the border into Serbia from Bosnia. Boskic also acted as a smuggler, but Boskic demanded payment, whereas Erdemovic did not. The smuggling ring was discovered by the BiH army and an attempt was made to arrest the HVO soldiers. When a BiH soldier was killed, the Croat group was forced to flee to VRS territory, where they were captured and held at Batkovic detention camp.

At the time that Erdemovic joined the unit, he was married to a Serbian woman and she was pregnant. See ICTY Sentencing transcript of Drazen Erdemovic, case IT-96-22-T, transcript page 37, lines 26 - 27. Erdemovic said that Boskic joined the unit in June 1994, a couple of months after Erdemovic had joined the unit. The unit officially became the 10th Sabotage Detachment in

October 1994.

Additional individuals were added to the unit and it was split into the Bijelina Platoon and the Vlasenica Platoon. Between October 1994 and July 1995 the 10th Sabotage Detachment was responsible for five to six operations. On the morning of July 16, 1995, the Detachment, including Boskic and Erdemovic, were told to get their equipment together for an assignment. Eight men got into a van at the Vlasenica barracks and proceeded north towards Zvornik. After stopping briefly at the Drina Corps headquarters in Zvornik, they traveled north to another location, later determined to be Branjevo Farm.

Erdemovic stated that he did not know where they were going or what was going to happen until they arrived at the Farm and the first bus of Muslims arrived. The Muslims were guarded by soldiers and were led off the buses blindfolded and with ligatures tying their wrists. Erdemovic stated that he was the only one to voice his aversion to what he now understood to be their assignment, but was told by the leader of the group that "[i]f you don't want to do it, give up your gun and join them."

Erdemovic estimated that there were 20 buses in all, each carrying approximately 60 men and boys. Prosecutor v. Erdemovic, Case No. IT-96-22-A, Judgement, ¶ 8 (Oct. 7, 1997). The men were escorted off the bus in groups of ten and were lined up in a row, with their backs to the firing squad. They were left where they

11

fell, until all the bodies were bulldozed into a mass grave.
After the third or fourth bus, one of the soldiers left and came
back with liquor.  Although Erdemovic did not drink, he said that
Boskic was one of the soldiers who did and became drunk.

   The prisoners were not merely executed, but also mistreated.
According to Erdemovic, some soldiers beat the Muslims, and some
shot them in their arms and legs, just to wound them first.[6]  In
addition, some prisoners were singled out, walked to the center
of the field, and shot in the arms and legs.  They were left to

_____

   [6]The forensic evidence corroborates this statement.  For
example,  Christopher Lawrence, a forensic pathologist, worked
for the Office of the Prosecutor ("OTP") (ICTY) as the chief
pathologist during the Bosnia exhumations in 1998.  He was the
chief pathologist for the Cancari 12 autopsies.  (Cancari 12 was
identified as a re-burial site for bodies that were exhumed from
Branjevo by the Bosnian-Serbs in an effort to hide their crimes.)
As chief pathologist, Lawrence personally performed many
autopsies of the victims recovered at Cancari 12, and was present
during most of the autopsies.  He wrote reports summarizing the
autopsies associated with the Srebrenica investigation.  Lawrence
testified during the Krstic trial at the ICTY.  In connection
with the wounds suffered by the victims, Dr. Lawrence concluded
that "[t]he large number of peripheral gunshot wounds especially
in the knee raises the possibility they may have been
deliberately inflicted to incapacitate and cause pain."  Further
"[s]everal cases show multiple gunshots to peripheral joints in a
pattern that appears to be deliberate."  For example, one fairly
intact body (with extensive soft tissue) showed five gunshot
wounds, in addition to a fatal shot to the face, to: the forearm,
the humerus just below the shoulder, the right hand, the left
elbow and the left humerus just below the shoulder.  Dr. Lawrence
stated in his report that gunshot wounds in the humerus and femur
usually cause rapid blood loss because major arteries to the
limbs lie close to the bone and are usually damaged.  These
wounds would not be immediately fatal.  See Report on Autopsies
of Human Remains From Cancari Road, Site 12, August 1998, by Dr.
C.H. Lawrence ("Lawrence Report"), attached hereto as Exhibit B.

suffer and die in the hot sun.  Some of the soldiers also used
iron bars to beat the Muslim prisoners.[7]

Erdemovic testified that "if I had been alone, if I had not
my wife and son, I would have fled and something else would have
happened.  I had to do that.  I was forced to do that."  In
regard to the actual shooting, Erdemovic testified that he felt
sick and "tried to avoid it as much as [he] could, [tried] to
avoid taking part in it."  Erdemovic tried to save one man who
had helped Serbs leave Srebrenica and go to the Federal Republic
of Yugoslavia.  However, he was told there should be no
witnesses.  See ICTY Sentencing transcript of Drazen Erdemovic,
case IT-96-22-T, transcript page 40, lines 16 - 28.

The killings lasted from 10:00 a.m. to 3:00 p.m. and
approximately 1,200 Muslims were killed.  Erdemovic estimated
that he personally killed 70 people.  Prosecutor v. Erdemovic,
Case No. IT-96-22-A, Judgement, ¶ 8 (Oct. 7, 1997)

Towards the end of the afternoon, the leader from Zvornik
directed the Detachment to a building in the nearby town of
Pilica where 500 more Muslims were being guarded and ordered them
to shoot the prisoners.  At this point, Erdemovic again refused

---

[7]The forensic evidence corroborates this statement; some
bodies showed evidence of blunt force trauma.  See, for example,
autopsy report of body recovered at Branjevo, designated PLC-101
(the cause of death was determined to be "blunt head trauma and
gunshot wound through abdominal organs"), attached hereto as
Exhibit C.

but was joined by other members of the Detachment, including

Boskic.[8]  Erdemovic described the demeanor of the entire

Detachment as being "fed up."  Ultimately, another unit from

Bratunac came and went to the building in Pilica.  Erdemovic's

unit went to a café in Pilica that was across the street from

where the Muslims were being held.  From their location they

could hear firing from inside the building holding the Muslim

prisoners.

    After returning to Vlasenica that day and then on to

Bijelina, Erdemovic had a few days off.  During that time, he ran

into Boskic at a mutual friend's home.  Erdemovic stated that

Boskic spoke of other executions and atrocities committed by the

Unit during times when Erdemovic was not present.  Specifically,

Erdemovic stated that Boskic told him a story of a prisoner that

had been captured and was taken to his house claiming he had

money to exchange for his life.  Boskic told Erdemovic that after

no money was found, the prisoner was shot and crucified, and the

house was burned.  Erdemovic noted that while Boskic was telling

this story "he had a smile on his face, he was grinning.  I knew

he was there by the way he was telling the story."  Erdemovic

described Boskic as giving Erdemovic the sense that Boskic was

---

[8] No retribution was administered against the members of the
Unit who refused to kill the additional prisoners at Pilica.  In
fact, about three months later, at the one-year anniversary
celebration of the Unit, some of those who had refused the orders
received commendations and promotions.

bragging, in that Boskic was in a position of trust and knew more than others.

Erdemovic confessed his involvement in the Branjevo massacre and was prosecuted by the ICTY.  Because of his cooperation he ultimately received a five year sentence[9]; he testified against both Slobadan Milosevic[10] and Radislav Krstic.[11]  Indeed, the ICTY had been unaware of the events at Branjevo Farm before Erdemovic's cooperation:

> The Prosecutor emphasised [sic] the fact that he had been unaware of those events before they were revealed by the accused.  In addition, he declared that this information permitted his Office to initiate on-site investigations which, to a large extent, confirmed the truth of what he had been told.  During the hearing, the Prosecution witness presented several exhibits which confirmed the occurrence of

---

[9] Erdemovic was transferred to the ICTY on March 30, 1996 and was indicted on May 22, 1996 for his involvement at Branjevo Farm.  He pled guilty nine days later to "crimes against humanity" and was initially sentenced on November 29, 1996 to ten years imprisonment.  Prosecutor v. Erdemovic, Case No. IT-96-22-T, Sentencing Judgment, ¶ 111 (Nov. 29, 1996).  The Appeals Chamber remanded his case for re-plea finding that Erdemovic's May 1996 plea was not "informed."  Prosecutor v. Erdemovic, Case No. IT-96-22-A, Judgement, ¶ 20 (Oct. 7, 1997).  Erdemovic pled guilty to war crimes and was re-sentenced on March 5, 1998 to five years imprisonment.  Prosecutor v. Erdemovic, Case No. IT-96-22-Tbis, Sentencing Judgment, (Nov. 29, 1996).  The ICTY dismissed the count alleging crimes against humanity pursuant to a plea agreement.

[10] Milosevic, who was the President of Serbia, died on March 11, 2006, while on trial for genocide, crimes against humanity and war crimes by the ICTY.

[11] Krstic has been convicted by the ICTY of aiding and abetting genocide.  His conviction was recently affirmed, but his sentenced was reduced to 35 years.

the events at the Branjevo Farm and which allowed him to establish the link between the events at the farm and the Pilica school.  He thus affirmed that "had we not had Drazen Erdemovic's testimony, we would not have been able to discover through the investigation alone the place of execution of those prisoners who had been locked up in the Pilica school.

Prosecutor v. Erdemovic, Case No. IT-96-220Tbis, Sentencing Judgment, ¶ 99 (Mar. 5, 1998).

In 1996, after Erdemovic confessed to the killings at Branjevo and implicated the unit commander Milorad Pelemis, Boskic visited Erdemovic's wife's aunt in Bijelina, Bosnia.  He was accompanied by other unit members, including Zijad Zigic.[12] Boskic was the only one who spoke, and told Erdemovic's wife's aunt that Erdemovic had betrayed them, and that they were going to kill Erdemovic, his wife, and his family.

**(2)  Milorad Pelemis[13] [14]**

Milorad Pelemis ("Pelemis") was the commander of the 10th

---

[12] Defendant Boskic initially requested Zijad Zigic to testify on Boskic's behalf at trial.  However, Zigic ultimately decided not to come to the United States and testify.

[13] Pelemis was interviewed by United States law enforcement in September 2004.  The interview report is attached hereto as Exhibit D.

[14] Pelemis told United States law enforcement that he did not give the order to the Unit to commit the massacre at Branjevo, and was not in the area at that time.  This statement is inconsistent with Erdemovic and Boskic, but is corroborated by Zoran Obrenovic, as well as another member of the 10th Sabotage Detachment, who was also interviewed by the government.  The government does not credit this statement.

Sabotage Unit.  Pelemis indicated that members of the 10th
Sabotage Unit were paid by the mission, and Boskic would
volunteer for work.  Boskic participated in about twenty missions
with the 10th Sabotage Unit, which was more missions than a
normal soldier.  According to Pelemis, Boskic possessed no
particular expertise but typically served as a carrier of
explosives.

Pelemis described Boskic as "often drunk;" when off-duty,
Boskic would drink and get into fights.  Pelemis confirmed that
Boskic had been a member of the Bosnian-Croat army prior to
joining the Bosnian-Serb army, and that he had volunteered for
service in the 10th Sabotage Detachment.

### (3)  Zoran Obrenovic[15] [16]

Zoran Obrenovic ("Obrenovic")  was also a member of the
Unit.  On July 15th, the order was given by Major Petchko
("Petchko") to execute the Muslims on the next day.[17]  Obrenovic

---

[15] Obrenovic was interviewed by United States law enforcement
in September 2004 and in June 2005.  The interview reports are
attached hereto as Exhibit E.

[16] Obrenovic also told United States law enforcement that
Pelemis did not give the order to the unit to go to Branjevo
Farm.

[17] According to Obrenovic, the order to execute the prisoners
from Srebrenica was given to the 10th Sabotage Unit on the day
before the massacre at Branjevo.  This is consistent with
Boskic's version of events, but inconsistent with Erdemovic, who
claimed he did not receive any orders until the morning of the

refused to take part in the massacre and was told by Petchko that
he would be sorry for refusing an order.  Other members of the
unit witnessed his refusal and the subsequent confrontation with
Petchko.  Nevertheless, no other members of the group refused the
mission and Obrenovic did not suffer retribution as a result of
his refusal.

Obrenovic stated that when Boskic was in the Batkovic Camp,
he let Bosnian-Serb military officials know he could provide
information concerning the smuggling routes through the
mountains.  As a result, arrangements were made with the VRS not
to harm Boskic, and, once the 10th Sabotage Detachment was
formed, Boskic became a member.  Obrenovic also said that Boskic
had earlier been a member of the HVO before he joined the VRS.

**(4)  Boston Globe report[18]**

In 1996, Boskic was interviewed by Boston Globe reporter
Elizabeth Neuffer ("Neuffer").  Despite having agreed to meet the
reporter, Boskic threatened Neuffer's life during the meeting,

---

16th.  Of course, it is possible that Erdemovic did not receive
the orders until the morning of the mission and Boskic and
Obrenovic received their orders the day before.  In any event,
based on Boskic's version of events, whatever duress he was
subject to occurred the day before the massacre.

[18]  Elizabeth Neuffer interviewed Boskic for an article in
the Boston Globe.  The article is attached hereto as Exhibit F.
The piece subsequently became a basis for her book, The Key to My
Neighbor's House: Seeking Justice in Bosnia and Rwanda.  Neuffer
was killed in a traffic accident on May 9, 2003, while on
assignment in Iraq.

hissing, "Do you want to get whacked?" At the meeting, Boskic was again accompanied by Zigic[19], who Neuffer notes had previously been tried for murder and robbery and once set his parents' house on fire. At the mention of Erdemovic, both men reacted violently and Boskic angrily referred to him as a "traitor." Neuffer noted that Boskic goes by his *nom de guerre*, "Macak," or "Tomcat."

Neuffer noted that "Bosnian Serb military sources here identify him [Boskic] as a career criminal." Referring to the 10th Sabotage, Neuffer noted, "These units were composed of men with criminal records, a penchant for violence and a certain rootlessness [sic]." Neuffer confirmed that the unit was comprised of individuals on the run from the Muslim Bosnian government, having been charged with operating an illegal smuggling ring during the war.

**(5)  Activity in the United States**

Although Boskic has only been convicted of two separate crimes in the United States, he has been arrested several times involving assaultive behavior.[20] On April 12, 2003, Johnetta Kelley ("Kelley"), Boskic's sometime girlfriend, reported that he

---

[19] See supra note 12.

[20] These arrests have all resulted in the filing of *nolle prosequi* by the Essex County District Attorney's Office or dismissals. All reports are attached hereto as Exhibit G.

stole $3000 from her as they were in his car.  Boskic pushed
Kelley out of the car and left.  Boskic denied that he did so
when interviewed by Salem Police.  One month later, Kelley
reported to Peabody Police that when she refused to have sex with
Boskic, he slapped her and spit in her face.

Boskic was arrested and convicted for leaving the scene of
property damage for a May 17, 2003 incident in which he crashed a
rental car into the rental agency and left.  On November 11,
2003, Peabody Police were called to Boskic's home for a
disturbance and a man with a baseball bat.  When Boskic opened
the door to the police, he was holding the bat.  The two women in
the apartment reported that had been hit by Boskic with the bat
and police noted the smell of alcohol on Boskic's breath.  One
woman indicated that she was pregnant and Boskic had jammed the
bat into her stomach.  Police noted a round red area on her
stomach.

On January 18, 2004, Boskic punched and threw a glass bottle
at Kelley and attacked Liban Egal ("Egal") with a knife and
punched him in the lip.  Police noted a minor injury to Egal's
lip, confiscated the knife and noted a broken glass bottle on the
floor in the apartment.  Kelley said that she and Egal were there
to collect $3000 that Boskic owed her and that Boskic became
upset.  Police also noted that he appeared to have been drinking.

On March 25, 2004, Boskic chased Egal with a knife, cutting

20

him in the hand.  When Kelley interfered, Boskic bit her on the
hand.  A third witness corroborated the story to police and the
knife was found in Boskic's car.  Police noted that Boskic
appeared highly intoxicated and observed visible injuries on both
Egal and Kelley.

On April 9, 2004, Boskic was arrested and later convicted
for operating while under the influence.  Both tires on the right
side of the car were flattened by an apparent collision.  In
addition, when police seized the car, a glass of alcohol was in
the center console.  Boskic said it was Hennessey but denied that
it was his.

Kelley was also separately interviewed by the FBI and
Immigration and Customs Enforcement in August 2004.[21]  She noted
that her friendship with Boskic was based on fear and that Boskic
would harm her if she tried to dissolve their friendship.  On one
occasion, Boskic made sexual advances on her that went too far.
Egal confronted Boskic, at which point Boskic grabbed a knife and
tried to cut Egal.

Kelley stated that Boskic liked to drink, and would brag to
Kelley and Egal that he had killed before.  In addition, Boskic,
on several occasions, stated that he could have Kelley killed if
she ever testified against him.  Boskic also made statements that

---

[21] Interview report attached hereto as Exhibit H.

21

he had stabbed someone, and that he possessed a gun.

### (6)  Chronology

The following is a chronology of some of the events that resulted in public disclosures (and prosecutions) concerning the Branjevo massacre, as well as the dates on which the defendant Boskic took steps to distance himself from his actions at Branjevo.

Between March 3-7, 1996, Erdemovic and Radoslav Kremenovic told the story behind the Branjevo Farm killings to two media outlets in Serbia (ABC News and Le Figaro newspaper).  Both individuals were subsequently arrested by Serb police.  On March 30, 1996, Erdemovic was transferred to the custody of the ICTY. On May 31, 1996, Erdemovic pled guilty to one count of "crimes against humanity" before the ICTY.

Following the public disclosure of the involvement of this unit in war crimes, Elizabeth Neuffer, the Boston Globe reporter, tracked down a member of this unit, Boskic, in Bjieljina, Republika Srpska.  In a interview with Boskic, Neuffer told Boskic that Erdemovic had identified him as one of the executioners.  According to published accounts of that interview by Neuffer in her book <u>The Keys to My Neighbor's House: Seeking Justice in Bosnia and Rwanda</u>, upon hearing of Erdemovic's

cooperation, Boskic replied "the traitor."[22]

On July 05, 1996, Erdemovic first publicly testified before a trial chamber of the ICTY describing the involvement of the 10th Sabotage Detachment's role in the mass executions at Branjevo Farm on July 16, 1995.  In his testimony, he named Boskic as one of the unit members who participated in the execution.  See ICTY Rule 61 hearing on Mladic and Karadzic, case IT-95 5/18, transcript pages 843, line 05.  Proceedings transcripts are available on line at

http://www.un.org/icty/transe5&18/960705it.htm.    These proceedings were highly publicized throughout Europe and particularly in the former Yugoslavia.

On November 29, 1996, Erdemovic was sentenced to 10 years in prison for his role in the killings at Branjevo Farm.  According to trial testimony of Boskic's brother, Goran Boskic, by November 1996, Boskic had moved from the Republika Srpska to Germany.  However, Boskic told the agents in August 2004, that he left for Germany in 1998.

On March 5, 1998, Erdemovic's sentence was reduced on appeal to 5 years.  On December 2, 1998, the International Stabilization

---

[22] In his August 2004 interview, the defendant told the agents he recalled meeting the American reporter.

forces in Bosnia ("SFOR") arrested General Radislav Krstic[23], who was the commander of the Drina Corps in July 1995. On December 7, 1998, at his initial hearing, the indictment was made public. The indictment included responsibility for genocide and war crimes at Branjevo Farm on July 16, 1995. News of the arrest was widespread in both Europe and the United States.

On September 3, 1999, Boskic signed an English and Serbo-Croatian version of the Form I-590, seeking classification as a refugee. On February 17, 2000, Boskic appeared before U.S. Immigration official Francis Monin and signed the I-590.

On March 13, 2000, the trial of General Krstic started in the Hague, with intense media coverage. On April 26, 2000, Boskic left for the United States.

On May 22, 2000, Erdemovic testified in the trial of General Krstic. He again publicly testified that Boskic was a member of the unit who participated in the executions at Branjevo Farm on July 16, 1995. See ICTY case IT-98-33 (Srebrenica) Krstic trial transcripts, May 22, 2000, transcript pages 3117, 3137, 3147, and 3169. Available online at :

http://www.un.org/icty/transe33/000522it.htm.

_____

[23] He officiated and spoke at the 10th Sabotage Anniversary Celebration in October 1995; a video of this celebration was played at trial.

## II.   United States Sentencing Guidelines

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme
Court rendered the United States Sentencing Guideline regime
advisory rather than mandatory.  Nonetheless, courts are still
required to calculate the applicable guideline range and use that
range as one of the factors it considers in imposing an
appropriate sentence.  The district court must calculate the
advisory guidelines range, <u>including</u> a determination of the
appropriateness of downward or upward departures under the
guidelines, before it proceeds to consider the other sentencing
factors set forth in 18 U.S.C. § 3553(a)." <u>United States</u> v.
<u>Wallace</u>, 461 F.3d 15, 32 (1st Cir. 2006).

In establishing an appropriate sentence, Congress has
unequivocally authorized the district court to consider any
information regarding the background, character, and conduct of
the convicted defendant.  As the Supreme Court has explained, "18
U.S.C. § 3661 codifies the longstanding principle that sentencing
courts have broad discretion to consider various kinds of
information." <u>United States v. Watts</u>, 519 U.S. 148, 151 (1997).
Congress's mandate is broad: "No limitation shall be placed on
the information concerning the background, character, and conduct
of the person convicted of an offense which a court of the United
States may receive and consider for the purpose of imposing an

appropriate sentence". 18 U.S.C. §3661. The sentencing
guidelines have adopted this language as well: "In determining
the sentence to impose within the guideline range, or whether a
departure from the guidelines is warranted, the court may
consider, without limitation, any information concerning the
background, character and conduct of the defendant, unless
otherwise prohibited by law." U.S.S.G. § 1B1.4 (citing 18 U.S.C.
§ 3661).

Policy statement §6A1.3 provides guidance for the
admissibility standard at a sentencing hearing. It states, "the
parties shall be given an adequate opportunity to present
information to the court regarding [any disputed] factor."
U.S.S.G. § 6A1.3(a). The threshold of admissibility is greatly
reduced. "[T]he court may consider relevant information without
regard to its admissibility under the rules of evidence
applicable at trial, provided that the information has sufficient
indicia of reliability to support the probable accuracy."
U.S.S.G. § 6A1.3(a). In the commentary to the policy statement,
the Sentencing Commission noted several kinds of information that
are admissible in the sentencing hearing, including acquitted
conduct (citing United States v. Watts, 519 U.S. 148), conduct
that may be subject to subsequent prosecution (citing Witte v.
United States, 511 U.S. 738(1995), and reliable hearsay (citing
United States v. Petty, 982 F.2nd 1365 (9th Cir. 1993); United

26

States v. Sciarrino, 884 F.2nd 95 (3d Cir. 1989)). U.S.S.G. §
6A1.3 Commentary.  The touchstone of admissibility is
reliability.

### A.    Acquitted Conduct May be Considered in Sentencing

Acquitted conduct can be considered by the sentencing court
in fashioning an appropriate sentence.  Watts, 519 U.S. at 151;
United States v. Mescual-Cruz, 387 F.3d 1, 11 (1st Cir. 2004).
This is possible because the court need only find the defendant
responsible by a preponderance of the evidence, rather than by
proof beyond a reasonable doubt, the standard that governs
juries.  McMillan v. Pennsylvania, 477 U.S. 79, 79 (1986) (even
where sentencing factors increase minimum mandatory penalty, only
proof by preponderance of evidence required); United States v.
Malouf, 2006 WL 2924940 (1st Cir. Oct. 13 2006)(same); United
States v. Woodward, 277 F.3d 87, 91 (1st Cir. 2002) ("The
government has the burden of proving the facts central to upward
adjustments in offense levels by a preponderance of the evidence,
not by proof beyond a reasonable doubt.")

In United States v. Lombard, 102 F.3d 1 (1st Cir. 1996), the
Court of Appeals for the First Circuit affirmed the life sentence
imposed by the district court where the defendant was convicted
of being a felon in possession of a firearm, in violation of 18
U.S.C. § 922(g), and conspiracy, in violation of 18 U.S.C. § 371.

The government's evidence included two murders of which Lombard had been acquitted in state court, but which provided relevant facts for his firearm and conspiracy charges.  <u>Lombard</u>, 102 F.3d at 2.  Since the felon in possession guideline provided that where the firearm was used in connection with another offense, here, murder, the base offense level should be that of the "object" offense.  U.S.S.G. §§ 2K2.1(c)(2), 2X1.1.  <u>Id.</u>  Since the court had found that the defendant had committed the murders by a preponderance of the evidence, a life sentence was imposed. <u>Id.</u>

### B.    Upward Departures Allowed for Acts of Misconduct that are not the Subject of a Conviction

This Court can depart if the Court finds that the

> defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.

U.S.S.G. §4A1.3(a)(1).

> [I]n an appropriate case, a criminal history departure can be based upon dissimilar conduct that was neither charged nor the subject of a conviction.

<u>United States v. Brewster</u>, 127 F.3d 22,27 (1st Cir. 1997).

This Court can depart both horizontally across the sentencing table (by increasing the defendant's criminal history), as well as vertically (by increasing the offense level)

28

in a case where the guideline sentencing range does not

adequately reflect the defendant's past criminal history and

conduct.  <u>United States v. Doe</u>, 18 F.3d 41, 49-50 (1st Cir.

1994).[24]

     The Court can also increase the offense level based on

uncharged crimes.  <u>United States v. Amirault</u>, 224 F.3d 9, 12 (1st

Cir. 2000); <u>United States v. Kikumura</u>, 918 F.2d 1084, 1113 (3rd

Cir. 1990).  In <u>Amirault</u>, the Court of Appeals for the First

Circuit affirmed a five-level increase in the defendant's base

offense level where the defendant had been convicted of

possession of child pornography, but had, two decades earlier,

sexually assaulted two minor females and taken photographs of

them that he admitted to police he still retained and used to

masturbate.  In approving the district court's use of specific

offense characteristics in a different guideline (than that

applicable to the defendant's offense of conviction) as the basis

for the upward departure, the First Circuit noted that the

district court is free to "make suitable comparisons and draw

plausible analogies in considering whether to depart from the

guideline sentencing range."  <u>Amirault</u>, 224 F.3d at 12.

     In <u>Amirault</u>, the Court approved the use of an analogy to

_____

     [24] In this case, a horizontal departure from criminal history
category II to VI would result in a range of 24 – 30 months.
This is clearly inadequate considering the factors discussed
herein.

apply an offense characteristic applicable to a different offense of conviction.  Other cases have approved departures based on a calculation of offense levels applicable to uncharged crimes.

"[I]n an appropriate case, a criminal history departure can be based upon prior dissimilar conduct that was neither charged nor the subject of a conviction." United States v. Brewster, 127 F.3d 22, 27 (1st Cir. 1997).  In Brewster, the Court of Appeals for the First Circuit rejected the defendant's argument that a departure pursuant to U.S.S.G. § 4A1.3 based on uncharged conduct, was limited only to that uncharged conduct that was similar in nature to the sentencing offense.  In holding that dissimilar conduct may form a basis for departure, the First Circuit noted its "respectful disagreement with the Second Circuit" on this point.  Brewster, 127 F.3d at 27.  However, even under the Second Circuit's stricter view a departure would be warranted here because the prior conduct is "related" to the offense of conviction.

In United States v. Kim, 896 F.2d 678 (2d Cir. 1990), the defendant was convicted of a count that alleged a false statement concerning the name and nationality of an alien (whom the defendant had escorted into the United States).  896 F.2d at 680.  In calculating the offense level, the court considered offenses to which the defendant had not pleaded, and that were not relevant conduct under §1B1.3 of the Guidelines.

30

The Court of Appeals for the Second Circuit held that "the Commission intended to preclude departures for acts bearing no relationship to the offense of conviction." 896 F.2d at 684. Therefore, the Court analyzed whether the offenses considered by the district court related in some way to the offense of conviction.

In Kim, the defendant had been charged with, inter alia, two counts of smuggling aliens and one count of obtaining his own entry into the United States illegally by concealing his role in assisting the illegal entry of aliens. 896 F.2d at 680. The Court held that, even though he did not plead guilty to those counts, they were "sufficiently related to the offense of conviction," that is, the false statement offense, to "be available for consideration as a basis for departure." 896 F.2d at 685. Even charges related to his possession of counterfeit funds that were on his person at the time of his initial arrest for the attempt to illegally enter the United States, "bore a sufficient relationship to the alien smuggling misconduct to be available for consideration as a basis for departure." 896 F.2d at 686. The Court of Appeals, which remanded the case, directed the district court to do a multiple count calculation based on the related misconduct that was not the subject of convictions. 896 F.2d at 687.

Thus, in a false statement case, the subject matter of the

31

false statement and facts surrounding the commission of the
offense can be the basis for application of guideline provisions
other than those applicable to the offense of conviction and,
thereby, an upward departure.

Although the government has argued herein that the court can
consider acquitted conduct, it is not necessary for the court to
do so.  If the indictment had only alleged the false statements
concerning membership in the VRS, and not the questions
concerning the defendant's role in persecution and murder, the
government's argument would remain the same.  In order to convict
the defendant, the jury was required to find that the false
statements were material.  Membership alone in the VRS would not
have resulted in the denial of the defendant's application for
refugee status.  The only evidence of the materiality of that
false statement was that a truthful answer would have led to
questions revealing the defendant's role in the massacre (had he
answered them truthfully.)

C.    **Sentencing Court May Apply Analogous Guideline
      Provision to Determine Extent of Departure**

"The practice of relying on analogous provisions of the
Sentencing Guidelines when calculating the proper extent of a
departure is well established." United States v. Fuller, 426
F.3d 556, 564 (2d Cir. 2005); United States v. Atehortva, 69 F.3d
679, 687 (2d Cir. 1995)("The reasonableness of the departure is

measured according to analogous guidelines, not in relation to
the underlying offense."); United States v. Puello, 21 F.3d 7, 10
(2d Cir. 1994) ("A sentencing court is encouraged to look to
'analogous guideline provisions to determine the extent of the
departure.'" citing United States v. Rodriquez, 968 F.2d 130, 140
(2d. Cir 1992)); Kikumura, 918 F.2d at 1112 ("analogy to the
guidelines is also a useful tool for determining what offense
level a defendant's conduct most closely approximates.").

In United States v. Fan, 36 F.3d 240 (2d Cir. 1994), the
Second Circuit affirmed the district court's use of the
kidnapping guideline, raising the base offense level by 6 levels,
for a conspiracy to bring 150 illegal aliens into the country, in
violation of 8 U.S.C. § 1324(a)(1)(A), (1)(D), and (2)(B)(ii).
Defendants conspired to ship 150 Chinese aliens from China, south
through the Indian Ocean, around the southern tip of Africa,
across the Atlantic Ocean, and then north to the United States.
Fan, 36 F.3d at 242.  The passengers were required to pay from
$100 to $15,000 to board the ship, and then $25,000 to $30,000 to
be smuggled to the United States.  Id.  When authorities
approached from different ports, the crew told the aliens to hide
below the deck.  Id. at 243.  At one location, four aliens jumped
overboard, but were returned to the ship by the host country's
authorities.  Id.  There was also evidence at trial indicating
that the captain used a stun gun and a conventional gun during

the voyage, leading to the district court's analogy to the kidnapping guideline.  Id.

Although the practice of using analogous guidelines to estimate the extent of a departure is accepted, the First Circuit has held that it is not required.  In United States v. Ocasio, the defendant complained that the district court's departure from 27-33 months up to 60 months was too harsh.  United States v. Ocasio, 914 F.2d 330, 332 (1st Cir. 1990).  In finding that the departure was unreasonable, the First Circuit noted that the court should look to the "overall aggregate of known circumstances pertaining to the offense of conviction and to the offender who committed it."  Ocasio, 914 F.2d at 337.  Further, "while we agree that a district court may well look at relevant analogies in the guidelines, we continue to reject any bright-line rule that requires a sentencing judge, in essaying an upward departure . . . to subrogate [their] residual discretion to some explicit or external criteria."  Id. at 336.

Thus, while an analogy might be helpful in determining the extent of a departure, finding a precise analogous guideline that best fits the conduct of the defendant is not required in justifying an upward departure.

**III.    Analysis**

The defendant was convicted of two counts of violations of

making false statements on immigration documents.  The base offense level assigned to such violations is 8, and both charges are grouped as one.  U.S.S.G. §§ 2L2.1(a), 3D1.2(b).  A two-level enhancement for obstruction of justice is applicable resulting in a total base offense level of 10.  U.S.S.G. § 3C1.1.

The defendant was also acquitted of two counts alleging violations of making other false statements on immigration forms. Those counts involved him falsely reporting that he had never participated in murder or persecution of individuals because of their religion.[25]

This case is "outside the heartland" of a typical false statement case because here the false statement ultimately concerned the defendant's participation in mass murder.  The Court should therefore depart upward from the applicable

---

[25] The jury found the defendant not guilty of these counts even though he admitted that he had been a shooter at Branjevo Farm.  While it is never possible to determine the basis for a jury's verdict, in this case the jury may have believed that the defendant was under duress when he killed the victims and therefore, did not make a material false statement on the forms, that is, he did not murder or persecute anyone *because of* their religion, but because of an order he felt he could not refuse. It is also possible that the jury could have believed that the defendant's behavior did not amount to "persecution" as alleged in count three or that he killed any person because of "race, religion, nationality, ethnic origin and political opinion" as alleged in count four.  Notwithstanding the reason for acquittal, it is not relevant here because there doesn't seem to be any dispute that the defendant participated in the murder of over 1000 unarmed civilians.  Thus this Court can find, by a preponderance of the evidence, that he participated in those murders.  <u>See</u> discussion in section that follows.

guideline.  The court should consider the underlying conduct that formed the basis of the false statements in the counts in which the defendant was acquitted, as well as those for which he was convicted, because the defendant's proven participation in murder lies at the heart of what made the lies material.  Although the conduct (the murders) may not be "relevant" in the section 1B1.3 sense, it, nonetheless, relates meaningfully to the offense of conviction.  See, e.g., United States v. Kim, 896 F.2d at 684. In addition, the government submits that other information provided herein regarding the history and characteristics of the defendant is also relevant to the Court's analysis.

A.    **The Government has Proven by a Preponderance of the Evidence that the Defendant Participated in the Murder of Victims at Branjevo Farm**

In August 2004, when confronted with the video evidencing his membership in the 10th Sabotage Unit, the defendant admitted to his conduct at Branjevo Farm.  Although he claimed that he would have been killed had he not participated, he, nonetheless, agreed that he had been a shooter.  His statements were corroborated by the testimony of the victims, Salihovic and Hasic, who testified that the massacre had taken place at Branjevo Farm and they had escaped under the cover of night. However, neither identified Boskic as a shooter.

During the defendant's trial, Richard Butler, the

government's military expert, identified Milorad Pelemis as the commander of the 10th Sabotage Unit -- the same individual that Boskic stated had ordered him to commit the killings at Branjevo Farm.  In addition, this Court should consider the further details of the event that were provided by Erdemovic in his testimony and interviews for the ICTY and the Federal Republic of Yugoslavia in its evaluation of whether the government proved by a preponderance of the evidence that the defendant killed numerous people at Branjevo Farm.

### (1)   Testimony and Interviews Establishing Defendant's Participation in the Massacre at Branjevo Farm

As set forth above, previous testimony and statements of Drazen Erdemovic establish the defendant's role in the massacre of over 1000 Muslim unarmed civilian prisoners at Branjevo Farm on July 16, 1995.  Erdemovic identified Boskic as a shooter in several different proceedings, including the Rule 61 hearing of Mladic and Karadzic and in the trials of Krstic and Milosevic.

In addition, Erdemovic's statements suggest that Boskic was personally responsible for the killing of between 100 and 150 people in the course of the afternoon.  Erdemovic testified that approximately 15 - 20 buses came through, with 60 people on each bus.  Since only 8 shooters were present for the majority of the day, then each shooter was arguably responsible for killing between 100 - 150 victims.

37

An upward departure is warranted to account for the conduct underlying the false statements.  The analogous guideline range that most appropriately captures the conduct is the voluntary manslaughter provision.

**B.    The Voluntary Manslaughter Guideline Range**

The specific offense characteristics outlined in section 2L2.1 do not capture the type of conduct that underlies the false statements made here.  However, U.S.S.G. § 2A1.3, voluntary manslaughter, both captures defendant's admitted conduct and takes into consideration his claim of duress.  In addition, the murders are sufficiently related to the offense of conviction to provide the basis for the departure advocated by the government.

Murder is "the unlawful killing of a human being with malice aforethought."  18 U.S.C. § 1111.  Manslaughter is the "unlawful killing of a human being without malice."  18 U.S.C. 1112(a). Manslaughter is divided into voluntary manslaughter and involuntary manslaughter.  The former is defined as "upon a sudden quarrel or heat of passion" and the latter as "in the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."  18 U.S.C. 112(b).

At first glance, the appropriate guideline provision

38

applicable to the defendant's conduct at Branjevo Farm would be
the murder guideline, that is, either 2A1.1 (First Degree Murder)
or 2A1.2 (Second Degree Murder).  This is true because duress is
neither a defense to murder nor does can it mitigate murder to
manslaughter.  Rhode Island Recreation Center v. Aetna Casualty &
Surety Co., 177 F.2d 603, 605 (1st Cir. 1949); United States v.
Buchanan, 529 F.2d 1148, 1153 (7th Cir. 1976); Oswald v.
Bertrand, 374 F.3d 475, 481 (7th Cir. 2004); United States
v.LaFleur, 971 F.2d 200, 205 (9th Cir. 1992).

    To successfully assert the duress[26] defense, a defendant
must show that he (1) was faced with a choice of evils and chose
the lesser evil, (2) acted to prevent imminent harm, (3)
reasonably anticipated a direct causal relationship between his
acts and the harm to be averted, and (4) had no legal
alternative.  See United States v. Nelson-Rodriguez, 319 F.3d 12,
40 (1st Cir. 2003).

    A duress defense is not available to Boskic's acts of
homicide.  First, there is no direct evidence that Boskic, like
Erdemovic, participated in the killings only under an imminent
threat of harm.  Boskic claimed he was threatened by Pelemis the

---

    [26] The cases speaks in terms of a "necessity" defense.  Many
courts distinguish necessity from duress by defining a necessity
defense as involving physical forces beyond the defendant's
control, while duress involves coercion from another human being.
LaFleur, 971 F.2d at 205, n.3.

day before the actual massacre.  Second, as outlined above, Zoran
Obrenovic, who was a member of the 10th Sabotage Unit, stated
that members could and did refuse to participate and were not
killed.  Obrenovic stated that he refused an order to participate
in the Branjevo killings and was not killed or harmed in any way
for his refusal.  Third, even Boskic admitted that the Unit
refused to participate in the killing of 500 additional
prisoners, and its members were not punished for their refusal.
In fact, some of those who refused were later promoted and
received commendations.  Fourth, even assuming that Boskic would
have been himself killed if he didn't participate in the
execution of the Muslims, he still cannot excuse his
participation in the murder of hundreds of unarmed civilians.
See Rhode Island Recreation Center v. Aetna Casualty & Surety
Co., 177 F.2d 603, 605 (1st Cir. 1949) ("it appears to be
established, however, that *although coercion or necessity will
never excuse taking the life of an innocent person*, it will
excuse lesser crimes") (emphasis added).  This position has been
echoed in other circuits.  *See* United States v. Buchanan, 529
F.2d 1148, 1153 (7th Cir. 1976) ("coercion is not a defense to
murder"); Oswald v. Bertrand, 374 F.3d 475, 481 (7th Cir. 2004)
("[d]efenses such as self-defense, public and private necessity,
and coercion are not intended for cases in which a person kills
an innocent to save his own hide, as when the shipwrecked

defendants in the famous case of <u>Regina v. Dudley & Stevens</u>, 14
Q.B.D. 273 (1884), ate the cabin boy rather than starve, and were
convicted of murder"); LaFave & Scott, *Substantive Law* §5.3
(1986) ("Duress cannot justify the intentional killing ... of an
innocent third person.").

In <u>LaFleur</u>, the Court of Appeals for the Ninth Circuit
explained the rationale for rejecting a duress defense to murder.

> The duress defense, which provides the defendant a legal
> excuse for the commission of the criminal act, is based on
> the rationale that a person, when confronted with two evils,
> should not be punished for engaging in the lesser of the
> evils.

971 F.2d at 204.

> The rationale of the defense is not that the defendant,
> faced with the unnerving threat of harm unless he does an
> act which violates the literal language of the criminal law,
> somehow loses his mental capacity to commit the crime in
> question.  Nor is it that the defendant has not engaged in a
> voluntary act.  Rather it is that, even though he has done
> the act the crime requires and has the mental state which
> the crime requires, his conduct which violates the literal
> language of the criminal law is justified because he has
> thereby avoided a harm of greater magnitude.

971 F.2d at 205, quoting Lafave & Scott, *Substantive Criminal Law*
§5.3 (1986) (footnotes omitted).

> The "choice of evils" rationale for the duress defense is
> strained when a defendant is confronted with taking the life
> of an innocent third person in the face of a threat to his
> own life.  The choice of evils rationale necessarily
> presumes that the threatened harm to the defendant is
> greater than the resulting harm from the defendant's
> commission of the crime.  When the defendant commits murder
> under duress, the resulting harm – i.e. the death of an

41

> innocent person – is at least as great as the threatened
> harm – i.e. the death of the defendant.  For this reason,
> the common law rejected duress as a defense to murder.

971 F.2d at 205.

The Court in <u>LaFleur</u> held that "[w]e believe that, consistent

with the common law rule, a defendant should not be excused from

taking the life of an innocent third person because of threat of

harm to himself."  971 F.2d at 206.  In addition, "duress cannot

legally mitigate murder to manslaughter."  <u>Id.</u>

    Thus, as a legal matter, the defendant Boskic was guilty of

murder.  However, while not providing a legal defense nor

mitigation, duress can be a basis for a downward departure under

U.S.S.G. §5K2.12 of the Sentencing Guidelines, which provides, in

pertinent parts, as follows:

> If the defendant committed the offense because of serious
> coercion ... or duress, under circumstances not amounting to
> a complete defense, the court may depart downward.

    In deciding how much to upwardly depart (or how much to

depart downward from the murder guideline), the manslaughter

guideline may be viewed as providing some guidance.

## C.    <u>Mitigating Factors/Erdemovic v. Boskic</u>

    In addition, while the law of the United States (and other

Common Law countries) differs from the law applied by the ICTY

(and Civil Law countries), the decision of the ICTY on this issue

also provides some guidance on the applicability of duress to the
actions of Boskic at Branjevo.  This provides support for
applying the manslaughter guideline rather than the provision
applicable to murder.  In addition, the case involving Erdemovic
before the ICTY provides independent guidance concerning an
appropriate sentence in this case.

In the case of Erdemovic, the Appeals Chamber of the ICTY
found that while duress does not afford a complete defense to a
soldier charged with a crime against humanity and/or a war crime
involving the killing of innocent human beings, duress is
admissible in mitigation.  Prosecutor v. Erdemovic, Case No. IT-
96-22-A, Joint Separate Opinion of Judge McDonald and Judge
Vohrah, ¶ 88 (Oct. 7, 1997);  Prosecutor v. Erdemovic, Case No.
IT-96-22-Tbis, Sentencing Judgement, ¶ 17 (Nov. 29, 1996).

On March 5, 1998, Erdemovic was sentenced to 5 years'
incarceration for committing war crimes.  The sentencing court
gave consideration to Erdemovic's personal circumstances, his
family and background, his character, his admission of guilt, his
expressed remorse, his extensive cooperation with the Office of
the Prosecutor and the credible duress he claimed to have
suffered before killing the Muslim victims.

The ICTY sentence imposed provides guidance to this court as
Erdemovic was similarly situated as the defendant.  However,

43

there as some key differences that should be noted, that suggest
that it is appropriate for Boskic to receive a more substantial
sentence than Erdemovic.

In July 1995, Erdemovic was married with an infant at home.
Prosecutor v. Erdemovic, Case No. IT-96-22-Tbis, Sentencing
Judgment, ¶ 16i, Family Background (Mar. 5, 1998).  Erdemovic had
no criminal record and the Trial Chamber noted his "honest
disposition" citing the fact that "he came forward voluntarily
and told of his part in the massacres before his involvement was
known to any investigating authorities."  Id. at ¶ 16i,
Character.

The Trial Chamber noted the significance of a witness who
testified that Erdemovic had saved his life.  Id.  Erdemovic "was
with some other soldiers of the Bosnian Serbian Army when they
came across [the witness], and [Erdemovic] prevented his fellow
soldiers from killing his former colleague.  It was upon the
insistence of [Erdemovic] that the [the witness] was finally
released unharmed."  Id.

 In regard to his admission of guilt, the Trial Chamber
emphasized:

> An admission of guilt demonstrates honesty and it is
> important for the International Tribunal to encourage
> people to come forth, whether already indicted or as
> unknown perpetrators.  Furthermore, this voluntary
> admission of guilt which has saved the International
> Tribunal the time and effort of a lengthy

investigation and trial is to be commended.

Id. at ¶16ii, Admission of Guilt.

In addition, the Office of the Prosecutor investigator who interviewed Erdemovic testified that he "had no doubt that the accused feelings of sorrow and remorse were genuine and real, and that he really was going through an emotional process." Id. at ¶ 16iii, Remorse.

Significantly, the Trial Chamber quoted the prosecutor in its opinion, remarking that these words are rarely spoken: "The collaboration of Drazen Eredemovic has been absolutely excellent." Id. at ¶ 16iv, Cooperation with the OTP. It also noted that Erdemovic "cooperated without asking anything in return and that the extent and value of his cooperation has been such as to justify considerable mitigation." Id.

In addition to testifying in the Rule 61 hearing on Mladic and Karadzic and in the trials of Milosevic and Krstic, Erdemovic's cooperation continues to this day. He is expected to testify in Prosecutor v. Vujadin Popovic, et al., IT-05-88, which is presently ongoing and is focused on the events in July 1995.

It contrast to the mitigating factors that led to Erdemovic's lenient sentence, the defendant's life story has little to note. The defendant was not married and had no children in July 1995. When Erdemovic testified in the summer of 1996 against Mladic and Karadzic, the defendant, according to his

45

brother's testimony, escaped to Germany in November 1996 unnoticed.

By 1999, the defendant had applied to come to the United States purporting himself to be a victim, like the Muslims, of Serbian persecution.  When the defendant was interviewed in August 2004, before he understood that the agents knew of his true background, the defendant spoke disparagingly about the Muslims when confronted with his own arrest record: "Muslim people had more power and they can write or say what they want, what is true for Muslim people is not true for me."  Furthermore, the defendant's ultimate desire to cooperate with investigators was not borne out of genuine remorse for his actions.  When offering to help find others responsible, Boskic said: "If I go down, others will too."

Nor has the defendant gone on to live a dramatically different life in the United States.  In the course of one year's time, from 2003 - 2004, the defendant was arrested or interviewed by the local police seven times, for actions mostly involving alcohol and violence.[27]

The only similar mitigating factor between Erdemovic and the defendant is the duress.  Although, it is far from clear that the

---

[27] The defendant has only been convicted twice for crimes while in the United States.

46

defendant actually suffered from duress,[28] the government has
taken it into consideration in its sentencing recommendation.

### D.    The Guideline Calculation

The guideline provision applicable to voluntary manslaughter
is §2A1.3.  The offense level is 25.  Because the defendant
participated in the murder of over 1000, and was likely
personally responsible for killing about 100, five levels are
added pursuant to §3D1.4[29], resulting in a total offense level of
30.  Offense level 30 and criminal history II[30] results in a
sentencing range of 108 to 135 months.

### E.    The Departure is not Unreasonable

Sentencing courts have considered acts of terrorism
committed overseas as reason for substantial departure from the
guidelines.  In <u>United States v. Kikumura</u>, the sentencing court
imposed a 30 year prison term on the defendant who was convicted
of several passport and explosive offenses, for which the
sentencing guidelines prescribed a 27 to 33 month period of
imprisonment.  918 F.2d 1084 (3d Cir. 1990)(noting that, at the

---

[28] <u>See</u> p. 39, supra.

[29] The Commentary suggests that there are appropriate cases,
(perhaps) such as this case, where "[i]nasmuch as the maximum
increase provided in the guideline is 5 levels, departure would
be warranted in the unusual case where additional offenses
resulted in a total of significantly more than 5 Units."

[30]    That assumes no upward departure pursuant to
§4A1.3(a)(1).

47

time, it was "apparently the largest departure from an applicable
guideline range, in absolute or percentage terms, since the
sentencing guidelines became effective").  The defendant was
found with various explosives in his car, and admitted that they
were intended to be used to destroy property.  Id. at 1093-94.
After a brief bench trial on stipulated facts, he was found
guilty of 18 U.S.C. §444(d), prohibiting the transportation of
interstate commerce of any explosives with the intent to destroy
property.  Id.  In its sentencing memorandum, the government
stated that, "it would seek a substantial upward departure based
on Kikumura's alleged terroristic activities."  Id. at 1094.  In
addition to testimony concerning the particular bombing that
Kikumura was planning, the government also offered evidence of
prior terroristic activities.  The government introduced an
affidavit by a Dutch police officer, stating that Kikumura had
been arrested at an Amsterdam airport with two pounds of TNT, but
charges against him were eventually dropped because the search
was found to be illegal.  Id. at 1096.  The government also
introduced an affidavit of an FBI agent who oversaw the Bureau's
investigation of the terrorist organization of which Kikumura was
allegedly a member, the Japanese Red Army ("JRA").  Id.  The
agent's affidavit described how the defendant had previously
visited a terrorist training camp in Lebanon and had trained
others, including one JRA member who had bombed a USO club in

48

Italy, killing five.  Id. at 1097.  The district court accepted these facts as proven by both a preponderance standard and a clear and convincing standard.  Id. at 1101.[31]

The Third Circuit ultimately remanded to the district court to enter a sentence in the range of 210 to 262 months, based on its analysis of the reasonableness of the upward departure.  Id. at 1119.  This represented an upward departure of almost 20 levels[32] – similar to what the government is recommending in this case.  The holding by the Court of Appeals in Kikumura directed that the district court should impose a sentence that represented a slight decrease from the original 360 month imprisonment imposed by the district court, that had represented a 22 level increase.  918 F.2d at 1101 and 1119.

**F.    The Sentencing Recommendation of the Government is also an Appropriate Deviation from the Guidelines Pursuant to the Factors set forth in 18 U.S.C. §3553**

Title 18, United States Code, Section 3553(a), describes the factors that a court should consider in imposing sentence.  That

---

[31] The Third Circuit later overruled the clear and convincing standard utilized in Kikumura, and it has never been the standard in this Circuit.  See United States v. Grier, 449 F.3d 558, 570 (3rd Cir. 2006).

[32]  The upward departure was from an offense level of 18, criminal history I to a level 32, criminal history VI.  The Court found that a greater criminal history category was appropriate based on "an offender departure under §4A1.3," 918 F.2d at 1104, and an offense level departure based the fact that the guidelines provisions applicable to the defendant's conduct did not adequately take into account certain aggravating factors.  918 F.2d at 1109.

section provides, in part, as follows:

     (a) Factors to be considered in imposing a sentence. –
The court shall impose a sentence sufficient, but no greater
that necessary, to comply with the purposes set forth in
paragraph (2) of this subsection.  The court, in determining
the particular sentence to be imposed, shall consider –
     (1) the nature and circumstances of the offense
and the history and characteristics of the
defendant;
     (2) the need for the sentence imposed –
      (A) to reflect the seriousness of the
offense, to promote respect for the law, and to
provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal
conduct;
      (C) to protect the public from further crimes
of the defendant;

These considerations are no different from the pre-guideline

components of a federal sentence: punishment, general deterrence,

specific deterrence and rehabilitation.  "[B]efore making [the

sentencing] determination, a judge must appropriately conduct an

inquiry broad in scope, largely unlimited either as to the kind

of information he may consider or the source from which it may

come."  United States v. Tucker, 404 U.S. 443, 446 (1972).  This

directive to the sentencing court is codified in Title 18, United

States Code, Section 3661, which provides as follows:

    No limitation shall be placed on the information concerning
the background, character, and conduct of a person convicted
of an offense which a court of the United States may receive
and consider for the purpose of imposing an appropriate
sentence.

In considering all of the information set forth above, as

well as the evidence presented at trial, the Court has a clear

and unflattering picture of a defendant with a history of

violence, and no remorse, including, but not limited to,
information from Erdemovic regarding the defendant's actions
before and after Branjevo Farm, as well as a continuing pattern
of behavior in the United States, as illustrated by the
defendant's interactions with local police.  In addition, it
bears repeating that the defendant was involved in the largest
massacre in Eastern Europe since World War II.

The defense may argue that it is not appropriate for a Court
in the United States to punish the defendant for crimes committed
in Bosnia, even if they are related to the offense of conviction;
he may argue that punishment should come in the Bosnian War
Crimes Court.  However, such an argument is unavailing.

First, there are no guarantees that the Bosnian War Crimes
Court will be able to prosecute the defendant.  His admissions to
U.S. investigators in 2004 may well not be admissible under
Bosnian law.[33]  In addition, there have been problems with
obtaining witnesses' testimony during the limited number of

---

[33]  Article 45 of the Criminal Procedure Code of Bosnia and
Hercegovina requires that a suspect should have an attorney
present for questioning by authorities where he is suspected of a
criminal offense for which a penalty of long-term imprisonment
may be imposed.  This is called the "mandatory defence" and is a
common feature of civil law tradition jurisdiction.  Pursuant to
Article 78(3), a suspect may not waive the presence of his
attorney at questioning if Article 45 applies.  Finally, if any
actions are taken contrary to the provisions regarding the
questioning, then the Court's decision may not be based on the
statement of a suspect, pursuant to Article 78(6).

trials they have held.[34]

Second, the United States, as a member of the community of
nations, has recognized that there is certain conduct which
deserves universal condemnation and therefore, under certain
circumstances, can be prosecuted at locations other than the site
of the offense.[35]  The defendant's conduct at Branjevo Farm,
although not being of the nature that allowed prosecution here in
United States[36], falls into that category of offenses that
nations recognized as universally condemned.[37]  Therefore, a
United States court has an independent and recognized interest in

---

[34] See e.g., Denis Dzidic, Witnesses Have Little to Say on
Srebrenica Massacre, Institute for War and Peace reporting,
September 11, 2006.  Attached hereto as Exhibit I.

[35] "Customary international law recognizes five bases on
which a State may exercise criminal jurisdiction over a citizen
or non-citizen for acts committed outside the prosecuting State."
United States v. Yousef, 327 F.3d 56, at n.24 (2d Cir. 2003).
One of these bases is the "universality principle," "which
provides for jurisdiction over the extraterritorial acts by a
citizen or non-citizen that are so heinous as to be universally
condemned by all civilized nations."  Id.
       The universality principle permits a State to prosecute
       an offender of any nationality for an offense committed
       outside of that State, but only for a few, near-unique
       offenses uniformly recognized by the "civilized
       nations" as an offense against the "Law of Nations."
327 F.3d at 103.  This limited list of crimes includes piracy,
"war crimes" and "crimes against humanity."  327 F.3d at 104-105.

[36] If either the defendant or one of the victims was an
American then the prosecution could have taken place here in the
United States.  18 U.S.C. § 2441.

[37] See footnote 35.

punishing this defendant for his actions.

Three, the defendant's material omission on his application resulted in the admission of an individual who (1) had a demonstrated proclivity for extreme violence that was subsequently borne out by all the local police incidents, and who (2) was not simply ineligible to enter (for example, like an individual who lacked the asserted skills that are required for a work visa) but who was consciously fleeing accountability for a war crime, i.e., a person of the kind that the government has been dedicated to affirmatively expelling from the U.S. since the Office of Special Investigations was formed in May 1979, a uniquely ineligible alien.

Four, although a substantial sentence from this Court may not by itself deter future acts of war crimes, it may serve to deter other war criminals from seeking refuge in the United States.  This Court has the opportunity to send a clear message that the United States is not a safe haven for war criminals, by sentencing this defendant in a manner that makes it clear that war criminals who lie to gain entry to the United States will receive serious punishment.

Finally, the United States, which has been a refuge for the persecuted, should set an example of how to deal with the persecutors.

## IV.  Conclusion

     This case is unique.  This Court has never sentenced, and
likely never again will sentence, a defendant who personally
participated in the murder of over 1000 unarmed civilians.  The
fact that Boskic participated in the largest massacre in Eastern
Europe since World War II is not in dispute.  The massacre is
related in a meaningful way to the offenses of conviction; the
subject of this false statement case concerns that massacre and
is therefore like no other false statements case.  The sentencing
scheme in United States Courts both pre- and post-<u>Booker</u> provide
this Court with alternative grounds on which to base a sentence
in this case that, <u>inter alia</u>, recognizes the unique danger posed
by this defendant, the compelling need to punish his unlawful
entry into the United States, and to deter others who are
similarly situated from doing the same.  This Court may be the
only court in which this defendant will ever face punishment
related to his actions at Branjevo Farm on July 16, 1995.  The
sentence this Court announces should adequately reflect these
factors.

                              Respectfully submitted,

                              For the United States

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:   /s/ Kimberly P. West
                              KIMBERLY P. WEST
                              JEFFREY AUERHAHN
                              Assistant U.S. Attorneys

Dated: October 19, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that these documents filed through the ECF
system will be sent electronically to the registered participants
as identified on the Notice of Electronic Filing (NEF).

                           /s/ Kimberly P. West
                          Kimberly P. West
                          Assistant U.S. Attorney