UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | Case No. 04-CR-10298-DPW |
| v. | ) ) |  |
| MARKO BOSKIC | ) ) |  |

**DEFENDANTS' SUPPLEMENTAL SENTENCING MEMORANDUM**

**Introduction**

The Guideline sentencing range in this case is 4 to 10 months.[1] This Court, while not bound by the Guidelines, "must consult those Guidelines and take them into account when sentencing." United States v. Booker, 543 U.S. 220, 364 (2005). "The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country." United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005). "[T]hey are the only integration of the multiple [sentencing] factors." United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006); United States v. Cooper, 437 F.3d 324, 331-32 (3rd Cir. 2006) (declining to adopt a rebuttable presumption of reasonableness, but noting that "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range." Id. at 331.) The Guidelines remain the touchstone of reasonableness.

Despite the fact that the Guidelines advise a sentence of 4 to 10 months in this case, the

---

[1] The base level is 8 and with no adjustment for obstruction of justice, the total offense level remains 8 (PSR, p. 11).

government is proposing a sentence of 135 months. In an effort to rationalize this radical departure, the government attempts to connect defendant's conduct in the war-torn, former Yugoslavia in 1995 with the false statement he made on immigration forms in Germany in 2000 and in the United States in 2001. No such connection exists in fact and the tenuous theoretical connection the government attempts to forge is legally insufficient to justify a departure.

The government's recommendation is an attempt to punish defendant, not for lying on immigration documents, but for the atrocities at Branjevo Farm. This attempt is at odds with the basic principle, embodied in the Guidelines, the Due Process Clause, and general sentencing principles, that punishment must be, at bottom, for the offense of conviction, not for the enhancing conduct, and must be according to the controlling sentencing principles of relatedness and proportionality (Argument I). Furthermore, in the circumstances of this case, it would be entirely inappropriate to enhance the punishment based on uncharged, foreign conduct committed during wartime (Argument II). Within the context of the Sentencing Guidelines, defendant's conduct in Bosnia is not a basis for departure under either 4A1.3 or 5K2.0 (Argument III).

### **Argument**

**I.  THE FOCUS OF ANY FEDERAL SENTENCE MUST BE THE CRIME OF CONVICTION AND ANY ENHANCEMENT MUST BE PROPORTIONAL TO THAT CRIME.**

A sentence must be "*for* the offense of conviction as opposed to punishment *for* the enhancing conduct." United States v. Lombard, 72 F.3d 170, 181 (1st Cir. 1995). Therefore, a sentencing court must abide by the principle of proportionality when sentencing as a safeguard to ensure that punishment for an enhancement does not overshadow the punishment for the

sentence of conviction. United States v. Ocasio, 914 F.2d 330 (1st Cir. 1990). To switch the focus at sentencing to a defendant's uncharged conduct is impermissible. The vice of such a switch is that it enables the government to prosecute a defendant for a comparably minor crime and then obtain a lengthy sentence based on evidence of an uncharged crime proved to a judge by a lesser standard.

To prevent such a result, sentence enhancements are subject to limitations, such as proportionality and relatedness, which arise from the recognition that it is not the conduct underlying the enhancement that must be the primary focus when imposing a sentence, but the conduct underlying the conviction. United States v. Lombard, 72 F.3d 170 (1st Cir. 1995). To have it otherwise would make a mockery of the central protections of our justice system, the requirement that a defendant be charged with a crime and that those charges be proved to a jury beyond a reasonable doubt. U.S. Constitution, Fifth Amendment.

The First Circuit in Lombard recognized the threat when uncharged conduct overshadows the crime of conviction at the sentencing stage. In Lombard, the defendant was convicted of firearms violations. He previously had been tried and acquitted in state court on murder charges. The firearms prosecution arose out of the same incident. Following conviction, the government sought a life sentence for the defendant on the basis of the acquitted murder charge. The district court, constrained to apply the relevant cross-sections in the Guidelines, and believing erroneously that it was powerless to make a downward departure, imposed a life sentence.

Both the district court and the court of appeals were significantly troubled by the significant sentence enhancement resulting from a shift in focus at sentencing from the crime of

conviction to the uncharged murder. "The punishment imposed in view of this other conduct far outstripped in degree and kind the punishment Lombard would otherwise have received for the offense of conviction." Id. at 177. The crucial question for both courts was what conduct had the defendant been sentenced for: "[I]f the life sentence that Lombard received can realistically be viewed as punishment *for* the murders, as opposed to punishment for the firearms offense, the constitutional difficulties. . . then come to the fore." Id. at 181. The court reached the same conclusion that needs to be reached in the present case, "the reality is that the murders were treated as the gravaman of the offense." Id. at 178. Such a conclusion offends the basic principles of our justice system:

> [A] rule structure that bars conviction of a firearms charge except on proof beyond a reasonable doubt, but then permits imposition of a life sentence upon proof of a murder by a preponderance of the evidence attaches, in effect, the lesser procedural protections to the issue that would naturally be viewed as having the greater significance."

Id. at 178.

The result of such a structure "raises the danger of the defendant's trial and conviction being turned into a means of achieving an end that could not be achieved directly: the imposition of a life sentence 'enhancement' based on a federally unprosecutable murder." Id. at 178. The court concluded: "Here. . .the tail has wagged the dog. The consideration of the murders at Lombard's sentencing upstaged his conviction for firearms possession." Id. at 177.

In order to avoid the altering of focus that occurred in Lombard, and that the government seeks to have occur here, courts must abide by the principle of proportionality in selecting a sentence. This principle acts as a safeguard to prevent the overshadowing of the crime of conviction by the enhancement conduct. The First Circuit has stated that a departure must be

proportional to the offense of conviction. "Courts cannot become preoccupied with a single tree and thereby lose sight of the forest." United States v. Ocasio, 914 F2d 330, 337 (1st Cir. 1990). In Ocasio, the Court held the departure based on the defendant's lengthy criminal record to have violated the principle of proportionality. The error was due to "the judge focus[ing] almost exclusively on Ocasio's admittedly Brobdingnagian criminal record and the GSR's failure to realistically to account for it." Id. at 337. Similarly, in the present case, the government's proposed sentence is directed at the defendant's conduct in the former Yugoslavia and overshadows his crime of conviction. The tail is wagging the dog.

II. **IN THE CIRCUMSTANCE OF THIS CASE, IT WOULD BE ENTIRELY INAPPROPRIATE TO ENHANCE THE PUNISHMENT BASED ON UNCHARGED, FOREIGN CONDUCT COMMITTED DURING WARTIME**

The government proposes that this Court sentence defendant for conduct for which he has never been charged in any jurisdiction and which took place more than ten years ago during a war in another country. Congress, however, has made the determination that United States courts should not become involved in crimes committed overseas, during wartime, by non-citizens. Indeed, the exercise of universal jurisdiction in the criminal context -- the only possible basis for jurisdiction to punish defendant's conduct in Bosnia in a United States court -- has been used with restraint where there is a system in place in the country where the crime occurred that is able to bring the defendant to justice. 92 Geo. L.J. 1057, 1132 (citing opinions of the Spanish Supreme Court and Belgium Court embracing the principle). The consensus of the cited courts suggests that the principle of restraint has ripened into one of customary international law. Congress has granted United States courts only the most limited jurisdiction to prosecute offenses that occurred in another country. It is only for acts of torture. 18 U.S.C §2340A(1994).

5

The federal genocide statute, 18 U.S.C. §1091(d)(1994) does not assert universal jurisdiction; neither does the federal war crimes statute. 18 U.S.C. §2441(b)(Supp. 1996).

Congress has decided that United States Courts will not punish for extra-judicial executions or homicides committed in another country.[2] In this case, to the extent the government had any power to address any of the acts in Bosnia, it was extremely limited to the acts of torture, and the government chose not to prosecute. For the rest of the conduct at Branjevo Farm, including acts of homicide, Congress has decided that United States courts should not be involved in such prosecutions. This Court should not allow the government to back door a lengthy prison sentence based on conduct with which the United States government has expressly decided not to become involved.

The Bosnia and Herzegovina War Crimes Tribunal is the proper court to judge and, if necessary, punish defendant. The defendant's conduct in the former Yugoslavia is not the type of "crime" contemplated by the drafters of the Guidelines. The defendant's conduct is not comparable, for instance, to a drug crime that may have taken place in another country where there are laws comparable to our own that prohibit such conduct. Such conduct can without difficulty be figured into a sentence. But, the defendant's conduct took place in the context of a war and in the absence of the predicate social and legal structure in which the Guidelines were drafted and intended to apply. The various principles that underlie the guidelines, such as retribution and deterrence, and the determinations made by the Sentencing Commission of how

---

[2] This is in contrast to the jurisdictional reach of the Torture Victim Protection Act of 1991, 28 U.S.C. §1350 which allows persons to sue civilly for acts of genocide. See Kadic v. Karadzi, 70 F. 3d 232, 241-244 (2nd cir 1995) cert. denied, 518 U.S. 1004(1996). (Genocide, war crimes, summary execution, and torture actionable.)

to weigh and balance certain types of conduct for the purpose of punishment, cannot be rationally carried out when evaluating conduct that occurred during wartime. The defendant's "crimes" are incommensurable with crime as it is understood in the context of sentencing in a United States court. The fact that Bosnia has instituted a War Crimes Tribunal where the defendant's conduct can be evaluated fairly weighs heavily in favor of this Court deferring to the judgment of that tribunal. This Court should respect principles of comity and allow the War Crimes Tribunal to make the decision as to how to deal with the defendant's crimes. His crimes arose out of a rupture in Bosnian society; it is that society that should make the decision whether to prosecute and what punishment to impose.

On the other hand, if Bosnia determines that it wishes to seek extradition of defendant, it can do so. And, if extradited, he will face a trial and be punished according to the policies and principles that the Bosnian Court deems to be fitting and just, a determination that this Court is unable to make. In that event, any punishment imposed by this court for the same offense would amount to unfair double punishment.

### III. THE DEFENDANT'S UNCHARGED, UNRELATED, FOREIGN CONDUCT THAT WAS NOT DIRECTED AGAINST THE UNITED STATES CANNOT BE A BASIS FOR DEPARTURE.

There is no basis for a departure in the circumstances of this case. The defendant's uncharged, unrelated, conduct in the former Yugoslavia that was not committed against the United States cannot support a departure.

In United States v. Chunza-Plazas, 45 F.3d 51 (2nd Cir 1995), the court held that unrelated, foreign criminal conduct not committed against the United States cannot be a basis for

departure. This holding remains good law. The government in its Preliminary Response to Defendant's Objections to Pre-Sentence Report and Defendant's Sentencing Memorandum (pp. 2-5) questions the viability of that holding based on the Second Circuit's subsequent holding in United States v. Cox, 299 F.3d 143 (2nd Cir. 1995). However, the disagreement with Chunza-Plazas by the Court in Cox was directed, not at the issue involving the use of foreign conduct, but the holding concerning the use of a dissimilar crime to support a departure pursuant to 4A1.3. Far from questioning Chunza-Plazas with respect to foreign conduct, the Cox court distinguished its facts on the basis that foreign conduct was not involved.

The government also relies upon United States v. Levario-Quiroz, 161 F.3d 903 (5th Cir. 1998) in support of its argument that the defendant's conduct in the former Yugoslavia may be used as a basis for departure. However, that case suggests that *related,* uncharged, foreign conduct may provide a basis for departure. There the defendant committed murder in Mexico, and when fleeing, shot at Mexican authorities en route to his illegal entry into the United States. His convictions were for importation of a firearm and illegal entry into the United States. Clearly, the conduct behind the departure, the murder, was related to his fleeing into the United States. The defendant's conduct, like that in Chunza-Plazas, is *unrelated* conduct and may not support a departure.

    A.    **Should this Court Depart, It must Do So Pursuant to 4A1.3.**

If this Court rejects defendant's argument with respect to use of defendant's conduct in the former Yugoslavia, and decides to depart, it may only do so pursuant to section 4A1.3, the criminal history departure provision, because the alternative departure provision, 5K2.0, is

inapplicable in these circumstances.[3]  A criminal history departure would yield only a modest increase in the defendant's Guideline sentence.

  The Guidelines contain two sections providing for departure, the criminal history departure provision, 4A1.3, and the more general departure provision, 5K2.0.  The latter allows for departure when the court "discovers that an offense characteristic was not adequately taken into account by the sentencing commission in formulating the guidelines."  United States v. Aymelek, 926 F.2d 64, 69 (1st Cir. 1991).  The former allows a court to depart "when it receives reliable information that the defendant's criminal history category (CHC) does not adequately reflect his past criminality or the likelihood that he will commit other crimes."  Id. at 69-70.  "On most occasions, this is an 'either/or' proposition; the court will decide to depart pursuant either to section 5K2.0 or to section 4A1.3."  Id. at 70.  "Section 4A1.3 focuses primarily on past criminal conduct. . ."  United States v. Hardy, 99 F3d 1242, 1248 (1st Cir. 1996).  On the other hand, "[t]he section 5K2.0 departure mechanism focuses primarily on 'unusual' *attributes of the offense of conviction. . .*"  Id. at 1248.

  The defendant's conduct in the former Yugoslavia can only reasonably be viewed as "past criminal conduct," not as "an attribute of the offense of conviction," for two reasons.  First, the conduct took place years prior to the defendant's immigration offenses.  Second, the First Circuit requires that for a departure under 5K2.0 there be a "meaningful relation" between the conduct underlying the conviction and the conduct justifying the departure, United States v. Amirault, 224 F.3d 9 (1st Cir. 2000), a requirement that cannot be demonstrated in the present

---

[3] Although the Guidelines became advisory following the Supreme Court's decision in Booker, the First Circuit still requires the sentencing court to calculate the Guideline sentence including any departures.  United States v. Jiminez-Beltre, 440 F.3d at 518.

case.

In <u>United States v. Kim</u>, 896 F.2d 678 (2nd Cir. 1990), the court held that the conduct upon which the court based a departure was meaningfully related because the conduct occurred simultaneously to the conduct underlying the crime of conviction and was a part of the overall criminality.  The defendant was arrested at the airport attempting to smuggle to illegal aliens into the United States.  He pleaded guilty to making false statements to immigration officials.  The court departed upward pursuant to 5K2.0 based on the fact the defendant at the time of his arrest was also in possession of counterfeit bills.  Possession of the bills, and importing them, both crimes with which he was charged, were obviously attributes of the crime of conviction and therefore meaningfully related to his conduct in smuggling the aliens into the country.

In the present case, no meaningful relationship can be established.  The defendant was convicted of lying on immigration documents in Germany in 2000 and in Boston, Massachusetts in 2001.  His participation in atrocities at Branjevo Farm in 1995 bears no meaningful relationship to his conviction for lying on immigration documents.  Nonetheless, the government performs gymnastics to establish the requisite meaningful relationship and makes the following argument:

> In order to convict the defendant, the jury was required to find that the false statement was material.  Membership in the VRS would not have resulted in denial of his application for refugee status.  The only evidence of the materiality of that false statement was that a truthful answer would have led to questions that would have revealed the defendant's role in the massacre (had he answered them truthfully).   His role in the Branjevo massacre was what made his false statement about his military service "material," and his role in mass murder was related to his counts of conviction.

(Government's Sentencing Memo, p. 3)

Essentially, the government's argument is that the defendant's conduct in the former Yugoslavia satisfied the materiality element of his conviction for false statements and what is *material* for purposes of conviction must also be *meaningfully related* for purposes of sentencing. The government offers no argument to make the leap from materiality to meaningful relationship, and a closer look at the two concepts reveals that satisfying the former does not necessarily satisfy the latter.

The term "meaningful relationship" derives its meaning within the context of sentencing. The "relationship" must therefore be one that would justify a sentence enhancement. Accordingly, in order for conduct to be meaningfully related it must enhance the culpability of the defendant for the crime of conviction. The concept of "materiality" as an element of the crime of false statements works to assure that a defendant is not convicted for conduct that could not potentially have affected the course of decision-making of the agency to which he lied. What makes conduct material in no way suggests the level of culpability of an individual, but only whether he is culpable at all.

"Meaningful relation," on the other hand, concerns whether the conduct in some manner makes the crime of conviction worse. For example, if a terrorist lied about his name so that he could enter this country to commit a terrorist act and had he revealed his true name, he would have been arrested and stopped from bombing a bus, what made the lie material would have also made the individual more culpable: Had the terrorist not lied about his name he would not have been able to commit the bombing. There is thus an identification between what made the act material and what made it meaningfully related, but that identification is only incidental due to the particular details of the example, not by virtue of a necessary connection between what is

11

material and what is meaningfully related. No such identification between materiality and heightened culpability exists in the present case.

The defendant's lie *qua* lie was not any more culpable because of the subject matter behind it. Like any lie which could lead to conviction under the statute, it likely would have changed the course of decision-making by the agency. No further harm justifying a sentence enhancement occurred as a result of the subject matter behind the lie and it was accordingly not meaningfully related.

Guideline 4A1.3 provides the only departure provision that is even arguably applicable.

The mechanics of departure pursuant to 4A1.3 are different from those under 5K2.0. Section 5K2.0 departures are "'unguided' and functionally vertical." United States v. Hardy, 99 F.3d at 1248. Section 4A1.3 departures, on the other hand, are "'guided' and horizontal." United States v. Hardy, 99 F.3d at 1248. Horizontal departures move successively to the right (or the left in the case of a downward departure) along the horizontal axis of the guideline chart to a higher criminal history score. Vertical departures move vertically along the chart to a higher (or lower) base offense level.

The difference in the mechanics of the different departures thus affects the ultimate result in two ways. The requirements that a criminal history departure be "guided" and move horizontally (at least at first with respect to an initial criminal history category below category VI) act as constraints on the degree of the sentence enhancement. A 5K2.0 departure, on the other hand, leaves it to the discretion of the judge to select whatever sentence appropriately reflects the 'unusual' circumstances in the case." Id. at 1248.

When departing pursuant to 4A1.3, a court must "evaluate adjacent criminal history

categories in sequence." United States v. Brewster, 127 F.3d 22, 31 (1st Cir 1997). The court "must determine that the offender's criminal history is similar to the criminal histories of defendants in the CHC to which the court wishes to migrate." Id. at 31, citing United States v. Pratt, 73 F.3d 450, 453 (1st Cir. 1996). "[A] court is required 'to proceed[] sequentially from the criminal history category determined by the defendant's criminal history point score through each higher criminal history category until it settles upon a category that fits the defendant.'" Id. at 31 quoting United States v. Topiano, 50 F.3d 157, 162 (2nd Cir 1995).

The PSR in this case indicates that defendant's criminal history score is II. The government's argument for departure revolves around its assertion that defendant's conduct in the former Yugoslavia is most appropriately viewed as voluntary manslaughter.[4] Accepting the government's characterization, had defendant been convicted of voluntary manslaughter and sentenced to a term exceeding one year and one month, pursuant to Guideline 4A1.1(a), three points would be added to defendant's criminal history score, placing him in Category III for sentencing, resulting in a GSR of 6 to 12 months.

> **B.     Even If the Court Determines There Is a Meaningful
>          Relationship Justifying a 5K2.0 Departure,
>          The Appropriate Analogue Is Flight to
>          Avoid Prosecution, Not Voluntary Manslaughter.**

As set out above, the fact that the defendant's conduct in the former Yugoslavia may have been the basis for satisfying the materiality element of his crime of conviction does not establish the "meaningful relationship" necessary for a departure based on section 5K2.0. The concept of "materiality" is distinct from "meaningful relationship" and serves a very different

---

[4] The more appropriate analogy is the five-year sentence given to Erdemovic, which, in any event, yields the same degree of departure as for voluntary manslaughter.

purpose. However, there is a perspective from which to view the defendant's conduct that would establish a meaningful relationship.  A view from that perspective, however, would render the government's preferred analogue for departure, voluntary manslaughter, wholly inappropriate. The perspective is as follows: Had the defendant lied on his immigration documents in order to enter this country and flee prosecution for his conduct at Branjevo Farm, a meaningful relationship might be established.  The defendant's lying could then be seen as an effort to cover up or avoid responsibility for his crime, thus increasing his culpability for his crime of conviction, namely, lying to immigration officials.

The government does not attempt to establish a meaningful relationship in this manner with any force, instead confining it to a single sentence on pg. 53 of its sentencing memorandum. The likely reason for the retreat to its strained argument based on "materiality" is that there is no evidence to support the idea that the defendant came to this country to avoid prosecution.  As previously set out in Defendant's Sentencing Memorandum (Section II), there is no evidence that anyone was seeking to hold the defendant responsible for his conduct, neither ICTY nor any tribunal in the former Yugoslavia.  Indeed, the evidence is to the contrary: Alistair Graham, an investigator for ICTY, testified at the suppression hearing that his principle purpose in coming to the United States was to aid the American government in its prosecution of the defendant. His secondary purpose was to gain information for ICTY.  He explicitly stated that the ICTY was not interested in defendant.

Furthermore, the defendant's conduct, prior to him entering  this country, as well as after he arrived, was manifestly inconsistent with the such a theory.  Defendant applied for refugee status in the United States using his own name and date of birth and he lived openly in

both Peabody and Salem, Massachusetts. There is no evidence that he took any steps to hide his identity.

Nonetheless, should this Court conclude that the defendant committed his crimes of conviction in order to flee prosecution, the appropriate analogue to be used for departure would not be voluntary manslaughter, but 18 U.S.C §1073, Travel in Foreign Commerce to Avoid Prosecution for Crimes Punishable Under Laws of the Place From Which the Fugitive Flees. This crime captures much more precisely the defendant's conduct than does voluntary manslaughter.

Appendix A of the Guidelines indicate that guidelines 2J1.5 (Failure to Appear by Material Witness) or 2J1.6 (Failure to Appear by Defendant) are the appropriate ones for a conviction under 18 U.S.C. §1073. The most appropriate one in the circumstances of this case is obviously 2J1.6, which applies to a defendant. The base offense level would be 6 plus [pursuant to 2J1.6(2)(A)] 9 for an offense "punishable by death or imprisonment for a term of 15 years or more." Defendant's base offense level would be 15, resulting in a GSR of 21 to 27 months (criminal history category II).

                                                Respectfully submitted,

                                                /s/ Patricia Garin
                                                Max D. Stern
                                                BBO NO. 479560
                                                Patricia Garin
                                                BBO No. 544770
                                                Jeffrey Wiesner
                                                BBO No. 655814
                                                Stern, Shapiro, Weissberg
                                                 & Garin, LLP
                                                90 Canal Street, Suite 500
                                                Boston, MA 02114-2022
                                                (617) 742-5800

Dated: November 16, 2006

**CERTIFICATE OF SERVICE**

      I hereby certify that this document(s) filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on  11/16/06  .
/s/ Patricia Garin