UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. No.  04-10298-DPW |
| | ) | |
| | ) | |
| MARKO BOSKIC | ) | |

GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States submits this supplemental memorandum to
address the issues raised by the Court during the hearing on
October 24, 2006.  The United States continues to rely on the
arguments made in the Government's Sentencing Memorandum, as well
as the Preliminary Response to Defendant's Objections to Pre-
Sentence Report and Defendant's Sentencing Memorandum.

I.   ARGUMENT

A.   The defendant's offense level should be increased two
levels for multiple perjurious statements in his
affidavit and testimony in support of a motion to
suppress.

The defendant Boskic filed a motion to suppress the
statements he made to law enforcement on the date of his arrest
in August 2004.  The statements were crucial evidence to the
government's case; without the statements, there was no evidence
available to the government to prove the defendant's
participation in the massacre at Branjevo Farms in July 1995.

The defendant submitted an affidavit in support of his
motion.  Defendant's Affidavit, Exhibit A in support of his

motion to suppress, dated February 11, 2005 (hereinafter

"Def.Aff."). In said affidavit he made several statements that

were perjurious, including the following[1]:

> *I do not recall being advised of my rights at this time* [the beginning of the interview by Agent Carroll] *and I did not sign anything at that time.*

Def.Aff. At ¶6. In fact, the defendant was advised of his rights

at the beginning of the interview by Agent Carroll and signed his

advice of rights form at 3:35 p.m. Memorandum and Order by this

Court in United States v. Boskic, 2006 WL 1540488 (D.Mass. 2006),

at page 4. ("After reciting the oath, Agent Carroll asked Boskic

to sit and he read Boskic his rights in English from a two-sided

Miranda rights form that had been prepared in advance.")

> [When Agent Hughes came in,] *I still believed I was being questioned in connection with my application for travel documents and had no idea that this was part of a criminal investigation.*

Def.Aff. At ¶7. In fact, later on the day of his arrest Boskic

admitted to the agents that he "knew what this was about when the

FBI came in." United States v. Boskic, 2006 WL 1540488, at fn 5.

> At some point, after I had already made statements to them disclosing events in Bosnia, I was given a number of documents to sign, including a form consenting to the search of my apartment. I did so. *This was the only time I was asked to sign any documents.*

Def.Aff. At ¶12. In fact, the defendant signed the advice of

rights form in English and Serbo-Croatian at 3:35 p.m. See

---

[1]The perjurious parts of his statements are presented in *italics.*

2

above.

> *At the very end of the session, which was about 8:30 pm*, I
> was told that I was being arrested on a criminal warrant
> that had been issued in court earlier that day, and that I
> would be taken to jail that night, and would see a judge in
> the morning. *This was the first time that I was given any
> hint that I was the target of a criminal investigation.*

Def.Aff. At ¶13. First, the end of the session was about 10:30

p.m. Sometime during the time he was writing his statement

(approximately 8:30 p.m.), the defendant asked what would happen

to him. He was told he would be arrested for immigration

charges. He then continued to write his statement. <u>Boskic</u>, 2006

WL 1540488, at page 6. Second, as stated above, he already knew

"what this was all about," as soon as Agent Hughes came in.

    The defendant also testified on April 19, 2006, in support

of his motion. The transcript of his testimony will be referred

to by page number as "TR at p." He again testified in a

perjurious manner with reference to a number of material facts in

an effort to suppress his statements.

> Question: Now did he [Agent Carroll] read you your rights at
>           that time [the beginning of Agent Carroll's
>           interview].
>
> Boskic:   *As far as I can remember, he didn't.*
>
>                       * * * *
>
> Question: [Referring to the advice of rights form] Did Agent
>           Carroll show you this document at that point in
>           time when you first came into that office?
>
> Boskic:   *No he didn't.*
>
> Question: Did he show it to you at a later time later that

evening?

Boskic:    *Yes, he did.  He showed it to me afterwards.*

Tr. at p.6-7.  As discussed above, the defendant was advised of
his rights and signed the advice of rights forms at the beginning
of Agent Carroll's interview.

Question: Did you ever say to Mr. Carroll or anybody else
          that night that when they brought in the FBI
          agent, you knew what this was all about or words
          to that effect?

Boskic:    *No, I didn't*

Tr. at p.11.  As discussed above, Boskic told the agents that he
knew what this was about when the FBI agent came in.

Question: [Referring to when agent Hughes came in] And were
          you read your rights at that point?

Boskic:    *No, they were not.*

Tr. at p.11.  In fact, when Agent Hughes came into the room,
"Agent Carroll ... gave what he called a condensed version of the
Miranda rights in English and reminded Boskic that they were
still in effect."  Boskic, 2006 WL 1540488, at page 4.

Question: [Referring to when Alistair Graham and the
          interpreter came in] Until that point in time, Mr.
          Boskic, did you at all times believe that this
          interview was concerning your request for travel
          documents?

Boskic:    *Yes.*

Tr. at p. 12.  As discussed above, when Agent Hughes came in,
Boskic "knew what this was all about."

Question: Prior to the time Mr. Graham said anything, did
          either Mr. Carroll or Mr. Hughes read you your

4

rights at that time?

    Boskic:   *No, the didn't.*

Tr. at p. 12.  In fact, after Graham and the interpreter entered the room, "Graham took the seat behind the desk.  Agent Carroll again reminded Boskic that his rights were still in effect."

<u>Boskic</u>, 2006 WL 1540488, at page 5.

> Question:  [Referring to the advice of rights form] About what time was it that Mr. Carroll showed you this form?

> Boskic:   *The document was shown to me at around 8:20 and that is when I signed it.*

> Question:  Tell the Court what happened.

> Boskic:   *When I asked Mr. Carroll when the interview would be over, Mr. Carroll showed this document to me, this paper.  He told me that I was to sign this paper and that I was to be sent to jail that evening and that the next day I was to appear before a Judge.  Mr. Carroll wrote the date and the time and the place on the side, this English version of the document.  He turned the other side for me.*

> *  *  *  *

> Question:  And why did you write the time 3:35 [on the Serbo-Croatian side of the form]?

> Boskic:   I think that was the time when more or less the whole interview started when I had entered.

Tr. at p. 20-21.  As discussed above, the advice of rights form was signed at the beginning of the Carroll interview and not at the end of the evening, that is, the time on the form is "3:35" because that is when the interview began and that is when the form was signed.

5

> Question: Mr. Boskic, at any time that evening, did you ever tell anyone that you knew what this was all about as soon as you saw the FBI agent?

> Boskic:    *No, I didn't..*

Tr. at p.21. As discussed above, this Court found that the defendant did in fact make that statement.

> Question: Now, after you had written your statement, didn't Agent Hughes ask you also to include in your statement your admissions about having lied on your immigration documents?

> Boskic:    *No, he didn't.*

Tr. at p. 20-21. In fact, "[w]hen Boskic was finishing his statement, Agent Hughes suggested that Boskic write something down about lying on his immigration forms since he put 'other stuff' down. Boskic refused to write anything on this subject, although he told Agent Hughes something about lying in order to be with someone he loved." <u>Boskic</u>, 2006 WL 1540488, at page 7.

> Question: And you said to Alistair Graham "if I go down, others would as well," isn't that correct?

> Boskic:    *No, I do not remember saying that. I said, "I am at your disposal. If I should go to the Hague, I will. Whatever I have to do to help, I'm ready to help."*

> Question: So you're saying you've never said to Alistair Graham something to the effect of "if I go down, others will as well?"

> Boskic:    *As far as I can remember, I did not say that.*

Tr. at p. 34. In fact, the defendant stated that if he "was to go down for what happened, others would go down as well." <u>Boskic</u>, 2006 WL 1540488, at page 5.

6

> Question: Sir, when you first came into the room with Agent
> Carroll, you raised your right hand and took an
> oath; isn't that correct?
>
> Boskic:   *I cannot remember.*
>
> Question: You don't remember him making you raise your right
> hand and administering an oath to you before the
> interview began?
>
> Boskic:   *No, I cannot remember that.*

Tr. at p. 34-35. In fact, when the interview began, "Agent

Carroll asked Boskic to remain standing so that he could

administer the oath." <u>Boskic</u>, 2006 WL 1540488, at page 4.

Further, when Agent Hughes came in, "Boskic started to stand up

and raise his right hand as if to take an oath again, but Agent

Carroll indicated that he did not need to because he was still

under oath." <u>Boskic</u>, 2006 WL 1540488, at page 4.

> U.S.S.G. §3C1.1 provides as follows:
>
> If (A) the defendant willfully obstructed or impeded, or
> attempted to obstruct or impede, the administration of
> justice during the curse of the investigation, prosecution,
> or sentencing of the instant offense of conviction, and (B)
> the obstructive conduct related to (i) the defendant's
> offense of conviction, and any relevant conduct; or (ii) a
> closely related offense, increase the offense level by 2
> levels.

Included in the "non-exhaustive list of examples" provided in the

Application Notes are "committing ... perjury" and "providing

materially false information to a judge." "Material evidence" is

defined as "evidence, fact, statement, or information that, if

believed, would tend to influence or affect the outcome of the

issue under determination."

> A witness testifying under oath [commits perjury] ... if she
> gives false testimony concerning a material matter with the
> willful intent to provide false testimony, rather than as a
> result of confusion, mistake, or faulty memory.

United States v. Dunnigan, 507 U.S. 87, 94 (1993).  If the court
determines that the defendant has committed perjury, "an
enhancement of sentence is required by the Sentencing
Commission."  507 U.S. 98.  The Dunnigan case involved perjurious
testimony at trial.  The enhancement has also been routinely
applied to perjurious testimony at a suppression hearing.  United
States v. Fox, 393 F.3d 52 (1st Cir. 2004) (vacated in light of
Booker and again affirmed after remand in 429 F.3d 316 (1st Cir.
2005); United States v. Reynoso, 336 F.3d 46 (1st Cir. 2003)
(involving perjury by defendant at suppression hearing concerning
whether he had been given his *Miranda* rights); United States v.
Galbraith, 200 F.3d 1006 (7th Cir. 2000 (same); United States v.
Matos, 907 F.2d 274 (2d Cir. 1990) (same); United States v.
Wilson, 240 F.3d 39 (D.C. Cir. 2001) (involving perjury at
suppression hearing by defendant concerning statements that were
material to waiver of *Miranda* rights); United States v.
Hawthorne, 316 F.3d 1140 (10th Cir. 2003) (perjury at suppression
hearing by defendant concerning voluntariness of statements);
United States v. Bradberry , 2006 WL 2873628 (11th Cir. Oct. 11,
2006) (involving subornation of perjury by defendant at
suppression hearing concerning whether he had been given his
*Miranda* rights); United States v. Mendoza-Gonzalez, 363 F.3d 788

8

(8th Cir. 2004) (perjury at suppression hearing by defendant concerning whether he had consented to a search); <u>United States v. Gleason</u>, 25 F.3d 605 (8th Cir. 1994)(same); <u>United States v. Akinoye</u>, 185 F.3d 192 (4th Cir. 1999); <u>United States v. Reed</u>, 26 F.3d 523 (5th Cir. 1994); <u>United States v. Charles</u>, 138 F.3d 257 (6th Cir. 1998) (involving perjurious affidavit and testimony by defendant in connection with suppression motion); <u>United States v. Reddick</u>, 90 F.3d 1276 (7th Cir. 1996); <u>United States v. Sherwood</u>, 98 F.3d 402 (9th Cir. 1996).

The defendant Boskic alleged and argued <u>inter alia</u> that the statements he made to the Agents in August 2004, were not voluntary. He also specifically and repeatedly testified that he was not given his *Miranda* warnings until after he made the relevant statements. This Court specifically found that these statements were false. This Court relied on testimony and made findings that contradicted a number of the defendant's statements.

In addition, the Court has also already found that said statements were material. In it's Memorandum and Order, this Court stated:

> Supporting a finding of voluntariness is the important fact that Boskic signed a *Miranda* form at the outset of the interview. Agent Carroll also reminded him of those rights when he brought both Agent Hughes and Graham into the room. 18 U.S.C. §3501(b)(3), (4).

<u>Boskic</u>, 2006 WL 1540488, at page 18. As noted above, in this

9

context "material" means something that "would tend to influence
or affect the outcome of the issue under determination."  The
defendant's perjurious statements concerning whether and when he
was given his *Miranda* rights were intended to and would have
affected the outcome of his motion to suppress.

Although only a single perjurious statement could support
the enhancement, it is worth noting that the defendant repeatedly
lied about whether the agents gave and then repeated the *Miranda*
warnings.  In addition, other lies were similarly material.  The
defendant attempted to convince the Court that he believed he was
speaking to Agents Carroll and Hughes concerning an immigration
matter, until Alistair Graham came in; then he thought he was
being asked to assist Graham and the ICTY in their cases against
his superiors.  He further testified (falsely) that he
immediately offered to help *("I am at your disposal.  If I should
go to the Hague, I will.  Whatever I have to do to help, I'm
ready to help.")*  Thus, when he denied admitting that he "knew
what this was all about" when Agent Hughes came in, that lie is
also material, as was his denial that he stated "if I go down,
others will as well."  This Court noted that this statement by
Boskic establishes that "despite the implicit false assurances by
Agents Carroll and Hughes that Boskic was not the subject of any
investigation, Boskic appears to have been aware that a man
implicated in a genocide would not escape all consequences for

his crimes against humanity. ... Together, these facts outweigh those suggesting that Boskic was coerced." _Boskic_, 2006 WL 1540488, at page 18.  _See also_ _Reed_, 26 F.3d at 531 ("The statements are material because they had a bearing on the determination of the credibility of witnesses, which is critical to determining matters such as voluntariness.")

Both the nature of his false statements and testimony and the number of lies clearly establish that the perjury was intentional and willful and not the product of faulty memory, mistake or confusion.  The defendant denied making statements that were attributed to him, and attributed to others statements that all other witnesses denied were ever made.  The defendant denied certain actions by himself and others (_e.g._, that he stood and was administered an oath, and stood a second time for the purpose of again taking an oath).  He described sequences of events that were complete fabrications (_e.g._, that he signed the advice of rights form at the same time as the consent to search form).  His lies were part of a pattern that represented an intentional attempt to obstruct the administration of justice by affecting - through false testimony, this Court's ruling on his motion to suppress.

Based on the defendant's perjury in his affidavit and testimony "an enhancement of sentence is required by the Sentencing Commission."  _Dunnigan_, 507 U.S. at 98.

11

**B.    The government is not relying on a theory of universal jurisdiction that it *chose* not to pursue.**

The court has inquired as to whether the government may request a sentence for a crime that it did not charge.  In other words,

> [i]f the government had the opportunity to bring what is essentially a murder case and didn't do it, can they by the back door undertake to increase the guideline against a standard of fair preponderance of the evidence and obtain involuntary manslaughter conviction lite – that is, by just proving to some judge that it was proof to a fair preponderance.  There is no question that there is a statutory regime in which the government could have prosecuted here under a theory of universal jurisdiction.  It chose not to for whatever reason.  And having chosen not to, it seems to me open to question whether or not it may rely upon the unpursued theory to enhance the sentence here.

United States v. Boskic, Sentencing Hearing, J. Woodlock, October 24, 2006, p. 4.

The government is arguing for a sentencing enhancement based on the defendant's participation in mass murder in Bosnia in 1995, which is ultimately what he was trying to hide by his false statements on the immigration forms.  "[T]he government [did not have] the opportunity to bring what is essentially a murder case."  The unpursued theories concern his role in war crimes and genocide.  These theories were not available to the government.

Title 18, Section 1091(a), Genocide, provides that:

Whoever, whether in time of peace or in time of war . . . with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious

12

group as such - (1) kills members of that group; [or] (2)
causes serious bodily injury to members of that group . . .
or attempts to do so [commits genocide]

The jurisdictional requirements for genocide, however,
require that "(1) the offense is committed within the United
States; or (2) the alleged offender is a national of the United
States," 18 U.S.C.A. § 1091(d).  Neither prong is satisfied in
this particular case and, therefore, the decision to not pursue
that theory was necessitated by a lack of jurisdiction.

Title 18, Section 2441, War Crimes, provides that:

Whoever, whether inside or outside the United States,
commits a war crime . . . shall be ... imprisoned ...
[where] the person committing such war crime or the victim
of such war crime is a member of the Armed Forces of the
United States or a national of the United States . . .

 Like the crime of Genocide, the War Crimes section may
apply in substance (see definition of "war crime" 18 U.S.C.A. §
2441©), but the jurisdictional reach is not sufficient, because
neither Boskic nor his victims were American nationals or
American soldiers.  Therefore, just as with Genocide, the
decision to not pursue war crime charges was necessitated by a
lack of jurisdiction.

Thus, the United States is not now seeking to rely on
theories that were unpursued for strategic reasons having to do
with a lower burden of proof.[2]  Notwithstanding the choice of

_____

     [2] The only potential crime that the government could have
charged, that would have been directly based on acts of the

13

charges the government did pursue, the wealth of cases indicate that the Court may consider both uncharged conduct and acquitted conduct in sentencing.

**C.    Uncharged conduct and acquitted conduct may be considered by the court in sentencing.**

In United States v. Lombard, 102 F.3d 1 (1st Cir. 1996), the Court of Appeals for the First Circuit affirmed the life sentence imposed by the district court where the defendant was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and conspiracy, in violation of 18 U.S.C. § 371. The government's evidence included two murders of which Lombard had been acquitted in state court, but which provided relevant facts for his firearm and conspiracy charges.    Lombard, 102 F.3d at 2.   Since the felon in possession guideline provided that where the firearm was used in connection with another offense,

_____

defendant in Bosnia, was Torture, in violation of Title 18, Section 2340.   The torture statute allows for jurisdiction in the United States if the "alleged offender is a national of the United States or the alleged offender is present in the United States, irrespective of the nationality of the victim or the alleged offender."  18 U.S.C. § 2340A(b).  However, that is not relevant for the purpose of this discussion.  The government is not seeking an enhancement based on the intentional infliction of pain and suffering on the victims at Branjevo.   Section 2340 defines the act of torture as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control."  In this sentencing, the government's argument is based on the murder of those victims, not their torture.  Therefore, the question of whether that charge was available to the government is irrelevant.

here, murder, the base offense level should be that of the "object" offense.  U.S.S.G. §§ 2K2.1(c)(2), 2X1.1.  <u>Id.</u>  Since the court had found that the defendant had committed the murders by a preponderance of the evidence, a life sentence was imposed. <u>Id.</u>

Earlier, in <u>United States v. Mocciola</u>,[3] 891 F.2d 13 (1st Cir. 1989), the Court of Appeals for the First Circuit affirmed the district court's application of a two level weapons enhancement to the defendant's guideline range, even where the defendant had been acquitted of the weapons charge.  The defendant elected to plea to possession of cocaine, but went to trial on use or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).  Although he was acquitted of the charge, the district court still applied the two-level enhancement for firearms possession pursuant to U.S.S.G. § 2D1.1(b)(1) when sentencing him to the cocaine charge. <u>See also</u> <u>United States v. Foster</u>, 19 F.3d 1452, 1455 (D.C.Cir. 1994); <u>United States v. Rodriquez-Gonzalez</u>, 899 F.2d 177, 182 (2d Cir. 1990).  The court of Appeals noted that acquitted conduct may be considered by the sentencing court when the facts "appear

_____

[3] In <u>United States v. Lanoue</u>, 71 F.3d 966, 984 (1st Cir. 1995), the Court of Appeals for the First Circuit asked the court to reconsider <u>en banc</u> the issue of using acquitted conduct in sentencing as promoted by <u>Mocciola</u>.  <u>Lanoue</u>, 71 F.3d at 984. However, one year later, the <u>Lombard</u> court reiterated that the practice was acceptable.  <u>Lombard</u> at 5.

[] reliable." <u>Mocciola</u>, 891 F.2d at 17, citing <u>United States v. Wright</u>, 873 F.2d 437, 441 (1st Cir. 1989).

Likewise, in <u>United States v. Fenner</u>, 147 F.3d 360 (4th Cir. 1998), defendant brothers were convicted of various drug and firearm offenses in federal court, but were acquitted in state court of related murder charges.  Nonetheless, the district court applied the murder cross reference and increased one defendant brother's sentence from 42 years to 55 years imprisonment and the other brother's sentence from 115 months imprisonment to 210 months imprisonment.  <u>Fenner</u>, 147 F.3d at 366.  The court found that the departure was appropriate and did not violate due process.  <u>Id.</u>

Similarly, in <u>United States v. Williams</u>, 18 Fed.Appx. 52 (4th Cir. 2001), the Court of Appeals for the Fourth Circuit affirmed the district courts' cross-reference to the murder guideline even though the defendant had been acquitted of conduct related to the murder, but had been found guilty of a drug crime. <u>Williams</u>, 18 Fed.Appx. at 57, n.3.  In doing so, the court emphasized that district courts "may consider acquitted conduct in applying the guidelines when the conduct has been proven by a preponderance of the evidence."  <u>Id.</u> citing <u>United States v. Watts</u>, 519 U.S. 148, 157 (1997).

In <u>United States v. Isom</u>, 886 F.2d 736 (5th Cir. 1989), the defendant was convicted of dealing in counterfeit obligations,

but acquitted of actual counterfeiting.  The case involved Isom
helping another person print counterfeit money on a print shop
press.  The court applied the offense level applicable to
counterfeiting, even though the jury acquitted him of the charge.
In finding that Isom never disputed that he operated the press,
just that he had an intent to defraud, the Court of Appeals for
the Fifth Circuit found the evidence reliable and affirmed the
enhancement.

     In United States v. Averi, 922 F.2d 765 (11th Cir. 1991),
the defendant was convicted of failing to maintain adequate
inventory records of controlled substances, and acquitted of four
counts of distributing a controlled substance to a minor for a
non-medical purpose.  Nonetheless, the court found by a
preponderance of the evidence that the defendant had distributed
some of the controlled substances for non-legitimate purpose and
imposed the maximum sentence in the guideline range.  Averi, 922
F.2d at 766 n.2.  In affirming the decision, the Court of Appeals
for Eleventh Circuit noted that the proof standard at sentencing
is lower than trial standard of beyond a reasonable doubt.  Id.
at 766.

     The defendant may also be sentenced for conduct that was
uncharged or dismissed.  In United States v. Amirault, 224 F.3d
9, 12 (1st Cir. 2000), the Court of Appeals for the First Circuit
affirmed a five-level increase in the defendant's base offense

level where the defendant had been convicted of possession of
child pornography, but had, two decades earlier, sexually
assaulted two minor females and taken photographs of them that he
admitted to police he still retained and used to masturbate.  In
approving the district court's use of specific offense
characteristics in a different guideline (than that applicable to
the defendant's offense of conviction) as the basis for the
upward departure, the First Circuit noted that the district court
is free to "make suitable comparisons and draw plausible
analogies in considering whether to depart from the guideline
sentencing range."  Amirault, 224 F.3d at 12.

In United States v. Kim, 896 F.2d 678 (2d Cir. 1990), the
defendant was convicted of a count that alleged a false statement
concerning the name and nationality of an alien (whom the
defendant had escorted into the United States).  896 F.2d at 680.
In calculating the offense level, the court considered offenses
to which the defendant had not pleaded, had been dismissed by the
government, and that were not relevant conduct under §1B1.3 of
the Guidelines.

The Court of Appeals for the Second Circuit held that "the
Commission intended to preclude departures for acts bearing no
relationship to the offense of conviction."  896 F.2d at 684.
Therefore, the Court analyzed whether the offenses considered by
the district court related in some way to the offense of

conviction.

In <u>Kim</u>, the defendant had been charged with, <u>inter alia</u>, two counts of smuggling aliens and one count of obtaining his own entry into the United States illegally by concealing his role in assisting the illegal entry of aliens.  896 F.2d at 680.  The Court held that, even though he did not plead guilty to those counts, they were "sufficiently related to the offense of conviction," that is, the false statement offense, to "be available for consideration as a basis for departure."  896 F.2d at 685.  Even charges related to his possession of counterfeit funds that were on his person at the time of his initial arrest for the attempt to illegally enter the United States, "bore a sufficient relationship to the alien smuggling misconduct to be available for consideration as a basis for departure."  896 F.2d at 686.  The Court of Appeals, which remanded the case, directed the district court to do a multiple count calculation based on the related misconduct that was not the subject of convictions.  896 F.2d at 687.

**C.    The court may depart upwards to a higher criminal history category or a higher offense level, or both.**

The court may depart horizontally to a higher criminal history category, or vertically to a higher offense level, or both.  In addition, depending on the reasons for the departure, the Court may base a departure on U.S.S.G. § 4A1.3, or U.S.S.G.

§5K2.0, or both; it not an "either/or proposition." <u>United States v. Aymelek</u>, 926 F.2d 64, 70 (1st Cir. 1991). Both grounds maybe used into a single departure decision. <u>Id.</u>

In <u>United States v. Hardy</u>, 99 F.3d 1242 (1st Cir. 1996), the court sentenced the defendant to a 300% upward departure pursuant to both U.S.S.G. § 4A1.3 and U.S.S.G. § 5K2.0. Citing the defendant's "ten-year history of grievous antisocial behavior" and some offense-related attributes, the court found that a full horizontal departure from Level 18, CHC III (33-41 months), to Level 18, CHC VI (57-71 months), would be inadequate to reflect to reflect the defendant's history and offense conduct. <u>Hardy</u>, 99 F.3d at 1245. Consequently, the court applied a vertical departure as well, from Level 18, CHC VI (57-71 months), to Level 24, CHC VI (100-125 months), and imposed a 120 month sentence. <u>Id.</u>

In <u>United States v. Chapman</u>, 241 F.3d 57 (1st Cir. 2001), the defendant was convicted of bank fraud and after adjustments for amount of loss, more than minimal planning and acceptance of responsibility, was assigned an offense level of nine. The defendant had an extremely long and serious criminal history and was categorized as a CHC VI. However, his record was so egregious that he had been assigned 36 criminal history point, well beyond the 13 point needed to place him in CHC VI. Consequently, the court departed vertically as well until it

20

reached an appropriate sentence.  The court favorably noted the
Sentencing Commission's commentary regarding this issue:

> There may, on occasion, be a case of an egregious, serious
> criminal record in which even the guideline range for
> Criminal History Category VI is not adequate to reflect the
> seriousness of the defendant's criminal history. In such a
> case, a departure above the guideline range for a defendant
> with Criminal History Category VI may be warranted. In
> determining whether an upward departure from Criminal
> History Category VI is warranted, the court should consider
> that the nature of the prior offenses rather than simply
> their number is often more indicative of the seriousness of
> the defendant's criminal record.... Where the court
> determines that the extent and nature of the defendant's
> criminal history, taken together, are sufficient to warrant
> an upward departure from Criminal History Category VI, the
> court should structure the departure by moving incrementally
> down the sentencing table to the next higher offense level
> in Criminal History Category VI until it finds a guideline
> range appropriate to the case.

U.S.S.G. § 4A1.3.

Similarly, in <u>United States v. Doe</u>, 18 F.3d 41 (1ST Cir.
1994), the court departed upward from level 12, CHC IV (21 - 27
months), to Level 19, CHC VI (63 - 78 months).  The court imposed
what it considered an appropriate sentence by finding that the
criminal history as reflected in CHC VI was too low at the
adjusted offense level, and it did not adequately reflect the
defendant's "egregious, serious criminal history."  <u>Doe</u>, 18 F.3d
at 49.  The Court of Appeals for the First Circuit affirmed the
district court's decision to depart vertically to 72 months; the
departure and sentence were reasonable.  <u>Id.</u>

21

Here, the defendant's conduct at Branjevo Farm constitutes grounds for an upward departure pursuant to both § 4A1.3[4] and §5K2.0 departure.  First, the defendant's criminal history category "substantially under-represents the seriousness of the defendant's criminal history [and] likelihood that the defendant will commit other crimes."  Second, aggravating factors exist in this case that were not adequately taken into account in establishing the offense level for this offense.  Clearly, this is not the typical false statements case.  See e.g., United States v. Levario-Quiroz, 161 F.3d 903 (5th Cir. 1998).  The false statements were intended to hide from the U.S. immigration officials the defendant's participation in mass murder.  His efforts were successful and because of his deception he gained entry to the United States.[5]

Were the Court to consider the defendant's conduct only in relation to criminal history, an increase to criminal history VI would still result in a sentencing range that is clearly inadequate, that is, 24-30 months; thus, the Court should depart vertically as well in order to find an appropriate sentence. Chapman at 241 F.3d at 63.

_____

[4] In the original sentencing memorandum, the United States identified other uncharged conduct that would support a departure under §4A1.3.

[5] As stated above, the United Sattes relies on the arguments made on this point in the original sentencing memorandum.

The defendant's conduct constitutes grounds for both criminal history and offense conduct departures, pursuant to §4A1.3 and § 5K2.0; therefore, the Court should depart horizontally and vertically until it reaches an appropriate sentence.  <u>Aymelek</u> 926 F.2d at 70.

**D.    The defendant should be sentenced to a longer term of imprisonment than that imposed on Drazen Erdemovic.**

The sentence this court imposes on the defendant should be longer than the sentence the International Criminal Tribunal for the Former Yugoslavia ("ICTY") imposed on Drazen Erdemovic ("Erdemovic") for the following reasons: (1) Erdemovic admitted to his actions before it was suspected that he was involved; (2) he showed considerable remorse and guilt for his conduct; and (3) he cooperated extensively with the ICTY, including testifying at the trials of others, and is expected to testify in the future as well.  In contrast, the defendant admitted to his actions only after he knew he was caught, has shown no remorse or guilt for what happened, and has not provided any cooperation to the international authorities that has proven fruitful.[6]  He agreed to cooperate only after he was confronted with the knowledge that the ICTY possessed concerning his role in the massacre.  His

---

[6]    In the <u>Government's Sentencing Memorandum</u>, the United Sattes outlined the facts supporting this argument on pages 15 - 16 and pages 42 - 46.  The government will not reiterate the facts here, but highlights the most salient.

general offer to help ("if I go down, others would as well") was
not based on any sense of guilt, and he has yet to help any
tribunal.

    Erdemovic's Path to the ICTY[7]

    Several days after the event at Branjevo Farm, Erdemovic
indicated that one of his colleagues shot him in his stomach and
lungs while at a bar.  Erdemovic thought it was in retaliation
for having refused to kill more Muslims at Pilica School, the
site where more killings took place after Branjevo Farm.
Erdemovic remained in the hospital for one month.  When he was
released, he contacted a western journalist in whom he confided
the events of Branjevo Farm.  Two days later, he was arrested by
the State Security Services of the Republic of Serbia and then
was transferred to a court in Novi Sad where he repeated his
story.

    Erdemovic was transferred to the ICTY on March 30, 1996 and
immediately confessed to the members of the Office of the
Prosecutor his involvement at Branjevo Farm.  Erdemovic was
indicted on May 22, 1996 for his actions and pled guilty nine
days later.

---

    [7] The following facts were garnered from the plea hearing
conducted on November 19, 1996 before the Trial Chamber of the
ICTY and from the sentencing judgement issued on November 29,
1996 and the second sentencing judgment issued on March 5, 1998.
The transcript and the opinion are accessible on www.icty.org.

The second sentencing court emphasized that one of the
reasons for their seemingly lenient sentence was the fact that
Erdemovic was the first to provide information regarding Branjevo
Farm and the Pilica School.  Information without which the ICTY
would have been unable to initiate its investigation of the
Pilica school:

> The Prosecutor emphasised [sic] the fact that he had been
> unaware of those events before they were revealed by the
> accused.  In addition, he declared that this information
> permitted his Office to initiate on-site investigations
> which, to a large extent, confirmed the truth of what he had
> been told.  During the hearing, the Prosecution witness
> presented several exhibits which confirmed the occurrence of
> the events at the Branjevo Farm and which allowed him to
> establish the link between the events at the farm and the
> Pilica school.  He thus affirmed that "had we not had Drazen
> Erdemovic's testimony, we would not have been able to
> discover through the investigation alone the place of
> execution of those prisoners who had been locked up in the
> Pilica school.

Prosecutor v. Erdemovic, Case No. IT-96-220Tbis, Sentencing
Judgment, ¶ 99 (Mar. 5, 1998).

Before Erdemovic provided information to the journalist, no
entity was pursuing him for arrest or prosecution.  He
volunteered the information, was transported to the ICTY, and has
continued to cooperate to this day.  His information was pivotal
in finding the location of the second killing site, the Pilica
School.

It is not unusual for the government or a court to reward
the defendant who comes forward first with information about a

crime.  This is so because it allows for further informed investigation and inspires others to come forward earlier than they may otherwise.  Erdemovic's history is different than the typical case because no one knew of his involvement before he confessed to it.  Not only did he come forward first out of remorse for his actions, but had he not, it is not certain that he ever would have been prosecuted at all.[8]

In complete contrast to Erdemovic, Boskic only confessed to his crime nine years later once it was certain that he had been caught.  Furthermore, the defendant's ultimate desire to cooperate with investigators was not borne out of genuine remorse for his actions.  When offering to help find others responsible, Boskic said: "If I go down, others will too."

---

[8]No other member of the 10th Sabotage Unit has been prosecuted by the ICTY or by Bosnia.

Consequently, for the reason stated above and its previous sentencing memorandum, it not unreasonable that the defendant be sentenced to a longer term of imprisonment than that imposed on Erdemovic.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney


By:    /s/ Kimberly P. West
KIMBERLY P. WEST
JEFFREY AUERHAHN
Assistant U.S. Attorneys

Dated: November 16, 2006

## CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 /s/ Kimberly P. West
Kimberly P. West
Assistant U.S. Attorney